UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MICHIGAN

| | |
|---|---|
| LAUREN HUNTINGTON, MICHAEL CHRISTIE, MICHAEL KEETH, DIAHANN MESSEGUER, ANDREW BERZANSKIS and MARGARET WILENSKY, a married couple, JAMES QUATTROPANI, and TRACY WHITMAN BRACE, individually and on behalf of all others similarly situated, | No. **JURY TRIAL DEMANDED** |
| Plaintiffs. | |
| v. | |
| FCA US LLC, a Delaware Limited Liability Company, | |
| Defendant. | |

## CLASS ACTION COMPLAINT

## TABLE OF CONTENTS

**Page**

I.    INTRODUCTION ................................................................ 1

II.   JURISDICTION ................................................................ 5

III.  VENUE ........................................................................ 6

IV.   PARTIES ...................................................................... 6

    A.    Plaintiffs ................................................................ 6

    B.    Defendant ............................................................ 14

V.    FACTUAL ALLEGATIONS ............................................ 15

    A.    FCA marketed the Pacifica Hybrid as an extremely safe
        plug-in electric hybrid that can run in electric mode or on
        gasoline. ............................................................... 15

    B.    The Hybrid Propulsion Defect ........................................ 18

    C.    The Hybrid Propulsion Defect causes sudden fires and
        explosions in the Affected Vehicles. ............................... 20

    D.    The latest recall is the third time that Pacifica Hybrids have
        been recalled for fire risks. ......................................... 25

    E.    There is an agency relationship between FCA and FCA
        dealerships. .......................................................... 26

VI.   TOLLING OF THE STATUTE OF LIMITATIONS ................. 30

    A.    Discovery Rule Tolling .............................................. 30

    B.    Fraudulent Concealment Tolling .................................. 31

    C.    Estoppel ............................................................... 31

VII.  CLASS ALLEGATIONS ................................................. 32

VIII. CLAIMS ...................................................................... 36

A.      Nationwide Claim ................................................................. 36

COUNT I  VIOLATION OF THE MAGNUSON-MOSS WARRANTY
ACT  15 U.S.C. § 2301, *et. seq.* .................................................. 36

B.      State-Specific Claims ........................................................ 41

COUNT II  BREACH OF IMPLIED WARRANTY OF
MERCHANTABILITY UNDER COLORADO LAW (Col. Rev.
Stat. § 4-2-314) .......................................................................... 41

COUNT III  UNJUST ENRICHMENT UNDER COLORADO LAW ............... 43

COUNT IV  BREACH OF IMPLIED WARRANTY OF
MERCHANTABILITY UNDER FLORIDA LAW (FLA. STAT.
ANN. §§ 672.314, 680.212) ........................................................ 44

COUNT V  UNJUST ENRICHMENT UNDER FLORIDA LAW ...................... 47

COUNT VI  BREACH OF IMPLIED WARRANTY OF
MERCHANTABILITY UNDER IDAHO LAW  (IDAHO CIV.
CODE § 28-2-314) ....................................................................... 48

COUNT VII  BREACH OF IMPLIED WARRANTY OF
MERCHANTABILITY UNDER NEW JERSEY LAW (N.J.
STAT. ANN. § 12A:2-314) ........................................................... 50

COUNT VIII  UNJUST ENRICHMENT UNDER NEW JERSEY
LAW ............................................................................................ 52

COUNT IX  BREACH OF IMPLIED WARRANTY OF
MERCHANTABILITY UNDER NEW YORK LAW (N.Y.
U.C.C. LAW § 2-314) .................................................................. 53

COUNT X  UNJUST ENRICHMENT UNDER NEW YORK LAW .................. 56

COUNT XI  IMPLIED WARRANTY IN TORT UNDER OHIO LAW ............ 57

COUNT XII  UNJUST ENRICHMENT UNDER OHIO LAW .......................... 59

COUNT XIII  UNJUST ENRICHMENT UNDER OREGON LAW ................... 62

REQUEST FOR RELIEF ....................................................................... 63

DEMAND FOR JURY TRIAL ............................................................... 64

010611-12 973802 V1

Plaintiffs file this lawsuit individually and on behalf of proposed Nationwide and state-wide classes. Plaintiffs allege the following based on personal knowledge as to their own acts and experiences and, as to all other matters, based on the investigation of counsel:

## I.      INTRODUCTION

1.      The most important duty of a car manufacturer is to provide consumers with a safe car. A second related duty is to warn consumers and fix or replace a car where the manufacturer learns of a vehicle defect that implicates serious safety issues.

2.      FCA US LLC ("FCA") breached these fundamental duties by selling Chrysler Pacifica Hybrid minivans that were dangerously defective and prone to catching fire and exploding. Then, long after FCA knew or should have known of the fire risk, it did nothing to either warn owners and lessees or provide a remedy for the defect.

3.      Model year 2017 and 2018 Chrysler Pacifica Hybrid minivans (the "Affected Vehicles")[1] contain a defect in the hybrid propulsion system that can

---

[1] So far, FCA has recalled only model years 2017 and 2018 of the Pacifica Hybrid. Plaintiffs' counsel continues to investigate whether other model years contain the same defect and should, therefore, be recalled. Plaintiffs may update the definition of Affected Vehicles to include subsequent model years.

cause vehicle fires and explosions, even when the vehicles are parked with the ignition in the "off" position (the "Hybrid Propulsion Defect").

4. The Hybrid Propulsion Defect exposes putative class members to an unreasonable risk of accident, injury, death, or property damage in the event that their vehicle catches fire while in operation or, perhaps more commonly, spontaneously ignites while the vehicle is parked at the class member's home, on a public street, or in a public parking lot. The Hybrid Propulsion Defect also exposes passengers, other drivers on the road, neighbors, owners of other cars parked near the Affected Vehicles, and other bystanders to an unreasonable risk of accident, injury, death, and/or property damage.

5. The catastrophic fire risk is the direct result of a defect long known to, concealed by, and still unremedied by FCA. Not only did FCA conceal the defect from consumers, but it also concealed its consequences, including the serious safety hazards and monetary harm caused by the Hybrid Propulsion Defect—e.g., damage to a home and injury or death to persons inhabiting that home should the Affected Vehicle spontaneously ignite while the vehicle is parked in an attached garage.

6. The Affected Vehicles are plug-in hybrid electric vehicles, and some (but not all) of the known fire incidents have occurred while the vehicles are charging. While FCA contends that the root cause of the fires is unknown, it

- 2 -

appears overwhelmingly likely that the defect is connected to the vehicles' high-voltage batteries used to propel the vehicles when they are operating in electric mode.

7.      The high-voltage batteries in the Affected Vehicles were made by LG Chem (now LG Energy Solution, or "LGES"). LGES also made the allegedly defective batteries that caused fires in GM Bolt electric vehicles and Hyundai electric vehicles. In connection with the Bolt recalls, LGES agreed to pay GM $1.9 billion dollars.

8.      Though FCA admits to having received reports of a dozen fires connected with the hybrid propulsion system since 2019, it waited until February 2022 before issuing a recall of the Affected Vehicles. However, FCA is not offering owners and lessees of the Affected Vehicles any remedy.

9.      Instead, FCA "is advising owners of these hybrid vehicles to refrain from charging them, and to park them away from structures and other vehicles." FCA does not explain what owners should do with their vehicles if they have no such place to park their vehicles. This places an unfair burden on class members who are unable to use the electric propulsion system they paid a premium for and are unable to park in their garage (and may have to park quite far away from their homes in order to park away from other vehicles).

10.     Moreover, not being able to plug in and charge the Affected Vehicles essentially defeats the central purpose of having a hybrid vehicle. Absent charging, the Affected Vehicles must run exclusively on their gasoline engine, causing owners of Affected Vehicles to constantly purchase gasoline, for which FCA has offered no remedy or compensation.

11.     FCA knew or should have known about the Hybrid Propulsion Defect for some time, as evidenced by: (1) consumer complaints launched with the National Highway Traffic Safety Administration ("NHTSA") and elsewhere online; (2) the current recall made in an attempt to address the Hybrid Propulsion Defect; and (3) the similar fire issues in other electric vehicles with LGES batteries.

12.     Stunningly, many of the Affected Vehicles have already been recalled twice to remedy other defects that also created a risk of fire. The first such recall came in 2018 and the second in 2020.

13.     FCA offers no actual remedy for the Hybrid Propulsion Defect and offers no reimbursement to Affected Vehicle owners and lessees for out-of-pocket expenses, loss of use, and loss of value. Because no repair is available, vehicle owners and lessees are left without a safely operable vehicle for an unknown and potentially lengthy period.

14.    Because of FCA's breaches of implied warranties and its failure to act more quickly in disclosing and providing a remedy for the Hybrid Propulsion Defect, owners and lessees of Affected Vehicles are injured in fact, incurred damages, and suffered ascertainable losses in money and property. Had Plaintiffs and the putative class members known of the Hybrid Propulsion Defect, then they would not have purchased or leased those vehicles, would have paid substantially less for them, or would have purchased non-hybrid versions of the vehicles, which cost substantially less. Fires in the Affected Vehicles also necessitate expensive repairs, car rentals, car payments, towing charges, property damage, time off work, loss of use and other miscellaneous costs. Moreover, because of the Hybrid Propulsion Defect and FCA's concealment, the Affected Vehicles have a lower market value and are worth less than they otherwise would be.

15.    Plaintiffs bring this class action to redress FCA's misconduct. Plaintiffs seek damages and a repair under the Magnuson-Moss Warranty Act, 15 U.S.C. §§ 23-1-2312, and state laws of implied warranty and unjust enrichment.

## II.    JURISDICTION

16.    This Court has original jurisdiction over this lawsuit under the Class Action Fairness Act of 2005, 28 U.S.C. §§ 1332(d)(2) and (6), because Plaintiffs and Defendant are citizens of different states; there are more than 100 members of the Classes (as defined herein); the aggregate amount in controversy exceeds $5

million, exclusive of attorneys' fees, interest, and costs; and class members reside across the United States. The citizenship of each party is described further below in the "Parties" section.

17.     This Court has personal jurisdiction over the Defendant by virtue of its transactions and business conducted in this judicial district, and because Defendant is headquartered in Michigan. Defendant has transacted and done business, and violated statutory and common law, in the State of Michigan and in this judicial district.

### III.    VENUE

18.     Venue is proper in this judicial district under 28 U.S.C. § 1391 because Defendant transacts substantial business and is headquartered in this district.

### IV.    PARTIES

**A.     Plaintiffs**

19.     Plaintiff and proposed class representative **Lauren Huntington** ("Plaintiff," for purposes of this paragraph) is a resident and citizen of Strongsville, Ohio. Plaintiff purchased a new 2018 Chrysler Pacifica Hybrid on March 30, 2019, from Cole Chrysler in Marshall, MI. Plaintiff's Pacifica Hybrid is an Affected Vehicle equipped with the Hybrid Propulsion Defect. Through exposure and interaction with Chrysler, Plaintiff was aware of Chrysler's uniform and pervasive marketing message of dependability and safety, upon which Plaintiff relied, and

which was a primary reason Plaintiff purchased the Affected Vehicle. However,

despite touting the safety and dependability of the Affected Vehicles, at no point

did Chrysler or its agents, dealers, or other representatives disclose to Plaintiff the

Hybrid Propulsion Defect. Plaintiff regularly services the vehicle but is now

concerned about driving it due to the dangers resulting from the Hybrid Propulsion

Defect and believes that its market value is diminished as a result. In addition, it is

impossible for Plaintiff to park the Affected Vehicle away from structures and

other vehicles as Chrysler has instructed because there are no such spaces near

Plaintiff's home or work. Moreover, because Plaintiff can no longer charge the

plug-in hybrid vehicle, Plaintiff must pay for gas to use the vehicle that Plaintiff

would not have needed were the hybrid propulsion system able to operate as

intended. Plaintiff would not have purchased the vehicle, or would have paid less

for it, or Plaintiff would have purchased a non-hybrid version of the Pacifica, had

Plaintiff known about the Hybrid Propulsion Defect.

20.    Plaintiff and proposed class representative **Michael Christie**

("Plaintiff," for purposes of this paragraph) is a resident and citizen of Sherwood,

OR. Plaintiff purchased a new 2018 Chrysler Pacifica Hybrid on June 17, 2019,

from Dick's Auto Group in Beaverton, OR. Plaintiff's Pacifica Hybrid is an

Affected Vehicle equipped with the Hybrid Propulsion Defect. Through exposure

and interaction with Chrysler, Plaintiff was aware of Chrysler's uniform and

- 7 -

pervasive marketing message of dependability and safety, upon which Plaintiff relied, and which was a primary reason Plaintiff purchased the Affected Vehicle. However, despite touting the safety and dependability of the Affected Vehicles, at no point did Chrysler or its agents, dealers, or other representatives disclose to Plaintiff the Hybrid Propulsion Defect. Plaintiff regularly services the vehicle but is now concerned about driving it due to the dangers resulting from the Hybrid Propulsion Defect and believes that its market value is diminished as a result. In addition, it is impossible for Plaintiff to park the Affected Vehicle away from structures and other vehicles as Chrysler has instructed because there are no such spaces near Plaintiff's home or work. Moreover, because Plaintiff can no longer charge the plug-in hybrid vehicle, Plaintiff must pay for gas to use the vehicle that Plaintiff would not have needed were the hybrid propulsion system able to operate as intended. Plaintiff would not have purchased the vehicle, or would have paid less for it, or Plaintiff would have purchased a non-hybrid version of the Pacifica, had Plaintiff known about the Hybrid Propulsion Defect.

21.     Plaintiff and proposed class representative **Michael Keeth** ("Plaintiff," for purposes of this paragraph) is a resident and citizen of Meridian, ID. Plaintiff purchased a new 2018 Chrysler Pacifica Hybrid on September 16, 2018, from Dennis Dillon Dodge Chrysler Jeep in Caldwell, ID. Plaintiff's Pacifica Hybrid is an Affected Vehicle equipped with the Hybrid Propulsion Defect.

Through exposure and interaction with Chrysler, Plaintiff was aware of Chrysler's uniform and pervasive marketing message of dependability and safety, upon which Plaintiff relied, and which was a primary reason Plaintiff purchased the Affected Vehicle. However, despite touting the safety and dependability of the Affected Vehicles, at no point did Chrysler or its agents, dealers, or other representatives disclose to Plaintiff the Hybrid Propulsion Defect. Plaintiff regularly services the vehicle but is now concerned about driving it due to the dangers resulting from the Hybrid Propulsion Defect and believes that its market value is diminished as a result. In addition, it is impossible for Plaintiff to park the Affected Vehicle away from structures and other vehicles as Chrysler has instructed because there are no such spaces near Plaintiff's home or work. Moreover, because Plaintiff can no longer charge the plug-in hybrid vehicle, Plaintiff must pay for gas to use the vehicle that Plaintiff would not have needed were the hybrid propulsion system able to operate as intended. Plaintiff would not have purchased the vehicle, or would have paid less for it, or Plaintiff would have purchased a non-hybrid version of the Pacifica, had Plaintiff known about the Hybrid Propulsion Defect.

22.     Plaintiff and proposed class representative **Diahann Messeguer** ("Plaintiff," for purposes of this paragraph) is a resident and citizen of Minneola, FL. Plaintiff purchased a new 2018 Chrysler Pacifica Hybrid on June 17, 2018, from Napleton Chrysler, Dodge, Jeep in Clermont, FL. Plaintiff's Pacifica Hybrid

is an Affected Vehicle equipped with the Hybrid Propulsion Defect. Through exposure and interaction with Chrysler, Plaintiff was aware of Chrysler's uniform and pervasive marketing message of dependability and safety, upon which Plaintiff relied, and which was a primary reason Plaintiff purchased the Affected Vehicle. However, despite touting the safety and dependability of the Affected Vehicles, at no point did Chrysler or its agents, dealers, or other representatives disclose to Plaintiff the Hybrid Propulsion Defect. Plaintiff regularly services the vehicle but is now concerned about driving it due to the dangers resulting from the Hybrid Propulsion Defect and believes that its market value is diminished as a result. In addition, it is impossible for Plaintiff to park the Affected Vehicle away from structures and other vehicles as Chrysler has instructed because there are no such spaces near Plaintiff's home or work. Moreover, because Plaintiff can no longer charge the plug-in hybrid vehicle, Plaintiff must pay for gas to use the vehicle that Plaintiff would not have needed were the hybrid propulsion system able to operate as intended. Plaintiff would not have purchased the vehicle, or would have paid less for it, or Plaintiff would have purchased a non-hybrid version of the Pacifica, had Plaintiff known about the Hybrid Propulsion Defect.

23.    Plaintiffs and proposed class representatives **Andrew Berzanskis** and **Margaret Wilensky** ("Plaintiffs," for purposes of this paragraph) are a married couple and residents and citizens of Louisville, CO. Plaintiffs purchased a certified

2018 Chrysler Pacifica Hybrid on January 9, 2021, from Autonation Chrysler, Dodge, Jeep Ram Southwest in Littleton, CO. Plaintiffs' Pacifica Hybrid is an Affected Vehicle equipped with the Hybrid Propulsion Defect. Through exposure and interaction with Chrysler, Plaintiffs were aware of Chrysler's uniform and pervasive marketing message of dependability and safety, upon which Plaintiffs relied, and which was a primary reason Plaintiffs purchased the Affected Vehicle. However, despite touting the safety and dependability of the Affected Vehicles, at no point did Chrysler or its agents, dealers, or other representatives disclose to Plaintiffs the Hybrid Propulsion Defect. Plaintiffs regularly service the vehicle but are now concerned about driving it due to the dangers resulting from the Hybrid Propulsion Defect and believe that its market value is diminished as a result. In addition, it is impossible for Plaintiffs to park the Affected Vehicle away from structures and other vehicles as Chrysler has instructed because there are no such spaces near Plaintiffs' home or work. Moreover, because Plaintiffs can no longer charge the plug-in hybrid vehicle, Plaintiffs must pay for gas to use the vehicle that Plaintiffs would not have needed were the hybrid propulsion system able to operate as intended. Plaintiffs would not have purchased the vehicle, or would have paid less for it, or Plaintiffs would have purchased a non-hybrid version of the Pacifica, had Plaintiffs known about the Hybrid Propulsion Defect.

010611-12 973802 V1

24.     Plaintiff and proposed class representative **James Quattropani** ("Plaintiff," for purposes of this paragraph) is a resident and citizen of Deer Park, NY. Plaintiff purchased a 2018 Chrysler Pacifica Hybrid on January 14, 2021, from Schumacher Chrysler in Delray, FL. Plaintiff's Pacifica Hybrid is an Affected Vehicle equipped with the Hybrid Propulsion Defect. Through exposure and interaction with Chrysler, Plaintiff was aware of Chrysler's uniform and pervasive marketing message of dependability and safety, upon which Plaintiff relied, and which was a primary reason Plaintiff purchased the Affected Vehicle. However, despite touting the safety and dependability of the Affected Vehicles, at no point did Chrysler or its agents, dealers, or other representatives disclose to Plaintiff the Hybrid Propulsion Defect. Plaintiff regularly services the vehicle but is now concerned about driving it due to the dangers resulting from the Hybrid Propulsion Defect and believes that its market value is diminished as a result. In addition, it is impossible for Plaintiff to park the Affected Vehicle away from structures and other vehicles as Chrysler has instructed because there are no such spaces near Plaintiff's home or work. Moreover, because Plaintiff can no longer charge the plug-in hybrid vehicle, Plaintiff must pay for gas to use the vehicle that Plaintiff would not have needed were the hybrid propulsion system able to operate as intended. Plaintiff would not have purchased the vehicle, or would have paid less

for it, or Plaintiff would have purchased a non-hybrid version of the Pacifica, had Plaintiff known about the Hybrid Propulsion Defect.

25.     Plaintiff and proposed class representative **Tracy Whitman Brace** ("Plaintiff," for purposes of this paragraph) is a resident and citizen of Scotch Plains, NJ. Plaintiff purchased a 2017 Chrysler Pacifica Hybrid on September 12, 2017, from Team Welsh in Far Hills, NJ. Plaintiff's Pacifica Hybrid is an Affected Vehicle equipped with the Hybrid Propulsion Defect. Through exposure and interaction with Chrysler, Plaintiff was aware of Chrysler's uniform and pervasive marketing message of dependability and safety, upon which Plaintiff relied, and which was a primary reason Plaintiff purchased the Affected Vehicle. However, despite touting the safety and dependability of the Affected Vehicles, at no point did Chrysler or its agents, dealers, or other representatives disclose to Plaintiff the Hybrid Propulsion Defect. Plaintiff regularly services the vehicle but is now concerned about driving it due to the dangers resulting from the Hybrid Propulsion Defect and believes that its market value is diminished as a result. In addition, it is impossible for Plaintiff to park the Affected Vehicle away from structures and other vehicles as Chrysler has instructed because there are no such spaces near Plaintiff's home or work. Moreover, because Plaintiff can no longer charge the plug-in hybrid vehicle, Plaintiff must pay for gas to use the vehicle that Plaintiff would not have needed were the hybrid propulsion system able to operate as

010611-12 973802 V1

intended. Plaintiff would not have purchased the vehicle, or would have paid less for it, or Plaintiff would have purchased a non-hybrid version of the Pacifica, had Plaintiff known about the Hybrid Propulsion Defect.

**B.      Defendant**

26.      Defendant FCA US LLC ("FCA"), formerly known as Chrysler Group, is a Delaware limited liability company organized and existing under the laws of the State of Delaware, and is wholly owned by Stellantis N.V., a Dutch corporation headquartered in Amsterdam, Netherlands. FCA's principal place of business and headquarters is at 1000 Chrysler Dr., Auburn Hills, MI 48326.

27.      FCA is a motor vehicle manufacturer and a licensed distributor of new, previously untitled Chrysler, Dodge, Jeep, and Ram brand motor vehicles. FCA's Chrysler brand is one of the "Big Three" American automobile brands. FCA engages in commerce by distributing and selling new and used passenger cars and motor vehicles under its Chrysler, Dodge, Jeep, and Ram brands.

28.      FCA, through its various entities, designs, manufactures, markets, distributes, and sells automobiles throughout the U.S. and worldwide. FCA and/or its agents designed and manufactured the Affected Vehicles. FCA also developed and disseminated the owner's manuals and warranty booklets, advertisements, brochures, and other promotional materials relating to the Affected Vehicles, with the intent that such documents be purposely distributed throughout all fifty states.

- 14 -

FCA is engaged in interstate commerce, selling vehicles through its network in every state of the United States.

29.     As further detailed below, FCA-authorized automobile dealerships act as FCA's agents in selling automobiles under the FCA name and disseminating vehicle information provided by FCA to customers. At all relevant times, FCA's dealerships served as its agents for motor vehicle repairs and warranty issues because they performed repairs, replacements, and adjustments covered by FCA's manufacturer warranty pursuant to the contracts between FCA and its more than 2,000 authorized dealerships nationwide.

## V.     FACTUAL ALLEGATIONS

**A.     FCA marketed the Pacifica Hybrid as an extremely safe plug-in electric hybrid that can run in electric mode or on gasoline.**

30.     In marketing the Affected Vehicles, FCA stressed that the Pacifica Hybrid was "America's first-ever Hybrid minivan" and that it averaged 84 miles per gallon.

31.     A major selling point of the Affected Vehicles is their ability to run on electric power.

32.     According to a sales brochure for the 2018 Pacifica Hybrid, the vehicle reflected "A mission for reducing emissions":



33.     Elsewhere in the same brochure, FCA continues to tout the electric

driving ability of the Affected Vehicles:



34.     Another 2018 brochure for the gas-powered and hybrid Pacifica stated

that:



35.     In addition to the alleged environmentally-friendly nature of the

Pacifica Hybrid, FCA also stressed the alleged extreme safety of the vehicles. In a

2018 brochure for the Affected Vehicles, FCA stated, "Your family's safety and

security are what matter most":



Your family's safety and security are what matter most

36.     Indeed, that same brochure is replete with pictures of children in the

Affected Vehicles and describes an extensive set of safety features.

010611-12 973802 V1

37.     Another brochure for the 2018 Pacifica states that "[y]our travels will inspire while ensuring the well-being of all your beings with over 100 standard and available safety and security features":



Long and winding roads reveal panoramic views within the purposefully planned, kid-friendly road-trip vehicle. Your travels will inspire while ensuring the well-being of all your beings with over 100 standard and available safety and security features. The available seating for eight offers plenty of elbow room, as well as your turn to relax, needing only to focus on the road ahead. The ergonomic advantages of Pacifica make it easy to count on a peaceful trip.



## B.     The Hybrid Propulsion Defect

38.     As FCA now admits in a February 14, 2022 notification of a safety recall sent to the National Highway Traffic Safety Administration ("NHTSA"), a defect in the Hybrid Propulsion System can cause the Affected Vehicles to spontaneously burst into flames.

39.     FCA further admits that "[a] vehicle fire can occur when parked, even with the vehicle in the off position."

40.     Plainly, FCA failed to adequately research, design, test, and manufacture the Affected Vehicles before warranting, advertising, promoting, marketing, and selling the Affected Vehicles as suitable and safe for use in an intended and reasonably foreseeable manner.

41.     Although FCA claims that the "root cause" of the Hybrid Propulsion Defect is unknown, the nature of the fires and the fact they can occur even while the vehicle is not running, strongly suggests that the defect is connected to the high-voltage lithium battery that powers the electric propulsion of the Affected Vehicles.[2]

42.     The high-voltage batteries in the Affected Vehicles are 16-kWh lithium-ion batteries made by LG Chem (now LG Energy Solution, or "LGES").

43.     LGES also made the batteries that allegedly caused fires in GM's Bolt EV and Bolt EUV cars built from 2017 to 2022. As a result, LGES agreed to pay GM $1.9 billion for the costs of a recall of those GM cars.

44.     In addition, LGES made the batteries used in 2017 to 2020 Hyundai vehicles that were recalled in February 2021 to address a battery defect that posed a fire risk.

45.     LGES issued the following statement in response to FCA's recall of the Affected Vehicles:

> There is no confirmed root cause of fires in the STLA vehicles that is subject to the recall, or proof directly linking to the battery, as mentioned in its statement. Considering STLA's statement, LGES has no further comment.

---

[2] See, e.g., https://www.youtube.com/watch?v=VvWGac0vnlQ.

46.     So far, FCA has only recalled the 2017 and 2018 Pacifica Hybrids.

However, FCA has continuously sold Pacifica Hybrids to this day, and continues

to use LGES 16-kWh lithium-ion batteries.

47.     Accordingly, Plaintiffs' counsel continues to investigate whether

additional model years of the Pacifica Hybrid are also plagued with the Hybrid

Propulsion Defect.

**C.     The Hybrid Propulsion Defect causes sudden fires and explosions in the Affected Vehicles.**

48.     On information and belief, FCA knew or should have known about

the Hybrid Propulsion Defect long before it disclosed the problem, as evidenced

by: (1) consumer complaints lodged with NHTSA and elsewhere online;

(2) consumer complaints lodged with FCA directly; and (3) other similar fire

issues in GM Bolts and Hyundai vehicles that (like the Affected Vehicles) use

LGES batteries for electric propulsion.

49.     No later than fall 2018, Pacifica owners and lessees began

complaining that their Affected Vehicles suddenly caught fire.

50.     All vehicle manufacturers, including FCA, are required by law to

routinely monitor and analyze NHTSA complaints to determine whether vehicles

or components should be recalled due to safety concerns. Thus, FCA has

knowledge of all NHTSA complaints filed concerning the vehicles it

manufacturers, including the Affected Vehicles. *See* TREAD Act, Pub. L. No. 106-414, 114 Stat. 1800 (2000).

51.     Complaints submitted to FCA and to NHTSA via Vehicle Owner Questionnaires ("VOQ") reveal multiple instances of Affected Vehicles catching on fire.

52.     As one Affected Vehicle owner stated in a complaint to NHTSA in 2018, only "[t]wo weeks" after purchasing a new Pacifica, "the engine started smoking and caught fire while I was driving my family" on a Washington highway.

53. Other owners reported similar experiences to NHTSA, reproduced, verbatim, in the following paragraphs.

54.     September 20, 2018 NHTSA ID NUMBER: 11130465
Components: ELECTRICAL SYSTEM, ENGINE
NHTSA ID Number: 11130465
Incident Date September 15, 2018
Consumer Location WOODBRIDGE, VA
Vehicle Identification Number 2C4RC1L72JR****
Summary of Complaint: TL* THE CONTACT OWNS A 2018 CHRYSLER
PACIFICA HYBRID. WHILE THE CONTACT'S WIFE WAS DRIVING 70
MPH, AN ABNORMAL NOISE WAS HEARD AND THE ENGINE STALLED.
THE CONTACT NOTICED SMOKE COMING FROM UNDER THE HOOD.
WHEN THE VEHICLE WAS STOPPED AND THE HOOD WAS LIFTED,
THE CONTACT NOTICED FLAMES COMING FROM THE REAR OF THE
ENGINE IN FRONT OF THE FIREWALL. THE FIRE MARSHALL
EXTINGUISHED THE FIRE AND THE POLICE FILED REPORT NUMBER:
2018-2716. THE CAUSE OF THE FIRE WAS UNKNOWN. THERE WERE NO
INJURIES. THE VEHICLE WAS TOWED TO AN UNKNOWN CHRYSLER
DEALER, BUT HAD NOT BEEN DIAGNOSED. IT WAS UNKNOWN IF THE
VEHICLE WAS DESTROYED. THE MANUFACTURER WAS NOT
NOTIFIED OF THE FAILURE. THE FAILURE MILEAGE WAS
APPROXIMATELY 2,900. CONSUMER STATED VEHICLE STATUS IS IN
LIMBO. CHRYSLER STATED "WE ARE UNABLE TO DISCUSS THE CASE

DUE TO AN OPEN ONGOING INVESTIGATION." AS OF THIS NEXT
SATURDAY, 6 OCTOBER, IT WILL BE 3 WEEKS THAT THE VEHICLE
WILL BE SITTING ON THE DEALERSHIP LOT. UPDATED 10/18/18*JB
...*BF *BF. UPDATED 10/31/18*JB
1 Affected Product: CHRYSLER       PACIFICA HYBRID 2018

55.    September 24, 2018 NHTSA ID NUMBER: 11130931
       Components: UNKNOWN OR OTHER
       NHTSA ID Number: 11130931
       Incident Date September 23, 2018
       Consumer Location HIRAM, GA
       Vehicle Identification Number 2C4RC1N75JR****
       Summary of Complaint: WE PURCHASED A NEW 2018 CHRYSLER
       PACIFICA HYBRID ON SEPTEMBER 3RD. YESTERDAY, SEPTEMBER
       23RD, WE LEFT TO GO ON A VACATION. LESS THAN 30 MINUTES INTO
       OUR TRIP (WITH 3 MILES REMAINING ELECTRIC RANGE) WE HEARD
       A CLUNK AND THE ENGINE LIGHT CAME ON. AS THE ELECTRIC
       RANGE WENT OUT WE LOST ALL PROPULSION, AND MY HUSBAND
       WAS ABLE TO STEER IT ONTO AN EXIT RAMP AS BLACK SMOKE
       BEGAN BILLOWING FROM BENEATH THE HOOD. WE AND OUR TWO
       CHILDREN AND MY UNCLE ALL EXITED THE VEHICLE. THE HOOD
       WAS POPPED AND A HERO UNIT ARRIVED, THE ENGINE
       COMPARTMENT WAS IN FLAMES. WE WERE ASKED TO GET AWAY
       FROM THE VEHICLE AND THE FIRE WAS EXTINGUISHED AS
       ANOTHER FIRE TRUCK ARRIVED. KNOWING THE AMOUNT OF
       LITHIUM ION BATTERIES ON BOARD, A FIRE, ESPECIALLY ONE THAT
       STARTED INEXPLICABLY, WAS TERRIFYING. WE HAVE NOT HAD A
       RESPONSE FROM OUR CHRYSLER DEALER, AT THIS TIME. ...
       *BF...*BF. UPDATED 10/29/18*JB UPDATED 10/31/18*JB
       1 Affected Product: CHRYSLER       PACIFICA HYBRID 2018

56.    June 15, 2019 NHTSA ID NUMBER: 11220341
       Components: ELECTRICAL SYSTEM, ENGINE, FUEL/PROPULSION
       SYSTEM
       NHTSA ID Number: 11220341
       Incident Date June 15, 2019
       Consumer Location FORT WORTH, TX
       Vehicle Identification Number 2C4RC1N74JR****
       Summary of Complaint: PHEV VAN WAS CHARGING OVERNIGHT WHILE
       PLUGGED INTO HOUSE OUTLET (110V) USING MANUFACTURER
       SUPPLIED CHARGING CABLE. AT AROUND 7 AM WE HEARD AN
       EXPLOSION AND FOUND THE VAN BURNING IN OUR DRIVEWAY.
       VEHICLE WAS QUICKLY ENGULFED IN FLAMES. FIRE TRUCK PUT IT
       OUT AFTER ARRIVING (~5-6 MINUTES, I THINK). NO ONE WAS
       INJURED, IN OR NEAR THE CAR WHEN IT HAPPENED. A NEST
       CAMERA ACROSS THE STREET SHOWED THAT THE VEHICLE WAS

SMOKING PRIOR TO THE EXPLOSION. *BF*JB *DT *DT*DT
INFORMATION REDACTED PURSUANT TO THE FREEDOM OF
INFORMATION ACT (FOIA), 5 U.S.C. 552(B)(6).*JB *TR
1 Affected Product: CHRYSLER     PACIFICA HYBRID 2018

57.     January 14, 2020 NHTSA ID NUMBER: 11299263
        Components: ELECTRICAL SYSTEM
        NHTSA ID Number: 11299263
        Incident Date September 20, 2019
        Consumer Location KALAMAZOO, MI
        Vehicle Identification Number 2C4RC1N73JR****
        Summary of Complaint: AS OF 1/14/20 CHRYSLER AND KEVIN PIKE FROM
        NEDERVELD ARE STILL INVESTIGATING. ON 9/20 AROUND 5AM WE
        WERE AWOKE TO AN EXPLOSION SOUND. IT WAS OUR GARAGE
        DOOR BEING BLOWN TO THE STREET AND THE INTERIOR GARAGE
        DOOR BEING BLOWN INWARDS. THIS WAS DUE TO A FIRE THAT
        STARTED IN OUR GARAGE CONFIRMED TO HAVE STARTED WHERE
        THE PACIFICA WAS PARKED. THE PACIFICA HAD BEEN PLUGGED IN
        TO A JUICEBOX CHARGER PROFESSIONALLY WIRED WITH A
        DEDICATED 220V OUTLET SINCE AROUND 7PM THE PREVIOUS
        EVENING. I BELIEVE SOMETHING MALFUNCTIONED WITH THE CAR'S
        ELECTRIC BATTERY CAUSING IT TO START A FIRE THAT BUILT UP IN
        THE GARAGE AND EVENTUALLY CAUSED A TOTAL LOSS OF OUR
        HOME AND EVERYTHING INSIDE IT. WE DID NOT HAVE ANY OTHER
        FLAMMABLE OR EXPLOSIVE SUBSTANCES IN THE GARAGE BESIDES
        A 1 GALLON GAS CONTAINER ON THE OTHER SIDE OF THE GARAGE
        CONFIRMED TO NOT BE NEAR THE START OF THE FIRE. THE VEHICLE
        HAD BEEN COMPLETELY DRAINED OF BATTERY THE PREVIOUS
        DAY, PLUGGED IN AND WAS CHARGING OVERNIGHT. THIS
        DESCRIPTION ALSO MATCHES THE SAME DESCRIPTION 2 OTHER
        FAMILIES HAVE POSTED ONLINE OF THEIR PACIFICA CATCHING
        FIRE BUT THEIR VEHICLES WERE PARKED OUTSIDE SO DID NOT
        BURN DOWN THEIR HOMES AND NO INVESTIGATION WAS
        CONDUCTED.*DT*JB*DT *DT*JB*DT*JB*DT THE CONSUMER
        PROVIDED PHOTOS. *TR
        1 Affected Product: CHRYSLER     PACIFICA HYBRID 2018

58.     Despite FCA's knowledge of the serious risk of explosion and fire in

the Affected Vehicles, it did nothing to remedy the problem or even warn

consumers until very recently.

59.     According to a Part 573 Recall Report that FCA sent to NHTSA on February 11, 2022, FCA's Technical Safety and Regulatory Compliance organization began investigating "a potential trend in fires" in certain Pacifica Hybrids on August 31, 2021.

60.     Between September 2021 and January 2022, FCA bought back two of these vehicles "for origin and cause investigation," but as of yet "[t]he cause of these fires is under investigation."

61.     In the Part 573, FCA admitted that it was "aware of ten additional fires," and "[t]he cause of these fires is under investigation," for a total of twelve such fires. According to FCA, it received the twelve field reports concerning these fires "from April 23, 2019, to December 14, 2021."

62.     Finally, on February 6, 2022, FCA's Vehicle Regulations Committee decided "to conduct a voluntary safety recall of the affected vehicles."

63.     However, in large part due to its slowness to even acknowledge the issue, FCA is not yet offering any remedy for the defect. Instead, FCA advises the hapless Affected Vehicle owners and lessees "to refrain from charging them, and to park them away from structures and other vehicles." FCA does not explain what owners should do with their vehicles if they have no such place to park their vehicles, and is not offering to buy back the vehicles or even provide loaner vehicles until such time as it can fix the problem.

**D.     The latest recall is the third time that Pacifica Hybrids have been recalled for fire risks.**

64.     FCA previously recalled over 10,000 2017 and 2018 Pacifica Plug-In Hybrid minivans in 2018 for a fire issue related to the vehicle's fuel system. According to the recall notice (Recall No. 18V740000), "After the vehicle has been operating in PHEV propulsion mode, the gas-fueled engine may not restart properly resulting in unburned fuel entering the exhaust catalyst."

65.     In other words, the engine might not restart properly after running in EV mode, and the fuel being fed to the engine could make its way past the exhaust manifold to the catalytic converters and ignite. The recall remedy was to update the computer, visually inspect the catalytic converters and replace them if needed.

66.     Then, in 2020, FCA issued another recall for some 23,079 Pacifica Plug-In Hybrid minivans due to a fire risk resulting from a corroded electrical connection involving the Pacifica's 12-volt battery system (Recall No. 20V334000). That battery is used to power auxiliary features such as radios and garage door openers, and is not part of the vehicle's plug-in hybrid propulsion system.

67.     When the 2020 recall issued, FCA advised Pacifica hybrid owners to park their vehicles outdoors and away from other vehicles until they were repaired.

010611-12 973802 V1

**E.    There is an agency relationship between FCA and FCA dealerships.**

68.    Upon information and belief, the manufacturer FCA has impliedly or expressly acknowledged that FCA-authorized dealerships are its sales agents, the dealers have accepted that undertaking, FCA has the ability to control authorized FCA dealers, and FCA acts as the principal in that relationship, as is shown by the following:

    i.    FCA can terminate the relationship with its dealers at will;

    ii.    The relationships are indefinite;

    iii.    FCA is in the business of selling vehicles as are its dealers;

    iv.    FCA provides tools and resources to help FCA dealers sell vehicles;

    v.    FCA supervises its dealers regularly;

    vi.    Without FCA, the relevant FCA dealers would not exist;

    vii.    FCA requires the following of its dealers:

        1.    Reporting of sales;

        2.    Computer network connection with FCA;

        3.    Training of dealers' sales and technical personnel;

        4.    Use of FCA-supplied computer software;

        5.    Participation in FCA's training programs;

        6.    Establishment and maintenance of service departments in

FCA dealerships;

7. Certification of FCA pre-owned vehicles;

8. Reporting to FCA with respect to the car delivery, including reporting Plaintiffs' names, addresses, preferred titles, primary and business phone numbers, e-mail addresses, vehicle VIN numbers, delivery date, type of sale, lease/finance terms, factory incentive coding, if applicable, vehicles' odometer readings, extended service contract sale designations, if any, and names of delivering dealership employees; and

9. Displaying FCA logos on signs, literature, products, and brochures within FCA dealerships.

viii. Dealerships bind FCA with respect to:

1. Warranty repairs on the vehicles the dealers sell; and

2. Issuing service contracts administered by FCA.

ix. FCA further exercises control over its dealers with respect to:

1. Financial incentives given to FCA dealer employees;

2. Locations of dealers;

3. Testing and certification of dealership personnel to ensure

- 27 -

compliance with FCA's policies and procedures; and

4.   Customer satisfaction surveys, pursuant to which FCA allocates the number of FCA cars to each dealer, thereby directly controlling dealership profits.

x.   FCA dealers sell FCA vehicles on FCA's behalf, pursuant to a "floor plan," and FCA does not receive payment for its cars until the dealerships sell them.

xi.   Dealerships bear FCA's brand names, use FCA's logos in advertising and on warranty repair orders, post FCA-branded signs for the public to see, and enjoy a franchise to sell FCA's products, including the Affected Vehicles.

xii.   FCA requires FCA dealers to follow the rules and policies of FCA in conducting all aspects of dealer business, including the delivery of FCA's warranties described above, and the servicing of defective vehicles such as the Affected Vehicles.

xiii.   FCA requires its dealers to post FCA's brand names, logos, and signs at dealer locations, including dealer service departments, and to identify themselves and to the public as authorized FCA dealers and servicing outlets for FCA cars.

xiv.   FCA requires its dealers to use service and repair forms

containing FCA's brand names and logos.

xv.    FCA requires FCA dealers to perform FCA's warranty diagnoses and repairs, and to do the diagnoses and repairs according to the procedures and policies set forth in writing by FCA.

xvi.    FCA requires FCA dealers to use parts and tools either provided by FCA, or approved by FCA, and to inform FCA when dealers discover that unauthorized parts have been installed on one of FCA's vehicles.

xvii.    FCA requires dealers' service and repair employees to be trained by FCA in the methods of repair of FCA-brand vehicles.

xviii.    FCA audits FCA dealerships' sales and service departments and directly contacts the customers of said dealers to determine their level of satisfaction with the sale and repair services provided by the dealers; dealers are then granted financial incentives or reprimanded depending on the level of satisfaction.

xix.    FCA requires its dealers to provide FCA with monthly statements and records pertaining, in part, to dealers' sales and servicing of FCA vehicles.

xx.    FCA provides technical service bulletins and messages to its

dealers detailing chronic defects present in product lines, and repair procedures to be followed for chronic defects.

xxi.   FCA provides its dealers with specially trained service and repair consultants with whom dealers are required by FCA to consult when dealers are unable to correct a vehicle defect on their own.

xxii.   FCA requires FCA vehicle owners to go to authorized FCA dealers to obtain servicing under FCA warranties.

xxiii.   FCA dealers are required to notify FCA whenever a car is sold or put into warranty service.

## VI.   TOLLING OF THE STATUTE OF LIMITATIONS

### A.   Discovery Rule Tolling

69.   Because FCA concealed the existence of the Hybrid Propulsion Defect, Class members had no way of knowing about the unreasonable fire risk of the Affected Vehicles.

70.   Within the period of any applicable statutes of limitation, Plaintiffs and members of the proposed Classes could not have discovered through the exercise of reasonable diligence that FCA was concealing the conduct complained of herein.

71.     Plaintiffs and the other Class members did not discover, and did not know of, facts that would have caused a reasonable person to suspect that FCA did not report information within its knowledge to federal and state authorities, its dealerships, or consumers; nor would a reasonable and diligent investigation have disclosed that FCA had concealed information about the unreasonable fire risk of the Affected Vehicles, which was discovered by Plaintiffs only shortly before this action was filed.

72.     For these reasons, all applicable statutes of limitation have been tolled by operation of the discovery rule with respect to claims as to the Affected Vehicles.

**B.      Fraudulent Concealment Tolling**

73.     All applicable statutes of limitation have also been tolled by FCA's knowing and active fraudulent concealment and denial of the facts alleged herein throughout the period relevant to this action.

**C.      Estoppel**

74.     FCA was under a continuous duty to disclose to Plaintiffs and the other Class members the true character, quality, and nature of the fire risk of the Affected Vehicles.

75.     FCA knowingly, affirmatively, and actively concealed or recklessly disregarded the true nature, quality, and character of the fire risk of the Affected Vehicles.

76.     Based on the foregoing, FCA is estopped from relying on any statutes of limitations in defense of this action.

## VII.   CLASS ALLEGATIONS

77.     Plaintiffs bring this action on behalf of themselves and as a class action, pursuant to the provisions of Rules 23(a) and (b)(3) of the Federal Rules of Civil Procedure, on behalf of the following classes:

> **Nationwide Class:** All persons or entities who purchased or leased one or more model year 2017-2018 Chrysler Pacifica Hybrid minivans (the "Affected Vehicles").
>
> **Colorado Class**: All persons or entities who purchased or leased one or more of the Affected Vehicles in the State of Colorado.
>
> **Florida Class**: All persons or entities who purchased or leased one or more of the Affected Vehicles in the State of Florida.
>
> **Idaho Class**: All persons or entities who purchased or leased one or more of the Affected Vehicles in the State of Idaho.
>
> **New Jersey Class**: All persons or entities who purchased or leased one or more of the Affected Vehicles in the State of New Jersey.
>
> **New York Class**: All persons or entities who purchased or leased one or more of the Affected Vehicles in the State of New York.

**Ohio Class**: All persons or entities who purchased or leased one or more of the Affected Vehicles in the State of Ohio.

**Oregon Class**: All persons or entities who purchased or leased one or more of the Affected Vehicles in the State of Oregon.

78.    Plaintiffs assert claims under the laws of each state set forth below.

79.    Excluded from each Class are individuals who have personal injury claims resulting from the fires or explosions caused by the Affected Vehicles. Also excluded from the Class are FCA and its subsidiaries and affiliates; all persons who make a timely election to be excluded from the Class; governmental entities; the Judge to whom this case is assigned and his/her immediate family; and Plaintiffs' Counsel. Plaintiffs reserve the right to revise the Class definition based upon information learned through discovery.

80.    Certification of Plaintiffs' claims for class-wide treatment is appropriate because Plaintiffs can prove the elements of their claims on a class-wide basis using the same evidence as would be used to prove those elements in individual actions alleging the same claim.

81.    This action has been brought and may be properly maintained on behalf of the Classes proposed herein under Federal Rule of Civil Procedure 23.

82.    **Numerosity**. Federal Rule of Civil Procedure 23(a)(1): The members of each Class are so numerous and geographically dispersed that individual joinder of all Class members is impracticable. For purposes of this complaint, Plaintiffs

allege that there are estimated to be 16,700 or more Affected Vehicles in the

Nationwide Class. The precise number of Class members is unknown to Plaintiffs

but may be ascertained from FCA's books and records. Class members may be

notified of the pendency of this action by recognized, Court-approved notice

dissemination methods, which may include U.S. Mail, electronic mail, Internet

postings, and/or published notice.

83.    **Commonality and Predominance**: Federal Rule of Civil Procedure

23(a)(2) and 23(b)(3): This action involves common questions of law and fact,

which predominate over any questions affecting individual Class members,

including, without limitation:

a)    Whether FCA engaged in the conduct alleged herein;

b)    Whether the Hybrid Propulsion Defect creates an unreasonable

risk of fires in the Affected Vehicles;

c)    When FCA first knew about the Hybrid Propulsion Defect;

d)    Whether FCA designed, manufactured, marketed, and

distributed the Affected Vehicles with defective high-voltage batteries;

e)    Whether FCA's conduct renders it liable for breach of the

implied warranty of merchantability;

f)    Whether FCA has been unjustly enriched at the expense of

Plaintiffs and the Classes;

g)      Whether Plaintiffs and the other Class members overpaid for

their vehicles at the point of sale; and

h)      Whether Plaintiffs and the other Class members are entitled to

damages and other monetary relief and, if so, in what amount.

84.     **Typicality**: Federal Rule of Civil Procedure 23(a)(3): Plaintiffs'

claims are typical of the other Class members' claims because, among other things,

all Class members were comparably injured through FCA's wrongful conduct as

described above.

85.     **Adequacy**: Federal Rule of Civil Procedure 23(a)(4): Plaintiffs are

adequate Class representatives because their interests do not conflict with the

interests of the other members of the Classes they seek to represent; Plaintiffs have

retained counsel competent and experienced in complex class action litigation; and

Plaintiffs intend to prosecute this action vigorously. The Classes' interests will be

fairly and adequately protected by Plaintiffs and their counsel.

86.     **Superiority**: Federal Rule of Civil Procedure 23(b)(3): A class action

is superior to any other available means for the fair and efficient adjudication of

this controversy, and no unusual difficulties are likely to be encountered in the

management of this class action. The damages or other financial detriment suffered

by Plaintiffs and the other Class members are relatively small compared to the

burden and expense that would be required to individually litigate their claims

- 35 -

against FCA, so it would be impracticable for the members of the Classes to individually seek redress for FCA's wrongful conduct. Even if Class members could afford individual litigation, the court system could not. Individualized litigation creates a potential for inconsistent or contradictory judgments and increases the delay and expense to all parties and the court system. By contrast, the class action device presents far fewer management difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court.

## VIII.  CLAIMS

**A.     Nationwide Claim**

## <u>COUNT I</u>

### VIOLATION OF THE MAGNUSON-MOSS WARRANTY ACT 15 U.S.C. § 2301, *ET. SEQ.*

87.     Plaintiffs re-allege and incorporate by reference all paragraphs as though fully set forth herein.

88.     Plaintiffs bring this Count on behalf of a Nationwide Class (collectively for purposes of this Count, the "Magnuson-Moss Class").

89.     This Court has jurisdiction to decide claims brought under 15 U.S.C. § 2301 by virtue of 28 U.S.C. § 1332(a)-(d).

90.     The Affected Vehicles are "consumer products" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(3). The Plaintiffs and

Magnuson-Moss Class members are consumers because they are persons entitled under applicable state law to enforce against the warrantor the obligations of its implied warranties.

91.     FCA is a "supplier" and "warrantor" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(4)-(5).

92.     15 U.S.C. § 2301(d)(1) provides a cause of action for any consumer who is damaged by the failure of a warrantor to comply with an implied warranty.

93.     FCA provided Plaintiffs and Magnuson-Moss Class members with an implied warranty of merchantability in connection with the purchase or lease of their vehicles that is an "implied warranty" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(7). As a part of the implied warranty of merchantability, FCA warranted that the Affected Vehicles engines were fit for their ordinary purpose as safe motor vehicles and would pass without objection in the trade as designed, manufactured, and marketed, and were adequately contained, packaged, and labeled.

98.     FCA breached its implied warranties, as described in more detail above, and is therefore liable to Plaintiffs pursuant to 15 U.S.C. § 2310(d)(1). Without limitation, the Affected Vehicles share a common defect in that they are all equipped with a Hybrid Propulsion System that makes the vehicles susceptible to a risk of spontaneous ignition, causing an unreasonable risk of death, serious

bodily harm and/or property damage to lessees and owners of the Affected Vehicles as well as their homes, passengers and bystanders. This defect rendered the Affected Vehicles when sold/leased and at all times thereafter, unmerchantable and unfit for their ordinary use of hybrid driving. In fact, as a result of the defect, FCA specifically advise owners and lessees not to charge their batteries and not to drive the Affected Vehicles in electric mode.

94.    In its capacity as warrantor and a result of its monitoring obligations under the TREAD Act as discussed above, FCA had knowledge of the inherently defective nature of the Hybrid Propulsion System in the Affected Vehicles long before Class members knew of the defect. Any effort by FCA to limit the implied warranties in a manner that would exclude coverage of the Affected Vehicles is unconscionable, and any such effort to disclaim or otherwise limit such liability is null and void.

95.    Any limitations FCA might seek to impose on its warranties are procedurally unconscionable. There was unequal bargaining power between FCA and Plaintiffs, as, at the time of purchase and lease, Plaintiffs had no other options for purchasing warranty coverage other than directly from FCA.

96.    Any limitations FCA might seek to impose on its warranties are substantively unconscionable. FCA knew that the Affected Vehicles were defective that the Affected Vehicles could spontaneously ignite when used as

intended long before Plaintiffs and the Class.  FCA failed to disclose  this defect to Plaintiffs and the Class. Thus, enforcement of the durational limitations on the warranties is harsh and shocks the conscience.

97.    Plaintiffs have had sufficient direct dealings with either FCA or  its agents (dealerships) to establish privity of contract between FCA and Plaintiffs. Nonetheless, privity is not required here because Plaintiffs are intended  third-party beneficiaries of contracts between FCA and its dealers, and specifically, of FCA's implied warranties. The dealers were not intended to be the ultimate consumers  of the Affected Vehicles and have no rights under the warranty agreements provided with the Affected Vehicles; the warranty agreements were designed for and intended to benefit consumers. Finally, privity is also not required because the Affected Vehicles  are dangerous instrumentalities due to the aforementioned defect, as spontaneous fires present an unreasonable risk of death, serious bodily harm and/or property damage to lessees and owners of the Affected Vehicles as well as their homes, passengers and bystanders.

98.    Pursuant to 15 U.S.C. § 2310(e), Plaintiffs are entitled to bring this class action and are not required to give FCA notice and an opportunity  to  cure until such time as the Court determines the representative capacity of Plaintiffs pursuant to Rule 23 of the Federal Rules of Civil Procedure.

99.    Plaintiffs would suffer economic hardship if they returned their Affected Vehicles but did not receive the return of all payments made by them. Because FCA will not acknowledge any revocation of acceptance and immediately return any payments made, Plaintiffs have not re-accepted their Affected Vehicles by retaining them.

100.    The amount in controversy of Plaintiffs' individual claims meets or exceeds the sum of $25. The amount in controversy of this action exceeds the sum of $50,000, exclusive of interest and costs, computed on the basis of all claims to be determined in this lawsuit. Plaintiffs, individually and on behalf of all other Magnuson-Moss Class members, seek all damages permitted by law, including diminution in value of their vehicles, in an amount to be proven at trial. In addition, pursuant to 15 U.S.C. § 2310(d)(2), Plaintiffs are entitled to recover a sum equal to the aggregate amount of costs and expenses (including attorneys' fees based on actual time expended) determined by the Court to have reasonably been incurred by Plaintiffs and the other Magnuson-Moss Class members in connection with the commencement and prosecution of this action.

101.    Plaintiffs also seek the establishment of an FCA-funded program for Plaintiffs and Magnuson-Moss Class members to recover out-of-pocket costs incurred in attempting to rectify and/or mitigate the effects of the Hybrid Propulsion System Defect in their Affected Vehicles.

- 40 -

**B.     State-Specific Claims**

## COUNT II

### BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY UNDER COLORADO LAW (COL. REV. STAT. § 4-2-314)

**(Alleged by Plaintiffs Berzanskis and Wilensky on Behalf of the Colorado Class)**

102.   Plaintiffs and the Colorado Class reallege and incorporate by reference all paragraphs as though fully set forth herein.

103.   Plaintiffs bring this action on behalf of themselves and the Colorado Class.

104.   FCA is a "merchant" of the Affected Vehicles within the meaning of Col. Rev. Stat. § 4-2-104(1) and a "seller" of the Affected Vehicles within the meaning of Col. Rev. Stat. § 4-2-103(d), and the Affected Vehicles are "goods" under Col. Rev. Stat. § 4-2-105(1).

105.   Under Colorado law, an implied warranty of merchantability attaches to the Affected Vehicles. Col. Rev. Stat. § 4-2-314.

106.   The Affected Vehicles were not merchantable when sold or leased because their Hybrid Propulsion Systems are prone to spontaneous ignition, and pose an unreasonable risk of fires due to the Hybrid Propulsion Defect as described herein. Without limitation, the Affected Vehicles share a common defect in that they are all equipped with a Hybrid Propulsion System that makes the vehicles

susceptible to a risk of spontaneous ignition, causing an unreasonable risk of death, serious bodily harm and/or property damage to lessees and owners of the Affected Vehicles as well as their homes, passengers and bystanders. This defect renders the Affected Vehicles when sold/leased and at all times thereafter, unmerchantable and unfit for their ordinary use of driving. In fact, as a result of the defect, FCA specifically advises owners and lessees not to charge their batteries and not to drive the Affected Vehicles in electric mode.

107.   Plaintiffs and the other Colorado Class members were and are third-party beneficiaries to FCA's contracts with FCA-certified/authorized retailers who sold or leased the Affected Vehicles to Plaintiffs and Colorado Class members.

108.   It was reasonable to expect that Plaintiff and the Colorado Class members would use, consume or be affected by the Affected Vehicles, and they are therefore entitled to the protections of the implied warranty of merchantability under Col. Rev. Stat. § 4-2-318.

109.   FCA was provided notice of these issues within a reasonable time of Plaintiffs' knowledge of the non-conforming or defective nature of the Affected Vehicles by the filing of this Complaint, by letters from Plaintiffs' counsel, on behalf of Plaintiffs, to FCA, consumer complaints to NHTSA regarding the defect that is the subject of this Complaint, and/or by the allegations contained in this Complaint. In addition, on or about March 8, 2022, Plaintiffs and Colorado Class

members sent notice letters to FCA complying with Col. Rev. Stat. § 4-2-607(3)(a),
to the extent such notice is required. Unless FCA remedies the Hybrid Propulsion
Defect within the requisite time period, Plaintiffs and the Colorado Class will seek
all damages and relief to which they are entitled.

110.    As a direct and proximate result of FCA's breach of the implied
warranty of merchantability, Plaintiff and the other Colorado Class members have
been damaged in an amount to be determined at trial.

## COUNT III

### UNJUST ENRICHMENT UNDER COLORADO LAW

**(Alleged by Plaintiffs Berzanskis and Wilensky
on behalf of the Colorado Class)**

111.    Plaintiffs incorporate by reference all paragraphs as though fully set
forth herein.

112.    Plaintiffs bring this claim on behalf of themselves and the Colorado
Class.

113.    This claim is pleaded in the alternative to the contract-based claims
brought on behalf of Plaintiffs and the Colorado Class.

114.    FCA has received and retained a benefit from Plaintiffs and Colorado
Class members and inequity has resulted.

115.    FCA has benefitted from selling, leasing, and distributing the Affected
Vehicles for more than they were worth as a result of FCA's conduct, at a profit,

- 43 -

and Plaintiffs have overpaid for the Affected Vehicles and been forced to pay other costs.

116.    Thus, all Plaintiffs conferred a benefit on FCA.

117.    It is inequitable for FCA to retain these benefits.

118.    Plaintiffs were not aware of the true facts about the Affected Vehicles and did not benefit from FCA's conduct.

119.    FCA knowingly accepted the benefits of its unjust conduct.

120.    As a result of FCA's conduct, the amount of its unjust enrichment should be determined in an amount according to proof.

## COUNT IV

### BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY UNDER FLORIDA LAW (FLA. STAT. ANN. §§ 672.314, 680.212)

**(Alleged by Plaintiff Messeguer on behalf of the Florida Class)**

121.    Plaintiff and the Florida Class reallege and incorporate by reference all paragraphs as though fully set forth herein.

122.    Plaintiff brings this action on behalf of herself and the Florida Class.

123.    FCA is a "merchant" with respect to motor vehicles under Fla. Stat. Ann. §§ 672.104(1) and 680.1031(3)(k), and a "seller" of motor vehicles under § 672.103(1)(d).

124.   With respect to leases, FCA is and was at all relevant times a "lessor" of motor vehicles.  Fla. Stat. Ann. § 680.1031(1)(p).

125.   The Affected Vehicles are "goods" within the meaning of Fla. Stat. Ann. § 672.105(1).

126.   Under Florida law, an implied warranty of merchantability attaches to the Affected Vehicles under Fla. Stat. Ann. §§ 672.314 and 680.212.

127.   The Affected Vehicles were not merchantable when sold or leased at all times thereafter because their Hybrid Propulsion Systems are prone to spontaneous ignition, and pose an unreasonable risk of fires due to the Hybrid Propulsion Defect as described herein. Without limitation, the Affected Vehicles share a common defect in that they are all equipped with a Hybrid Propulsion System that makes the vehicles susceptible to a risk of spontaneous ignition, causing an unreasonable risk of death, serious bodily harm and/or property damage to lessees and owners of the Affected Vehicles as well as their homes, passengers and bystanders. This defect renders the Affected Vehicles when sold/leased and at all times thereafter, unmerchantable and unfit for their ordinary use of driving. In fact, as a result of the defect, FCA specifically advises owners and lessees not to charge their batteries and not to drive the Affected Vehicles in electric mode.

128.   It was reasonable to expect that Plaintiff and the Florida Class members would use, consume or be affected by the Affected Vehicles.

- 45 -

129.   Plaintiff and the other Florida Class members were and are third-party beneficiaries to FCA's contracts with FCA-certified/authorized retailers who sold or leased the Affected Vehicles to Plaintiff and the Florida Class.

130.   In addition, or in the alternative, Plaintiff and the Florida Class members directly relied on FCA's advertising, as alleged above.

131.   FCA was provided notice of these issues within a reasonable time of Plaintiff's knowledge of the non-conforming or defective nature of the Affected Vehicles by the filing of this Complaint, by letters from Plaintiff's counsel, on behalf of Plaintiff, to FCA, consumer complaints to NHTSA regarding the defect that is the subject of this Complaint, and/or by the allegations contained in this Complaint. In addition, on or about March 8, 2022, Plaintiff and Florida Class members sent notice letters to FCA complying with Fla. Stat. Ann. § 672.314, *et seq.*, to the extent such notice is required. Unless FCA remedies the Hybrid Propulsion Defect within the requisite time period, Plaintiff and the Florida Class will seek all damages and relief to which they are entitled.

132.   As a direct and proximate result of FCA's breach of the implied warranty of merchantability, Plaintiff and the other Florida Class members have been damaged in an amount to be determined at trial.

## COUNT V

**UNJUST ENRICHMENT UNDER FLORIDA LAW**

**(Alleged by Plaintiff Messeguer on behalf of the Florida Class)**

133.   Plaintiff incorporates by reference all paragraphs as though fully set forth herein.

134.   Plaintiff brings this claim on behalf of herself and the Florida Class.

135.   This claim is pleaded in the alternative to the contract-based claims brought on behalf of Plaintiff and the Florida Class.

136.   FCA has received and retained a benefit from Plaintiff and Florida Class members and inequity has resulted.

137.   FCA has benefitted from selling, leasing, and distributing the Affected Vehicles for more than they were worth as a result of FCA's conduct, at a profit, and Plaintiff and Florida Class members have overpaid for the Affected Vehicles and been forced to pay other costs.

138.   Thus, all Plaintiff and Florida Class members conferred a benefit on FCA.

139.   It is inequitable for FCA to retain these benefits.

140.   Plaintiff and Florida Class members were not aware of the true facts about the Affected Vehicles and did not benefit from FCA's conduct.

141.   FCA knowingly accepted the benefits of its unjust conduct.

142.   As a result of FCA's conduct, the amount of its unjust enrichment should be determined in an amount according to proof.

## COUNT VI

### BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY UNDER IDAHO LAW (IDAHO CIV. CODE § 28-2-314)

**(Alleged by Plaintiff Keeth on behalf of the Idaho Class)**

143.   Plaintiff and the Idaho Class reallege and incorporate by reference all paragraphs as though fully set forth herein.

144.   Plaintiff brings this action on behalf of himself and the Idaho Class.

145.   FCA is a "merchant" within the meaning of Idaho Civ. Code § 28-2-104(1) and "seller" of motor vehicles within the meaning of Idaho Civ. Code § 28-2-103(d), and the Affected Vehicles are "goods" under Idaho law.

146.   Under Idaho Civ. Code § 28-2-314, an implied warranty of merchantability attaches to the Affected Vehicles.

147.   The Affected Vehicles were not merchantable when sold or leased because their Hybrid Propulsion Systems are prone to spontaneous ignition, and pose an unreasonable risk of fires due to the Hybrid Propulsion Defect as described herein. Without limitation, the Affected Vehicles share a common defect in that they are all equipped with a Hybrid Propulsion System that makes the vehicles susceptible to a risk of spontaneous ignition, causing an unreasonable risk of death,

- 48 -

serious bodily harm and/or property damage to lessees and owners of the Affected

Vehicles as well as their homes, passengers and bystanders. This defect renders the

Affected Vehicles when sold/leased and at all times thereafter, unmerchantable and

unfit for their ordinary use of driving. In fact, as a result of the defect, FCA

specifically advises owners and lessees not to charge their batteries and not to drive

the Affected Vehicles in electric mode.

148.    It was reasonable to expect that Plaintiff and the Idaho Class members

would use, consume or be affected by the Affected Vehicles.

149.    Plaintiff and the other Idaho Class members were and are third-party

beneficiaries to FCA's contracts with FCA-certified/authorized retailers who sold

or leased the Affected Vehicles to Plaintiff and Idaho Class members.

150.    FCA was provided notice of these issues within a reasonable time of

Plaintiff's knowledge of the non-conforming or defective nature of the Affected

Vehicles by the filing of this Complaint, by letters from Plaintiff's counsel, on

behalf of Plaintiff, to FCA, consumer complaints to NHTSA regarding the defect

that is the subject of this Complaint, and/or by the allegations contained in this

Complaint. In addition, on or about March 8, 2022, Plaintiff and Idaho Class

members sent notice letters to FCA complying with Idaho Civ. Code § 28-2-314, *et

seq.*, to the extent such notice is required. Unless FCA remedies the Hybrid

Propulsion Defect within the requisite time period, Plaintiff and the Idaho Class

will seek all damages and relief to which they are entitled.

151.   As a direct and proximate result of FCA's breach of the implied

warranty of merchantability, Plaintiff and the other Idaho Class members have

been damaged in an amount to be determined at trial.

<u>**COUNT VII**</u>

**BREACH OF IMPLIED WARRANTY OF
MERCHANTABILITY UNDER NEW JERSEY LAW
(N.J. STAT. ANN. § 12A:2-314)**

**(Alleged by Plaintiff Brace on behalf of the New Jersey Class)**

152.   Plaintiff and the New Jersey Class reallege and incorporate by

reference all paragraphs as though fully set forth herein.

153.   Plaintiff brings this action on behalf of herself and the New Jersey

Class.

154.   FCA is a "merchant" and "seller" of motor vehicles and the Affected

Vehicles are "goods" under New Jersey law. N.J. STAT. ANN. § 12A:2-104(1).

155.   Under New Jersey law, an implied warranty of merchantability

attaches to the Affected Vehicles under N.J. STAT. ANN. § 12A:2-104(1).

156.   The Affected Vehicles were not merchantable when sold or leased

because their Hybrid Propulsion Systems are prone to spontaneous ignition, and

pose an unreasonable risk of fires due to the Hybrid Propulsion Defect as described

herein. Without limitation, the Affected Vehicles share a common defect in that they are all equipped with a Hybrid Propulsion System that makes the vehicles susceptible to a risk of spontaneous ignition, causing an unreasonable risk of death, serious bodily harm and/or property damage to lessees and owners of the Affected Vehicles as well as their homes, passengers and bystanders. This defect renders the Affected Vehicles when sold/leased and at all times thereafter, unmerchantable and unfit for their ordinary use of driving. In fact, as a result of the defect, FCA specifically advises owners and lessees not to charge their batteries and not to drive the Affected Vehicles in electric mode.

157.   It was reasonable to expect that Plaintiff and the New Jersey Class members would use, consume or be affected by the Affected Vehicles.

158.   Plaintiff and the other New Jersey Class members were and are third-party beneficiaries to FCA's contracts with FCA-certified/authorized retailers who sold or leased the Affected Vehicles to Plaintiff and New Jersey Class members.

159.   FCA was provided notice of these issues within a reasonable time of Plaintiff's knowledge of the non-conforming or defective nature of the Affected Vehicles by the filing of this Complaint, by letters from Plaintiff's counsel, on behalf of Plaintiff, to FCA, consumer complaints to NHTSA regarding the defect that is the subject of this Complaint, and/or by the allegations contained in this Complaint. In addition, on or about March 8, 2022, Plaintiff and New Jersey Class

members sent notice letters to FCA complying with N.J. STAT. ANN. § 12A:2-104(1), *et seq*., to the extent such notice is required. Unless FCA remedies the Hybrid Propulsion Defect within the requisite time period, Plaintiff and the New Jersey Class will seek all damages and relief to which they are entitled.

160.   As a direct and proximate result of FCA's breach of the implied warranty of merchantability, Plaintiff and the other New Jersey Class members have been damaged in an amount to be determined at trial.

## COUNT VIII

### UNJUST ENRICHMENT UNDER NEW JERSEY LAW

### (Alleged by Plaintiff Brace on behalf of the New Jersey Class)

161.   Plaintiff incorporates by reference all paragraphs as though fully set forth herein.

162.   Plaintiff brings this claim on behalf of herself and the New Jersey Class.

163.   This claim is pleaded in the alternative to the contract-based claims brought on behalf of Plaintiff and the New Jersey Class.

164.   FCA has received and retained a benefit from Plaintiff and New Jersey Class members and inequity has resulted.

165.   FCA has benefitted from selling, leasing, and distributing the Affected Vehicles for more than they were worth as a result of FCA's conduct, at a profit,

and Plaintiff and New Jersey Class members have overpaid for the Affected

Vehicles and been forced to pay other costs.

166.    Thus, Plaintiff and New Jersey Class members conferred a benefit on

FCA.

167.    It is inequitable for FCA to retain these benefits.

168.    Plaintiff and New Jersey Class members were not aware of the true

facts about the Affected Vehicles and did not benefit from FCA's conduct.

169.    FCA knowingly accepted the benefits of its unjust conduct.

170.    As a result of FCA's conduct, the amount of its unjust enrichment

should be determined in an amount according to proof.

<u>**COUNT IX**</u>

**BREACH OF IMPLIED WARRANTY**
**OF MERCHANTABILITY UNDER NEW YORK LAW**
**(N.Y. U.C.C. LAW § 2-314)**

**(Alleged by Plaintiff Quattropani on behalf of the New York Class)**

171.    Plaintiff and the New York Class reallege and incorporate by

reference all paragraphs as though fully set forth herein.

172.    Plaintiff brings this action on behalf of himself and the New York

Class.

173.    FCA is a "merchant" of the Affected Vehicles within the meaning of

N.Y. U.C.C. Law § 2-104(1), and "seller" of the Affected Vehicles within the

meaning of N.Y. U.C.C. Law § 2-103(1)(d), and the Affected Vehicles are "goods" under New York U.C.C. Law § 2-105(1).

174.   Under New York law, an implied warranty of merchantability attaches to the Affected Vehicles under N.Y. U.C.C. § 2-314.

175.   The Affected Vehicles were not merchantable when sold or leased because their Hybrid Propulsion Systems are prone to spontaneous and catastrophic fires. The Affected Vehicles were not merchantable when sold or leased because their Hybrid Propulsion Systems are prone to spontaneous ignition, and pose an unreasonable risk of fires due to the Hybrid Propulsion Defect as described herein. Without limitation, the Affected Vehicles share a common defect in that they are all equipped with a Hybrid Propulsion System that makes the vehicles susceptible to a risk of spontaneous ignition, causing an unreasonable risk of death, serious bodily harm and/or property damage to lessees and owners of the Affected Vehicles as well as their homes, passengers and bystanders. This defect renders the Affected Vehicles when sold/leased and at all times thereafter, unmerchantable and unfit for their ordinary use of driving. In fact, as a result of the defect, FCA specifically advises owners and lessees not to charge their batteries and not to drive the Affected Vehicles in electric mode.

176.   It was reasonable to expect that Plaintiff and the New York Class members would use, consume or be affected by the Affected Vehicles.

- 54 -

177.   Plaintiff and the other New York Class members were and are third-party beneficiaries to FCA's contracts with FCA-certified/authorized retailers who sold or leased the Affected Vehicles to Plaintiff and New York Class members.

178.   FCA was provided notice of these issues within a reasonable time of Plaintiff's knowledge of the non-conforming or defective nature of the Affected Vehicles by the filing of this Complaint, by letters from Plaintiff's counsel, on behalf of Plaintiff, to FCA, consumer complaints to NHTSA regarding the defect that is the subject of this Complaint, and/or by the allegations contained in this Complaint. In addition, on or about March 8, 2022, Plaintiff and New York Class members sent notice letters to FCA complying with N.Y. U.C.C. § 2-314, *et seq.*, to the extent such notice is required. Unless FCA remedies the Hybrid Propulsion Defect within the requisite time period, Plaintiff and the New York Class will seek all damages and relief to which they are entitled.

179.   As a direct and proximate result of FCA's breach of the implied warranty of merchantability, Plaintiff and other New York Class members have been damaged in an amount to be determined at trial.

## COUNT X

### UNJUST ENRICHMENT UNDER NEW YORK LAW

### (Alleged by Plaintiff Quattropani on behalf of the New York Class)

180.   Plaintiff incorporates by reference all paragraphs as though fully set forth herein.

181.   Plaintiff brings this claim on behalf of herself and the New York Class.

182.   This claim is pleaded in the alternative to the contract-based claims brought on behalf of Plaintiff and the New York Class.

183.   FCA has received and retained a benefit from Plaintiff and New York Class members and inequity has resulted.

184.   FCA has benefitted from selling, leasing, and distributing the Affected Vehicles for more than they were worth as a result of FCA's conduct, at a profit, and Plaintiff and New York Class members have overpaid for the Affected Vehicles and been forced to pay other costs.

185.   Thus, Plaintiff and New York Class members conferred a benefit on FCA.

186.   It is inequitable for FCA to retain these benefits.

187.   Plaintiff and New York Class members were not aware of the true facts about the Affected Vehicles and did not benefit from FCA's conduct.

188.   FCA knowingly accepted the benefits of its unjust conduct.

189.   As a result of FCA's conduct, the amount of its unjust enrichment should be determined in an amount according to proof.

## COUNT XI

**IMPLIED WARRANTY IN TORT UNDER OHIO LAW**

**(Alleged by Plaintiff Huntington on behalf of the Ohio Class)**

190.   Plaintiff and the Ohio Class reallege and incorporate by reference all paragraphs as though fully set forth herein.

191.   Plaintiff brings this action on behalf of herself and the Ohio Class.

192.   The Affected Vehicles, when sold and at all times thereafter, were not merchantable and are not fit for the ordinary purpose for which cars are used.

193.   The Affected Vehicles are inherently defective because their Hybrid Propulsion Systems are prone to spontaneous ignition, and pose an unreasonable risk of fires due to the Hybrid Propulsion Defect as described herein. Without limitation, the Affected Vehicles share a common defect in that they are all equipped with a Hybrid Propulsion System that makes the vehicles susceptible to a risk of spontaneous ignition, causing an unreasonable risk of death, serious bodily harm and/or property damage to lessees and owners of the Affected Vehicles as well as their homes, passengers and bystanders. This defect renders the Affected Vehicles when sold/leased and at all times thereafter, unmerchantable and unfit for

their ordinary use of driving. In fact, as a result of the defect, FCA specifically advise owners and lessees not to charge their batteries and not to drive the Affected Vehicles in electric mode.

194.   The design, manufacturing, and/or assembly defect existed at the time the Affected Vehicles containing the defective Hybrid Propulsion Systems left the possession or control of FCA.

195.   Based upon the dangerous product defects, FCA failed to meet the expectations of a reasonable consumer. The Affected Vehicles failed their ordinary, intended use because the ignition systems in the vehicles do not function as a reasonable consumer would expect. Moreover, the defect presents a serious danger to Plaintiff and the Ohio Class that cannot be eliminated without significant cost.

196.   FCA was provided notice of the Hybrid Propulsion Defect and its consequences by pre-sale investigation, complaints made to NHTSA, and internal investigations before or within a reasonable amount of time after FCA issued the recall and the allegations of the defect became public.

197.   As a direct and proximate result of FCA's breach of the implied warranty of merchantability, Plaintiff and the Ohio Class have been damaged in an amount to be proven at trial.

## COUNT XII

### UNJUST ENRICHMENT UNDER OHIO LAW

### (Alleged by Plaintiff Huntington on behalf of the Ohio Class)

198.   Plaintiff incorporates by reference all paragraphs as though fully set forth herein.

199.   Plaintiff brings this claim on behalf of herself and the Ohio Class.

200.   This claim is pleaded in the alternative to the contract-based claims brought on behalf of Plaintiff and the Ohio Class.

201.   FCA has received and retained a benefit from Plaintiff and Ohio Class members and inequity has resulted.

202.   FCA has benefitted from selling, leasing, and distributing the Affected Vehicles for more than they were worth as a result of FCA's conduct, at a profit, and Plaintiff and Ohio Class members have overpaid for the Affected Vehicles and been forced to pay other costs.

203.   Thus, Plaintiff and Ohio Class members conferred a benefit on FCA.

204.   It is inequitable for FCA to retain these benefits.

205.   Plaintiff and Ohio Class members were not aware of the true facts about the Affected Vehicles and did not benefit from FCA's conduct.

206.   FCA knowingly accepted the benefits of its unjust conduct.

010611-12 973802 V1

207.   As a result of FCA's conduct, the amount of its unjust enrichment

should be determined in an amount according to proof.

## COUNT XIII

### BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY UNDER OREGON LAW (OR. REV. STAT. § 72.3140)
### (Alleged by Plaintiff Christie on behalf of the Oregon Class)

208.   Plaintiff and the Oregon Class reallege and incorporate by reference

all paragraphs as though fully set forth herein.

209.   Plaintiff brings this action on behalf of himself and the Oregon Class.

210.   FCA is a "merchant" within the meaning of Or. Rev. Stat. §

72.1040(1), and "seller" of motor vehicles within the meaning of Or. Rev. Stat. §

72.1030(1)(d) and the Affected Vehicles are "goods" under Or. Rev. Stat.

§ 72.5010 (*see* Or. Rev. Stat. § 72.1030(2)(m)).

211.   Under Or. Rev. Stat. § 72.3140, an implied warranty of

merchantability attaches to the Affected Vehicles.

212.   The Affected Vehicles were not merchantable when sold or leased

because their Hybrid Propulsion Systems are prone to spontaneous ignition, and

pose an unreasonable risk of fires due to the Hybrid Propulsion Defect as described

herein. Without limitation, the Affected Vehicles share a common defect in that

they are all equipped with a Hybrid Propulsion System that makes the vehicles

susceptible to a risk of spontaneous ignition, causing an unreasonable risk of death,

serious bodily harm and/or property damage to lessees and owners of the Affected Vehicles as well as their homes, passengers and bystanders. This defect renders the Affected Vehicles when sold/leased and at all times thereafter, unmerchantable and unfit for their ordinary use of driving. In fact, as a result of the defect, FCA specifically advises owners and lessees not to charge their batteries and not to drive the Affected Vehicles in electric mode.

213. Plaintiff and the other Oregon Class members were and are third-party beneficiaries to FCA's contracts with FCA-certified/authorized retailers who sold or leased the Affected Vehicles to Plaintiff and Oregon Class members.

214. FCA was provided notice of these issues within a reasonable time of Plaintiff's knowledge of the non-conforming or defective nature of the Affected Vehicles by the filing of this Complaint, by letters from Plaintiff's counsel, on behalf of Plaintiff, to FCA, consumer complaints to NHTSA regarding the defect that is the subject of this Complaint, and/or by the allegations contained in this Complaint. In addition, on or about March 8, 2022, Plaintiff and Oregon Class members sent notice letters to FCA complying with Or. Rev. Stat. § 72.3140, *et seq.*, to the extent such notice is required. Unless FCA remedies the Hybrid Propulsion Defect within the requisite time period, Plaintiff and the Oregon Class will seek all damages and relief to which they are entitled.

215.   As a direct and proximate result of FCA's breach of the implied warranty of merchantability, Plaintiff and the other Oregon Class members have been damaged in an amount to be determined at trial.

## COUNT XIII

### UNJUST ENRICHMENT UNDER OREGON LAW

**(Alleged by Plaintiff Christie on behalf of the Oregon Class)**

216.   Plaintiff incorporates by reference all paragraphs as though fully set forth herein.

217.   Plaintiff brings this claim on behalf of himself and the Oregon Class.

218.   This claim is pleaded in the alternative to the contract-based claims brought on behalf of Plaintiff and the Oregon Class.

219.   FCA has received and retained a benefit from Plaintiff and Oregon Class members and inequity has resulted.

220.   FCA has benefitted from selling, leasing, and distributing the Affected Vehicles for more than they were worth as a result of FCA's conduct, at a profit, and Plaintiff and Oregon Class members have overpaid for the Affected Vehicles and been forced to pay other costs.

221.   Thus, Plaintiff and Oregon Class members conferred a benefit on FCA.

222.   It is inequitable for FCA to retain these benefits.

010611-12 973802 V1

223.   Plaintiff and Oregon Class members were not aware of the true facts about the Affected Vehicles and did not benefit from FCA's conduct.

224.   FCA knowingly accepted the benefits of its unjust conduct.

225.   As a result of FCA's conduct, the amount of its unjust enrichment should be determined in an amount according to proof.

## REQUEST FOR RELIEF

WHEREFORE, Plaintiffs, individually and on behalf of members of the Classes, respectfully request that the Court enter judgment in their favor and against FCA, as follows:

A.      Certification of the proposed Multistate and State Classes, including appointment of Plaintiffs' counsel as Class Counsel;

B.      Restitution, including at the election of Class members, recovery of the purchase price of their Affected Vehicles, or the overpayment or diminution in value of their vehicles;

C.      Damages, including punitive damages, costs, and disgorgement in an amount to be determined at trial, except that monetary relief under certain consumer protection statutes, as stated above, shall be limited prior to completion of the applicable notice requirements;

D.      An order requiring Defendants to pay both pre- and post-judgment interest on any amounts awarded;

010611-12 973802 V1

E.      An award of costs and attorneys' fees; and

F.      Such other or further relief as may be appropriate.

## DEMAND FOR JURY TRIAL

Plaintiffs hereby demand a jury trial for all claims so triable.

DATED: March 8, 2022          Respectfully Submitted,

HAGENS BERMAN SOBOL SHAPIRO LLP

By */s/ Steve W. Berman*
    Steve W. Berman
Thomas E. Loeser
1301 Second Avenue, Suite 2000
Seattle, WA 98101
Telephone: (206) 623-7292
Facsimile: (206) 623-0594
steve@hbsslaw.com
toml@hbsslaw.com

E. Powell Miller (P39487)
Sharon S. Almonrode (P33938)
The Miller Law Firm PC
950 W. University Dr., Ste. 300
Rochester, MI 48307
Telephone: (248) 841-2200
Facsimile: (248) 652-2852
epm@millerlawpc.com
ssa@millerlawpc.com

*Attorneys for Plaintiffs and the Proposed Class*