UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MICHIGAN

| | |
|---|---|
| LAUREN HUNTINGTON, *et al.*, individually and on behalf of all others similarly situated, | Case No. 4:22-cv-10508-SDK-EAS |
| | Hon. Shalina D. Kumar |
| Plaintiffs, | **<u>JURY TRIAL DEMANDED</u>** |
| v. | |
| FCA US LLC, a Delaware Limited Liability Company, | |
| Defendant. | |

**<u>CONSOLIDATED CLASS ACTION COMPLAINT</u>**

# TABLE OF CONTENTS

**Page**

I.    INTRODUCTION ........................................................................... 1

II.   JURISDICTION ............................................................................. 9

III.  VENUE ........................................................................................ 10

IV.   PARTIES ..................................................................................... 10

    A.   Plaintiffs .............................................................................. 10

        1.    Veronica Bryan (California) ....................................... 10

        2.    Scott Carney (California) ........................................... 11

        3.    Sean Clancy (California) ............................................ 13

        4.    Elias Ramirez and Michelle Tinio Ramirez
             (California) ................................................................ 14

        5.    Kent Schumann (California) ...................................... 15

        6.    Alexander Shusta (California) .................................... 17

        7.    Andrew Berzanskis and Margaret Wilensky
             (Colorado) ............................................................... 18

        8.    Kelsey and Peter Keefe (Connecticut) ...................... 19

        9.    John Latacki (Florida) .............................................. 20

        10.   Diahann Messeguer (Florida) ................................... 22

        11.   John Spruance (Georgia) ........................................... 23

        12.   Michael Keeth (Idaho) .............................................. 24

        13.   Tim Ferguson (Illinois) ............................................. 25

        14.   Owen Ryan (Illinois) ................................................. 28

        15.   Devlin Su (Illinois) ................................................... 29

        16.   Spence Voss (Illinois) ............................................... 31

        17.   Christine Winter (Indiana) ........................................ 32

        18.   Tim Banas (Iowa) ..................................................... 33

        19.   Salyi Vu (Kansas) ..................................................... 34

011086-11/1924902 V1

20.   Diane and David Davidson (Maryland) .................................. 36

21.   Ruth Hoffman (Maryland) ..................................................... 37

22.   Alicia Maltz and David Maltz (Massachusetts) ...................... 38

23.   Michael Natale (Massachusetts) ............................................ 39

24.   Javin T. Olson (Massachusetts) ............................................. 41

25.   Jacob Kitzman (Michigan) ..................................................... 42

26.   Elizabeth Niemioja (Minnesota) ........................................... 43

27.   R. Scott Perry (Missouri) ...................................................... 44

28.   Scott Lewandowski (Nevada) ................................................ 45

29.   Matthew Bergantino (New Hampshire) .................................. 47

30.   Nicole and Stephen Costa (New Hampshire) ......................... 48

31.   Tracy Whitman Brace (New Jersey) ....................................... 49

32.   James Quattropani (New York) .............................................. 50

33.   Chad Fong (North Carolina) .................................................. 51

34.   Jared Gadomski Littleton (Ohio) ........................................... 52

35.   Lauren Huntington (Ohio) ..................................................... 54

36.   Michael Christie (Oregon) ..................................................... 55

37.   Clea Van Tol and Ladd Van Tol (Oregon) ............................. 56

38.   Joseph Ohodnicki (Pennsylvania) .......................................... 58

39.   Helen Bartek (Rhode Island) ................................................. 59

40.   Michael Carbajales-Dale (South Carolina) ............................ 60

41.   Rolando Pedroza (South Carolina) ........................................ 61

42.   Rickey Butler (Tennessee) ..................................................... 63

43.   Meagan Findeiss and Cal Findeiss (Texas) ............................ 64

44.   Patricia Ransom (Texas) ........................................................ 65

45.   Shawn Sheehan (Texas) ......................................................... 67

46.   Richard Golland (Virginia) .................................................... 68

47.   Andrew Ventura (Virginia) .................................................... 69

48.   Ami Benzur (Washington) ...................................................... 70

B. Defendant ....................................................................... 71

V. FACTUAL ALLEGATIONS ................................................. 73

A. FCA marketed the Pacifica Hybrid as an extremely safe plug-in electric hybrid that can run in electric mode and knew that these attributes were material to consumers. .................. 73

B. The Spontaneous Fire Defect. ........................................... 78

C. The Spontaneous Fire Defect is likely the result of defective high-voltage lithium batteries. ........................................... 80

D. FCA knew or should have known of the Spontaneous Fire Defect long before it disclosed the problem to Plaintiffs ................. 82

1. Brief overview of lithium-ion batteries. ................. 83

2. Notwithstanding the great body of knowledge about the risks of calamitous spontaneous combustion in lithium-ion batteries, FCA evidently launched the Fire Defect Vehicles without either protecting against that risk or advising consumers of that risk. ................... 85

3. FCA launches the Fire Defect Vehicles, and fires result. ........................................................... 92

4. FCA conceals its knowledge of the Spontaneous Fire Defect for years before finally announcing a recall without providing consumers with any remedy other than refraining from charging their batteries, and parking the cars far away from residences and any other real or personal property. ............................ 96

E. The latest recall is the third time that Pacifica Hybrids have been recalled for fire risks. ............................................... 98

F. There is an agency relationship between FCA and FCA dealerships. .................................................................. 99

VI. TOLLING OF THE STATUTE OF LIMITATIONS ............... 104

A. Discovery Rule Tolling .................................................. 104

B. Fraudulent Concealment Tolling ...................................... 105

C. Estoppel ...................................................................... 105

VII.   CLASS ALLEGATIONS ........................................................... 105

VIII.  CLAIMS ................................................................................... 112

    A.   Nationwide Claims ........................................................ 112

COUNT I VIOLATION OF THE MAGNUSON-MOSS WARRANTY
    ACT (15 U.S.C. § 2301, *et seq.*).................................. 112

COUNT II FRAUDULENT CONCEALMENT (COMMON LAW)................. 117

COUNT III UNJUST ENRICHMENT (COMMON LAW) ............................. 121

    B.   State-Specific Claims ..................................................... 122

        1.   California ................................................... 122

COUNT IV VIOLATION OF THE CALIFORNIA CONSUMER
    LEGAL REMEDIES ACT (Cal. Civ. Code § 1750, *et seq.*) .................... 122

COUNT V VIOLATIONS OF THE CALIFORNIA UNFAIR
    COMPETITION LAW (Cal. Bus. & Prof. Code § 17200)...................... 126

COUNT VI VIOLATIONS OF CALIFORNIA FALSE ADVERTISING
    LAW (Cal. Bus. & Prof. Code § 17500, *et seq.*)........................................ 129

COUNT VII VIOLATION OF SONG-BEVERLY CONSUMER
    WARRANTY ACT FOR BREACH OF IMPLIED WARRANTY
    OF MERCHANTABILITY UNDER CALIFORNIA LAW (Cal.
    Civ. Code §§ 1791.1 & 1792)................................... 131

        2.   Colorado ................................................... 135

COUNT VIII VIOLATIONS OF THE COLORADO CONSUMER
    PROTECTION ACT (Col. Rev. Stat. § 6-1-101, *et seq.*) ........................ 135

COUNT IX BREACH OF IMPLIED WARRANTY OF
    MERCHANTABILITY UNDER COLORADO LAW (Col. Rev.
    Stat. § 4-2-314) .................................................... 139

        3.   Connecticut ............................................... 141

COUNT X VIOLATION OF CONNECTICUT UNLAWFUL TRADE
    PRACTICES ACT (Conn. Gen. Stat. § 42-110a, *et seq.*)........................ 141

- iv -

COUNT XI BREACH OF IMPLIED WARRANTY OF
      MERCHANTABILITY UNDER CONNECTICUT LAW (Conn.
      Gen. Stat. § 42a-2-314)................................................................ 145

            4.       Florida ............................................................................ 147

COUNT XII VIOLATION OF FLORIDA'S UNFAIR & DECEPTIVE
      TRADE PRACTICES ACT (Fla. Stat. § 501.201, *et seq.*)....................... 147

COUNT XIII BREACH OF IMPLIED WARRANTY OF
      MERCHANTABILITY UNDER FLORIDA LAW (Fla. Stat.
      § 672.314).................................................................................. 151

            5.       Georgia ............................................................................ 152

COUNT XIV VIOLATION OF GEORGIA'S FAIR BUSINESS
      PRACTICES ACT (Ga. Code Ann. § 10-1-390, *et seq.*)........................... 152

COUNT XV BREACH OF IMPLIED WARRANTY OF
      MERCHANTABILITY UNDER GEORGIA LAW (Ga. Code
      Ann. § 11-2-314(1)).................................................................... 156

            6.       Idaho ............................................................................... 158

COUNT XVI VIOLATION OF THE IDAHO CONSUMER
      PROTECTION ACT (Idaho Civ. Code § 48-601, *et seq.*) ....................... 158

COUNT XVII BREACH OF IMPLIED WARRANTY OF
      MERCHANTABILITY UNDER IDAHO LAW (Idaho Civ. Code
      § 28-2-314) ............................................................................... 163

            7.       Illinois ............................................................................ 164

COUNT XVIII VIOLATION OF ILLINOIS CONSUMER FRAUD
      AND DECEPTIVE BUSINESS PRACTICES ACT (810 ILCS
      505/1, *et seq.*, and 720 ILCS 295/1A) ......................................... 164

COUNT XIX BREACH OF IMPLIED WARRANTY OF
      MERCHANTABILITY UNDER ILLINOIS LAW (810 ILCS 5/2-
      314) ........................................................................................ 169

            8.       Indiana ............................................................................ 170

COUNT XX VIOLATIONS OF THE INDIANA DECEPTIVE
      CONSUMER SALES ACT (Ind. Code § 24-5, *et seq.*)........................... 170

            9.       Iowa ................................................................................ 175

011086-11/1924902 V1

COUNT XXI VIOLATIONS OF THE IOWA PRIVATE RIGHT OF
   ACTION FOR CONSUMER FRAUDS ACT (Iowa Code
   § 714h.1, *et seq.*) ........................................................................ 175

COUNT XXII BREACH OF IMPLIED WARRANTY OF
   MERCHANTABILITY UNDER IOWA LAW (Iowa Code
   § 554.2314) ................................................................................... 179

   10.   Kansas ............................................................................... 181

COUNT XXIII VIOLATIONS OF THE KANSAS CONSUMER
   PROTECTION ACT (Kan. Stat. § 50-623, *et seq.*) .................................. 181

COUNT XXIV BREACH OF IMPLIED WARRANTY OF
   MERCHANTABILITY (Kan. Stat. Ann. § 84-2-314) ............................ 183

   11.   Maryland ........................................................................... 185

COUNT XXV VIOLATIONS OF THE MARYLAND CONSUMER
   PROTECTION ACT (Md. Code Com. Law § 13-101, *et seq.*)................ 185

COUNT XXVI BREACH OF IMPLIED WARRANTY OF
   MERCHANTABILITY UNDER MARYLAND LAW (Md. Code
   Com. Law § 2-314).................................................................... 189

   12.   Massachusetts.................................................................... 191

COUNT XXVII DECEPTIVE ACTS OR PRACTICES PROHIBITED
   BY MASSACHUSETTS LAW (Mass. Gen. Laws Ch. 93A, § 1,
   *et seq.*).......................................................................................... 191

COUNT XXVIII BREACH OF IMPLIED WARRANTY OF
   MERCHANTABILITY UNDER MASSACHUSETTS LAW (Alm
   Gl. Ch. 106, § 2-314) ................................................................. 195

   13.   Michigan ........................................................................... 198

COUNT XXIX BREACH OF IMPLIED WARRANTY OF
   MERCHANTABILITY UNDER MICHIGAN LAW (Mich.
   Comp. Laws § 440.314) .............................................................. 198

   14.   Minnesota .......................................................................... 199

COUNT XXX VIOLATION OF MINNESOTA PREVENTION OF
   CONSUMER FRAUD ACT (Minn. Stat. § 325F.68, *et seq.*) .................. 199

- vi -

COUNT XXXI VIOLATION OF MINNESOTA UNIFORM
DECEPTIVE TRADE PRACTICES ACT (Minn. Stat. § 325D.43-
48, *et seq.*) ............................................................................... 203

COUNT XXXII BREACH OF IMPLIED WARRANTY OF
MERCHANTABILITY UNDER MINNESOTA LAW (Minn.
Stat. § 336.2-314) .................................................................... 208

    15.   Missouri ................................................................. 210

COUNT XXXIII VIOLATION OF MISSOURI MERCHANDISING
PRACTICES ACT (Mo. Rev. Stat. § 407.010, *et seq.*) ............ 210

    16.   Nevada ................................................................... 214

COUNT XXXIV VIOLATION OF THE NEVADA DECEPTIVE
TRADE PRACTICES ACT (Nev. Rev. Stat. § 598.0903, *et seq.*)........... 214

COUNT XXXV BREACH OF IMPLIED WARRANTY OF
MERCHANTABILITY UNDER NEVADA LAW (Nev. Rev. Stat.
§ 104.2314) .............................................................................. 218

    17.   New Hampshire ...................................................... 220

COUNT XXXVI VIOLATION OF NEW HAMPSHIRE CONSUMER
PROTECTION ACT (N.H. Rev. Stat. § 358-A:1, *et seq.*) ........ 220

COUNT XXXVII BREACH OF IMPLIED WARRANTY OF
MERCHANTABILITY UNDER NEW HAMPSHIRE LAW (N.H.
Rev. Stat. § 382-A:2-314)........................................................ 224

    18.   New Jersey ............................................................. 226

COUNT XXXVIII VIOLATION OF NEW JERSEY CONSUMER
FRAUD ACT (N.J. Stat. Ann. § 56:8-1, *et seq.*)...................... 226

COUNT XXXIX BREACH OF IMPLIED WARRANTY OF
MERCHANTABILITY UNDER NEW JERSEY LAW (N.J. Stat.
Ann. § 12A:2-314).................................................................... 230

    19.   New York .............................................................. 231

COUNT XL DECEPTIVE ACTS OR PRACTICES (N.Y. Gen. Bus.
Law §§ 349-350)...................................................................... 231

COUNT XLI BREACH OF IMPLIED WARRANTY OF
        MERCHANTABILITY UNDER NEW YORK LAW (N.Y.
        U.C.C. Law § 2-314) ................................................................. 235

        20.    North Carolina....................................................... 237

COUNT XLII VIOLATION OF NORTH CAROLINA UNFAIR AND
        DECEPTIVE ACTS AND PRACTICES ACT (N.C. Gen. State
        §§ 75-1.1, *et seq.*) ...................................................... 237

COUNT XLIII BREACH OF IMPLIED WARRANTY OF
        MERCHANTABILITY UNDER NORTH CAROLINA LAW
        (N.C. Gen. Stat. § 25-2-314) .................................... 240

        21.    Ohio........................................................................ 242

COUNT XLIV VIOLATION OF OHIO CONSUMER SALES
        PRACTICES ACT (Ohio Rev. Code § 1345.01, *et seq.*)........................ 242

COUNT XLV IMPLIED WARRANTY IN TORT UNDER OHIO LAW ........ 248

        22.    Oregon.................................................................... 250

COUNT XLVI VIOLATION OF THE OREGON UNLAWFUL TRADE
        PRACTICES ACT (Or. Rev. Stat. §§ 646.605, *et seq.*)............................ 250

COUNT XLVII BREACH OF IMPLIED WARRANTY OF
        MERCHANTABILITY UNDER OREGON LAW (Or. Rev. Stat.
        §72.3140) ........................................................................ 255

        23.    Pennsylvania ........................................................ 257

COUNT XLVIII VIOLATION OF THE PENNSYLVANIA UNFAIR
        TRADE PRACTICES AND CONSUMER PROTECTION LAW
        (73 P.S. § 201-1, *et seq.*).......................................... 257

COUNT XLIX BREACH OF IMPLIED WARRANTY OF
        MERCHANTABILITY UNDER PENNSYLVANIA LAW (13 Pa.
        Cons. Stat. Ann. § 2314)........................................... 261

        24.    Rhode Island ........................................................ 263

COUNT L VIOLATION OF THE RHODE ISLAND UNFAIR TRADE
        PRACTICES AND CONSUMER PROTECTION ACT RHODE
        ISLAND LAW (R.I. Gen. Laws § 6-13.1, *et seq.*)................................... 263

COUNT LI BREACH OF IMPLIED WARRANTY OF
    MERCHANTABILITY UNDER RHODE ISLAND LAW (R.I.
    Gen Laws § 6A-2-314) ................................................................ 267

        25.   South Carolina ....................................................... 269

COUNT LII VIOLATIONS OF THE SOUTH CAROLINA
    REGULATION OF MANUFACTURERS, DISTRIBUTORS,
    AND DEALERS ACT (S.C. Code Ann. § 56-15-10, *et seq.*) ................. 269

COUNT LIII BREACH OF IMPLIED WARRANTY OF
    MERCHANTABILITY UNDER SOUTH CAROLINA LAW
    (S.C. Code § 36-2-314) ............................................................... 274

        26.   Tennessee ............................................................. 276

COUNT LIV VIOLATION OF TENNESSEE CONSUMER
    PROTECTION ACT ( Tenn. Code Ann. § 47-18-101, *et seq.*) ............... 276

        27.   Texas .................................................................... 280

COUNT LV VIOLATIONS OF THE TEXAS DECEPTIVE TRADE
    PRACTICES CONSUMER PROTECTION ACT ("DTPA") (Tex.
    Bus. & Com. Code §§ 17.41, *et seq.)* ........................................... 280

COUNT LVI BREACH OF THE IMPLIED WARRANTY OF
    MERCHANTABILITY UNDER TEXAS LAW (Tex. Bus. &
    Com. Code § 2.314) .................................................................. 285

        28.   Virginia ................................................................ 287

COUNT LVII VIOLATION OF VIRGINIA CONSUMER
    PROTECTION (Va. Code Ann. §§ 59.1-196, *et seq.*) .......................... 287

COUNT LVIII BREACH OF IMPLIED WARRANTY OF
    MERCHANTABILITY UNDER VIRGINIA LAW (Va. Code
    Ann. § 8.2-314) ....................................................................... 291

        29.   Washington ........................................................... 293

COUNT LIX VIOLATION OF THE WASHINGTON CONSUMER
    PROTECTION ACT (Rev. Code Wash. §§ 19.86.010, *et seq.*) ............. 293

COUNT LX BREACH OF IMPLIED WARRANTY OF
    MERCHANTABILITY UNDER WASHINGTON LAW (Rev.
    Code Wash. § 62A.2-314) .......................................................... 297

011086-11/1924902 V1

REQUEST FOR RELIEF ...................................................................... 299

DEMAND FOR JURY TRIAL ............................................................. 299

011086-11/1924902 V1

Plaintiffs file this lawsuit individually and on behalf of proposed Nationwide and statewide classes. Plaintiffs allege the following based on personal knowledge as to their own acts and experiences and, as to all other matters, based on the investigation of counsel:

## I.     INTRODUCTION

1.     The most important duty of a car manufacturer is to provide consumers with a safe car. A second related duty is to promptly warn consumers and fix or replace a car where the manufacturer learns of a defect that implicates serious safety issues.

2.     FCA US LLC ("FCA") breached these fundamental duties by selling Chrysler Pacifica Hybrid plug-in electric minivans that were dangerously defective and prone to catching fire and exploding. Then, though FCA knew or should have known of the fire risk prior to launching the vehicles, it did nothing to warn owners and lessees until very recently. And to this day, long after FCA knew that Pacifica Hybrids were bursting into flames, FCA has yet to provide a remedy for the defect or even suggest when it might be able to offer a remedy.

3.     In fact, if FCA had conducted adequate pre-launch testing of the hybrid propulsion system in the Pacifica Hybrids, including stress and durability testing of the sort that is the norm for automobile manufacturers planning to market vehicles using volatile lithium-ion batteries for propulsion, it would have learned

- 1 -

of the unreasonable and catastrophic risks posed by the lithium-ion battery and the related components meant to enable the safe operation of the minivans in electric mode. FCA was therefore, at a minimum, reckless (and likely worse) in its rush to release the first-ever plug-in electric hybrid minivan.

4.     Model year 2017 and 2018 Chrysler Pacifica Hybrid minivans (the "Fire Defect Vehicles")[1] contain a defect in the hybrid propulsion system that can cause vehicle fires and explosions, even when the vehicles are parked with the ignition in the "off" position (the "Spontaneous Fire Defect").

5.     The Spontaneous Fire Defect exposes putative class members to an unreasonable risk of accident, injury, death, or property damage in the event that their vehicle catches fire while in operation or, perhaps more commonly, spontaneously ignites while the vehicle is parked at the class member's home, on a public street, or in a public parking lot. The Spontaneous Fire Defect also exposes passengers, other drivers on the road, neighbors, owners of other cars parked near the Fire Defect Vehicles, and other bystanders to an unreasonable risk of accident, injury, death, and/or property damage.

---

[1] So far, FCA has recalled only model years 2017 and 2018 of the Pacifica Hybrid. Plaintiffs' counsel continues to investigate whether other model years contain the same defect and should, therefore, be recalled. Plaintiffs may update the definition of Fire Defect Vehicles to include subsequent model years.

- 2 -

6.    The results of the Spontaneous Fire Defect are horrific, as the

following photos illustrate:[2]



Source: https://www.pacificaforums.com/threads/a-second-pacifica-phev-fire.43545/#lg=thread-43545&slide=0

---

[2] **Exhibit 1**, photos of Pacifica fire posted by user Bsmith to Pacifica Forums, https://www.pacificaforums.com/threads/a-second-pacifica-phev-fire.43545/ (June 15, 2019).

- 3 -



Source: https://www.pacificaforums.com/threads/a-second-pacifica-phev-fire.43545/#lg=thread-43545&slide=1



Source: https://www.pacificaforums.com/threads/a-second-pacifica-phev-fire.43545/#lg=thread-43545&slide=2

- 4 -

7.     The catastrophic fire risk is the direct result of a defect long known to, concealed by, and still unremedied by FCA. Not only did FCA conceal the defect from consumers both before and after their purchases of the Fire Defect Vehicles, but it also concealed its consequences, including the serious safety hazards and monetary harm caused by the Spontaneous Fire Defect—e.g., damage to a home and injury or death to persons inhabiting that home should the Fire Defect Vehicle spontaneously ignite while the vehicle is parked in an attached garage.

8.     Some (but not all) of the known fire incidents have occurred while the vehicles were charging. Alarmingly to consumers, while FCA contends that the root cause of the fires is unknown, it appears virtually certain that the defect is connected to the vehicles' high-voltage lithium-ion batteries and related components used to propel the vehicles when they are operating in electric mode.

9.     The high-voltage lithium-ion batteries in the Fire Defect Vehicles were made by LG Chem (now LG Energy Solution, or "LGES"). LGES also made the allegedly defective batteries that caused fires in GM Bolt electric vehicles and Hyundai electric vehicles. In connection with the Bolt recalls, LGES agreed to pay GM $1.9 billion dollars.

10.     Though FCA now admits to having received reports of a dozen fires connected with the hybrid propulsion system since 2019, it waited until February

- 5 -

2022 before issuing a recall of the Fire Defect Vehicles. However, FCA is not offering owners and lessees of the Fire Defect Vehicles any remedy.

11.     Instead, FCA "is advising owners of these hybrid vehicles to refrain from charging them, and to park them away from structures and other vehicles." **A plug-in electric hybrid that cannot be parked at its home or operated in electric mode is not fit for its ordinary purpose**. FCA does not tell Fire Defect Vehicle owners just what constitutes a "safe" distance from an exploding vehicle, or explain what owners should do with their vehicles if they have no such place to park their vehicles. This places an unfair burden on class members who are unable to use the electric propulsion system they paid a $6,000 premium for and are unable to park in their garage (and may have to park quite far away from their homes in order to park away from other vehicles).

12.     Many Plaintiffs and putative class members are not even theoretically able to comply with FCA's directive to park their Fire Defect Vehicles a "safe" distance from structures or other vehicles near their residences, let alone at places they might wish to drive their vehicles. And, especially in this time of spiking gas prices, many class members see little choice but to charge their vehicles rather than wait for FCA to come up with a fix. Still others, justifiably not wanting to bear the risk of a catastrophic fire, have sold their Fire Defect Vehicles at a massive loss as

- 6 -

a result of FCA's conduct and inability or unwillingness to provide any sort of fix. A Hobson's choice foisted on consumers by FCA is nothing short of outrageous.

13.     Not being able to plug in and charge the Fire Defect Vehicles defeats the central purpose of having a plug-in hybrid electric vehicle. Absent charging, the Fire Defect Vehicles must run exclusively on their gasoline engine, causing owners of Fire Defect Vehicles to consistently purchase gasoline. Again, this defect renders a plug-in hybrid electric vehicle unfit for its ordinary purpose.

14.     FCA knew or should have known about the Spontaneous Fire Defect before the Fire Defect Vehicles went to market, and certainly knew well before it issued its confounding "recall," as evidenced by: (1) the significant knowledge of the fire risks of lithium-ion batteries prior to the time the Fire Defect Vehicles hit the market;[3] (2) FCA's evident decision to choose profits over safety by not incorporating available safety technology in the Fire Defect Vehicles; (3) the rigorous pre-launch testing of the Fire Defect Vehicles and their hybrid propulsion that any responsible manufacturer would have conducted, including testing that would have revealed the batteries' propensity to simultaneously combust; (4) the consumer complaints lodged with the National Highway Traffic Safety

---

[3] *See generally* **Exhibit 2,** *Lithium-Ion Battery Safety Issues for Electric and Plug-in Hybrid Vehicles*, NATIONAL HIGHWAY TRAFFIC SAFETY ADMINISTRATION (Oct. 2017) ("2017 NHTSA Report").

- 7 -

Administration ("NHTSA") and elsewhere online; (5) its own investigation of fires in the Fire Defect Vehicles; and (6) the similar fire issues in other electric vehicles with LGES lithium-ion batteries.

15.     Stunningly, many of the Fire Defect Vehicles have already been recalled twice to remedy other defects that also created a risk of fire. The first such recall came in 2018 and the second in 2020.

16.     FCA offers no actual remedy for the Spontaneous Fire Defect and offers no reimbursement to Fire Defect Vehicle owners and lessees for out-of-pocket expenses, loss of use, and loss of value. Because no repair is available, vehicle owners and lessees are left without a safely operable vehicle for an unknown and potentially lengthy period.

17.     To add further insult to injury, rather than do the right thing and globally offer every consumer a buy back of their Fire Defect Vehicle at a fair price (e.g., the Blue Book value on the day before the recall was announced), or at least offer to provide a comparable loaner or rental minivan while storing the dangerous Fire Defect Vehicles until such time as it is able to repair them, FCA has done nothing of the sort.

18.     Because of FCA's fraudulent concealment of the defect in violation of state consumer protection acts and the common law of fraudulent concealment, its breaches of implied warranties of merchantability and its failure to act more

quickly in disclosing and providing a remedy for the Spontaneous Fire Defect once the fires began occurring amongst putative class members, owners and lessees of Fire Defect Vehicles are injured in fact, incurred damages, and suffered ascertainable losses in money and property. Had Plaintiffs and the putative class members known of the Spontaneous Fire Defect, then they would either not have purchased or leased those vehicles, or would have paid substantially less for them, or would have purchased non-hybrid versions of the vehicles, which cost at least $6,000 less. Fires in the Fire Defect Vehicles also necessitate expensive repairs, car rentals, car payments, towing charges, property damage, time off work, loss of use, and other miscellaneous costs.

19.     Plaintiffs bring this class action to redress FCA's misconduct. Plaintiffs seek damages and a repair under the Magnuson-Moss Warranty Act, 15 U.S.C. §§ 23-1-2312, and state consumer protection acts and the common law of fraudulent concealment as well as implied warranty and unjust enrichment.

## II.     JURISDICTION

20.     This Court has original jurisdiction over this lawsuit under the Class Action Fairness Act of 2005, 28 U.S.C. § 1332(d)(2) and (6), because Plaintiffs and Defendant are citizens of different states; there are more than 100 members of the Class and each Subclass (as defined herein); the aggregate amount in controversy exceeds $5 million, exclusive of attorneys' fees, interest, and costs;

and class members reside across the United States. The citizenship of each party is described further below in the "Parties" section.

21.    This Court has personal jurisdiction over the Defendant by virtue of its transactions and business conducted in this judicial district, and because Defendant is headquartered in Michigan. Defendant has transacted and done business, and violated statutory and common law, in the State of Michigan and in this judicial district.

### III.   VENUE

22.    Venue is proper in this judicial district under 28 U.S.C. § 1391 because Defendant transacts substantial business and is headquartered in this district.

### IV.   PARTIES

**A.    Plaintiffs**

**1.    Veronica Bryan (California)**

23.    Plaintiff and proposed class representative Veronica Bryan ("Plaintiff," for purposes of this paragraph) is a resident and citizen of Roseville, California. Plaintiff purchased a 2018 Chrysler Pacifica Hybrid on October 28, 2018, from the AutoNation Chrysler Dodge Jeep Ram dealership in Roseville, California. Plaintiff's Pacifica Hybrid is a Fire Defect Vehicle equipped with the Spontaneous Fire Defect. Through exposure and interaction with Chrysler, Plaintiff was aware of Chrysler's uniform and pervasive marketing messages of

- 10 -

dependability and safety and the benefits of being able to drive the vehicle in electric mode; these were primary reasons Plaintiff purchased the Fire Defect Vehicle. However, despite touting the safety and dependability of the Fire Defect Vehicles and the benefits of using the vehicle in its electric mode, at no point did Chrysler or its agents, dealers, or other representatives disclose to Plaintiff the Spontaneous Fire Defect. Plaintiff regularly services the vehicle but is now concerned about driving it due to the dangers resulting from the Spontaneous Fire Defect. In addition, it is impossible for Plaintiff to park the Fire Defect Vehicle away from structures and other vehicles as Chrysler has instructed because there are no such spaces near Plaintiff's home or work. Moreover, because Plaintiff can no longer charge the plug-in hybrid vehicle, Plaintiff must pay for gas to use the vehicle that Plaintiff would not have needed were the hybrid propulsion system able to operate as intended. Plaintiff would not have purchased the vehicle, or would have paid less for it, or Plaintiff would have purchased a non-hybrid version of the Pacifica, had Plaintiff known about the Spontaneous Fire Defect.

### 2.    Scott Carney (California)

24.    Plaintiff and proposed class representative Scott Carney ("Plaintiff," for purposes of this paragraph) is a resident and citizen of Bakersfield, California. Plaintiff purchased a 2018 Chrysler Pacifica Hybrid on Monday, August 6, 2018, from the Rydell dealership in San Fernando, California. Plaintiff's Pacifica Hybrid

is an Fire Defect Vehicle equipped with the Spontaneous Fire Defect. Through

exposure and interaction with Chrysler, Plaintiff was aware of Chrysler's uniform

and pervasive marketing messages of dependability and safety and the benefits of

being able to drive the vehicle in electric mode; these were primary reasons

Plaintiff purchased the Fire Defect Vehicle. However, despite touting the safety

and dependability of the Fire Defect Vehicles and the benefits of using the vehicle

in its electric mode, at no point did Chrysler or its agents, dealers, or other

representatives disclose to Plaintiff the Spontaneous Fire Defect. Plaintiff regularly

services the vehicle but is now concerned about driving it due to the dangers

resulting from the Spontaneous Fire Defect. In addition, it is impossible for

Plaintiff to park the Fire Defect Vehicle away from structures and other vehicles as

Chrysler has instructed because there are no such spaces near Plaintiff's home or

work. Moreover, because Plaintiff can no longer charge the plug-in hybrid vehicle,

Plaintiff must pay for gas to use the vehicle that Plaintiff would not have needed

were the hybrid propulsion system able to operate as intended. Plaintiff would not

have purchased the vehicle, or would have paid less for it, or Plaintiff would have

purchased a non-hybrid version of the Pacifica, had Plaintiff known about the

Spontaneous Fire Defect.

011086-11/1924902 V1

### 3. Sean Clancy (California)

25.     Plaintiff and proposed class representative Sean Clancy ("Plaintiff," for purposes of this paragraph) is a resident and citizen of Sacramento, California. Plaintiff purchased a 2018 Chrysler Pacifica Hybrid on October 28, 2018, from the Sacramento Chrysler Jeep Dodge Ram dealership in Sacramento, California. Plaintiff's Pacifica Hybrid is a Fire Defect Vehicle equipped with the Spontaneous Fire Defect. Through exposure and interaction with Chrysler, Plaintiff was aware of Chrysler's uniform and pervasive marketing messages of dependability and safety and the benefits of being able to drive the vehicle in electric mode; these were primary reasons Plaintiff purchased the Fire Defect Vehicle. However, despite touting the safety and dependability of the Fire Defect Vehicles and the benefits of using the vehicle in its electric mode, at no point did Chrysler or its agents, dealers, or other representatives disclose to Plaintiff the Spontaneous Fire Defect. Plaintiff regularly services the vehicle but is now concerned about driving it due to the dangers resulting from the Spontaneous Fire Defect. In addition, it is impossible for Plaintiff to park the Fire Defect Vehicle away from structures and other vehicles as Chrysler has instructed because there are no such spaces near Plaintiff's home or work. Moreover, because Plaintiff can no longer safely charge the plug-in hybrid vehicle, Plaintiff must pay for gas to use the vehicle that Plaintiff would not have needed were the hybrid propulsion system able to operate

- 13 -

as intended. Sometimes. When the conditions are such that a fire might be prevented, Plaintiff sometimes charges the vehicles, rolls the dice, and hopes for the best. Plaintiff would not have purchased the vehicle, or would have paid less for it, or Plaintiff would have purchased a non-hybrid version of the Pacifica, had Plaintiff known about the Spontaneous Fire Defect.

### 4. Elias Ramirez and Michelle Tinio Ramirez (California)

26.     Plaintiffs and proposed class representatives Elias Ramirez and Michelle Tinio Ramirez ("Plaintiffs," for purposes of this paragraph) are residents and citizens of Chula Vista, California. They purchased a new 2018 Chrysler Pacifica Plug-in Hybrid vehicle in July or August 2018 at Redlands Chrysler Dodge Jeep Ram in Redlands, California. The Chrysler Pacifica Plug-in Hybrid purchased by Plaintiffs is a Fire Defect Vehicle equipped with the Spontaneous Fire Defect. Through exposure and interaction with Chrysler, Plaintiffs were aware of Chrysler's uniform and pervasive marketing messages of dependability and safety and the benefits of being able to drive the vehicle in electric mode; these were primary reasons Plaintiffs purchased the Fire Defect Vehicle. However, despite touting the safety and dependability of the Fire Defect Vehicles and the benefits of using the vehicle in its electric mode, at no point did Chrysler or its agents, dealers, or other representatives disclose to Plaintiffs the Spontaneous Fire Defect. Plaintiffs regularly service the vehicle but are now concerned about driving

it due to the dangers resulting from the Spontaneous Fire Defect. In addition, it is not feasible for Plaintiffs to park the Fire Defect Vehicle away from structures and other vehicles as Chrysler has instructed because there are no such reasonably accessible spaces near Plaintiffs' home or work. Moreover, because Plaintiffs can no longer charge the plug-in hybrid vehicle, Plaintiffs must pay for gas to use the vehicle that Plaintiffs would not have needed were the hybrid propulsion system able to operate as intended. Since purchasing their Fire Defect Vehicle, Plaintiffs have noticed a burned metal smell when charging their vehicle and the floor of the vehicle has been unusually warm. Plaintiffs typically charge their vehicle in the garage with the factory standard charger supplied by the dealership at which they purchased the Fire Defect Vehicle. Plaintiff Michelle Ramirez no longer feels comfortable driving the vehicle with their four children in the vehicle due to the risk of explosion and fire. Plaintiffs would not have purchased the vehicle had Plaintiffs known about the Spontaneous Fire Defect.

### 5.    Kent Schumann (California)

27.    Plaintiff and proposed class representative Kent Schumann ("Plaintiff," for purposes of this paragraph) is a resident and citizen of Bonsall, California. Plaintiff first purchased a 2018 Chrysler Pacifica Hybrid in the Fall of 2017 from Tuttle-Click Chrysler Dodge Jeep Ram in Irvine, California. When the car stopped functioning in mid-2018, however, the dealership acknowledged that

- 15 -

the car was a lemon, and replaced it in about late November 2018 with a new 2018

Chrysler Pacifica Hybrid. Plaintiff's Pacifica Hybrid is a Fire Defect Vehicle

equipped with the Spontaneous Fire Defect. Through exposure and interaction with

Chrysler, Plaintiff was aware of Chrysler's uniform and pervasive marketing

messages of dependability and safety and the benefits of being able to drive the

vehicle in electric mode; these were primary reasons Plaintiff purchased the Fire

Defect Vehicle. However, despite touting the safety and dependability of the Fire

Defect Vehicles and the benefits of using the vehicle in its electric mode, at no

point did Chrysler or its agents, dealers, or other representatives disclose to

Plaintiff the Spontaneous Fire Defect. Plaintiff regularly services the vehicle but is

now concerned about driving it due to the dangers resulting from the Spontaneous

Fire Defect. In addition, it is not feasible for Plaintiff to park the Fire Defect

Vehicle away from structures and other vehicles as Chrysler has instructed because

there are no such reasonably accessible spaces near Plaintiff's home or work.

Moreover, because Plaintiff can no longer charge the plug-in hybrid vehicle,

Plaintiff must pay for gas to use the vehicle that Plaintiff would not have needed

were the hybrid propulsion system able to operate as intended. Plaintiff would not

have purchased the vehicle had Plaintiff known about the Spontaneous Fire Defect.

- 16 -

### 6.    Alexander Shusta (California)

28.    Plaintiff and proposed class representative Alexander Shusta

("Plaintiff," for purposes of this paragraph) is a resident and citizen of Carlsbad,

California. Plaintiff purchased a 2018 Chrysler Pacifica Hybrid on March 9, 2018,

from Stewart Chrysler Jeep Dodge Ram dealership in Colma, California. Plaintiff's

Pacifica Hybrid is a Fire Defect Vehicle equipped with the Spontaneous Fire

Defect. Through exposure and interaction with Chrysler, Plaintiff was aware of

Chrysler's uniform and pervasive marketing messages of dependability and safety

and the benefits of being able to drive the vehicle in electric mode; these were

primary reasons Plaintiff purchased the Fire Defect Vehicle. However, despite

touting the safety and dependability of the Fire Defect Vehicles and the benefits of

using the vehicle in its electric mode, at no point did Chrysler or its agents, dealers,

or other representatives disclose to Plaintiff the Spontaneous Fire Defect. Plaintiff

regularly services the vehicle but is now concerned about driving it due to the

dangers resulting from the Spontaneous Fire Defect. In addition, it is impossible

for Plaintiff to park the Fire Defect Vehicle away from structures and other

vehicles as Chrysler has instructed because there are no such spaces near Plaintiff's

home or work. Moreover, because Plaintiff can no longer charge the plug-in hybrid

vehicle, Plaintiff must pay for gas to use the vehicle that Plaintiff would not have

needed were the hybrid propulsion system able to operate as intended. Plaintiff

would not have purchased the vehicle, or would have paid less for it, or Plaintiff would have purchased a non-hybrid version of the Pacifica, had Plaintiff known about the Spontaneous Fire Defect.

### 7. Andrew Berzanskis and Margaret Wilensky (Colorado)

29. Plaintiffs and proposed class representatives Andrew Berzanskis and Margaret Wilensky ("Plaintiffs," for purposes of this paragraph) are a married couple and residents and citizens of Louisville, Colorado. Plaintiffs purchased a certified 2018 Chrysler Pacifica Hybrid on January 9, 2021, from AutoNation Chrysler, Dodge, Jeep Ram Southwest in Littleton, Colorado. Plaintiffs' Pacifica Hybrid is an Fire Defect Vehicle equipped with the Spontaneous Fire Defect. Through exposure and interaction with Chrysler, Plaintiffs were aware of Chrysler's uniform and pervasive marketing messages of dependability and safety and the benefits of being able to drive the vehicle in electric mode; these were primary reasons Plaintiffs purchased the Fire Defect Vehicle. However, despite touting the safety and dependability of the Fire Defect Vehicles and the benefits of using the vehicle in its electric mode, at no point did Chrysler or its agents, dealers, or other representatives disclose to Plaintiff the Spontaneous Fire Defect. Plaintiffs regularly service the vehicle but are now concerned about driving it due to the dangers resulting from the Spontaneous Fire Defect. In addition, it is impossible for Plaintiffs to park the Fire Defect Vehicle away from structures and other

- 18 -

vehicles as Chrysler has instructed because there are no such spaces near Plaintiffs'

home or work. Moreover, because Plaintiffs can no longer charge the plug-in

hybrid vehicle, Plaintiffs must pay for gas to use the vehicle that Plaintiffs would

not have needed were the hybrid propulsion system able to operate as intended.

Plaintiffs would not have purchased the vehicle, or would have paid less for it, or

Plaintiffs would have purchased a non-hybrid version of the Pacifica, had Plaintiffs

known about the Spontaneous Fire Defect.

### 8.    Kelsey and Peter Keefe (Connecticut)

30.    Plaintiffs and proposed class representatives Kelsey and Peter Keefe

("Plaintiffs," for purposes of this paragraph) are a married couple and residents and

citizens of Mansfield Center, Connecticut. Plaintiffs purchased a 2018 Chrysler

Pacifica Hybrid on April 12, 2019, from Valenti Chrysler, Dodge, Jeep Ram in

Mystic, Connecticut. Plaintiffs' Pacifica Hybrid is a Fire Defect Vehicle equipped

with the Spontaneous Fire Defect. Through exposure and interaction with Chrysler,

Plaintiffs were aware of Chrysler's uniform and pervasive marketing messages of

dependability and safety and the benefits of being able to drive the vehicle in

electric mode; these were primary reasons Plaintiffs purchased the Fire Defect

Vehicle. However, despite touting the safety and dependability of the Fire Defect

Vehicles and the benefits of using the vehicle in its electric mode, at no point did

Chrysler or its agents, dealers, or other representatives disclose to Plaintiff the

Spontaneous Fire Defect. Plaintiffs regularly service the vehicle but are now concerned about driving it due to the dangers resulting from the Spontaneous Fire Defect, in particular because Plaintiffs have two children in car seats and it may not be possible to safely and quickly evacuate them from the Fire defect Vehicle in the event of a fire. In addition, it is impossible for Plaintiffs to park the Fire Defect Vehicle away from structures and other vehicles as Chrysler has instructed because there are no such spaces near Plaintiffs' home or work. When Plaintiffs tried to park it safely away from all other structures and vehicles, mice invaded the car and caused nearly $500 of damage. And the only possible parking spot near Plaintiffs' home has several large oak trees above it and these trees drop acorns which can readily dent the vehicle. Moreover, because Plaintiffs can no longer charge the plug-in hybrid vehicle, Plaintiffs must pay for gas to use the vehicle that Plaintiffs would not have needed were the hybrid propulsion system able to operate as intended. Plaintiffs would not have purchased the vehicle, or would have paid less for it, or Plaintiffs would have purchased a non-hybrid version of the Pacifica, had Plaintiffs known about the Spontaneous Fire Defect.

### 9.    John Latacki (Florida)

31.    Plaintiff and proposed class representative John Latacki ("Plaintiff," for purposes of this paragraph) is a resident and citizen of Oakland, Florida. Plaintiff purchased a 2018 Chrysler Pacifica Hybrid on August 30, 2018, from the

- 20 -

Orlando Dodge Chrysler dealership in Orlando, Florida. Plaintiff's Pacifica Hybrid is a Fire Defect Vehicle equipped with the Spontaneous Fire Defect. Through exposure and interaction with Chrysler, Plaintiff was aware of Chrysler's uniform and pervasive marketing messages of dependability and safety and the benefits of being able to drive the vehicle in electric mode; these were primary reasons Plaintiff purchased the Fire Defect Vehicle. However, despite touting the safety and dependability of the Fire Defect Vehicles and the benefits of using the vehicle in its electric mode, at no point did Chrysler or its agents, dealers, or other representatives disclose to Plaintiff the Spontaneous Fire Defect. Plaintiff regularly services the vehicle but is now concerned about driving it due to the dangers resulting from the Spontaneous Fire Defect. In addition, it is impossible for Plaintiff to park the Fire Defect Vehicle away from structures and other vehicles as Chrysler has instructed because there are no such spaces near Plaintiff's home or work. Moreover, because Plaintiff can no longer charge the plug-in hybrid vehicle, Plaintiff must pay for gas to use the vehicle that Plaintiff would not have needed were the hybrid propulsion system able to operate as intended. Plaintiff would not have purchased the vehicle, or would have paid less for it, or Plaintiff would have purchased a non-hybrid version of the Pacifica, had Plaintiff known about the Spontaneous Fire Defect.

- 21 -

### 10. Diahann Messeguer (Florida)

32.     Plaintiff and proposed class representative Diahann Messeguer

("Plaintiff," for purposes of this paragraph) is a resident and citizen of Minneola,

Florida. Plaintiff purchased a new 2018 Chrysler Pacifica Hybrid on June 17, 2018,

from Napleton Chrysler, Dodge, Jeep in Clermont, Florida. Plaintiff's Pacifica

Hybrid is an Fire Defect Vehicle equipped with the Spontaneous Fire Defect.

Through exposure and interaction with Chrysler, Plaintiff was aware of Chrysler's

uniform and pervasive marketing messages of dependability and safety and the

benefits of being able to drive the vehicle in electric mode; these were primary

reasons Plaintiff purchased the Fire Defect Vehicle. However, despite touting the

safety and dependability of the Fire Defect Vehicles and the benefits of using the

vehicle in its electric mode, at no point did Chrysler or its agents, dealers, or other

representatives disclose to Plaintiff the Spontaneous Fire Defect. Plaintiff regularly

services the vehicle but is now concerned about driving it due to the dangers

resulting from the Spontaneous Fire Defect. In addition, it is impossible for

Plaintiff to park the Fire Defect Vehicle away from structures and other vehicles as

Chrysler has instructed because there are no such spaces near Plaintiff's home or

work. Moreover, because Plaintiff can no longer charge the plug-in hybrid vehicle,

Plaintiff must pay for gas to use the vehicle that Plaintiff would not have needed

were the hybrid propulsion system able to operate as intended. Plaintiff would not

have purchased the vehicle, or would have paid less for it, or Plaintiff would have purchased a non-hybrid version of the Pacifica, had Plaintiff known about the Spontaneous Fire Defect.

### 11.   John Spruance (Georgia)

33.     Plaintiff and proposed class representative John Spruance ("Plaintiff," for purposes of this paragraph) is a resident and citizen of Boynton Beach, Florida. Plaintiff leased a 2017 Chrysler Pacifica Hybrid on November 18, 2017, from the Troncalli Chrysler Dodge Jeep Ram dealership in Cumming, Georgia. In November 2020, Plaintiff exercised the option in his lease to purchase the Pacifica. Plaintiff's Pacifica Hybrid is a Fire Defect Vehicle equipped with the Spontaneous Fire Defect. Through exposure and interaction with Chrysler, Plaintiff was aware of Chrysler's uniform and pervasive marketing messages of dependability and safety and the benefits of being able to drive the vehicle in electric mode; these were primary reasons Plaintiff purchased the Fire Defect Vehicle. However, despite touting the safety and dependability of the Fire Defect Vehicles and the benefits of using the vehicle in its electric mode, at no point did Chrysler or its agents, dealers, or other representatives disclose to Plaintiff the Spontaneous Fire Defect. Plaintiff regularly services the vehicle but is now concerned about driving it due to the dangers resulting from the Spontaneous Fire Defect. In addition, it is impossible for Plaintiff to park the Fire Defect Vehicle away from structures and

- 23 -

other vehicles as Chrysler has instructed because there are no such spaces near Plaintiff's home or work. Moreover, because Plaintiff can no longer charge the plug-in hybrid vehicle, Plaintiff must pay for gas to use the vehicle that Plaintiff would not have needed were the hybrid propulsion system able to operate as intended. Plaintiff would not have purchased the vehicle, or would have paid less for it, or Plaintiff would have purchased a non-hybrid version of the Pacifica, had Plaintiff known about the Spontaneous Fire Defect.

### 12. Michael Keeth (Idaho)

34.     Plaintiff and proposed class representative Michael Keeth ("Plaintiff," for purposes of this paragraph) is a resident and citizen of Meridian, Idaho. Plaintiff purchased a new 2018 Chrysler Pacifica Hybrid on September 16, 2018, from Dennis Dillon Dodge Chrysler Jeep in Caldwell, Idaho. Plaintiff's Pacifica Hybrid is an Fire Defect Vehicle equipped with the Spontaneous Fire Defect. Through exposure and interaction with Chrysler, Plaintiff was aware of Chrysler's uniform and pervasive marketing messages of dependability and safety and the benefits of being able to drive the vehicle in electric mode; these were primary reasons Plaintiff purchased the Fire Defect Vehicle. However, despite touting the safety and dependability of the Fire Defect Vehicles and the benefits of using the vehicle in its electric mode, at no point did Chrysler or its agents, dealers, or other representatives disclose to Plaintiff the Spontaneous Fire Defect. Plaintiff regularly

- 24 -

services the vehicle but is now concerned about driving it due to the dangers

resulting from the Spontaneous Fire Defect. In addition, it is impossible for

Plaintiff to park the Fire Defect Vehicle away from structures and other vehicles as

Chrysler has instructed because there are no such spaces near Plaintiff's home or

work. Moreover, because Plaintiff can no longer charge the plug-in hybrid vehicle,

Plaintiff must pay for gas to use the vehicle that Plaintiff would not have needed

were the hybrid propulsion system able to operate as intended. Plaintiff would not

have purchased the vehicle, or would have paid less for it, or Plaintiff would have

purchased a non-hybrid version of the Pacifica, had Plaintiff known about the

Spontaneous Fire Defect.

### 13.   Tim Ferguson (Illinois)

35.    Plaintiff and proposed class representative Tim Ferguson ("Plaintiff,"

for purposes of this paragraph) is a resident and citizen of Centralia, Illinois.

Plaintiff purchased a used 2017 Chrysler Pacifica Hybrid on December 4, 2020,

from the Monken Dodge Chrysler Jeep Ram dealership in Centralia, Illinois.

Plaintiff's Pacifica Hybrid was a Fire Defect Vehicle equipped with the

Spontaneous Fire Defect. Through exposure and interaction with Chrysler, Plaintiff

was aware of Chrysler's uniform and pervasive marketing messages of

dependability and safety and the benefits of being able to drive the vehicle in

electric mode; these were primary reasons Plaintiff purchased the Fire Defect

Vehicle. However, despite touting the safety and dependability of the Fire Defect

Vehicles and the benefits of using the vehicle in its electric mode, at no point did

Chrysler or its agents, dealers, or other representatives disclose to Plaintiff the

Spontaneous Fire Defect.

36.     On the morning of August 26, 2021, at approximately 4:00 a.m.,

Plaintiff's Fire Defect Vehicle exploded into flames while it was parked in his

garage at his house. The explosion blew out the garage doors and set the garage

and the Pacifica aflame. The Pacifica was destroyed, and the fire caused extensive

damage to Plaintiff's home, rendering it uninhabitable. Below are photographs of

Plaintiff Ferguson's destroyed Fire Defect Vehicle within his also destroyed

garage. Since the time of the explosion and fire, Plaintiff has had to live in a rental

home and Plaintiff lost many irreplaceable personal items and other property in the

fire caused by the explosion of his Fire Defect Vehicle. Plaintiff would not have

purchased the vehicle, or would have paid less for it, or Plaintiff would have

purchased a non-hybrid version of the Pacifica, had Plaintiff known about the

Spontaneous Fire Defect.







### 14. Owen Ryan (Illinois)

37.     Plaintiff and proposed class representative Owen Ryan ("Plaintiff," for purposes of this paragraph) is a resident and citizen of Plano, Texas. Plaintiff purchased a used 2018 Chrysler Pacifica Hybrid on March 15, 2019, from Heller Motors, a Chrysler Dodge Jeep and Ram dealership in Pontiac, Illinois. Plaintiff's Pacifica Hybrid is a Fire Defect Vehicle equipped with the Spontaneous Fire Defect. Through exposure and interaction with Chrysler, Plaintiff was aware of Chrysler's uniform and pervasive marketing messages of dependability and safety and the benefits of being able to drive the vehicle in electric mode; these were primary reasons Plaintiff purchased the Fire Defect Vehicle. However, despite touting the safety and dependability of the Fire Defect Vehicles and the benefits of

- 28 -

using the vehicle in its electric mode, at no point did Chrysler or its agents, dealers, or other representatives disclose to Plaintiff the Spontaneous Fire Defect. Plaintiff regularly services the vehicle but is now concerned about driving it due to the dangers resulting from the Spontaneous Fire Defect. In addition, it is impossible for Plaintiff to park the Fire Defect Vehicle away from structures and other vehicles as Chrysler has instructed because there are no such spaces near Plaintiff's home. Moreover, because Plaintiff can no longer charge the plug-in hybrid vehicle, Plaintiff must pay for gas to use the vehicle that Plaintiff would not have needed were the hybrid propulsion system able to operate as intended. Plaintiff would not have purchased the vehicle, or would have paid less for it, or Plaintiff would have purchased a non-hybrid version of the Pacifica, had Plaintiff known about the Spontaneous Fire Defect.

**15.    Devlin Su (Illinois)**

38.    Plaintiff and proposed class representative Devlin Su ("Plaintiff," for purposes of this paragraph) is a resident and citizen of Naperville, Illinois. Plaintiff purchased a 2018 Chrysler Pacifica Hybrid on February 5, 2022, from the Bettenhausen Chrysler Dodge Jeep Ram dealership in Tinley Park, Illinois. Plaintiff's Pacifica Hybrid is a Fire Defect Vehicle equipped with the Spontaneous Fire Defect. Through exposure and interaction with Chrysler, Plaintiff was aware of Chrysler's uniform and pervasive marketing messages of dependability and

- 29 -

safety and the benefits of being able to drive the vehicle in electric mode; these were primary reasons Plaintiff purchased the Fire Defect Vehicle. However, despite touting the safety and dependability of the Fire Defect Vehicles and the benefits of using the vehicle in its electric mode, at no point did Chrysler or its agents, dealers, or other representatives disclose to Plaintiff the Spontaneous Fire Defect. Plaintiff is now concerned about driving the vehicle due to the dangers resulting from the Spontaneous Fire Defect, particularly because Plaintiff has two children in car seats (including a newborn) who would not be able to evacuate the vehicle quickly in the event of a fire.

39.     It is impossible for Plaintiff to park the Fire Defect Vehicle away from structures and other vehicles as Chrysler has instructed because plaintiff is not aware of any such legal places to park near Plaintiff's home or work. Plaintiff thus has no choice but to park the vehicle directly outside Plaintiff's garage, which subjects the Fire Defect Vehicle to increased wear and tear during the Illinois summer, including from thunderstorms which can have damaging hail and flying debris, and during the Illinois winter, when snow and ice abound. Moreover, because Plaintiff can no longer charge the plug-in hybrid vehicle, Plaintiff must pay for gas to use the vehicle that Plaintiff would not have needed were the hybrid propulsion system able to operate as intended, even though Plaintiff's daily driving distance rarely exceeds the range of electric-only mode. Plaintiff would not have

- 30 -

purchased the vehicle, or would have paid less for it, or Plaintiff would have purchased a non-hybrid version of the Pacifica, had Plaintiff known about the Spontaneous Fire Defect.

### 16.    Spence Voss (Illinois)

40.    Plaintiff and proposed class representative Spence Voss ("Plaintiff," for purposes of this paragraph) is a resident and citizen of Kenosha, Wisconsin. Plaintiff purchased a 2018 Chrysler Pacifica Hybrid from the Liberty Chrysler Dodge Ram dealership in Libertyville, Illinois, on June 28, 2019. Plaintiff's Pacifica Hybrid is an Fire Defect Vehicle equipped with the Spontaneous Fire Defect. Through exposure and interaction with Chrysler, Plaintiff was aware of Chrysler's uniform and pervasive marketing messages of dependability and safety and the benefits of being able to drive the vehicle in electric mode; these were primary reasons Plaintiff purchased the Fire Defect Vehicle. However, despite touting the safety and dependability of the Fire Defect Vehicles and the benefits of using the vehicle in its electric mode, at no point did Chrysler or its agents, dealers, or other representatives disclose to Plaintiff the Spontaneous Fire Defect. Plaintiff regularly services the vehicle but is now concerned about driving it due to the dangers resulting from the Spontaneous Fire Defect. In addition, it is impossible for Plaintiff to park the Fire Defect Vehicle away from structures and other vehicles as Chrysler has instructed because there are no such spaces near Plaintiff's

home or work. Moreover, because Plaintiff can no longer charge the plug-in hybrid vehicle, Plaintiff must pay for gas to use the vehicle that Plaintiff would not have needed were the hybrid propulsion system able to operate as intended. Plaintiff would not have purchased the vehicle, or would have paid less for it, or Plaintiff would have purchased a non-hybrid version of the Pacifica, had Plaintiff known about the Spontaneous Fire Defect.

**17. Christine Winter (Indiana)**

41. Plaintiff and proposed class representative Christine Winter ("Plaintiff," for purposes of this paragraph) is a resident and citizen of Peru, Indiana. Plaintiff purchased a 2018 Chrysler Pacifica Hybrid on December 5, 2018, from Button Motors in Kokomo, Indiana. Plaintiff's Pacifica Hybrid is a Fire Defect Vehicle equipped with the Spontaneous Fire Defect. Through exposure and interaction with Chrysler, Plaintiff was aware of Chrysler's uniform and pervasive marketing messages of dependability and safety and the benefits of being able to drive the vehicle in electric mode; these were primary reasons Plaintiff purchased the Fire Defect Vehicle. However, despite touting the safety and dependability of the Fire Defect Vehicles and the benefits of using the vehicle in its electric mode, at no point did Chrysler or its agents, dealers, or other representatives disclose to Plaintiff the Spontaneous Fire Defect. Plaintiff is now concerned about driving the vehicle due to the dangers resulting from the Spontaneous Fire Defect. In addition,

- 32 -

it is impossible for Plaintiff to park the Fire Defect Vehicle away from other vehicles as Chrysler has instructed because there are no such spaces near Plaintiff's home or at other places Plaintiff needs to park her vehicle. Moreover, despite FCA's recall telling Plaintiff that she cannot charge her vehicle, Plaintiff's dealer told her that she can charge it, provided she does not use a 110v outlet, leaving Plaintiff with fear and uncertainty about charging. Recently, Plaintiff sought to trade her Fire Defect Vehicle for a different electric vehicle, however the other manufacturer refused to take Plaintiff's Fire Defect Vehicle in trade because of the recall and the unresolved Spontaneous Fire Defect. Plaintiff would not have purchased the vehicle had Plaintiff known about the Spontaneous Fire Defect.

### 18.    Tim Banas (Iowa)

42.    Plaintiff and proposed class representative Tim Banas ("Plaintiff," for purposes of this paragraph) is a resident and citizen of Bolingbrook, Illinois. Plaintiff purchased a 2018 Chrysler Pacifica Hybrid on December 3, 2019, from Turpin Chrysler Dodge Jeep in Dubuque, Iowa. Plaintiff's Pacifica Hybrid is a Fire Defect Vehicle equipped with the Spontaneous Fire Defect. Through exposure and interaction with Chrysler, Plaintiff was aware of Chrysler's uniform and pervasive marketing messages of the benefits of being able to drive the vehicle in electric mode; that was the primary reason Plaintiff purchased the Fire Defect Vehicle. Plaintiff also believed the vehicle was safe. However, despite touting the safety

- 33 -

and dependability of the Fire Defect Vehicles and the benefits of using the vehicle in its electric mode, at no point did Chrysler or its agents, dealers, or other representatives disclose to Plaintiff the Spontaneous Fire Defect. Plaintiff regularly services the vehicle but is now concerned about driving it due to the dangers resulting from the Spontaneous Fire Defect. In addition, it is impossible for Plaintiff to park the Fire Defect Vehicle away from structures and other vehicles as Chrysler has instructed because there are no such spaces near Plaintiff's work. Since the time of the initial filing of the complaint in which Plaintiff is named, frustrated by the cryptic recall notice and Chrysler's failure to provide any updates as to when a recall remedy might be available, Plaintiff purchased a $200 level 2 charger extension cable and now charges the Fire Defect Vehicle in the driveway about 15 feet from his house. Plaintiff keeps only a small amount of fuel in the car at all times (between an eighth and a quarter of a tank) to minimize the chances of a large explosion if a battery fire were to occur. Plaintiff would not have purchased the vehicle, or would have paid less for it, or Plaintiff would have purchased a non-hybrid version of the Pacifica, had Plaintiff known about the Spontaneous Fire Defect.

### 19.    Salyi Vu (Kansas)

43.    Plaintiff and proposed class representative Salyi Vu ("Plaintiff," for purposes of this paragraph) is a resident and citizen of Wichita, Kansas. Plaintiff

- 34 -

purchased a new 2018 Chrysler Pacifica Hybrid on or about September 9, 2019, from Park Motors in Augusta, Kansas. Plaintiff's Pacifica Hybrid is a Fire Defect Vehicle equipped with the Spontaneous Fire Defect. Through exposure and interaction with Chrysler, Plaintiff was aware of Chrysler's uniform and pervasive marketing messages of dependability and safety and the benefits of being able to drive the vehicle in electric mode; these were primary reasons Plaintiff purchased the Fire Defect Vehicle. However, despite touting the safety and dependability of the Fire Defect Vehicles and the benefits of using the vehicle in its electric mode, at no point did Chrysler or its agents, dealers, or other representatives disclose to Plaintiff the Spontaneous Fire Defect. Plaintiff is now concerned about driving the vehicle due to the dangers resulting from the Spontaneous Fire Defect. In addition, while it is possible for Plaintiff to park the Fire Defect Vehicle away from other vehicles at Plaintiff's home, as Chrysler has instructed, this requires him to park at the bottom of his long driveway, which is close to a giant Maple tree, which Plaintiff is concerned could itself catch fire and fall on his house. Plaintiff has limited mobility following a vehicle accident and surgery, so having to walk up and down his long driveway is particularly inconvenient and painful. Moreover, because Plaintiff can no longer charge the plug-in hybrid vehicle, Plaintiff must pay for gas to use the vehicle that Plaintiff would not have needed were the hybrid

propulsion system able to operate as intended. Plaintiff would not have purchased the vehicle had Plaintiff known about the Spontaneous Fire Defect.

### 20.   Diane and David Davidson (Maryland)

44.    Plaintiffs and proposed class representatives Diane and David Davidson ("Plaintiffs," for purposes of this paragraph) are residents and citizens of Midlothian Virginia. Plaintiffs purchased a 2018 Chrysler Pacifica Hybrid from the Tate dealership in Glen Burnie, Maryland. Plaintiffs' Pacifica Hybrid is an Fire Defect Vehicle equipped with the Spontaneous Fire Defect. Through exposure and interaction with Chrysler, Plaintiffs were aware of Chrysler's uniform and pervasive marketing messages of dependability and safety and the benefits of being able to drive the vehicle in electric mode; these were primary reasons Plaintiffs purchased the Fire Defect Vehicle. However, despite touting the safety and dependability of the Fire Defect Vehicles and the benefits of using the vehicle in its electric mode, at no point did Chrysler or its agents, dealers, or other representatives disclose to Plaintiffs the Spontaneous Fire Defect. Plaintiffs regularly service the vehicle but are now concerned about driving it due to the dangers resulting from the Spontaneous Fire Defect. In addition, it is impossible for Plaintiffs to park the Fire Defect Vehicle away from structures and other vehicles as Chrysler has instructed because there are no such spaces near Plaintiffs' home or work. Moreover, because Plaintiffs can no longer charge the plug-in

hybrid vehicle, Plaintiffs must pay for gas to use the vehicle that Plaintiffs would not have needed were the hybrid propulsion system able to operate as intended. Plaintiffs would not have purchased the vehicle, or would have paid less for it, or Plaintiffs would have purchased a non-hybrid version of the Pacifica, had Plaintiffs known about the Spontaneous Fire Defect.

### 21. Ruth Hoffman (Maryland)

45. Plaintiff and proposed class representative Ruth Hoffman ("Plaintiff," for purposes of this paragraph) is a resident and citizen of Kensington, Maryland. Plaintiff purchased a 2017 Chrysler Pacifica Hybrid on April 27, 2017, from the Criswell Chrysler Jeep Dodge Ram FIAT dealership in Gathersberg, Maryland. Plaintiff's Pacifica Hybrid is a Fire Defect Vehicle equipped with the Spontaneous Fire Defect. Through exposure and interaction with Chrysler, Plaintiff was aware of Chrysler's uniform and pervasive marketing messages of dependability and safety and the benefits of being able to drive the vehicle in electric mode; these were primary reasons Plaintiff purchased the Fire Defect Vehicle. However, despite touting the safety and dependability of the Fire Defect Vehicles and the benefits of using the vehicle in its electric mode, at no point did Chrysler or its agents, dealers, or other representatives disclose to Plaintiff the Spontaneous Fire Defect. Plaintiff is now concerned about driving the vehicle due to the dangers resulting from the Spontaneous Fire Defect. In addition, it is impossible for

- 37 -

Plaintiff to park the Fire Defect Vehicle away from structures and other vehicles as

Chrysler has instructed because there are no such spaces near Plaintiff's home or

work. Moreover, because Plaintiff can no longer charge the plug-in hybrid vehicle,

Plaintiff must pay for gas to use the vehicle that Plaintiff would not have needed

were the hybrid propulsion system able to operate as intended. Plaintiff would not

have purchased the vehicle, or would have paid less for it, or Plaintiff would have

purchased a non-hybrid version of the Pacifica, had Plaintiff known about the

Spontaneous Fire Defect.

### 22. Alicia Maltz and David Maltz (Massachusetts)

46.     Plaintiffs and proposed class representatives Alicia Maltz and David

Maltz ("Plaintiffs," for purposes of this paragraph) are a married couple and

residents and citizens of Stoughton, Massachusetts. Plaintiffs purchased a 2018

Chrysler Pacifica Hybrid on September 15, 2018, from Quirk Chrysler in

Braintree, Massachusetts. Plaintiffs' Pacifica Hybrid is an Fire Defect Vehicle

equipped with the Spontaneous Fire Defect. Through exposure and interaction with

Chrysler, Plaintiffs were aware of Chrysler's uniform and pervasive marketing

messages of dependability and safety and the benefits of being able to drive the

vehicle in electric mode; these were primary reasons Plaintiffs purchased the Fire

Defect Vehicle. However, despite touting the safety and dependability of the Fire

Defect Vehicles and the benefits of using the vehicle in its electric mode, at no

point did Chrysler or its agents, dealers, or other representatives disclose to

Plaintiffs the Spontaneous Fire Defect. Plaintiffs regularly service the vehicle but

are now concerned about driving it due to the dangers resulting from the

Spontaneous Fire Defect. In addition, it is impossible for Plaintiffs to park the Fire

Defect Vehicle away from structures and other vehicles as Chrysler has instructed

because there are no such spaces near Plaintiffs' home or work. Moreover, because

Plaintiffs can no longer charge the plug-in hybrid vehicle, Plaintiffs must pay for

gas to use the vehicle that Plaintiffs would not have needed were the hybrid

propulsion system able to operate as intended. Plaintiffs would not have purchased

the vehicle, or would have paid less for it, or Plaintiffs would have purchased a

non-hybrid version of the Pacifica, had Plaintiffs known about the Spontaneous

Fire Defect.

### 23.   Michael Natale (Massachusetts)

47.     Plaintiff and proposed class representative Michael Natale

("Plaintiff," for purposes of this paragraph) is a resident and citizen of Boxford,

Massachusetts. Plaintiff purchased a 2018 Chrysler Pacifica Hybrid on

November 28, 2018, from the Kelly Jeep Chrysler ("Kelly Chrysler") dealership in

Lynnfield, Massachusetts. Plaintiff's Pacifica Hybrid is a Fire Defect Vehicle

equipped with the Spontaneous Fire Defect. Through exposure and interaction with

Chrysler, Plaintiff was aware of Chrysler's uniform and pervasive marketing

messages of dependability and safety and the benefits of being able to drive the vehicle in electric mode; these were primary reasons Plaintiff purchased the Fire Defect Vehicle. However, despite touting the safety and dependability of the Fire Defect Vehicles and the benefits of using the vehicle in its electric mode, at no point did Chrysler or its agents, dealers, or other representatives disclose to Plaintiff the Spontaneous Fire Defect. Once they learned of the defect, Plaintiff and his wife were terrified at the prospect of driving their family transportation vehicle given the risk of sudden combustion. In addition, while Plaintiff was able to park the vehicle in his driveway away from the family residence, because the surrounding area is very heavily wooded, Mr. Natale and his wife were constantly afraid that the vehicle would cause a forest fire. Mr. Natale then went back to the Chrysler dealership looking to trade in his Fire Defect Vehicle. While he had received an automated email from the Chrysler dealership saying that his Pacifica has a trade-in value of $33,000, and one of the sales managers told him that that his vehicle was worth up to $38,000 if sold privately, it was clear that no one was going to buying the dangerous vehicle with an outstanding recall and not even an estimate as to when a fix might be available. After back and forth, the dealership gave him a final "best offer" of $26,000. Alternatively, the dealership offered to store Plaintiff's Pacifica and give him a junky used SUV while all concerned wait an unknown amount of time for FCA to offer any kind of recall fix. In frustration,

- 40 -

Plaintiff was able to trade-in his Fire Defect Vehicle Plaintiff for a Subaru—well below what he would have been able to get in the absence of the Spontaneous Fire Defect and FCA's long concealment of that defect. Plaintiff would not have purchased the vehicle had Plaintiff known about the Spontaneous Fire Defect.

### 24.   **Javin T. Olson (Massachusetts)**

48.    Plaintiff and proposed class representative Javin T. Olson ("Plaintiff," for purposes of this paragraph) is a resident and citizen of Concord, Massachusetts. He purchased a new 2018 Chrysler Pacifica Plug-in Hybrid vehicle on August 31, 2019, at the McGovern Chrysler Jeep Dodge Ram dealership located in Newton, Massachusetts. Plaintiff Olson's Chrysler Pacifica Plug-in Hybrid is a Fire Defect Vehicle equipped with the Spontaneous Fire Defect. Through exposure and interaction with Chrysler, Plaintiff was aware of Chrysler's uniform and pervasive marketing messages of dependability and safety and the benefits of being able to drive the vehicle in electric mode; these were primary reasons Plaintiff purchased the Fire Defect Vehicle. However, despite touting the safety and dependability of the Fire Defect Vehicles and the benefits of using the vehicle in its electric mode, at no point did Chrysler or its agents, dealers, or other representatives disclose to Plaintiff the Spontaneous Fire Defect. Plaintiff is now concerned about driving the vehicle due to the dangers resulting from the Spontaneous Fire Defect. In addition, it is impossible for Plaintiff to park the Fire Defect Vehicle away from other

- 41 -

vehicles as Chrysler has instructed because there are no such spaces near Plaintiff's home or at other places Plaintiff needs to park the vehicle. Moreover, because Plaintiff can no longer charge the plug-in hybrid vehicle, Plaintiff must pay for gas to use the vehicle that Plaintiff would not have needed were the hybrid propulsion system able to operate as intended. Plaintiff would not have purchased the vehicle had Plaintiff known about the Spontaneous Fire Defect.

### 25.  Jacob Kitzman (Michigan)

49.     Plaintiff and proposed class representative Jacob Kitzman ("Plaintiff," for purposes of this paragraph) is a resident and citizen of Ann Arbor, Michigan. Plaintiff purchased a 2017 Chrysler Pacifica Hybrid on November 8, 2017, from Fox Hills Chrysler Jeep in Plymouth, Michigan. Plaintiff's Pacifica Hybrid is a Fire Defect Vehicle equipped with the Spontaneous Fire Defect. Through exposure and interaction with Chrysler, Plaintiff was aware of Chrysler's uniform and pervasive marketing messages of dependability and safety and the benefits of being able to drive the vehicle in electric mode; these were primary reasons Plaintiff purchased the Fire Defect Vehicle. However, despite touting the safety and dependability of the Fire Defect Vehicles and the benefits of using the vehicle in its electric mode, at no point did Chrysler or its agents, dealers, or other representatives disclose to Plaintiff the Spontaneous Fire Defect. Plaintiff is now concerned about driving the vehicle due to the dangers resulting from the

Spontaneous Fire Defect. In addition, it is impractical for Plaintiff to park the Fire

Defect Vehicle away from other vehicles as Chrysler has instructed because there

are no such spaces near Plaintiff's place of work or at other places Plaintiff needs

to park the vehicle. Moreover, because Plaintiff does charge the plug-in hybrid

vehicle routinely, Plaintiff must pay for gas to use the vehicle that Plaintiff would

not have needed were the hybrid propulsion system able to operate as intended.

Plaintiff would not have purchased the vehicle had Plaintiff known about the

Spontaneous Fire Defect.

### 26.   Elizabeth Niemioja (Minnesota)

50.     Plaintiff and proposed class representative Elizabeth Niemioja

("Plaintiff," for purposes of this paragraph) is a resident and citizen of Inver Grove

Heights, Minnesota. Plaintiff purchased a 2017 Chrysler Pacifica Hybrid from the

Bloomington Chrysler-Dodge dealership in Bloomington, Minnesota. Plaintiff's

Pacifica Hybrid is an Fire Defect Vehicle equipped with the Spontaneous Fire

Defect. Through exposure and interaction with Chrysler, Plaintiff was aware of

Chrysler's uniform and pervasive marketing messages of dependability and safety

and the benefits of being able to drive the vehicle in electric mode; these were

primary reasons Plaintiff purchased the Fire Defect Vehicle. However, despite

touting the safety and dependability of the Fire Defect Vehicles and the benefits of

using the vehicle in its electric mode, at no point did Chrysler or its agents, dealers,

or other representatives disclose to Plaintiff the Spontaneous Fire Defect. Plaintiff regularly services the vehicle but is now concerned about driving it due to the dangers resulting from the Spontaneous Fire Defect. In addition, it is impossible for Plaintiff to park the Fire Defect Vehicle away from structures and other vehicles as Chrysler has instructed because there are no such spaces near Plaintiff's home or work. Moreover, because Plaintiff can no longer charge the plug-in hybrid vehicle, Plaintiff must pay for gas to use the vehicle that Plaintiff would not have needed were the hybrid propulsion system able to operate as intended. Plaintiff would not have purchased the vehicle, or would have paid less for it, or Plaintiff would have purchased a non-hybrid version of the Pacifica, had Plaintiff known about the Spontaneous Fire Defect.

### 27. R. Scott Perry (Missouri)

51.    Plaintiff and proposed class representative R. Scott Perry ("Plaintiff," for purposes of this paragraph) is a resident and citizen of Westborough, Massachusetts. Plaintiff purchased a certified pre-owned 2017 Chrysler Pacifica Hybrid on February 5, 2019, from Woody's Automotive Group in Chillicothe, Missouri. Plaintiff's Pacifica Hybrid is a Fire Defect Vehicle equipped with the Spontaneous Fire Defect. Through exposure and interaction with Chrysler, Plaintiff was aware of Chrysler's uniform and pervasive marketing messages of dependability and safety and the benefits of being able to drive the vehicle in

electric mode; these were primary reasons Plaintiff purchased the Fire Defect

Vehicle. However, despite touting the safety and dependability of the Fire Defect

Vehicles and the benefits of using the vehicle in its electric mode, at no point did

Chrysler or its agents, dealers, or other representatives disclose to Plaintiff the

Spontaneous Fire Defect. Plaintiff regularly services the vehicle but is now

concerned about driving it due to the dangers resulting from the Spontaneous Fire

Defect. Plaintiff is also concerned about having to park his vehicle outside (as

opposed to in his garage) because of the detrimental impacts of inclement weather.

Plaintiff is also concerned about the threat that his vehicle will be vandalized. In

addition, it is impossible for Plaintiff to park the Fire Defect Vehicle away from

structures and other vehicles as Chrysler has instructed whenever he leaves his

home in the vehicle. Plaintiff would not have purchased the vehicle, or would have

paid less for it, or Plaintiff would have purchased a non-hybrid version of the

Pacifica, had Plaintiff known about the Spontaneous Fire Defect.

### 28.   Scott Lewandowski (Nevada)

52.    Plaintiff and proposed class representative Scott Lewandowski

("Plaintiff," for purposes of this paragraph) is a resident and citizen of Pahrump,

Nevada. Plaintiff purchased a 2018 Chrysler Pacifica Hybrid on April 3, 2018,

from Chapman Chrysler Jeep in Henderson, Nevada. Plaintiff's Pacifica Hybrid is

a Fire Defect Vehicle equipped with the Spontaneous Fire Defect. Through

- 45 -

exposure and interaction with Chrysler, Plaintiff was aware of Chrysler's uniform and pervasive marketing messages of dependability and safety and the benefits of being able to drive the vehicle in electric mode; these were primary reasons Plaintiff purchased the Fire Defect Vehicle. However, despite touting the safety and dependability of the Fire Defect Vehicles and the benefits of using the vehicle in its electric mode, at no point did Chrysler or its agents, dealers, or other representatives disclose to Plaintiff the Spontaneous Fire Defect. Plaintiff regularly services the vehicle but is now concerned about driving it due to the dangers resulting from the Spontaneous Fire Defect. Plaintiff is also concerned about having to park his vehicle outside (as opposed to in his garage) because of the detrimental impacts of inclement weather (including dust storms, extreme sunlight, and temperatures that can exceed 110 degrees). Plaintiff is also concerned about the threat that his vehicle will be vandalized. In addition, it is impossible for Plaintiff to park the Fire Defect Vehicle away from structures and other vehicles as Chrysler has instructed whenever he leaves his home in the vehicle. Moreover, because Plaintiff can no longer charge the plug-in hybrid vehicle, Plaintiff must pay for gas to use the vehicle that Plaintiff would not have needed were the hybrid propulsion system able to operate as intended. Plaintiff would not have purchased the vehicle, or would have paid less for it, or Plaintiff would have purchased a non-

hybrid version of the Pacifica, had Plaintiff known about the Spontaneous Fire Defect.

### 29.   Matthew Bergantino (New Hampshire)

53.     Plaintiff and proposed class representative Matthew Bergantino ("Plaintiff," for purposes of this paragraph) is a resident and citizen of Tampa, Florida. Plaintiff purchased a 2017 Chrysler Pacifica Hybrid on May 1, 2017, from the Allen Mello Chrysler Dodge Jeep Ram dealership in Nashua, New Hampshire. Plaintiff's Pacifica Hybrid is a Fire Defect Vehicle equipped with the Spontaneous Fire Defect. Through exposure and interaction with Chrysler, Plaintiff was aware of Chrysler's uniform and pervasive marketing messages of dependability and safety and the benefits of being able to drive the vehicle in electric mode; these were primary reasons Plaintiff purchased the Fire Defect Vehicle. However, despite touting the safety and dependability of the Fire Defect Vehicles and the benefits of using the vehicle in its electric mode, at no point did Chrysler or its agents, dealers, or other representatives disclose to Plaintiff the Spontaneous Fire Defect. Plaintiff is now concerned about driving the vehicle due to the dangers resulting from the Spontaneous Fire Defect. In addition, it is impossible for Plaintiff to park the Fire Defect Vehicle away from structures and other vehicles as Chrysler has instructed because there are no such spaces near Plaintiff's home or work. Moreover, because Plaintiff can no longer charge the plug-in hybrid vehicle,

Plaintiff must pay for gas to use the vehicle that Plaintiff would not have needed were the hybrid propulsion system able to operate as intended. Plaintiff would not have purchased the vehicle had Plaintiff known about the Spontaneous Fire Defect.

### 30.   Nicole and Stephen Costa (New Hampshire)

54.    Plaintiffs and proposed class representatives Nicole and Stephen Costa ("Plaintiffs," for purposes of this paragraph) are residents and citizens of Marblehead, Massachusetts. Plaintiffs purchased a 2018 Chrysler Pacifica Hybrid from the Bonneville Chrysler dealership in Manchester, New Hampshire, in December 2017. Plaintiffs' Pacifica Hybrid is an Fire Defect Vehicle equipped with the Spontaneous Fire Defect. Through exposure and interaction with Chrysler, Plaintiffs were aware of Chrysler's uniform and pervasive marketing messages of dependability and safety and the benefits of being able to drive the vehicle in electric mode; these were primary reasons Plaintiffs purchased the Fire Defect Vehicle. However, despite touting the safety and dependability of the Fire Defect Vehicles and the benefits of using the vehicle in its electric mode, at no point did Chrysler or its agents, dealers, or other representatives disclose to Plaintiffs the Spontaneous Fire Defect. Plaintiffs regularly service the vehicle but are now concerned about driving it due to the dangers resulting from the Spontaneous Fire Defect. In addition, it is impossible for Plaintiffs to park the Fire Defect Vehicle away from structures and other vehicles as Chrysler has instructed because there

are no such spaces near Plaintiffs' home or work. Moreover, because Plaintiff can

no longer charge the plug-in hybrid vehicle, Plaintiffs must pay for gas to use the

vehicle that Plaintiffs would not have needed were the hybrid propulsion system

able to operate as intended. Plaintiffs would not have purchased the vehicle, or

would have paid less for it, or Plaintiffs would have purchased a non-hybrid

version of the Pacifica, had Plaintiffs known about the Spontaneous Fire Defect.

### 31.  Tracy Whitman Brace (New Jersey)

55.  Plaintiff and proposed class representative Tracy Whitman Brace

("Plaintiff," for purposes of this paragraph) is a resident and citizen of Scotch

Plains, New Jersey. Plaintiff purchased a 2017 Chrysler Pacifica Hybrid on

September 12, 2017, from Team Welsh in Far Hills, New Jersey. Plaintiff's

Pacifica Hybrid is an Fire Defect Vehicle equipped with the Spontaneous Fire

Defect. Through exposure and interaction with Chrysler, Plaintiff was aware of

Chrysler's uniform and pervasive marketing messages of dependability and safety

and the benefits of being able to drive the vehicle in electric mode; these were

primary reasons Plaintiff purchased the Fire Defect Vehicle. However, despite

touting the safety and dependability of the Fire Defect Vehicles and the benefits of

using the vehicle in its electric mode, at no point did Chrysler or its agents, dealers,

or other representatives disclose to Plaintiff the Spontaneous Fire Defect. Plaintiff

regularly services the vehicle but is now concerned about driving it due to the

dangers resulting from the Spontaneous Fire Defect. In addition, it is impossible for Plaintiff to park the Fire Defect Vehicle away from structures and other vehicles as Chrysler has instructed because there are no such spaces near Plaintiff's home or work. Moreover, because Plaintiff can no longer charge the plug-in hybrid vehicle, Plaintiff must pay for gas to use the vehicle that Plaintiff would not have needed were the hybrid propulsion system able to operate as intended. Plaintiff would not have purchased the vehicle, or would have paid less for it, or Plaintiff would have purchased a non-hybrid version of the Pacifica, had Plaintiff known about the Spontaneous Fire Defect.

### 32.  James Quattropani (New York)

56.    Plaintiff and proposed class representative James Quattropani ("Plaintiff," for purposes of this paragraph) is a resident and citizen of Deer Park, New York. Plaintiff purchased a 2018 Chrysler Pacifica Hybrid on January 14, 2021, from Schumacher Chrysler in Delray, Florida. Plaintiff's Pacifica Hybrid is an Fire Defect Vehicle equipped with the Spontaneous Fire Defect. Through exposure and interaction with Chrysler, Plaintiff was aware of Chrysler's uniform and pervasive marketing messages of dependability and safety and the benefits of being able to drive the vehicle in electric mode; these were primary reasons Plaintiff purchased the Fire Defect Vehicle. However, despite touting the safety and dependability of the Fire Defect Vehicles and the benefits of using the vehicle

in its electric mode, at no point did Chrysler or its agents, dealers, or other representatives disclose to Plaintiff the Spontaneous Fire Defect. Plaintiff regularly services the vehicle but is now concerned about driving it due to the dangers resulting from the Spontaneous Fire Defect. In addition, it is impossible for Plaintiff to park the Fire Defect Vehicle away from structures and other vehicles as Chrysler has instructed because there are no such spaces near Plaintiff's home or work. Moreover, because Plaintiff can no longer charge the plug-in hybrid vehicle, Plaintiff must pay for gas to use the vehicle that Plaintiff would not have needed were the hybrid propulsion system able to operate as intended. Plaintiff would not have purchased the vehicle, or would have paid less for it, or Plaintiff would have purchased a non-hybrid version of the Pacifica, had Plaintiff known about the Spontaneous Fire Defect.

### 33.    Chad Fong (North Carolina)

57.    Plaintiff and proposed class representative Chad Fong ("Plaintiff," for purposes of this paragraph) is a resident and citizen of Carthage, North Carolina. Plaintiff purchased a Certified used 2018 Chrysler Pacifica Hybrid on January 9, 2019, from National Jeep Chrysler Dodge in Jacksonville, North Carolina. Plaintiff's Pacifica Hybrid is a Fire Defect Vehicle equipped with the Spontaneous Fire Defect. Through exposure and interaction with Chrysler, Plaintiff was aware of Chrysler's uniform and pervasive marketing messages of dependability and

safety and the benefits of being able to drive the vehicle in electric mode; these were primary reasons Plaintiff purchased the Fire Defect Vehicle, including specifically that he believed the vehicle would offer safe and reliable transportation for his family with three small children. However, despite touting the safety and dependability of the Fire Defect Vehicles and the benefits of using the vehicle in its electric mode, at no point did Chrysler or its agents, dealers, or other representatives disclose to Plaintiff the Spontaneous Fire Defect. Plaintiff is now concerned about driving the vehicle due to the dangers resulting from the Spontaneous Fire Defect and he is very concerned about whether he would be able to safely remove his children from the car in the event of a fire. In addition, it is impossible for Plaintiff to park the Fire Defect Vehicle away from other vehicles as Chrysler has instructed because there are no such spaces near Plaintiff's home or at other places Plaintiff needs to park the vehicle. Moreover, because Plaintiff can no longer charge the plug-in hybrid vehicle, Plaintiff must pay for gas to use the vehicle that Plaintiff would not have needed were the hybrid propulsion system able to operate as intended. Plaintiff would not have purchased the vehicle had Plaintiff known about the Spontaneous Fire Defect.

### 34. Jared Gadomski Littleton (Ohio)

58. Plaintiff and proposed class representative Jared Gadomski Littleton ("Plaintiff," for purposes of this paragraph) is a resident and citizen of Cleveland,

- 52 -

Ohio. Plaintiff purchased a used 2018 Chrysler Pacifica Hybrid on October 14, 2021, from the Terry Henricks Chrysler Dodge Jeep Ram dealership in Archbold, Ohio. Plaintiff's Pacifica Hybrid is a Fire Defect Vehicle equipped with the Spontaneous Fire Defect. Through exposure and interaction with Chrysler, Plaintiff was aware of Chrysler's uniform and pervasive marketing messages of the benefits of being able to drive the vehicle in electric mode; that was the primary reason Plaintiff purchased the Fire Defect Vehicle. Because he lives only five miles from his workplace, the allure of the vehicle was that he would only have to use electricity for his daily driving. The hybrid feature would allow him to take the vehicle on occasional longer trips. The lessened environmental impact of the vehicle was also a strong reason for his purchase of the expensive vehicle. Plaintiff also relied on the safety of his Fire Defect Vehicle when he purchased it; after all he trusted the vehicle to safely transport his family. However, despite touting the safety and dependability of the Fire Defect Vehicles and the benefits of using the vehicle in its electric mode, at no point did Chrysler or its agents, dealers, or other representatives disclose to Plaintiff the Spontaneous Fire Defect. Plaintiff is now concerned about the safety of his vehicle due to the dangers resulting from the Spontaneous Fire Defect. Plaintiff's driveway is only one car-width wide, so it is not possible for Plaintiff to comply with Chrysler's direction and park his Fire Defect Vehicle far away from his residence. Plaintiff does not park his vehicle on

- 53 -

the street as he believes this would be unfair to others whose vehicles and houses would be put at risk. Moreover, because Plaintiff can no longer charge the plug-in hybrid vehicle, Plaintiff must pay for gas to use the vehicle that Plaintiff would not have needed were the hybrid propulsion system able to operate as intended. Plaintiff would not have purchased his Fire Defect Vehicle, and instead would have purchased a much less expensive vehicle, had Plaintiff known about the Spontaneous Fire Defect.

## 35. Lauren Huntington (Ohio)

59. Plaintiff and proposed class representative Lauren Huntington ("Plaintiff," for purposes of this paragraph) is a resident and citizen of Strongsville, Ohio. Plaintiff purchased a new 2018 Chrysler Pacifica Hybrid on March 30, 2019, from Cole Chrysler in Marshall, Michigan. Plaintiff's Pacifica Hybrid is an Fire Defect Vehicle equipped with the Spontaneous Fire Defect. Through exposure and interaction with Chrysler, Plaintiff was aware of Chrysler's uniform and pervasive marketing messages of dependability and safety and the benefits of being able to drive the vehicle in electric mode; these were primary reasons Plaintiff purchased the Fire Defect Vehicle. However, despite touting the safety and dependability of the Fire Defect Vehicles and the benefits of using the vehicle in its electric mode, at no point did Chrysler or its agents, dealers, or other representatives disclose to Plaintiff the Spontaneous Fire Defect. Plaintiff regularly services the vehicle but is

now concerned about driving it due to the dangers resulting from the Spontaneous Fire Defect. In addition, Plaintiff is forced to park the Fire Defect Vehicle outside as Chrysler has instructed, although it is not very far from her house and her neighbor's house. She is concerned about the additional wear and tear on her vehicle whilst parking outside due to exposure to the elements, the risk of criminal activity and the potential for damage caused by rodents. And because she now must park outside, Plaintiff must expend time and money to clean the bird droppings off her car on a near daily basis. Moreover, because Plaintiff can no longer charge the plug-in hybrid vehicle, Plaintiff must pay for gas to use the vehicle that Plaintiff would not have needed were the hybrid propulsion system able to operate as intended. Plaintiff would not have purchased the vehicle, or would have paid less for it, or Plaintiff would have purchased a non-hybrid version of the Pacifica, had Plaintiff known about the Spontaneous Fire Defect.

### 36. Michael Christie (Oregon)

60. Plaintiff and proposed class representative Michael Christie ("Plaintiff," for purposes of this paragraph) is a resident and citizen of Sherwood, Oregon. Plaintiff purchased a new 2018 Chrysler Pacifica Hybrid on June 17, 2019, from Dick's Auto Group in Beaverton, Oregon. Plaintiff's Pacifica Hybrid is an Fire Defect Vehicle equipped with the Spontaneous Fire Defect. Through exposure and interaction with Chrysler, Plaintiff was aware of Chrysler's uniform

- 55 -

and pervasive marketing messages of dependability and safety and the benefits of being able to drive the vehicle in electric mode; these were primary reasons Plaintiff purchased the Fire Defect Vehicle. However, despite touting the safety and dependability of the Fire Defect Vehicles and the benefits of using the vehicle in its electric mode, at no point did Chrysler or its agents, dealers, or other representatives disclose to Plaintiff the Spontaneous Fire Defect. Plaintiff regularly services the vehicle but is now concerned about driving it due to the dangers resulting from the Spontaneous Fire Defect. In addition, it is impossible for Plaintiff to park the Fire Defect Vehicle away from structures and other vehicles as Chrysler has instructed because there are no such spaces near Plaintiff's home. Moreover, because Plaintiff can no longer charge the plug-in hybrid vehicle, Plaintiff must pay for gas to use the vehicle that Plaintiff would not have needed were the hybrid propulsion system able to operate as intended. Plaintiff would not have purchased the vehicle, or would have paid less for it, or Plaintiff would have purchased a non-hybrid version of the Pacifica, had Plaintiff known about the Spontaneous Fire Defect.

### 37.   Clea Van Tol and Ladd Van Tol (Oregon)

61.    Plaintiffs and proposed class representative Clea Van Tol and Ladd Van Tol, husband and wife ("Plaintiffs," for purposes of this paragraph), are residents and citizens of Portland, Oregon. They purchased a new 2018 Chrysler

- 56 -

Pacifica Plug-in Hybrid vehicle in October 2018 at the Lithia Chrysler Dodge Jeep Ram of Portland dealership located in Portland, Oregon. Plaintiffs' Chrysler Pacifica Plug-in Hybrid is a Fire Defect Vehicle equipped with the Spontaneous Fire Defect. Through exposure and interaction with Chrysler, Plaintiff was aware of Chrysler's uniform and pervasive marketing messages of dependability and safety and the benefits of being able to drive the vehicle in electric mode; these were primary reasons Plaintiff purchased the Fire Defect Vehicle. However, despite touting the safety and dependability of the Fire Defect Vehicles and the benefits of using the vehicle in its electric mode, at no point did Chrysler or its agents, dealers, or other representatives disclose to Plaintiff the Spontaneous Fire Defect. Plaintiff is now concerned about driving the vehicle due to the dangers resulting from the Spontaneous Fire Defect. In addition, it is impossible for Plaintiff to park the Fire Defect Vehicle away from other vehicles as Chrysler has instructed because there are no such spaces near Plaintiff's home or at other places Plaintiff needs to park the vehicle. Moreover, because Plaintiff can no longer charge the plug-in hybrid vehicle, Plaintiff must pay for gas to use the vehicle that Plaintiff would not have needed were the hybrid propulsion system able to operate as intended. Plaintiff would not have purchased the vehicle had Plaintiff known about the Spontaneous Fire Defect.

### 38.    Joseph Ohodnicki (Pennsylvania)

62.    Plaintiff and proposed class representative Joseph Ohodnicki ("Plaintiff," for purposes of this paragraph) is a resident and citizen of Pittsburg, Pennsylvania. Plaintiff purchased a 2018 Chrysler Pacifica Hybrid on May 15, 2019, from CarRight Chrysler Jeep Dodge Ram in Moon Township, Pennsylvania. Plaintiff's Pacifica Hybrid is a Fire Defect Vehicle equipped with the Spontaneous Fire Defect. Through exposure and interaction with Chrysler, Plaintiff was aware of Chrysler's uniform and pervasive marketing messages of dependability and safety and the benefits of being able to drive the vehicle in electric mode; these were primary reasons Plaintiff purchased the Fire Defect Vehicle. However, despite touting the safety and dependability of the Fire Defect Vehicles and the benefits of using the vehicle in its electric mode, at no point did Chrysler or its agents, dealers, or other representatives disclose to Plaintiff the Spontaneous Fire Defect. Plaintiff is now concerned about driving the vehicle due to the dangers resulting from the Spontaneous Fire Defect. In addition, it is impossible for Plaintiff to park the Fire Defect Vehicle away from other vehicles as Chrysler has instructed because there are no such spaces near Plaintiff's home or at other places Plaintiff needs to park the vehicle. Moreover, because Plaintiff can no longer charge the plug-in hybrid vehicle, Plaintiff must pay for gas to use the vehicle that Plaintiff would not have needed were the hybrid propulsion system able to operate

- 58 -

as intended. Plaintiff would not have purchased the vehicle had Plaintiff known about the Spontaneous Fire Defect.

**39.     Helen Bartek (Rhode Island)**

63.     Plaintiff and proposed class representative Helen Bartek ("Plaintiff," for purposes of this paragraph) is a resident and citizen of Guilford, Connecticut. Plaintiff purchased a 2018 Chrysler Pacifica Hybrid on January 12, 2019, from Paul Baileys Chrysler Dodge Jeep Ram dealership in North Kingstown, Rhode Island. Plaintiff's Pacifica Hybrid is a Fire Defect Vehicle equipped with the Spontaneous Fire Defect. Through exposure and interaction with Chrysler, Plaintiff was aware of Chrysler's uniform and pervasive marketing messages of dependability and safety and the benefits of being able to drive the vehicle in electric mode; these were primary reasons Plaintiff purchased the Fire Defect Vehicle. However, despite touting the safety and dependability of the Fire Defect Vehicles and the benefits of using the vehicle in its electric mode, at no point did Chrysler or its agents, dealers, or other representatives disclose to Plaintiff the Spontaneous Fire Defect. Plaintiff is now concerned about driving the vehicle due to the dangers resulting from the Spontaneous Fire Defect. This is especially concerning for Plaintiff, who has young children who are still strapped into car seats. In addition, while it is possible for Plaintiff to park the Fire Defect Vehicle at the bottom of her driveway, this creates a risk of break-in and significant

- 59 -

inconvenience as Plaintiff must then manage getting her small children and whatever else she has in the Fire Defect Vehicle from this distant location to her house. Moreover, because Plaintiff can no longer charge the plug-in hybrid vehicle, Plaintiff must pay for gas to use the vehicle that Plaintiff would not have needed were the hybrid propulsion system able to operate as intended. Plaintiff would not have purchased the vehicle, or would have paid less for it, or Plaintiff would have purchased a non-hybrid version of the Pacifica, had Plaintiff known about the Spontaneous Fire Defect.

### 40. Michael Carbajales-Dale (South Carolina)

64.     Plaintiff and proposed class representative Michael "Mik" Carbajales-Dale ("Plaintiff," for purposes of this paragraph) is a resident and citizen of Seneca, South Carolina. Plaintiff purchased a 2018 Chrysler Pacifica Hybrid on June 20, 2018, from Lake Keowee Chrysler Dodge in Seneca, South Carolina. Plaintiff's Pacifica Hybrid is a Fire Defect Vehicle equipped with the Spontaneous Fire Defect. Through exposure and interaction with Chrysler, Plaintiff was aware of Chrysler's uniform and pervasive marketing messages of dependability and safety and the benefits of being able to drive the vehicle in electric mode; these were primary reasons Plaintiff purchased the Fire Defect Vehicle. However, despite touting the safety and dependability of the Fire Defect Vehicles and the benefits of using the vehicle in its electric mode, at no point did Chrysler or its

- 60 -

agents, dealers, or other representatives disclose to Plaintiff the Spontaneous Fire Defect. Plaintiff is now concerned about driving the vehicle due to the dangers resulting from the Spontaneous Fire Defect. Plaintiff has four children and is particularly concerned about being able to safely evacuate the kids from the car quickly in the event of a spontaneous fire. It is effectively impossible for Plaintiff to park the vehicle away from all other structures and vehicles at his home, and especially when he uses the car away from his home. Moreover, because Plaintiff can no longer charge the plug-in hybrid vehicle, Plaintiff must pay for gas to use the vehicle that Plaintiff would not have needed were the hybrid propulsion system able to operate as intended. Plaintiff was able to charge his vehicle for free at work, meaning he had nearly no operating costs for fuel. Plaintiff would not have purchased the vehicle, or would have paid less for it, or Plaintiff would have purchased a non-hybrid version of the Pacifica, had Plaintiff known about the Spontaneous Fire Defect.

### 41.    Rolando Pedroza (South Carolina)

65.    Plaintiff and proposed class representative Rolando Pedroza ("Plaintiff," for purposes of this paragraph) is a resident and citizen of Greenville, South Carolina. Plaintiff purchased a 2018 Chrysler Pacifica Hybrid on July 14, 2019, from Spartanburg Chrysler Dodge Jeep Ram in Spartanburg, South Carolina. Plaintiff's Pacifica Hybrid is a Fire Defect Vehicle equipped with the Spontaneous

Fire Defect. Through exposure and interaction with Chrysler, Plaintiff was aware of Chrysler's uniform and pervasive marketing messages of dependability and safety and the benefits of being able to drive the vehicle in electric mode; these were primary reasons Plaintiff purchased the Fire Defect Vehicle. However, despite touting the safety and dependability of the Fire Defect Vehicles and the benefits of using the vehicle in its electric mode, at no point did Chrysler or its agents, dealers, or other representatives disclose to Plaintiff the Spontaneous Fire Defect. Plaintiff is now concerned about driving the vehicle due to the dangers resulting from the Spontaneous Fire Defect. Plaintiff and his wife have five children, four of whom are in car seats, so they are very concerned with their ability to safely evacuate their children from the vehicle in the event of a fire. It is effectively impossible for Plaintiff to park the vehicle away from all other structures and vehicles at his home, and especially when he uses the car away from his home. Moreover, because Plaintiff can no longer charge the plug-in hybrid vehicle, Plaintiff must pay for gas to use the vehicle that Plaintiff would not have needed were the hybrid propulsion system able to operate as intended. Plaintiff would not have purchased the vehicle, or would have paid less for it, or Plaintiff would have purchased a non-hybrid version of the Pacifica, had Plaintiff known about the Spontaneous Fire Defect.

42.    **Rickey Butler (Tennessee)**

66.     Plaintiff and proposed class representative Rickey Butler ("Plaintiff," for purposes of this paragraph) is a resident and citizen of Killen, Alabama. Plaintiff purchased a 2018 Chrysler Pacifica Hybrid on October 18, 2018, from Franklin Chrysler Dodge Ram in Franklin, Tennessee. Plaintiff's Pacifica Hybrid is a Fire Defect Vehicle equipped with the Spontaneous Fire Defect. Through exposure and interaction with Chrysler, Plaintiff was aware of Chrysler's uniform and pervasive marketing messages of dependability and safety and the benefits of being able to drive the vehicle in electric mode; these were primary reasons Plaintiff purchased the Fire Defect Vehicle. However, despite touting the safety and dependability of the Fire Defect Vehicles and the benefits of using the vehicle in its electric mode, at no point did Chrysler or its agents, dealers, or other representatives disclose to Plaintiff the Spontaneous Fire Defect. Plaintiff is now concerned about driving the vehicle due to the dangers resulting from the Spontaneous Fire Defect. It is effectively impossible for Plaintiff to park the vehicle away from all other structures and vehicles at his home, and especially when he uses the car away from his home. Moreover, because Plaintiff can no longer charge the plug-in hybrid vehicle, Plaintiff must pay for gas to use the vehicle that Plaintiff would not have needed were the hybrid propulsion system able to operate as intended. Plaintiff would not have purchased the vehicle, or

would have paid less for it, or Plaintiff would have purchased a non-hybrid version of the Pacifica, had Plaintiff known about the Spontaneous Fire Defect.

### 43. Meagan Findeiss and Cal Findeiss (Texas)

67.    Plaintiffs and proposed class representatives Meagan Findeiss and Cal Findeiss, husband and wife ("Plaintiffs," for purposes of this paragraph), are residents and citizens of Dallas, Texas. They purchased a new 2018 Chrysler Pacifica Plug-in Hybrid vehicle in August, 2019 at Benson Chrysler Dodge Jeep Ram in Greer, South Carolina. The Chrysler Pacifica Plug-in Hybrid purchased by Plaintiffs is a Fire Defect Vehicle equipped with the Spontaneous Fire Defect. Through exposure and interaction with Chrysler, Plaintiffs were aware of Chrysler's uniform and pervasive marketing messages of dependability and safety and the benefits of being able to drive the vehicle in electric mode; these were primary reasons Plaintiffs purchased the Fire Defect Vehicle. However, despite touting the safety and dependability of the Fire Defect Vehicles and the benefits of using the vehicle in its electric mode, at no point did Chrysler or its agents, dealers, or other representatives disclose to Plaintiffs the Spontaneous Fire Defect. Since purchasing their Fire Defect Vehicle, Plaintiffs have received a Recall Notice for their vehicle. They are fearful driving the vehicle due to the risk of explosion and fire and are concerned about the proximity of their vehicle to their home given the Spontaneous Fire Defect and the consequent risk of fire. It is effectively impossible

- 64 -

for Plaintiffs to park the vehicle away from all other structures and vehicles at their home, and especially when they use the car away from home. Moreover, Plaintiffs must pay for gas to use the vehicle that Plaintiffs would not have needed were the hybrid propulsion system able to operate as intended. Plaintiffs would not have purchased the vehicle, or would have paid less for it, or Plaintiffs would have purchased a non-hybrid version of the Pacifica, had Plaintiffs known about the Spontaneous Fire Defect.

### 44.   Patricia Ransom (Texas)

68.     Plaintiff and proposed class representative Patricia Ransom ("Plaintiff," for purposes of this paragraph) is a resident and citizen of Austin, Texas, and will be moving to Denver, Colorado, in May 2022. Plaintiff purchased a 2018 Chrysler Pacifica Hybrid on October 20, 2018, from the River Oaks Chrysler Jeep Dodge dealership in Houston, Texas. Plaintiff's Pacifica Hybrid is a Fire Defect Vehicle equipped with the Spontaneous Fire Defect. Through exposure and interaction with Chrysler, Plaintiff was aware of Chrysler's uniform and pervasive marketing messages of dependability and safety and the benefits of being able to drive the vehicle in electric mode; these were primary reasons Plaintiff purchased the Fire Defect Vehicle. However, despite touting the safety and dependability of the Fire Defect Vehicles and the benefits of using the vehicle in its electric mode, at no point did Chrysler or its agents, dealers, or other

representatives disclose to Plaintiff the Spontaneous Fire Defect. Plaintiff is now concerned about driving the vehicle due to the dangers resulting from the Spontaneous Fire Defect. In addition, it is impossible for Plaintiff to park the Fire Defect Vehicle away from structures and other vehicles as Chrysler has instructed because there are no such spaces near Plaintiff's home or work. Moreover, because Plaintiff can no longer charge the plug-in hybrid vehicle, Plaintiff must pay for gas to use the vehicle that Plaintiff would not have needed were the hybrid propulsion system able to operate as intended. Had Plaintiff known of the Spontaneous Fire Defect, she would not have purchased the Pacifica, but would have instead purchased another, safer hybrid vehicle. FCA has put Plaintiff in the untenable position of having to drive an unsafe vehicle from a company that has proven itself to her to be untrustworthy and has not resolved this issue in a timely manner but instead provides unrealistic "options" for an indefinite period of time; Plaintiff has now been forced to trade in her Fire Defect Vehicle at a reduced value due to the conduct of FCA and, to make matters worse, has had to do so in a vehicle market that is far worse for buyers than at the time she bought her Pacifica. She owned the Pacifica outright, but has had to sell stock in order to trade in her Fire Defect Vehicle in order to get her family into a safe vehicle.

- 66 -

### 45.   Shawn Sheehan (Texas)

69.      Plaintiff and proposed class representative Shawn Sheehan

("Plaintiff," for purposes of this paragraph) is a resident and citizen of Little Elm,

Texas. Plaintiff purchased a used 2017 Chrysler Pacifica Hybrid on September 18,

2020, from the Dodge City CDJR City of McKinney dealership in McKinney,

Texas. Plaintiff's Pacifica Hybrid is a Fire Defect Vehicle equipped with the

Spontaneous Fire Defect. Through exposure and interaction with Chrysler, Plaintiff

was aware of Chrysler's uniform and pervasive marketing messages of

dependability and safety and the benefits of being able to drive the vehicle in

electric mode; these were primary reasons Plaintiff purchased the Fire Defect

Vehicle. However, despite touting the safety and dependability of the Fire Defect

Vehicles and the benefits of using the vehicle in its electric mode, at no point did

Chrysler or its agents, dealers, or other representatives disclose to Plaintiff the

Spontaneous Fire Defect. Plaintiff is now concerned about driving the vehicle due

to the dangers resulting from the Spontaneous Fire Defect and the challenges posed

in finding safe spaces to park the vehicle when Plaintiff drives the vehicle to work

or runs errands. Moreover, because Plaintiff can no longer charge the plug-in

hybrid vehicle, Plaintiff must pay for gas to use the vehicle that Plaintiff would not

have needed were the hybrid propulsion system able to operate as intended.

Plaintiff would not have purchased the vehicle, or would have paid less for it, or

Plaintiff would have purchased a non-hybrid version of the Pacifica, had Plaintiff

known about the Spontaneous Fire Defect.

### 46. Richard Golland (Virginia)

70.    Plaintiff and proposed class representative Richard Golland

("Plaintiff," for purposes of this paragraph) is a resident and citizen of Potomac,

Maryland. Plaintiff purchased a 2018 Chrysler Pacifica Hybrid on July 21, 2019,

from the Safford Chrysler Jeep Dodge Ram & FIAT of Springfield dealership in

Springfield, Virginia. Plaintiff's Pacifica Hybrid is a Fire Defect Vehicle equipped

with the Spontaneous Fire Defect. Through exposure and interaction with Chrysler,

Plaintiff was aware of Chrysler's uniform and pervasive marketing messages of

dependability and safety and the benefits of being able to drive the vehicle in

electric mode; these were primary reasons Plaintiff purchased the Fire Defect

Vehicle. However, despite touting the safety and dependability of the Fire Defect

Vehicles and the benefits of using the vehicle in its electric mode, at no point did

Chrysler or its agents, dealers, or other representatives disclose to Plaintiff the

Spontaneous Fire Defect. Plaintiff is now concerned about driving the vehicle due

to the dangers resulting from the Spontaneous Fire Defect. In addition, it is

impossible for Plaintiff to park the Fire Defect Vehicle away from structures and

other vehicles as Chrysler has instructed whenever he leaves his home in the

vehicle. Moreover, because Plaintiff can no longer charge the plug-in hybrid

- 68 -

vehicle, Plaintiff must pay for gas to use the vehicle that Plaintiff would not have needed were the hybrid propulsion system able to operate as intended. Plaintiff would not have purchased the vehicle, or would have paid less for it, or Plaintiff would have purchased a non-hybrid version of the Pacifica, had Plaintiff known about the Spontaneous Fire Defect.

### 47.   Andrew Ventura (Virginia)

71.     Plaintiff and proposed class representative Andrew Ventura ("Plaintiff," for purposes of this paragraph) is a resident and citizen of Waynseboro, Virginia. Plaintiff purchased a 2018 Chrysler Pacifica Hybrid from the CMA Valley Chrysler Dodge Jeep Ram dealership in Staunton, Virginia. Plaintiff's Pacifica Hybrid is an Fire Defect Vehicle equipped with the Spontaneous Fire Defect. Through exposure and interaction with Chrysler, Plaintiff was aware of Chrysler's uniform and pervasive marketing messages of dependability and safety and the benefits of being able to drive the vehicle in electric mode; these were primary reasons Plaintiff purchased the Fire Defect Vehicle. However, despite touting the safety and dependability of the Fire Defect Vehicles and the benefits of using the vehicle in its electric mode, at no point did Chrysler or its agents, dealers, or other representatives disclose to Plaintiff the Spontaneous Fire Defect. Plaintiff regularly services the vehicle but is now concerned about driving it due to the dangers resulting from the Spontaneous Fire

Defect. In addition, it is impossible for Plaintiff to park the Fire Defect Vehicle

away from structures and other vehicles as Chrysler has instructed because there

are no such spaces near Plaintiff's home or work. Moreover, because Plaintiff can

no longer charge the plug-in hybrid vehicle, Plaintiff must pay for gas to use the

vehicle that Plaintiff would not have needed were the hybrid propulsion system

able to operate as intended. Plaintiff would not have purchased the vehicle, or

would have paid less for it, or Plaintiff would have purchased a non-hybrid version

of the Pacifica, had Plaintiff known about the Spontaneous Fire Defect.

### 48.   Ami Benzur (Washington)

72.     Plaintiff and proposed class representative Ami Benzur ("Plaintiff,"

for purposes of this paragraph) is a resident and citizen of Bellevue, Washington.

Plaintiff purchased a 2018 Chrysler Pacifica Hybrid on September 1, 2018, from

the AutoNation Chrysler Jeep Dodge Ram dealership in Bellevue, Washington.

Plaintiff's Pacifica Hybrid is a Fire Defect Vehicle equipped with the Spontaneous

Fire Defect. Through exposure and interaction with Chrysler, Plaintiff was aware

of Chrysler's uniform and pervasive marketing messages of dependability and

safety and the benefits of being able to drive the vehicle in electric mode; these

were primary reasons Plaintiff purchased the Fire Defect Vehicle. However,

despite touting the safety and dependability of the Fire Defect Vehicles and the

benefits of using the vehicle in its electric mode, at no point did Chrysler or its

agents, dealers, or other representatives disclose to Plaintiff the Spontaneous Fire

Defect. Plaintiff is now concerned about driving the vehicle due to the dangers

resulting from the Spontaneous Fire Defect. In addition, it is impossible for

Plaintiff to park the Fire Defect Vehicle away from the fence in her drive in her

driveway and other vehicles as Chrysler has instructed because there are no such

spaces near Plaintiff's home or at other places Plaintiff needs to park her vehicle.

Moreover, because Plaintiff can no longer charge the plug-in hybrid vehicle,

Plaintiff must pay for gas to use the vehicle that Plaintiff would not have needed

were the hybrid propulsion system able to operate as intended. Plaintiff would not

have purchased the vehicle had Plaintiff known about the Spontaneous Fire Defect.

**B.    Defendant**

73.    Defendant FCA US LLC ("FCA"), formerly known as Chrysler

Group, is a Delaware limited liability company organized and existing under the

laws of the State of Delaware, and is wholly owned by Stellantis N.V., a Dutch

corporation headquartered in Amsterdam, Netherlands. FCA's principal place of

business and headquarters is at 1000 Chrysler Dr., Auburn Hills, MI 48326.

74.    FCA is a motor vehicle manufacturer and a licensed distributor of

new, previously untitled Chrysler, Dodge, Jeep, and Ram brand motor vehicles.

FCA's Chrysler brand is one of the "Big Three" American automobile brands.

- 71 -

FCA engages in commerce by distributing and selling new and used passenger cars and motor vehicles under its Chrysler, Dodge, Jeep, and Ram brands.

75.     FCA, through its various entities, designs, manufactures, markets, distributes, and sells automobiles throughout the U.S. and worldwide. FCA and/or its agents designed and manufactured the Fire Defect Vehicles. FCA also developed and disseminated the owner's manuals and warranty booklets, advertisements, brochures, and other promotional materials relating to the Fire Defect Vehicles, with the intent that such documents be purposely distributed throughout all fifty states. FCA is engaged in interstate commerce, selling vehicles through its network in every state of the United States.

76.     As further detailed below, FCA-authorized automobile dealerships act as FCA's agents in selling automobiles under the FCA name and disseminating vehicle information provided by FCA to customers. At all relevant times, FCA's dealerships served as its agents for motor vehicle repairs and warranty issues because they performed repairs, replacements, and adjustments covered by FCA's manufacturer warranty pursuant to the contracts between FCA and its more than 2,000 authorized dealerships nationwide.

## V.    FACTUAL ALLEGATIONS

**A.    FCA marketed the Pacifica Hybrid as an extremely safe plug-in electric hybrid that can run in electric mode and knew that these attributes were material to consumers.**

77.    Plug-in hybrid-electric vehicles like the Fire Defect Vehicles have significant environmental advantages over conventional vehicles with internal combustion engines. While operating in electric mode, the Fire Defect Vehicles do not produce any of the noxious tailpipe emissions—such as nitrogen oxides and other smog-forming pollutants, other pollutants harmful to human health, and greenhouse gases such as carbon dioxide and methane—that vehicles with internal combustion engines produce.[4] When functioning properly, then, the Fire Defect Vehicles can be beneficial for air quality and public health, and can help to reduce the overall ecological damage caused by using personal vehicles for transportation.[5] This benefit is especially significant in states where most electricity is generated from sources other than coal-fired plants.[6]

---

[4] **Exhibit 3**, *Emissions from Hybrid and Plug-In Electric Vehicles*, U.S. DEP'T OF ENERGY, https://afdc.energy.gov/vehicles/electric_emissions.html (last visited March 24, 2022).

[5] *Id.*

[6] *Id.* (state-by-state calculator showing that charging an all-electric vehicle in Oregon produces less than 17% of the carbon dioxide equivalent of that produced by gasoline-powered vehicles).

- 73 -

78.     In addition to the environmental benefits of electric propulsion, the cost of the electricity necessary to enable the operation of the Fire Defect Vehicles in electric mode vehicle is generally considerably less than the cost of fueling with gasoline or diesel.[7]

79.     Consumers paid a substantial premium for the plug-in hybrid propulsion system in the Fire Defect Vehicles. In 2018, the base sticker price for the Pacifica Hybrid was $6,000 more than the price for a standard Pacifica.[8]

80.     The only reason to pay the premium price commanded by the Fire Defect Vehicles was because of the perceived environmental and financial benefits they offered as a result of their status as plug-in hybrid electric vehicles.

---

[7] **Exhibit 4**, Brooke Crothers, *Rising Gas Prices Driving You To An Electric Car? Cost To Charge A Tesla Model 3 Vs Gas*, FORBES (May 22, 2021) https://www.forbes.com/sites/brookecrothers/2021/05/22/rising-gas-prices-driving-you-to-an-electric-car-cost-to-charge-a-tesla-model-3-vs-gas/?sh=47c68b4a7192 (last visited March 24, 2022); **Exhibit 5**, Roberto Baldwin, *EV vs. Gas: Which Cars Are Cheaper to Own?*, CAR AND DRIVER (May 22, 2020), https://www.caranddriver.com/shopping-advice/a32494027/ev-vs-gas-cheaper-to-own/ (last visited March 24, 2022).

[8] *See* **Exhibit 6**, Eric Bangeman, *Higher sticker price, lower fuel costs: The Chrysler Pacifica Hybrid, reviewed*, ARS TECHNICA (Apr. 2, 2018), https://arstechnica.com/cars/2018/04/review-go-greener-with-chryslers-plug-in-pacifica-hybrid-minivan/#:~:text=The%20Pacifica%20Hybrid%20starts%20at,a%20base%20price%20of%20%2444%2C995 (last visited April 8, 2022).

- 74 -

81.     Not surprisingly, then, in marketing the Fire Defect Vehicles, FCA stressed that the Pacifica Hybrid was "America's first-ever Hybrid minivan" and that it averaged 84 miles per gallon.

82.     Indeed, a major selling point of the Fire Defect Vehicles is their ability to run on electric power.

83.     According to a sales brochure for the 2018 Pacifica Hybrid, the vehicle reflected "A mission for reducing emissions":



84.     Elsewhere in the same brochure, FCA continues to tout the electric driving ability of the Fire Defect Vehicles:



85.     Another 2018 brochure for the gas-powered and hybrid Pacifica stated

that:



86.     In addition to the alleged environmentally-friendly nature of the

Pacifica Hybrid, FCA also stressed the alleged extreme safety of the vehicles as

FCA knew this was a material attribute for consumers. In a 2018 brochure for the

Fire Defect Vehicles, FCA stated, "Your family's safety and security are what matter most":



Your family's safety and security are what matter most

87.     Indeed, that same brochure is replete with pictures of children in the Fire Defect Vehicles and describes an extensive set of safety features.

88.     Another brochure for the 2018 Pacifica states that "[y]our travels will inspire while ensuring the well-being of all your beings with over 100 standard and available safety and security features":

- 77 -



Long and winding roads reveal panoramic views within the purposefully planned, kid-friendly road-trip vehicle. Your travels will inspire while ensuring the well-being of all your beings with over 100 standard and available safety and security features. The available seating for eight offers plenty of elbow room, as well as your turn to relax, needing only to focus on the road ahead. The ergonomic advantages of Pacifica make it easy to count on a peaceful trip.



**B.     The Spontaneous Fire Defect.**

89.     As FCA now admits in a February 14, 2022 notification of a safety recall sent to the National Highway Traffic Safety Administration ("NHTSA"), a defect in the hybrid propulsion system can cause the Fire Defect Vehicles to spontaneously burst into flames.

90.     FCA further admits that "[a] vehicle fire can occur when parked, even with the vehicle in the off position."

91.     Plainly, as discussed in more detail below, FCA failed to adequately research, design, test, and manufacture the Fire Defect Vehicles before warranting, advertising, promoting, marketing, and selling the Fire Defect Vehicles as suitable and safe for use in an intended and reasonably foreseeable manner.

92.     Although FCA claims that the "root cause" of the Spontaneous Fire Defect is unknown, the nature of the fires and the fact they can occur even while the vehicle is not running together with FCA's direction to refrain from charging the vehicle until it is willing and able to provide a fix, strongly suggests that the

- 78 -

defect is connected to the high-voltage lithium battery that powers the electric propulsion of the Fire Defect Vehicles.

93.     The high-voltage batteries in the Fire Defect Vehicles are 16-kWh lithium-ion batteries made by LG Chem (now LG Energy Solution, or "LGES").

94.     LGES also made the batteries that allegedly caused fires in GM's Bolt EV and Bolt EUV cars built from 2017 to 2022. As a result, LGES agreed to pay GM $1.9 billion for the costs of a recall of those GM cars.

95.     In addition, LGES made the batteries used in 2017 to 2020 Hyundai vehicles that were recalled in February 2021 to address a battery defect that posed a fire risk.

96.     LGES issued the following statement in response to FCA's recall of the Fire Defect Vehicles:

> There is no confirmed root cause of fires in the STLA[9] vehicles that is subject to the recall, or proof directly linking to the battery, as mentioned in its statement. Considering STLA's statement, LGES has no further comment.

97.     So far, FCA has only recalled the 2017 and 2018 Pacifica Hybrids. However, FCA has continuously sold Pacifica Hybrids to this day, and continues to use LGES 16-kWh lithium-ion batteries.

---

[9] Stellantis N.V., parent company of FCA.

98.     Accordingly, Plaintiffs' counsel continue to investigate whether additional model years of the Pacifica Hybrid are also plagued with the Spontaneous Fire Defect.

**C.     The Spontaneous Fire Defect is likely the result of defective high-voltage lithium batteries.**

99.     Like the Fire Defect Vehicles, most electric and hybrid electric vehicles use lithium-ion, or Li-ion, batteries because of their "high power-to-weight rations, high energy efficiency, good high-temperature performance, and low self-discharge."[10]

100.     However, Li-ion batteries also carry well-documented risks of spontaneous combustion.[11] Safety concerns related to unexpected fires connected with Li-ion batteries are well-documented, and were known to FCA at the time it designed, manufactured, and sold the Fire Defect Vehicles.[12]

---

[10] **Exhibit 7**, *Batteries for Hybrid and Plug-In Electric Vehicles*, U.S. DEP'T OF ENERGY, https://afdc.energy.gov/vehicles/electric_batteries.html (last visited March 24, 2022).

[11] *See* **Exhibit 8**, Adreesh Ghoshal, *How Lithium Ion Batteries in EVs Catch Fire*, MEDIUM (Aug. 16, 2020), https://medium.com/the-innovation/how-lithium-ion-batteries-in-evs-catch-fire-9d166c5b3af1 (last visited March 24, 2022); *see also* **Exhibit 9**, Ryan Fogelman, *April 2020 Fire Report: How & Why Do Lithium-Ion Batteries Fail, Insight from the Jedi Master of Lithium Power!*, WASTE360 (May 5, 2020), https://www.waste360.com/safety/april-2020-fire-report-how-why-do-lithium-ion-batteries-fail-insight-jedi-master-lithium (last visited March 24, 2022).

[12] *See* 2017 NHTSA Report at 2-24 through 2-27, 3-9-3 through 3-11 (discussing fire risks of high-voltage lithium-ion batteries in vehicles).

- 80 -

101.   Indeed, several years prior to the sale of the Fire Defect Vehicles, reports broke of spontaneous fires and explosions in cell phones using much smaller Li-ion batteries.[13] The harms to people and property caused by spontaneous combustion are obviously much more catastrophic in vehicles such as the Fire Defect Vehicles that are designed to transport large groups of people and to be parked in garages to charge while often in close proximity to flammable liquids and family residences.

102.   At a high-level, the fire risk posed by the use of lithium-ion batteries stems primarily from the fact that the batteries use organic liquid electrolytes; these electrolytes are volatile and flammable when operating at high temperatures.[14]

103.   Significantly, the documented fires in the Fire Defect Vehicles do not appear to be the result of external abuse. And most have resulted from an internal failure while the cars are parked. Reports suggest that this type of spontaneous

---

[13] *See, e.g.*, **Exhibit 10**, Erin Hawley, *Cell phone catches fire under teen's pillow*, KATV, https://katv.com/archive/cell-phone-catches-fire-under-teens-pillow (July 28, 2014); **Exhibit 11**, Andy Walker, *Smouldering smartphones: a brief history of mobile phone fires and how to avoid them*, GEARBURN, https://memeburn.com/gearburn/2014/07/smouldering-smartphones-a-brief-history-of-mobile-phone-fires-and-how-to-avoid-them/ (July 29, 2014).

[14] **Exhibit 12**, Heekyon Yang, *Explainer: Are lithium-ion batteries in EVs a fire hazard?*, Reuters (Aug. 23, 2021), https://www.reuters.com/business/autos-transportation/are-lithium-ion-batteries-evs-fire-hazard-2021-08-23/#:~:text=Lithium%2Dion%20batteries%2C%20whether%20they,battery%20is%20not%20designed%20correctly (last visited March 24, 2022).

- 81 -

combustion caused by so-called "thermal runaway propagation" has caused as many as 80% of Li-ion battery fires.[15]

104.  According to GM, the fires that led to the Bolt recall were caused by manufacturing defects in the LGES Li-ion batteries.[16] LGES Li-ion batteries are also used to power the Fire Defect Vehicles in their electric mode.

105.  These facts make it overwhelmingly likely that the Spontaneous Fire Defect is in fact the result of defectively designed, manufactured, or installed batteries.

**D.    FCA knew or should have known of the Spontaneous Fire Defect long before it disclosed the problem to Plaintiffs.**

106.  On information and belief, FCA knew or should have known about the Spontaneous Fire Defect before it sold the Fire Defect Vehicles and certainly long before it disclosed the problem, as evidenced by: (1) the well-documented

---

[15] *See* **Exhibit 8**, Adreesh Ghoshal, *How Lithium Ion Batteries in EVs Catch Fire*, MEDIUM (Aug. 16, 2020), https://medium.com/the-innovation/how-lithium-ion-batteries-in-evs-catch-fire-9d166c5b3af1 (last visited March 24, 2022); *see also* **Exhibit 9**, Ryan Fogelman, *April 2020 Fire Report: How & Why Do Lithium-Ion Batteries Fail, Insight from the Jedi Master of Lithium Power!*, WASTE360 (May 5, 2020), https://www.waste360.com/safety/april-2020-fire-report-how-why-do-lithium-ion-batteries-fail-insight-jedi-master-lithium (last visited March 24, 2022).

[16] **Exhibit 12,** Heekyon Yang, *Explainer: Are lithium-ion batteries in EVs a fire hazard?*, Reuters (Aug. 23, 2021), https://www.reuters.com/business/autos-transportation/are-lithium-ion-batteries-evs-fire-hazard-2021-08-23/#:~:text=Lithium%2Dion%20batteries%2C%20whether%20they,battery%20is%20not%20designed%20correctly (last visited April 25, 2022).

- 82 -

risks of runaway propagation in lithium-ion batteries; (2) the rigorous pre-launch

testing FCA must have done on the batteries and hybrid propulsion system;

(3) consumer complaints lodged with NHTSA and elsewhere online; (4) consumer

complaints lodged with FCA directly; and (5) other similar fire issues in GM Bolts

and Hyundai vehicles that (like the Fire Defect Vehicles) use LGES batteries for

electric propulsion.

### 1.    Brief overview of lithium-ion batteries.

107.   Like other batteries, Li-ion batteries are made up of multiple power-

generating compartments called "cells."[17] Each cell contains the basic functional

components of a simple battery: a positive electrode, a negative electrode, and an

electrolyte.[18] In addition, each cell contains a separator designed to keep the

positive electrode from coming in contact with the negative electrode.[19]

108.   Electrodes store the lithium. The electrolyte carries the lithium ions

between electrodes.[20] When lithium ions flow from the negative electrode, or

anode, to the positive electrode, or cathode, energy is discharged from the battery

---

[17] **Exhibit 13**, Chris Woodford, *Lithium-ion batteries*, EXPLAINTHATSTUFF!
(Nov. 23, 2020), https://www.explainthatstuff.com/how-lithium-ion-batteries-work.html (last visited March 24, 2022).

[18] *Id.*

[19] *Id.*

[20] *Id.*

cell in the form of electricity.[21] When the cell is charging, those ions flow in the opposite direction, or from cathode to anode.[22]

109.   Of course, a single cell cannot store nearly enough energy to power an automobile, so cells are grouped into modules and packs. Those modules and packs, together with control systems, constitute the complete battery.[23]

110.   A module ordinarily contains an array of cells, sensors, controls, protective safety devices, mounts, cooling elements or cooling provisions, and communications capabilities.[24]

111.   Beyond this, there are various methods of: (i) arranging the cells into arrays within the module; (ii) managing the flow of electrical current to and from the module or arrays within the module; and (iii) monitoring and managing the temperature of the cells within the module. Finally, there are various other necessary safety features, and integration with vehicle with the vehicle also plays an important role in the safety of the Li-ion battery.[25]

---

[21] *Id.*

[22] *Id.*

[23] 2017 NHTSA Report, § 4.

[24] *Id.*, § 4.1.1.

[25] *Id.*, Ch. 4.

112.   Just as important as the design and safety features used in an Li-ion battery pack is rigorous pre-launch testing.[26]

113.   While it is impossible, pre-discovery, to know the precise methods used or not used in the architecture and testing of the Li-ion batteries in the Fire Defect Vehicles, it is only too clear that FCA launched the Pacifica Hybrid with catastrophically defective battery packs and/or related components of the hybrid propulsion system. The use of better safety systems and more rigorous testing would have prevented the fires in certain owners' vehicles and the significant cost and inconvenience now visited upon all owners and lessees of the Fire Defect Vehicles.

**2.      Notwithstanding the great body of knowledge about the risks of calamitous spontaneous combustion in lithium-ion batteries, FCA evidently launched the Fire Defect Vehicles without either protecting against that risk or advising consumers of that risk.**

114.   The 2017 NHTSA Report on lithium-ion battery safety issues is particularly revealing because it documents the well-known fire risks, cites to the vast body of academic and engineering studies on those risks, and recommends rigorous design and testing protocols to protect against those risks. All of this would have been known to FCA at the time it launched the Fire Defect Vehicles.

---

[26] *Id.*, Ch. 8.

115.   NHTSA reiterated that all car manufacturers had a duty "to conduct their own due diligence safety testing and analysis, while the industry is working to develop a consensus."[27] Unfortunately for Plaintiffs and the putative Class and Subclasses, FCA recklessly or intentionally breached this solemn duty in order to pad its profits.

116.   A central focus of the NHTSA Report is the fire risk associated with the use of Li-ion batteries, and recommended protection methods and rigorous testing required to mitigate that risk.[28] The major cause of these fires is the propagation of thermal runaway.

117.   Simply put, thermal runaway "is a phenomenon in which the lithium-ion cell enters an uncontrollable, self-heating state."[29] If a cell short-circuits, the cell electrolyte can combust; pressure in the cell rapidly increases until the cell bursts and releases the flammable electrolyte. The temperature of the ruptured cell can increase to above 1,832 degrees Fahrenheit.[30]

---

[27] *Id.* at xx.

[28] *See id.* at xvi; *see also id.* at Ch. 6 (management and control systems), 8-10 (testing, "gap assessments," and "hazards, risks and risk mitigation strategies").

[29] **Exhibit 14**, *What is Thermal Runaway?*, UNDERWRITERS LABORATORIES, https://ul.org/what-we-do/electrochemical-safety/getting-started-electrochemical-safety/what-thermal-runaway#:~:text= (Aug. 24, 2021).

[30] **Exhibit 15**, Alysha Liebscher and Gary Gayman, *Preventing Thermal Runaway in Electric Vehicle Batteries*, MACHINE DESIGN, https://www.machine

- 86 -

118.   As the 2017 NHTSA Report stresses:

> [T]hermal runaway of a Li-ion cell is one of the fundamental failure mechanisms leading to safety hazards from Li-ion batteries. Cell heating is normal, but temperatures must be maintained within a predetermined safe operating level. Thermal runaway is most likely to be realized when an event occurs that results in rapid heating of the cell that outpaces the rate of heat dissipation by the cell. Rapid heating may be caused by internal or external short circuits, overcharging, and general use [among other things]….[31]

As the Report further notes, "[t]he thermal and mechanical design of a cell strongly influences its ability to control and dissipate heat, thereby influencing its safety performance."[32]

119.   When thermal runaway spreads from one cell to adjacent cells in the module, the result is what appears to be happening in the Fire Defect Vehicles— thermal runaway propagation (or runaway propagation), causing spontaneous combustion even when the cars are parked. In other words, "the rapid and extreme rise in temperature (thermal runaway) can easily propagate to nearby cells in a

---

design.com/materials/article/21837402/preventing-thermal-runaway-in-electric-vehicle-batteries at 3 (Dec. 26, 2018).

[31] 2017 NHTSA Report at 3.2.

[32] *Id.*

domino effect that has been dubbed thermal runaway propagation."[33] Fires and explosions then result.

120.   Given the extreme hazards of runaway propagation in high-voltage Li-ion batteries such as those used in the Fire Defect Vehicles, it is incumbent upon manufacturers to incorporate strong safety measures and rigorous testing.

121.   As the 2017 NHTSA report noted in a statement that has been sadly prophetic for Plaintiffs and all other owners and lessees of the Fire Defect Vehicles, as of 2017 car manufacturers were not adequately designing and testing electric and plug-in-hybrid electric systems powered by highly volatile Li-ion batteries—indeed, the "safety standards" employed by car manufactures such as FCA appeared "to trail—rather than lead—technology development."[34]

122.   As of 2017, there were a good number of standards and testing protocols designed to guide manufacturers in constructing Li-ion battery systems to be safely used in electric and plug-in hybrid electric vehicles, and many safety technologies and testing protocols existed at the time of the launch of the Fire Defect Vehicles.[35]

---

[33] **Exhibit 15**, Alysha Liebscher and Gary Gayman, *Preventing Thermal Runaway in Electric Vehicle Batteries*, MACHINE DESIGN, https://www.machine design.com/materials/article/21837402/preventing-thermal-runaway-in-electric-vehicle-batteries at 3 (Dec. 26, 2018).

[34] 2017 NHTSA Report at 1-3.

[35] *See id.* at 3-9 through 3-11, Ch. 8.

123.    Appropriate safety measures to prevent thermal runaway at the cellular level included a range of "electrical components and subsystems to prevent heating and overpressure to the cell by opening the circuit, increasing resistance, or changing the chemical composition of the cell."[36]

124.    Protection technology at the module level also existed, including technologies for "charge and discharge management," designed to limit the electric current to and from the battery module or cellular arrays within a module. Such technologies also protect against the potential for abnormal discharge caused by failures such as short circuiting, which can trigger thermal runaway and ultimately runaway propagation.[37]

125.    Also at the module level, manufacturers must ensure adequate thermal management to monitor and prevent the spikes in temperature associated with thermal runaway. "Thermal management functions at the module level include, first monitoring, then cooling," and various available technologies serve this function.[38] Thermal management must also occur at the battery pack level in order

---

[36] *Id.* at 3-10.

[37] *Id.* at 4-6.

[38] *Id.* at 4-10 through 4-15.

011086-11/1924902 V1

to maintain "an average temperature within the battery's specifications, and with even temperature distribution throughout the pack."[39]

126.   Other available safety features at the module level included "interlock circuits, pressure sensors, and communication architecture that allows the battery status to be monitored by the automobile electronic control unit."[40]

127.   Other available safety measures operate at the battery pack level, including (but not limited to) thermal management (discussed above), an array of communication, control and reporting functions,[41] and the appropriate integration of the battery pack with the vehicle.[42]

128.   On information and belief, any number of combinations of the above-referenced safety protocols, in combination with effective safety testing, would have rendered the Fire Defect Vehicles safe and fit for their intended purpose of operating as plug-in hybrid electric vehicles.

129.   The dilemma facing electric and plug-in hybrid electric vehicles is that incorporating adequate safety measures is not only expensive, but also "is likely to reduce the vehicle's range because any protective materials means less

---

[39] *Id.* at 4-24.

[40] *Id.* at 4-16 through 4-19.

[41] *Id.* at 4-28.

[42] *Id.* at 4-34.

space for the electricity-storing cells."[43] On information and belief, FCA skimped on available protection measures in order to tout the high electric mode range and overall range of the Fire Defect Vehicles—all to the benefit of FCA's bottom line and to the detriment of owners and lessees of the Fire Defect Vehicles.

130.   Regardless of the safety measures incorporated in the battery and related components designed to prevent runaway propagation, before launching an electric or plug-in hybrid electric vehicle, propagation testing is of the utmost importance.[44]

131.   Once again, at the time of the launch of the Fire Defect Vehicles, there were a wide array of standards and safety testing of Li-ion batteries and vehicles that use them, including those promulgated by the Society for Automotive Engineers (SAE), the International Organization for Standardization, Underwriters Laboratories, the Institute for Electrical and Electronics Engineers, the United Nations Economic Commission for Europe, and Sandia National Laboratories for the FreedomCAR program.[45]

---

[43] **Exhibit 15**, Alysha Liebscher and Gary Gayman, *Preventing Thermal Runaway in Electric Vehicle Batteries*, MACHINE DESIGN, https://www.machine design.com/materials/article/21837402/preventing-thermal-runaway-in-electric-vehicle-batteries at 3 (Dec. 26, 2018).

[44] 2017 NHTSA Report at 3-9 (discussing propagation testing *circa* 2014).

[45] *Id.* at 8-1.

- 91 -

132.   Many of these standards and testing protocols protect against runaway propagation and the resulting catastrophe for vehicle owners and anyone or anything in their vicinity.[46]

133.   These standards and testing protocols provided FCA with a wide range of guidelines on design and laboratory testing considerations to ensure the safety of Li-ion batteries in the Fire Defect Vehicles.

134.   On information and belief, any adequate testing of the Fire Defect Vehicle would have revealed the Li-ion batteries' propensity to spontaneously combust as the result of runaway propagation.

### 3.   FCA launches the Fire Defect Vehicles, and fires result.

135.   No later than Fall 2018, Pacifica owners and lessees began complaining that their Fire Defect Vehicles suddenly caught fire.

136.   All vehicle manufacturers, including FCA, routinely monitor and analyze NHTSA complaints to determine whether vehicles or components should be recalled due to safety concerns. Thus, on information and belief, FCA has knowledge of all NHTSA complaints filed concerning the vehicles it manufacturers, including the Fire Defect Vehicles. *See* TREAD Act, Pub. L. No. 106-414, 114 Stat. 1800 (2000).

---

[46] *See id.* at Ch. 8.

137.   Complaints submitted to FCA and to NHTSA via Vehicle Owner Questionnaires ("VOQ") reveal multiple instances of Fire Defect Vehicles catching on fire.

138.   As one Fire Defect Vehicle owner stated in a complaint to NHTSA in 2018, only "[t]wo weeks" after purchasing a new Pacifica, "the engine started smoking and caught fire while I was driving my family" on a Washington highway.

139.   Other owners reported similar experiences to NHTSA, reproduced, verbatim, in the following paragraphs.

> September 20, 2018 NHTSA ID NUMBER: 11130465
> Components: ELECTRICAL SYSTEM, ENGINE
> NHTSA ID Number: 11130465
> Incident Date September 15, 2018
> Consumer Location WOODBRIDGE, VA
> Vehicle Identification Number 2C4RC1L72JR****
> Summary of Complaint: TL* THE CONTACT OWNS A 2018
> CHRYSLER PACIFICA HYBRID. WHILE THE CONTACT'S
> WIFE WAS DRIVING 70 MPH, AN ABNORMAL NOISE WAS
> HEARD AND THE ENGINE STALLED. THE CONTACT
> NOTICED SMOKE COMING FROM UNDER THE HOOD. WHEN
> THE VEHICLE WAS STOPPED AND THE HOOD WAS LIFTED,
> THE CONTACT NOTICED FLAMES COMING FROM THE REAR
> OF THE ENGINE IN FRONT OF THE FIREWALL. THE FIRE
> MARSHALL EXTINGUISHED THE FIRE AND THE POLICE
> FILED REPORT NUMBER: 2018-2716. THE CAUSE OF THE
> FIRE WAS UNKNOWN. THERE WERE NO INJURIES. THE
> VEHICLE WAS TOWED TO AN UNKNOWN CHRYSLER
> DEALER, BUT HAD NOT BEEN DIAGNOSED. IT WAS
> UNKNOWN IF THE VEHICLE WAS DESTROYED. THE
> MANUFACTURER WAS NOT NOTIFIED OF THE FAILURE.
> THE FAILURE MILEAGE WAS APPROXIMATELY 2,900.

CONSUMER STATED VEHICLE STATUS IS IN LIMBO.
CHRYSLER STATED "WE ARE UNABLE TO DISCUSS THE
CASE DUE TO AN OPEN ONGOING INVESTIGATION." AS OF
THIS NEXT SATURDAY, 6 OCTOBER, IT WILL BE 3 WEEKS
THAT THE VEHICLE WILL BE SITTING ON THE DEALERSHIP
LOT. UPDATED 10/18/18*JB ...*BF *BF. UPDATED 10/31/18*JB
1 Affected Product: CHRYSLER PACIFICA HYBRID 2018

September 24, 2018 NHTSA ID NUMBER: 11130931
Components: UNKNOWN OR OTHER
NHTSA ID Number: 11130931
Incident Date September 23, 2018
Consumer Location HIRAM, GA
Vehicle Identification Number 2C4RC1N75JR****
Summary of Complaint: WE PURCHASED A NEW 2018
CHRYSLER PACIFICA HYBRID ON SEPTEMBER 3RD.
YESTERDAY, SEPTEMBER 23RD, WE LEFT TO GO ON A
VACATION. LESS THAN 30 MINUTES INTO OUR TRIP (WITH
3 MILES REMAINING ELECTRIC RANGE) WE HEARD A
CLUNK AND THE ENGINE LIGHT CAME ON. AS THE
ELECTRIC RANGE WENT OUT WE LOST ALL PROPULSION,
AND MY HUSBAND WAS ABLE TO STEER IT ONTO AN EXIT
RAMP AS BLACK SMOKE BEGAN BILLOWING FROM
BENEATH THE HOOD. WE AND OUR TWO CHILDREN AND
MY UNCLE ALL EXITED THE VEHICLE. THE HOOD WAS
POPPED AND A HERO UNIT ARRIVED, THE ENGINE
COMPARTMENT WAS IN FLAMES. WE WERE ASKED TO GET
AWAY FROM THE VEHICLE AND THE FIRE WAS
EXTINGUISHED AS ANOTHER FIRE TRUCK ARRIVED.
KNOWING THE AMOUNT OF LITHIUM ION BATTERIES ON
BOARD, A FIRE, ESPECIALLY ONE THAT STARTED
INEXPLICABLY, WAS TERRIFYING. WE HAVE NOT HAD A
RESPONSE FROM OUR CHRYSLER DEALER, AT THIS TIME.
... *BF...*BF. UPDATED 10/29/18*JB UPDATED 10/31/18*JB
1 Affected Product: CHRYSLER PACIFICA HYBRID 2018

June 15, 2019 NHTSA ID NUMBER: 11220341
Components: ELECTRICAL SYSTEM, ENGINE,
FUEL/PROPULSION SYSTEM
NHTSA ID Number: 11220341

- 94 -

Incident Date June 15, 2019
Consumer Location FORT WORTH, TX
Vehicle Identification Number 2C4RC1N74JR****
Summary of Complaint: PHEV VAN WAS CHARGING
OVERNIGHT WHILE PLUGGED INTO HOUSE OUTLET (110V)
USING MANUFACTURER SUPPLIED CHARGING CABLE. AT
AROUND 7 AM WE HEARD AN EXPLOSION AND FOUND THE
VAN BURNING IN OUR DRIVEWAY. VEHICLE WAS
QUICKLY ENGULFED IN FLAMES. FIRE TRUCK PUT IT OUT
AFTER ARRIVING (~5-6 MINUTES, I THINK). NO ONE WAS
INJURED, IN OR NEAR THE CAR WHEN IT HAPPENED. A
NEST CAMERA ACROSS THE STREET SHOWED THAT THE
VEHICLE WAS SMOKING PRIOR TO THE EXPLOSION. *BF*JB
*DT *DT*DT INFORMATION REDACTED PURSUANT TO THE
FREEDOM OF INFORMATION ACT (FOIA), 5 U.S.C.
552(B)(6).*JB *TR
1 Affected Product: CHRYSLER PACIFICA HYBRID 2018

January 14, 2020 NHTSA ID NUMBER: 11299263
Components: ELECTRICAL SYSTEM
NHTSA ID Number: 11299263
Incident Date September 20, 2019
Consumer Location KALAMAZOO, MI
Vehicle Identification Number 2C4RC1N73JR****
Summary of Complaint: AS OF 1/14/20 CHRYSLER AND KEVIN
PIKE FROM NEDERVELD ARE STILL INVESTIGATING. ON
9/20 AROUND 5AM WE WERE AWOKE TO AN EXPLOSION
SOUND. IT WAS OUR GARAGE DOOR BEING BLOWN TO THE
STREET AND THE INTERIOR GARAGE DOOR BEING BLOWN
INWARDS. THIS WAS DUE TO A FIRE THAT STARTED IN
OUR GARAGE CONFIRMED TO HAVE STARTED WHERE THE
PACIFICA WAS PARKED. THE PACIFICA HAD BEEN
PLUGGED IN TO A JUICEBOX CHARGER PROFESSIONALLY
WIRED WITH A DEDICATED 220V OUTLET SINCE AROUND
7PM THE PREVIOUS EVENING. I BELIEVE SOMETHING
MALFUNCTIONED WITH THE CAR'S ELECTRIC BATTERY
CAUSING IT TO START A FIRE THAT BUILT UP IN THE
GARAGE AND EVENTUALLY CAUSED A TOTAL LOSS OF
OUR HOME AND EVERYTHING INSIDE IT. WE DID NOT
HAVE ANY OTHER FLAMMABLE OR EXPLOSIVE

- 95 -

SUBSTANCES IN THE GARAGE BESIDES A 1 GALLON GAS
CONTAINER ON THE OTHER SIDE OF THE GARAGE
CONFIRMED TO NOT BE NEAR THE START OF THE FIRE.
THE VEHICLE HAD BEEN COMPLETELY DRAINED OF
BATTERY THE PREVIOUS DAY, PLUGGED IN AND WAS
CHARGING OVERNIGHT. THIS DESCRIPTION ALSO
MATCHES THE SAME DESCRIPTION 2 OTHER FAMILIES
HAVE POSTED ONLINE OF THEIR PACIFICA CATCHING FIRE
BUT THEIR VEHICLES WERE PARKED OUTSIDE SO DID NOT
BURN DOWN THEIR HOMES AND NO INVESTIGATION WAS
CONDUCTED.*DT*JB*DT *DT*JB*DT*JB*DT THE
CONSUMER PROVIDED PHOTOS. *TR
1 Affected Product: CHRYSLER PACIFICA HYBRID 2018

**4.** **FCA conceals its knowledge of the Spontaneous Fire Defect for
years before finally announcing a recall without providing
consumers with any remedy other than refraining from charging
their batteries, and parking the cars far away from residences and
any other real or personal property.**

140. Despite FCA's knowledge of the serious risk of explosion and fire in
the Fire Defect Vehicles, it did nothing to remedy the problem or even warn
consumers until very recently.

141. According to a Part 573 Recall Report that FCA sent to NHTSA on
February 11, 2022, FCA's Technical Safety and Regulatory Compliance
organization began investigating "a potential trend in fires" in certain Pacifica
Hybrids on August 31, 2021.

142. Between September 2021 and January 2022, FCA bought back two of
these vehicles "for origin and cause investigation," but as of yet "[t]he cause of
these fires is under investigation."

143.   In the Part 573, FCA admitted that it was "aware of ten additional fires," and "[t]he cause of these fires is under investigation," for a total of twelve such fires. According to FCA, it received the twelve field reports concerning these fires "from April 23, 2019, to December 14, 2021."

144.   Finally, on February 6, 2022, FCA's Vehicle Regulations Committee decided "to conduct a voluntary safety recall of the Fire Defect Vehicles."

145.   However, in large part due to its slowness to even acknowledge the issue, FCA is not yet offering any remedy for the defect. Instead, FCA advises the hapless Fire Defect Vehicle owners and lessees "to refrain from charging them, and to park them away from structures and other vehicles." FCA does not explain what constitutes a safe distance from an exploding car or what owners should do with their vehicles if they have no such place to park them, and is not globally offering to buy back the vehicles or even provide loaner or rental vehicles until such time as it can fix the problem.

146.   Faced with this Hobson's choice foisted upon them by FCA, owners and lessees of the Fire Defect Vehicles predictably and reasonably have made a variety of choices. Some have been able to comply with FCA's instructions, are paying the high fuel costs they bargained to avoid, and have distant parking spaces they can access at great inconvenience and risk to their vehicles of parking in distant and/or unsafe locations.

- 97 -

147.    Perhaps more commonly, many are simply unable to find a "safe" place to park their Fire Defect Vehicles at home, work, and/or anywhere else they need to take their vehicles, and have no choice but to park them in unsafe locations. Others, faced with spiking fuel costs, simply cannot afford *not* to charge them.

148.    Finally, some owners—justified in their unwillingness to play Russian roulette with their vehicles—are selling or trading them in at greatly reduced prices as a result of FCA's conduct.

149.    All owners and lessees of the Fire Defect Vehicles have suffered ascertainable loss.

**E.    The latest recall is the third time that Pacifica Hybrids have been recalled for fire risks.**

150.    FCA previously recalled over 10,000 2017 and 2018 Pacifica Plug-In Hybrid minivans in 2018 for a fire issue related to the vehicle's fuel system. According to the recall notice (Recall No. 18V740000), "[a]fter the vehicle has been operating in PHEV propulsion mode, the gas-fueled engine may not restart properly resulting in unburned fuel entering the exhaust catalyst."

151.    In other words, the engine might not restart properly after running in EV mode, and the fuel being fed to the engine could make its way past the exhaust manifold to the catalytic converters and ignite. The recall remedy was to update the computer, visually inspect the catalytic converters, and replace them if needed.

- 98 -

152.   Then, in 2020, FCA issued another recall for some 23,079 Pacifica Plug-In Hybrid minivans due to a fire risk resulting from a corroded electrical connection involving the Pacifica's 12-volt battery system (Recall No. 20V334000). That battery is used to power auxiliary features such as radios and garage door openers, and is not part of the vehicle's plug-in hybrid propulsion system.

153.   When the 2020 recall issued, FCA advised Pacifica hybrid owners to park their vehicles outdoors and away from other vehicles until they were repaired.

**F.   There is an agency relationship between FCA and FCA dealerships.**

154.   Upon information and belief, the manufacturer FCA has impliedly or expressly acknowledged that FCA-authorized dealerships are its sales agents, the dealers have accepted that undertaking, FCA has the ability to control authorized FCA dealers, and FCA acts as the principal in that relationship, as is shown by the following:

i.     FCA can terminate the relationship with its dealers at will;

ii.    The relationships are indefinite;

iii.   FCA is in the business of selling vehicles as are its dealers;

iv.    FCA provides tools and resources to help FCA dealers sell vehicles;

v.     FCA supervises its dealers regularly;

- 99 -

vi.     Without FCA, the relevant FCA dealers would not exist;

vii.    FCA requires the following of its dealers:

1.  Reporting of sales;

2.  Computer network connection with FCA;

3.  Training of dealers' sales and technical personnel;

4.  Use of FCA-supplied computer software;

5.  Participation in FCA's training programs;

6.  Establishment and maintenance of service departments in FCA dealerships;

7.  Certification of FCA pre-owned vehicles;

8.  Reporting to FCA with respect to the car delivery, including reporting Plaintiffs' names, addresses, preferred titles, primary and business phone numbers, e-mail addresses, vehicle VIN numbers, delivery date, type of sale, lease/finance terms, factory incentive coding, if applicable, vehicles' odometer readings, extended service contract sale designations, if any, and names of delivering dealership employees; and

9.  Displaying FCA logos on signs, literature, products, and brochures within FCA dealerships.

- 100 -

viii. Dealerships bind FCA with respect to:

1. Warranty repairs on the vehicles the dealers sell; and

2. Issuing service contracts administered by FCA.

ix. FCA further exercises control over its dealers with respect to:

1. Financial incentives given to FCA dealer employees;

2. Locations of dealers;

3. Testing and certification of dealership personnel to ensure compliance with FCA's policies and procedures; and

4. Customer satisfaction surveys, pursuant to which FCA allocates the number of FCA cars to each dealer, thereby directly controlling dealership profits.

x. FCA dealers sell FCA vehicles on FCA's behalf, pursuant to a "floor plan," and FCA does not receive payment for its cars until the dealerships sell them.

xi. Dealerships bear FCA's brand names, use FCA's logos in advertising and on warranty repair orders, post FCA-branded signs for the public to see, and enjoy a franchise to sell FCA's products, including the Fire Defect Vehicles.

xii. FCA requires FCA dealers to follow the rules and policies of FCA in conducting all aspects of dealer business, including the

- 101 -

delivery of FCA's warranties described above, and the servicing

of defective vehicles such as the Fire Defect Vehicles.

xiii.  FCA requires its dealers to post FCA's brand names, logos, and

signs at dealer locations, including dealer service departments,

and to identify themselves and to the public as authorized FCA

dealers and servicing outlets for FCA cars.

xiv.  FCA requires its dealers to use service and repair forms

containing FCA's brand names and logos.

xv.  FCA requires FCA dealers to perform FCA's warranty

diagnoses and repairs, and to do the diagnoses and repairs

according to the procedures and policies set forth in writing by

FCA.

xvi.  FCA requires FCA dealers to use parts and tools either provided

by FCA, or approved by FCA, and to inform FCA when dealers

discover that unauthorized parts have been installed on one of

FCA's vehicles.

xvii.  FCA requires dealers' service and repair employees to be

trained by FCA in the methods of repair of FCA-brand vehicles.

xviii.  FCA audits FCA dealerships' sales and service departments and

directly contacts the customers of said dealers to determine their

- 102 -

level of satisfaction with the sale and repair services provided by the dealers; dealers are then granted financial incentives or reprimanded depending on the level of satisfaction.

xix.  FCA requires its dealers to provide FCA with monthly statements and records pertaining, in part, to dealers' sales and servicing of FCA vehicles.

xx.  FCA provides technical service bulletins and messages to its dealers detailing chronic defects present in product lines, and repair procedures to be followed for chronic defects.

xxi.  FCA provides its dealers with specially trained service and repair consultants with whom dealers are required by FCA to consult when dealers are unable to correct a vehicle defect on their own.

xxii.  FCA requires FCA vehicle owners to go to authorized FCA dealers to obtain servicing under FCA warranties.

xxiii.  FCA dealers are required to notify FCA whenever a car is sold or put into warranty service.

011086-11/1924902 V1

## VI.   TOLLING OF THE STATUTE OF LIMITATIONS

**A.   Discovery Rule Tolling**

155.   Because FCA concealed the existence of the Spontaneous Fire Defect, Class members had no way of knowing about the unreasonable fire risk of the Fire Defect Vehicles.

156.   Within the period of any applicable statutes of limitation, Plaintiffs and members of the proposed Class and Subclasses could not have discovered through the exercise of reasonable diligence that FCA was concealing the conduct complained of herein.

157.   Plaintiffs and the other Class members did not discover, and did not know of, facts that would have caused a reasonable person to suspect that FCA did not report information within its knowledge to federal and state authorities, its dealerships, or consumers; nor would a reasonable and diligent investigation have disclosed that FCA had concealed information about the unreasonable fire risk of the Fire Defect Vehicles, which was discovered by Plaintiffs only shortly before this action was filed.

158.   For these reasons, all applicable statutes of limitation have been tolled by operation of the discovery rule with respect to claims as to the Fire Defect Vehicles.

- 104 -

**B.    Fraudulent Concealment Tolling**

159.   All applicable statutes of limitation have also been tolled by FCA's knowing and active fraudulent concealment and denial of the facts alleged herein throughout the period relevant to this action.

**C.    Estoppel**

160.   FCA was under a continuous duty to disclose to Plaintiffs and the other Class members the true character, quality, and nature of the fire risk of the Fire Defect Vehicles.

161.   FCA knowingly, affirmatively, and actively concealed or recklessly disregarded the true nature, quality, and character of the fire risk of the Fire Defect Vehicles.

162.   Based on the foregoing, FCA is estopped from relying on any statutes of limitations in defense of this action.

## VII.   CLASS ALLEGATIONS

163.   Plaintiffs bring this action on behalf of themselves and as a class action, pursuant to the provisions of Rules 23(a) and (b)(3) of the Federal Rules of Civil Procedure, on behalf of the following class and subclasses:

> **Nationwide Class**: All persons or entities who purchased or leased one or more model year 2017-2018 Chrysler Pacifica Hybrid minivans (the "Fire Defect Vehicles").
>
> **California Subclass**: All persons or entities who purchased or leased one or more of the Fire Defect Vehicles in the State of California.

- 105 -

**Colorado Subclass**: All persons or entities who purchased or leased one or more of the Fire Defect Vehicles in the State of Colorado.

**Connecticut Subclass**: All persons or entities who purchased or leased one or more of the Fire Defect Vehicles in the State of Connecticut.

**Florida Subclass**: All persons or entities who purchased or leased one or more of the Fire Defect Vehicles in the State of Florida.

**Georgia Subclass**: All persons or entities who purchased or leased one or more of the Fire Defect Vehicles in the State of Georgia.

**Idaho Subclass**: All persons or entities who purchased or leased one or more of the Fire Defect Vehicles in the State of Idaho.

**Illinois Subclass**: All persons or entities who purchased or leased one or more of the Fire Defect Vehicles in the State of Illinois.

**Indiana Subclass**: All persons or entities who purchased or leased one or more of the Fire Defect Vehicles in the State of Indiana.

**Iowa Subclass**: All persons or entities who purchased or leased one or more of the Fire Defect Vehicles in the State of Iowa.

**Kansas Subclass**: All persons or entities who purchased or leased one or more of the Fire Defect Vehicles in the State of Kansas.

**Maryland Subclass**: All persons or entities who purchased or leased one or more of the Fire Defect Vehicles in the State of Maryland.

**Massachusetts Subclass**: All persons or entities who purchased or leased one or more of the Fire Defect Vehicles in the State of Massachusetts.

- 106 -

**Michigan Subclass**: All persons or entities who purchased or leased one or more of the Fire Defect Vehicles in the State of Michigan.

**Minnesota Subclass**: All persons or entities who purchased or leased one or more of the Fire Defect Vehicles in the State of Minnesota.

**Missouri Subclass**: All persons or entities who purchased or leased one or more of the Fire Defect Vehicles in the State of Missouri.

**Nevada Subclass:** All persons or entities who purchased or leased one or more of the Fire Defect Vehicles in the State of Nevada.

**New Hampshire Subclass**: All persons or entities who purchased or leased one or more of the Fire Defect Vehicles in the State of New Hampshire.

**New Jersey Subclass**: All persons or entities who purchased or leased one or more of the Fire Defect Vehicles in the State of New Jersey.

**New York Subclass**: All persons or entities who purchased or leased one or more of the Fire Defect Vehicles in the State of New York.

**North Carolina Subclass:** All persons or entities who purchased or leased one or more of the Fire Defect Vehicles in the State of North Carolina.

**Ohio Subclass**: All persons or entities who purchased or leased one or more of the Fire Defect Vehicles in the State of Ohio.

**Oregon Subclass**: All persons or entities who purchased or leased one or more of the Fire Defect Vehicles in the State of Oregon.

**Pennsylvania Subclass**: All persons or entities who purchased or leased one or more of the Fire Defect Vehicles in the State of Pennsylvania.

- 107 -

**Rhode Island Subclass:** All persons or entities who purchased or leased one or more of the Fire Defect Vehicles in the State of Rhode Island.

**South Carolina Subclass**: All persons or entities who purchased or leased one or more of the Fire Defect Vehicles in the State of South Carolina.

**Tennessee Subclass**: All persons or entities who purchased or leased one or more of the Fire Defect Vehicles in the State of Tennessee.

**Texas Subclass:** All persons or entities who purchased or leased one or more of the Fire Defect Vehicles in the State of Texas.

**Virginia Subclass**: All persons or entities who purchased or leased one or more of the Fire Defect Vehicles in the State of Virginia.

**Washington Subclass**: All persons or entities who purchased or leased one or more of the Fire Defect Vehicles in the State of Washington.

164.    Plaintiffs assert claims under the laws of each state set forth below.

165.    Excluded from the definitions of each Class and Subclass are any personal injury or property damages claims resulting from the fires or explosions caused by the Fire Defect Vehicles. Also excluded from the Class and Subclasses are FCA and its subsidiaries and affiliates; all persons who make a timely election to be excluded from this action; governmental entities; the Judge to whom this case is assigned and his/her immediate family; and Plaintiffs' Counsel. Plaintiffs reserve the right to revise the Class and Subclass definitions based upon information learned through discovery.

- 108 -

166.    Certification of Plaintiffs' claims for class-wide treatment is appropriate because Plaintiffs can prove the elements of their claims on a class-wide basis using the same evidence as would be used to prove those elements in individual actions alleging the same claim.

167.    This action has been brought and may be properly maintained on behalf of the Classes and Subclasses proposed herein under Federal Rule of Civil Procedure 23.

168.    **Numerosity**. Federal Rule of Civil Procedure 23(a)(1): The members of each Class and Subclass are so numerous and geographically dispersed that individual joinder of all Class members is impracticable. For purposes of this complaint, Plaintiffs allege that there are estimated to be 16,700 or more Fire Defect Vehicles in the Nationwide Class. The precise number of Class and Subclass members is unknown to Plaintiffs but may be ascertained from FCA's books and records. Class and Subclass members may be notified of the pendency of this action by recognized, Court-approved notice dissemination methods, which may include U.S. Mail, electronic mail, Internet postings, and/or published notice.

169.    **Commonality and Predominance**: Federal Rule of Civil Procedure 23(a)(2) and 23(b)(3): This action involves common questions of law and fact, which predominate over any questions affecting individual Class and Subclass members, including, without limitation:

- 109 -

a.      Whether FCA engaged in the conduct alleged herein;

b.      Whether the Spontaneous Fire Defect creates an
        unreasonable risk of fires in the Fire Defect Vehicles;

c.      When FCA first knew about the Spontaneous Fire
        Defect;

d.      Whether FCA designed, manufactured, marketed, and
        distributed the Fire Defect Vehicles with defective high-
        voltage batteries;

e.      Whether FCA's conduct renders it liable for breach of the
        implied warranty of merchantability;

f.      Whether FCA has been unjustly enriched at the expense
        of Plaintiffs and the Class and Subclasses;

g.      Whether Plaintiffs and the other Class and Subclass
        members overpaid for their vehicles at the point of sale;
        and

h.      Whether Plaintiffs and the other Class and Subclass
        members are entitled to damages and other monetary
        relief and, if so, in what amount.

170.   **Typicality**: Federal Rule of Civil Procedure 23(a)(3): Plaintiffs'

claims are typical of the other Class and Subclass members' claims because,

among other things, all Class and Subclass members were comparably injured

through FCA's wrongful conduct as described above.

171.   **Adequacy**: Federal Rule of Civil Procedure 23(a)(4): Plaintiffs are

adequate Class and Subclass representatives because their interests do not conflict

with the interests of the other members of the Class and Subclasses they seek to

represent; Plaintiffs have retained counsel competent and experienced in complex

- 110 -

class action litigation; and Plaintiffs intend to prosecute this action vigorously. The Class and Subclasses' interests will be fairly and adequately protected by Plaintiffs and their counsel.

172.   **Superiority**: Federal Rule of Civil Procedure 23(b)(3): A class action is superior to any other available means for the fair and efficient adjudication of this controversy, and no unusual difficulties are likely to be encountered in the management of this class action. The damages or other financial detriment suffered by Plaintiffs and the other Class and Subclass members are relatively small compared to the burden and expense that would be required to individually litigate their claims against FCA, so it would be impracticable for the members of the Class and Subclasses to individually seek redress for FCA's wrongful conduct. Even if Class and Subclass members could afford individual litigation, the court system could not. Individualized litigation creates a potential for inconsistent or contradictory judgments and increases the delay and expense to all parties and the court system. By contrast, the class action device presents far fewer management difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court.

# VIII.  CLAIMS

**A.     Nationwide Claims**

## COUNT I

### VIOLATION OF THE MAGNUSON-MOSS WARRANTY ACT
### (15 U.S.C. § 2301, *et seq.*)

**(Alleged by all Plaintiffs on behalf of the Nationwide Class)**

173.    Plaintiffs re-allege and incorporate by reference all paragraphs as though fully set forth herein.

174.    Plaintiffs bring this claim on behalf of the Nationwide Class.

175.    This Court has jurisdiction to decide claims brought under 15 U.S.C. § 2301 by virtue of 28 U.S.C. § 1332(a)-(d).

176.    The Fire Defect Vehicles are "consumer products" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(3). Plaintiffs and Nationwide Class members are consumers because they are persons entitled under applicable state law to enforce against the warrantor the obligations of its implied warranties.

177.    FCA is a "supplier" and "warrantor" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(4)-(5).

178.    15 U.S.C. § 2301(d)(1) provides a cause of action for any consumer who is damaged by the failure of a warrantor to comply with an implied warranty.

- 112 -

179.   FCA provided Plaintiffs and Nationwide Class members with an implied warranty of merchantability in connection with the purchase or lease of their vehicles that is an "implied warranty" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(7). As a part of the implied warranty of merchantability, FCA warranted that the Fire Defect Vehicles engines were fit for their ordinary purpose as safe plug-in hybrid electric motor vehicles and would pass without objection in the trade as designed, manufactured, and marketed, and were adequately contained, packaged, and labeled.

180.   FCA breached its implied warranties, as described in more detail above, and is therefore liable to Plaintiffs pursuant to 15 U.S.C. § 2310(d)(1). Without limitation, the Fire Defect Vehicles share a common defect in that they are all equipped with a hybrid propulsion system that makes the vehicles susceptible to a risk of spontaneous combustion, causing an unreasonable risk of death, serious bodily harm and/or property damage to lessees and owners of the Fire Defect Vehicles as well as their homes, passengers, and bystanders. This defect rendered the Fire Defect Vehicles, when sold/leased and at all times thereafter, unmerchantable and unfit for their ordinary use of hybrid driving. In fact, as a result of the defect, FCA specifically advised owners and lessees not to charge their batteries and not to drive the Fire Defect Vehicles in electric mode.

- 113 -

181.   As discussed above, on information and belief, FCA skimped on available safety technologies that would have precluded the Spontaneous Fire Defect, and, through the sort of testing that any responsible vehicle manufacturer would have done prior to launching the Fire Defect Vehicles, FCA knew or should have known of the defect. Yet, in order to pad its bottom line and launch the first-ever plug-in hybrid electric vehicle with the highest possible electric and overall range, FCA intentionally or recklessly foisted the outrageously dangerous Fire Defect Vehicles on unwitting class members.

182.   Any effort by FCA to limit the implied warranties in a manner that would exclude coverage of the Fire Defect Vehicles is unconscionable, and any such effort to disclaim or otherwise limit such liability is null and void.

183.   Any limitations FCA might seek to impose on its warranties are procedurally unconscionable. There was unequal bargaining power between FCA and Plaintiffs, as, at the time of purchase and lease, Plaintiffs had no other options for purchasing warranty coverage other than directly from FCA.

184.   Any limitations FCA might seek to impose on its warranties are substantively unconscionable. FCA knew that the Fire Defect Vehicles were defective and that the Fire Defect Vehicles could spontaneously ignite when used as intended long before Plaintiffs and the Class. FCA failed to disclose this defect

to Plaintiffs and the Class. Thus, enforcement of the durational limitations on the warranties is harsh and would shock the conscience.

185.   Plaintiffs have had sufficient direct dealings with either FCA or its agents (dealerships) to establish privity of contract between FCA and Plaintiffs. Nonetheless, privity is not required here because Plaintiffs are intended third-party beneficiaries of contracts between FCA and its dealers, and specifically, of FCA's implied warranties. The dealers were not intended to be the ultimate consumers of the Fire Defect Vehicles and have no rights under the warranty agreements provided with the Fire Defect Vehicles; the warranty agreements were designed for and intended to benefit consumers. Finally, privity is also not required because the Fire Defect Vehicles are dangerous instrumentalities due to the aforementioned defect, as spontaneous fires present an unreasonable risk of death, serious bodily harm and/or property damage to lessees and owners of the Fire Defect Vehicles as well as their homes, other nearby structures and vehicles, passengers and bystanders.

186.   Pursuant to 15 U.S.C. § 2310(e), Plaintiffs are entitled to bring this class action and are not required to give FCA notice and an opportunity to cure until such time as the Court determines the representative capacity of Plaintiffs pursuant to Rule 23 of the Federal Rules of Civil Procedure.

187.   Plaintiffs would suffer economic hardship if they returned their Fire Defect Vehicles but did not receive the return of all payments made by them. Because FCA will not acknowledge any revocation of acceptance and immediately return any payments made, Plaintiffs have not re-accepted their Fire Defect Vehicles by retaining them.

188.   The amount in controversy of Plaintiffs' individual claims meets or exceeds the sum of $25. The amount in controversy of this action exceeds the sum of $50,000, exclusive of interest and costs, computed on the basis of all claims to be determined in this lawsuit. Plaintiffs, individually and on behalf of all other Nationwide Class members, seek all damages permitted by law, including diminution in value of their vehicles, in an amount to be proven at trial. In addition, pursuant to 15 U.S.C. § 2310(d)(2), Plaintiffs are entitled to recover a sum equal to the aggregate amount of costs and expenses (including attorneys' fees based on actual time expended) determined by the Court to have reasonably been incurred by Plaintiffs and the Nationwide Class members in connection with the commencement and prosecution of this action.

189.   Plaintiffs also seek the establishment of an FCA-funded program for Plaintiffs and Nationwide Class members to recover out-of-pocket costs incurred in attempting to rectify and/or mitigate the effects of the hybrid propulsion system Defect in their Fire Defect Vehicles.

## COUNT II

### FRAUDULENT CONCEALMENT
### (COMMON LAW)

**(Alleged by all Plaintiffs on behalf of the Nationwide Class)**

190.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

191.   Plaintiffs assert this claim on behalf of themselves and the Nationwide Class, or, in the alternative, on behalf of the State-specific Subclasses.

192.   A nationwide class is appropriate because the elements of a fraudulent concealment (or "fraud by concealment") claim are virtually identical in all states. In all states, Plaintiffs can prevail by showing that: **(i)** FCA had a duty to disclose material facts in connection with the sale or lease of the Fire Defect Vehicles; **(ii)** FCA **either** (a) knowingly made a false representation concerning material information in connection with the sale or lease of the Fire Defect Vehicles, **or** (b) knowingly concealed material information in connection with the sale or lease of the Fire Defect Vehicles, **or** (c) knowingly failed to disclose material information in connection with the sale or lease of the Fire Defect Vehicles; **and** **(iii)** as a result of FCA's conduct, Plaintiffs suffered economic damages.

193.   FCA concealed and suppressed material facts concerning the serious safety defects in Plaintiffs' vehicles.

- 117 -

194.   FCA sold the Fire Defect Vehicles to Plaintiffs without disclosing the Spontaneous Fire Defect, and concealed and suppressed the defect from regulators and consumers.

195.   FCA concealed and suppressed the Spontaneous Fire Defect with the intent to deceive Plaintiffs.

196.   FCA did so in order to falsely assure purchasers, lessees, and owners of the Fire Defect Vehicles that the vehicles they were purchasing or leasing were safe and could be operated in electric mode in order to cut costs and avoid the requisite safety technology and/or rigorous testing of the hybrid propulsion system and its volatile Li-ion batteries prior to launching the Fire Defect Vehicles, and then to avoid the cost and negative publicity of a recall. The concealed information was material to consumers, both because it concerned the quality and safety of the Fire Defect Vehicles and because the information would have significantly decreased the value and sales price of the vehicles.

197.   FCA had a duty to disclose the Spontaneous Fire Defect because it was known and/ only knowable by FCA; FCA had superior knowledge and access to the facts; and FCA knew the facts were not known to, or reasonably discoverable by, Plaintiffs. FCA also had a duty to disclose because it made many affirmative representations about the safety and quality of the Fire Defect Vehicles and touted the ability of the vehicles to operate as plug-in hybrid electric vehicles,

as set forth above; these representations were misleading, deceptive, and incomplete without the disclosure of the Spontaneous Fire Defect. Having provided information to Plaintiffs, FCA had the duty to disclose not just the partial truth, but the entire truth. Finally, once the Fire Defect Vehicles were on the road, FCA had a duty to monitor the Fire Defect Vehicles under the TREAD Act and implementing regulations, including the duty to promptly notify consumers of known safety defects.

198.   FCA concealed and/or suppressed these material facts, in whole or in part, to protect its profits and avoid recalls that would hurt FCA's image and cost FCA money, and it did so at the expense of Plaintiffs and the Nationwide Class.

199.   On information and belief, FCA has still not made full and adequate disclosure and continues to defraud Plaintiffs and conceal material information regarding the Spontaneous Fire Defect.

200.   Plaintiffs were unaware of these omitted material facts and would not have acted as they did if they had known of the concealed and/or suppressed facts, in that they would not have purchased their Fire Defect Vehicles and paid the high premium as the result of FCA's claims that they could be safely operated as plug-in hybrid electric vehicles. Plaintiffs' actions were justified. FCA was in exclusive control of the material facts and such facts were not known to the public, including Plaintiffs.

201.   Because of the concealment and/or suppression of the facts, Plaintiffs sustained damage. In purchasing or leasing their Fire Defect Vehicles, Plaintiffs did not get the benefit of their bargain since the vehicles were worth less than they would have been without the defects, and because they own vehicles that diminished in value as a result of FCA's concealment of, and failure to timely disclose and remedy, the defects. Those Nationwide Class members who sold their catastrophically dangerous Fire Defect Vehicles at a substantial loss have also suffered quantifiable damages, as will all those who sell between now and the time FCA implements an adequate recall repair (if it ever does). Had Plaintiffs been aware of the concealed defects that existed in the Fire Defect Vehicles, Plaintiffs would have paid less for their vehicles or would not have purchased or leased them at all.

202.   Accordingly, FCA is liable to Plaintiffs and the Nationwide Class for damages in an amount to be proven at trial.

203.   FCA's acts were done maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiffs' rights and well-being in order to enrich FCA. FCA's conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

- 120 -

## COUNT III

### UNJUST ENRICHMENT
### (COMMON LAW)

### (Alleged by all Plaintiffs on behalf of the Nationwide Class)

204.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

205.   Plaintiffs assert this claim on behalf of themselves and the Nationwide Class, or, in the alternative, on behalf of the State-specific Subclasses. A Nationwide Class is appropriate because the elements of unjust enrichment are uniform in all the states.

206.   This claim is pleaded in the alternative to the contract-based claims brought on behalf of Plaintiffs and the Nationwide Class.

207.   FCA has received and retained a benefit from Plaintiffs and Nationwide Class members and inequity has resulted.

208.   FCA has benefitted from selling, leasing, and distributing the Fire Defect Vehicles for more than they were worth as a result of FCA's conduct, and Plaintiffs and Nationwide Subclass members have overpaid for the Fire Defect Vehicles and been forced to pay other costs.

209.   Thus, Plaintiffs and the Nationwide Subclass conferred a benefit on FCA.

210.   It is inequitable for FCA to retain these benefits.

- 121 -

211.   Plaintiffs and the Nationwide Subclass were not aware of the true facts about the Fire Defect Vehicles and did not benefit from FCA's conduct.

212.   FCA knowingly accepted the benefits of its unjust conduct.

213.   As a result of FCA's conduct, the amount of its unjust enrichment should be determined in an amount according to proof.

**B.     State-Specific Claims**

    **1.     California**

## COUNT IV

**VIOLATION OF THE CALIFORNIA
CONSUMER LEGAL REMEDIES ACT
(Cal. Civ. Code § 1750, *et seq.*)**

**(Alleged by Plaintiffs Bryan, Carney, Clancy, Elias Ramirez, Michelle Tinio Ramirez, Schumann, and Shusta on behalf of the California Subclass)**

214.   Plaintiffs and the California Subclass ("Subclass," for the purposes of this claim) reallege and incorporate by reference all paragraphs as though fully set forth herein.

215.   Plaintiffs bring this claim on behalf of themselves and the California Subclass.

216.   FCA is a person as defined in California Civil Code § 1761(c).

217.   Plaintiffs and the California Subclass members are consumers as defined in California Civil Code § 1761(d).

011086-11/1924902 V1

218.   Defendants engaged in unfair and deceptive acts in violation of the California Consumer Legal Remedies Act (CLRA) through the practices described herein, and by knowingly and intentionally concealing the Spontaneous Fire Defect in the Fire Defect Vehicles from Plaintiffs and California Subclass members, along with concealing the risks, costs, and monetary damage resulting from the defect. These acts and practices violate, at a minimum, the following sections of the CLRA: (a)(2) misrepresenting the source, sponsorship, approval, or certification of goods or services; (a)(5) representing that goods or services have sponsorships, characteristics, uses, benefits, or quantities which they do not have, or that a person has a sponsorship, approval, status, affiliation, or connection which he or she does not have; (a)(7) representing that goods or services are of a particular standard, quality, or grade, or that goods are of a particular style or model, if they are of another; and (a)(9) advertising goods and services with the intent not to sell them as advertised.

219.   FCA's unfair and deceptive acts or practices occurred repeatedly in its trade or business, were capable of deceiving a substantial portion of the purchasing public and imposed a serious safety risk on the public.

220.   FCA knew the Fire Defect Vehicles were defectively designed and/or manufactured, were prone to cause fires, and were not suitable for their intended use.

- 123 -

221.   In the course of its business, FCA concealed the Spontaneous Fire Defect in the Fire Defect Vehicles and its failure to adequately design and test the vehicles to ensure their safety as described herein and otherwise engaged in activities with a tendency or capacity to deceive. FCA also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of the Fire Defect Vehicles.

222.   FCA had a duty to Plaintiffs and Subclass members to disclose the defective nature of the Fire Defect Vehicles because:

a.   FCA was in a superior position to know the true state of facts about the Spontaneous Fire Defect and associated risks of spontaneous combustion in the Fire Defect Vehicles, and the defect affects a core function of the car;

b.   Plaintiffs and Subclass members could not reasonably have been expected to learn or discover that the Fire Defect Vehicles had a dangerous safety defect until repeated fires forced FCA to finally issue the recall without a remedy; and

c.   FCA knew that Plaintiffs and Subclass members could not reasonably have been expected to learn or discover the Hybrid Electrical Defect and the catastrophic consequences thereof until repeated fires forced FCA to finally disclose the defect; and

d.   FCA actively concealed the defect and the consequences thereof by knowingly failing to recall the Fire Defect Vehicles at an earlier date.

- 124 -

223.   In failing to disclose the Spontaneous Fire Defect and the associated safety risks and repair costs that result from it, FCA has knowingly and intentionally concealed material facts and breached its duty to disclose.

224.   The facts concealed or not disclosed by FCA to Plaintiffs and Subclass members are material in that a reasonable consumer would have considered them important in deciding whether to purchase the Fire Defect Vehicles or to pay a lesser price. Had Plaintiffs and the Subclass members known about the defective nature of the Fire Defect Vehicles, they would not have purchased or leased the Subclass Vehicles or would have paid less for them.

225.   FCA's violations present a continuing risk to Plaintiffs as well as to the general public. In particular and as alleged herein, FCA's failure to provide a recall remedy leaves Fire Defect Vehicle owners facing 's choice: follow FCA's instructions, if possible, at the great inconvenience of parking far from home and the expense and environmental impact of additional consumption of gasoline; ignore FCA's instructions and risk calamity; or sell the vehicles at a substantial loss as a result of FCA's conduct. FCA's unlawful acts and practices complained of herein affect the public interest.

226.   On or about March 8, 2022, Plaintiffs' undersigned counsel provided FCA written notice of their violations of the CLRA under California Civil Code § 1782(a) regarding the Fire Defect Vehicles.

- 125 -

227.   Plaintiffs and Subclass members' injuries were proximately caused by Defendants' fraudulent and deceptive business practices.

228.   Plaintiffs and the Subclass members seek all relief available under the CLRA, including equitable relief, damages, punitive damages, and attorneys' fees.

## COUNT V

**VIOLATIONS OF THE CALIFORNIA UNFAIR COMPETITION LAW**
**(Cal. Bus. & Prof. Code § 17200)**

**(Alleged by Plaintiffs Bryan, Carney, Clancy, Elias Ramirez, Michelle Tinio Ramirez, Schumann, and Shusta on behalf of the California Subclass)**

229.   Plaintiffs and the California Subclass ("Subclass" for the purpose of this claim) reallege and incorporate by reference all paragraphs as though fully set forth herein.

230.   Plaintiffs bring this claim on behalf of themselves and the Subclass against all Defendants.

231.   The California Unfair Competition Law ("UCL") prohibits acts of "unfair competition," including any "unlawful, unfair or fraudulent business act or practice" and "unfair, deceptive, untrue or misleading advertising." Cal. Bus. & Prof. Code § 17200.

232.   In the course of its business, FCA concealed the Spontaneous Fire Defect in the Fire Defect Vehicles and its failure to adequately design and test the vehicles to ensure their safety as described herein and otherwise engaged in

- 126 -

activities with a tendency or capacity to deceive. FCA also engaged in unlawful

trade practices by employing deception, deceptive acts or practices, fraud,

misrepresentations, or concealment, suppression or omission of material facts with

intent that others rely upon such concealment, suppression or omission, in

connection with the sale of the Fire Defect Vehicles.

233.   FCA engaged in unfair competition and unfair, unlawful, or

fraudulent business practices through the conduct, statements, and omissions

described herein, and by knowingly and intentionally concealing the Spontaneous

Fire Defect in the Fire Defect Vehicles from Plaintiffs and Subclass members,

along with concealing the risks, costs, and monetary damage resulting from the

defect. FCA should have disclosed this information because it was in a superior

position to know the true facts related to the Spontaneous Fire Defect, and

Plaintiffs and Subclass members could not reasonably be expected to learn or

discover the true facts related to the Spontaneous Fire Defect.

234.   The Spontaneous Fire Defect causes catastrophic fire in the Fire

Defect Vehicles, and this constitutes a safety issue that triggered FCA's duty to

disclose the safety issue to consumers.

235.   FCA's acts and practices deceived Plaintiffs and are likely to deceive

the public. In failing to disclose the Spontaneous Fire Defect and suppressing other

material facts from Plaintiffs and Subclass members, FCA breached its duty to

- 127 -

disclose these facts, violated the UCL, and caused injuries to Plaintiffs and Subclass members. FCA's omissions and concealment concerned information that was material to Plaintiffs and Subclass members, as it would have been to all reasonable consumers.

236. The injuries suffered by Plaintiffs and Subclass members are not greatly outweighed by any potential countervailing benefit to consumers or to competition, nor are they injuries that Plaintiffs and Subclass members could or should have reasonably avoided.

237. FCA's acts and practices are unlawful because they violate California Civil Code §§ 1668, 1709, 1710, and 1750, *et seq.*, and California Commercial Code § 2313. FCA knew or should have known its conduct violated the UCL.

238. Plaintiffs and Subclass members have suffered an injury in fact, including the loss of money or property, because of FCA's unfair, unlawful, and deceptive practices.

239. Plaintiffs seek to enjoin further unlawful, unfair, and fraudulent acts or practices by FCA, to obtain restitutionary disgorgement of all monies and revenues generated because of such practices, and all other relief allowed under California Business & Professions Code § 17200.

## COUNT VI

### VIOLATIONS OF CALIFORNIA FALSE ADVERTISING LAW
### (Cal. Bus. & Prof. Code § 17500, *et seq*.)

**(Alleged by Plaintiffs Bryan, Carney, Clancy, Elias Ramirez, Michelle Tinio Ramirez, Schumann, and Shusta on behalf of the California Subclass)**

240.   Plaintiffs and the California Subclass ("Subclass" for the purpose of this claim) reallege and incorporate by reference all paragraphs as though fully set forth herein.

241.   Plaintiffs bring this claim on behalf of themselves and the Subclass against FCA.

242.   California Business & Professions Code § 17500 states: "It is unlawful for any … corporation … with intent directly or indirectly to dispose of real or personal property … to induce the public to enter into any obligation relating thereto, to make or disseminate or cause to be made or disseminated … from this state before the public in any state, in any newspaper or other publication, or any advertising device, … or in any other manner or means whatever, including over the Internet, any statement … which is untrue or misleading, and which is known, or which by the exercise of reasonable care should be known, to be untrue or misleading."

243.   FCA caused to be made or disseminated through California and the United States, through advertising, marketing and other publications, statements

- 129 -

that were untrue or misleading, and which were known, or through the exercise of reasonable care should have been known to FCA, to be untrue and misleading to consumers, including Plaintiffs and the Subclass members.

244.   FCA violated Section 17500 because its misrepresentations and omissions regarding the safety, reliability, and functionality of the Fire Defect Vehicles as plug-in hybrid electric vehicles as described herein were material, untrue, and misleading, and likely to deceive a reasonable consumer.

245.   Plaintiffs and Subclass members have suffered an injury in fact, including the loss of money or property, because of FCA's deceptive advertising. In purchasing or leasing their Fire Defect Vehicles, Plaintiffs and Subclass members relied on FCA's misrepresentations and omissions regarding the safety, reliability, and functionality of the vehicles. FCA's representations and omissions were untrue because the Fire Defect Vehicles were sold or leased with a defective hybrid propulsion system. Had Plaintiffs and the Subclass members known this, they would not have purchased or leased their Subclass Vehicles or paid as much for them. Accordingly, Plaintiffs and the Subclass members overpaid for their Fire Defect Vehicles and did not receive the benefit of their bargain.

246.   All the wrongful conduct alleged herein occurred, and continues to occur, in the conduct of FCA's business. FCA's wrongful conduct is part of a

pattern or generalized course of conduct that is still perpetuated and repeated, both in California and nationwide.

247.   Plaintiffs, individually and on behalf of the Subclass members, request this Court enter such orders or judgments as necessary to enjoin FCA from continuing its unlawful and deceptive advertising, to restore to Plaintiffs and the Subclass members any money FCA acquired by its deceptive advertising, including restitution and restitutionary disgorgement, and for such other relief permitted.

## COUNT VII

### VIOLATION OF SONG-BEVERLY CONSUMER WARRANTY ACT FOR BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY UNDER CALIFORNIA LAW
### (Cal. Civ. Code §§ 1791.1 & 1792)

**(Alleged by Bryan, Carney, Clancy, Elias Ramirez, Michelle Tinio Ramirez, Schumann, and Shusta on behalf of the California Subclass)**

248.   Plaintiffs and the California Subclass reallege and incorporate by reference all paragraphs as though fully set forth herein.

249.   Plaintiffs bring this claim on behalf of themselves and the California Subclass.

250.   Plaintiffs and the California Subclass members are "buyers" within the meaning of Cal. Civ. Code § 1791(b).

251.   The Fire Defect Vehicles are "consumer goods" within the meaning of Civ. Code § 1791(a).

252.   FCA is the "manufacturer" of the Fire Defect Vehicles within the meaning of Cal. Civ. Code § 1791(j).

253.   FCA impliedly warranted to Plaintiffs and the California Subclass that the Fire Defect Vehicles were "merchantable" within the meaning of Cal. Civ. Code §§ 1791.1(a) & 1792; however, the Fire Defect Vehicles do not have the quality that a buyer would reasonably expect, and were therefore not merchantable.

254.   Cal. Civ. Code § 1791.1(a) states:

> "Implied warranty of merchantability" or "implied warranty that goods are merchantable" means that the consumer goods meet each of the following:
>
> (1)    Pass without objection in the trade under the contract description.
>
> (2)    Are fit for the ordinary purposes for which such goods are used.
>
> (3)    Are adequately contained, packaged, and labeled.
>
> (4)    Conform to the promises or affirmations of fact made on the container or label.

255.   The Fire Defect Vehicles were not merchantable when sold or leased because their hybrid propulsion systems are prone to spontaneous combustion, and pose an unreasonable risk of fires due to the Spontaneous Fire Defect as described herein. Without limitation, the Fire Defect Vehicles share a common defect in that

- 132 -

they are all equipped with a hybrid propulsion system that makes the vehicles

susceptible to a risk of spontaneous combustion, causing an unreasonable risk of

death, serious bodily harm and/or property damage to lessees and owners of the

Fire Defect Vehicles as well as their homes, passengers and bystanders. This defect

renders the Fire Defect Vehicles when sold/leased and at all times thereafter,

unmerchantable and unfit for their ordinary use of driving. In fact, as a result of the

defect, FCA specifically advises owners and lessees not to charge their batteries,

not to drive the Fire Defect Vehicles in electric mode, and not to park the vehicles

in the vicinity of their homes or other vehicles.

256.   FCA breached the implied warranty of merchantability by selling Fire

Defect Vehicles containing defects leading to the sudden incineration of the

vehicles during ordinary operating conditions, or while parked. This defect has

deprived Plaintiff and the California Subclass members of the benefit of their

bargain.

257.   Notice of breach is not required because Plaintiffs and the California

members Subclass did not purchase their automobiles directly from FCA.

Nonetheless, Plaintiffs' counsel sent notification to FCA on or about March 8,

2022.

258.   Plaintiffs and the other California Subclass members were and are

third-party beneficiaries to FCA's contracts with FCA-certified/authorized retailers

- 133 -

who sold or leased the Fire Defect Vehicles to Plaintiff and California Subclass members.

259.   As a direct and proximate result FCA's breach of the implied warranty of merchantability, Plaintiffs and the California Subclass members received goods whose dangerous condition now renders them at least partially inoperable and substantially impairs their value. Plaintiffs and the California Subclass members have been damaged as they overpaid for their vehicles, and now suffer the partial or complete loss of use of their Fire Defect Vehicles.

260.   Under Cal. Civ. Code §§ 1791.1(d) & 1794, Plaintiffs and the California Subclass members are entitled to damages and other legal and equitable relief including, at their election, the purchase price of their Fire Defect Vehicles, or the overpayment or diminution in value of their Fire Defect Vehicles.

261.   Under Cal. Civ. Code § 1794, Plaintiffs and the California Subclass members are entitled to costs and attorneys' fees.

011086-11/1924902 V1

2.      **Colorado**

## COUNT VIII

**VIOLATIONS OF THE COLORADO CONSUMER PROTECTION ACT**
**(Col. Rev. Stat. § 6-1-101, *et seq.*)**

**(Alleged by Plaintiffs Berzanskis and Wilensky**
**on behalf of the Colorado Subclass)**

262.    Plaintiffs and the Colorado Subclass ("Plaintiffs," for the purposes of this claim) reallege and incorporate by reference all paragraphs as though fully set forth herein.

263.    Plaintiffs bring this action on behalf of themselves and the Colorado Subclass.

264.    FCA is a "person" within the meaning of § 6-1-102(6) of the Colorado Consumer Protection Act ("Colorado CPA"), Col. Rev. Stat. § 6-1-101, *et seq*.

265.    Plaintiffs are "consumers" for purposes of Col. Rev. Stat § 6-1-113(1)(a).

266.    The Colorado CPA prohibits deceptive trade practices in the course of a person's business. FCA engaged in deceptive trade practices prohibited by the Colorado CPA, including: (1) knowingly making a false representation as to the characteristics, uses, and benefits of the Fire Defect Vehicles that had the capacity or tendency to deceive Plaintiffs; (2) representing that the Fire Defect Vehicles are of a particular standard, quality, and grade even though FCA knew or should have known they are not; (3) advertising the Fire Defect Vehicles with the intent not to

- 135 -

sell them as advertised; and (4) failing to disclose material information concerning the Fire Defect Vehicles that was known to FCA at the time of advertisement or sale with the intent to induce Plaintiffs to purchase, lease or retain the Fire Defect Vehicles.

267.   In the course of its business, FCA concealed the Spontaneous Fire Defect in the Fire Defect Vehicles as described herein and otherwise engaged in activities with a tendency or capacity to deceive. FCA also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of a material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of the Fire Defect Vehicles.

268.   By failing to disclose and by actively concealing the defects in the Fire Defect Vehicles, which it marketed as safe, reliable, of high quality, and fit for use as plug-in hybrid electric vehicles, FCA engaged in unfair and deceptive business practices in violation of the Colorado CPA.

269.   In the course of FCA's business, it willfully failed to disclose and actively concealed the dangerous risk posed by the Fire Defect Vehicles.

270.   FCA's unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers, including Plaintiffs and the Subclass members, about the true safety and reliability of their vehicles.

- 136 -

271.   FCA intentionally and knowingly misrepresented material facts regarding the Fire Defect Vehicles with the intent to mislead Plaintiffs.

272.   FCA knew or should have known that its conduct violated the Colorado CPA.

273.   As alleged above, FCA made material statements about the safety and reliability of the Fire Defect Vehicles when operating as plug-in hybrid electric vehicles that were either false or misleading.

274.   FCA owed Plaintiffs a duty to disclose the true safety and reliability of the Fire Defect Vehicles because FCA:

a.   Possessed exclusive knowledge about the Spontaneous Fire Defect;

b.   Intentionally concealed the foregoing from Plaintiffs;

c.   Made incomplete representations about the safety and reliability of the Fire Defect Vehicles, while purposefully withholding material facts from Plaintiffs and Subclass that contradicted these representations; and/or

d.   Had duties under the TREAD Act and related regulations to disclose and remedy the defect.

275.   Because FCA fraudulently concealed the Spontaneous Fire Defect, Fire Defect Vehicle owners were deprived of the benefit of their bargain since the vehicles they purchased were worth less than they would have been if they were free from this catastrophic defect. Had Fire Defect Vehicle owners and lessees

- 137 -

been aware of the defects in their vehicles, they would have either not have bought or leased their Fire Defect Vehicles or would have paid less for them.

276.   FCA's concealment of the Spontaneous Fire Defect was material to Plaintiffs.

277.   Plaintiffs suffered ascertainable loss caused by FCA's misrepresentations and its concealment of and failure to disclose the Spontaneous Fire Defect. Plaintiffs either would have paid less for their vehicles or would not have purchased or leased them at all.

278.   FCA's violations present a continuing risk to Plaintiffs as well as to the general public. In particular and as alleged herein, FCA has yet to offer any fix for the Fire Defect Vehicles. FCA's unlawful acts and practices complained of herein affect the public interest.

279.   As a direct and proximate result of FCA's violations of the Colorado CPA, Plaintiffs have suffered injury-in-fact and/or actual damage as alleged above.

280.   Pursuant to Colo. Rev. Stat. § 6-1-113, Plaintiffs seek monetary relief against FCA measured as the greater of (a) actual damages in an amount to be determined at trial and discretionary trebling of such damages, or (b) statutory damages in the amount of $500 for each Plaintiff.

281.   Plaintiffs also seek an order enjoining FCA's unfair, unlawful, and/or deceptive practices, declaratory relief, attorneys' fees, and any other just and proper relief available under the Colorado CPA.

## COUNT IX

### BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY UNDER COLORADO LAW
### (Col. Rev. Stat. § 4-2-314)

### (Alleged by Plaintiffs Berzanskis and Wilensky on behalf of the Colorado Subclass)

282.   Plaintiffs and the Colorado Subclass ("Plaintiffs," for the purposes of this claim) reallege and incorporate by reference all paragraphs as though fully set forth herein.

283.   Plaintiffs bring this action on behalf of themselves and the Colorado Subclass.

284.   FCA is a "merchant" of the Fire Defect Vehicles within the meaning of Col. Rev. Stat. § 4-2-104(1) and a "seller" of the Fire Defect Vehicles within the meaning of Col. Rev. Stat. § 4-2-103(d), and the Fire Defect Vehicles are "goods" under Col. Rev. Stat. § 4-2-105(1).

285.   Under Colorado law, an implied warranty of merchantability attaches to the Fire Defect Vehicles. Col. Rev. Stat. § 4-2-314.

286.   The Fire Defect Vehicles were not merchantable when sold or leased because their hybrid propulsion systems are prone to spontaneous combustion, and

- 139 -

pose an unreasonable risk of fires due to the Spontaneous Fire Defect as described herein. Without limitation, the Fire Defect Vehicles share a common defect in that they are all equipped with a hybrid propulsion system that makes the vehicles susceptible to a risk of spontaneous combustion, causing an unreasonable risk of death, serious bodily harm and/or property damage to lessees and owners of the Fire Defect Vehicles as well as their homes, passengers and bystanders. This defect rendered the Fire Defect Vehicles when sold/leased and at all times thereafter, unmerchantable and unfit for their ordinary use of driving. In fact, as a result of the defect, FCA specifically advises owners and lessees not to charge their batteries and not to drive the Fire Defect Vehicles in electric mode.

287.   Plaintiffs were and are third-party beneficiaries to FCA's contracts with FCA-certified/authorized retailers who sold or leased the Fire Defect Vehicles to Plaintiffs.

288.   It was reasonable to expect that Plaintiffs would use, consume or be affected by the Fire Defect Vehicles, and they are therefore entitled to the protections of the implied warranty of merchantability under Col. Rev. Stat. § 4-2-318.

289.   FCA was provided notice of these issues within a reasonable time of Plaintiffs' knowledge of the non-conforming or defective nature of the Fire Defect Vehicles by the filing of this Complaint, by letters from Plaintiffs' counsel to

- 140 -

FCA, consumer complaints to NHTSA regarding the defect that is the subject of this Complaint, and/or by the allegations contained in this Complaint. In addition, on or about March 8, 2022, Plaintiffs sent a notice letter to FCA complying with Col. Rev. Stat. § 4-2-607(3)(a), to the extent such notice is required. Because FCA has failed to remedy the Spontaneous Fire Defect within the requisite time period, Plaintiffs seek all damages and other relief to which they are entitled.

290.   As a direct and proximate result of FCA's breach of the implied warranty of merchantability, Plaintiff and the other Colorado Subclass members have been damaged in an amount to be determined at trial.

### 3.   Connecticut

## COUNT X

**VIOLATION OF CONNECTICUT UNLAWFUL TRADE PRACTICES ACT
(Conn. Gen. Stat. § 42-110a, *et seq.*)**

**(Alleged by Plaintiffs Kelsey and Peter Keefe
on behalf of the Connecticut Subclass)**

291.   Plaintiffs and the Connecticut Subclass ("Subclass," for the purposes of this claim) reallege and incorporate by reference all paragraphs as though fully set forth herein.

292.   Plaintiffs brings this claim on behalf of themselves and the Subclass.

293.   FCA is a "person" within the meaning of Conn. Gen. Stat. § 42-110a(3). FCA's challenged acts occurred is in "trade" or "commerce" within the meaning of Conn. Gen. Stat. § 42-110a(4).

294.   The Connecticut Unfair Trade Practices Act ("Connecticut UTPA") provides: "No person shall engage in unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce." Conn. Gen. Stat. § 42-110b(a). By concealing the Spontaneous Fire Defect in the Fire Defect Vehicles, FCA participated in unfair and deceptive trade practices that violated the Connecticut UTPA as described herein.

295.   In the course of its business, FCA concealed the Spontaneous Fire Defect in the Fire Defect Vehicles as described herein and otherwise engaged in activities with a tendency or capacity to deceive. FCA also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of a material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of the Fire Defect Vehicles.

296.   By failing to disclose and by actively concealing the Spontaneous Fire Defect in the Fire Defect Vehicles, which it marketed as safe, reliable, of high quality, and fit for use as plug-in hybrid electric vehicles, FCA engaged in unfair and deceptive business practices in violation of the Connecticut UTPA.

- 142 -

297.   In the course of FCA's business, it willfully failed to disclose and actively concealed the dangerous risk posed by the defects in the Fire Defect Vehicles.

298.   FCA's unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers, including Plaintiffs and the Subclass members, about the true safety and reliability of their vehicles.

299.   FCA intentionally and knowingly misrepresented material facts regarding the Fire Defect Vehicles with the intent to mislead Plaintiffs and the Subclass.

300.   FCA knew or should have known that its conduct violated the Connecticut UTPA.

301.   As alleged above, FCA made material statements about the safety and reliability of the Fire Defect Vehicles when operating as plug-in hybrid electric vehicles that were either false or misleading.

302.   FCA owed Plaintiffs and the Subclass a duty to disclose the true safety and reliability of the Fire Defect Vehicles because FCA:

      a.    Possessed exclusive knowledge about the Spontaneous Fire Defect;

      b.    Intentionally concealed the foregoing from Plaintiffs and the Subclass;

      c.    Made incomplete representations about the safety and reliability of the Fire Defect Vehicles, while purposefully

- 143 -

withholding material facts from Plaintiffs and Subclass that contradicted these representations; and/or

d.    Had duties under the TREAD Act and related regulations to disclose and remedy the defect.

303.   Because FCA fraudulently concealed the Spontaneous Fire Defect, Fire Defect Vehicle owners were deprived of the benefit of their bargain since the vehicles they purchased were worth less than they would have been if they were free from defects. Had Fire Defect Vehicle owners and lessees been aware of the defects in their vehicles, they would have either not have bought or leased their Fire Defect Vehicles or would have paid less for them.

304.   FCA's concealment of the defects in the Fire Defect Vehicles was material to Plaintiffs and the Subclass.

305.   Plaintiffs and the Subclass suffered ascertainable loss caused by FCA's misrepresentations and its concealment of and failure to disclose Spontaneous Fire Defect. Plaintiffs and Subclass members either would have paid less for their vehicles or would not have purchased or leased them at all.

306.   FCA's violations present a continuing risk to Plaintiffs and the Subclass as well as to the general public. In particular and as alleged herein, FCA has yet to offer any fix for the Fire Defect Vehicles. FCA's unlawful acts and practices complained of herein affect the public interest.

- 144 -

307.   As a direct and proximate result of FCA's violations of the

Connecticut UTPA Plaintiffs and the Subclass have suffered injury-in-fact and/or

actual damage as alleged above.

308.   Plaintiffs are entitled to recover their actual damages, punitive

damages, and attorneys' fees pursuant to Conn. Gen. Stat. § 42-110g.

309.   FCA acted with a reckless indifference to another's rights or wanton

or intentional violation to another's rights and otherwise engaged in conduct

amounting to a particularly aggravated, deliberate disregard of the rights and safety

of others. Therefore, punitive damages are warranted.

## COUNT XI

### BREACH OF IMPLIED WARRANTY OF
### MERCHANTABILITY UNDER CONNECTICUT LAW
### (Conn. Gen. Stat. § 42a-2-314)

### (Alleged by Plaintiffs Kelsey and Peter Keefe
### on behalf of the Connecticut Subclass)

310.   Plaintiffs and the Connecticut Subclass reallege and incorporate by

reference all paragraphs as though fully set forth herein.

311.   Plaintiffs brings this claim on behalf of themselves and the

Connecticut Subclass ("Subclass," for the purposes of this claim).

312.   FCA is a "merchant" within the meaning of Conn. Gen. Stat. § 42a-2-

104(1).

- 145 -

313.   Under Connecticut law, an implied warranty of merchantability attaches to the Fire Defect Vehicles. Conn. Gen. Stat. § 42a-2-314.

314.   The Fire Defect Vehicles were not merchantable when sold or leased because their hybrid propulsion systems are prone to spontaneous combustion, and pose an unreasonable risk of fires due to the Spontaneous Fire Defect as described herein. Without limitation, the Fire Defect Vehicles share a common defect in that they are all equipped with a hybrid propulsion system that makes the vehicles susceptible to a risk of spontaneous combustion, causing an unreasonable risk of death, serious bodily harm and/or property damage to lessees and owners of the Fire Defect Vehicles as well as their homes, passengers and bystanders. This defect renders the Fire Defect Vehicles when sold/leased and at all times thereafter, unmerchantable and unfit for their ordinary use of driving. In fact, as a result of the defect, FCA specifically advises owners and lessees not to charge their batteries and not to drive the Fire Defect Vehicles in electric mode.

315.   Plaintiffs and the other Subclass members were and are third-party beneficiaries of FCA's contracts with FCA-certified/authorized retailers who sold or leased the Fire Defect Vehicles to Plaintiffs and Subclass members.

316.   As a direct and proximate result of FCA's breach of the implied warranty of merchantability, Plaintiffs and the other Subclass members have been damaged in an amount to be determined at trial.

- 146 -

4.      **Florida**

## COUNT XII

**VIOLATION OF FLORIDA'S UNFAIR &
DECEPTIVE TRADE PRACTICES ACT
(Fla. Stat. § 501.201, *et seq.*)**

**(Alleged by Plaintiffs Latacki and Messeguer
on behalf of the Florida Subclass)**

317.   Plaintiffs and the Florida Subclass reallege and incorporate by reference all paragraphs as though fully set forth herein.

318.   Plaintiffs brings this claim on behalf of themselves and the Florida Subclass ("Subclass," for the purposes of this claim).

319.   Plaintiffs and the Subclass are "consumers" within the meaning of the Florida Unfair and Deceptive Trade Practices Act ("FUDTPA"), Fla. Stat. § 501.203(7).

320.   FCA engaged in "trade or commerce" within the meaning of Fla. Stat. § 501.203(8).

321.   The FUDTPA prohibits "[u]nfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce …." Fla. Stat. § 501.204(1). By concealing the Spontaneous Fire Defect in the Fire Defect Vehicles, FCA participated in unfair and deceptive trade practices that violated the FUDTPA as described herein.

- 147 -

322.   FCA's actions, as set forth above, occurred in the conduct of trade or commerce.

323.   In the course of its business, FCA concealed the Spontaneous Fire Defect in the Fire Defect Vehicles as described herein and otherwise engaged in activities with a tendency or capacity to deceive. FCA also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of a material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of the Fire Defect Vehicles.

324.   By failing to disclose and by actively concealing the Spontaneous Fire Defect in the Fire Defect Vehicles, which it marketed as safe, reliable, of high quality, and fit for use as plug-in hybrid electric vehicles, FCA engaged in unfair and deceptive business practices in violation of the FUDTPA.

325.   In the course of FCA's business, it willfully failed to disclose and actively concealed the dangerous risk posed by the defects in the Fire Defect Vehicles.

326.   FCA's unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers, including Plaintiffs and Subclass members, about the true safety and reliability of their vehicles.

- 148 -

327.   FCA intentionally and knowingly misrepresented material facts regarding the Fire Defect Vehicles with the intent to mislead Plaintiffs and the Subclass.

328.   FCA knew or should have known that its conduct violated the FUDTPA.

329.   As alleged above, FCA made material statements about the safety and reliability of the Fire Defect Vehicles when operating as plug-in hybrid electric vehicles that were either false or misleading.

330.   FCA owed Plaintiffs and the Subclass a duty to disclose the true safety and reliability of the Fire Defect Vehicles because FCA:

    a.    Possessed exclusive knowledge about the Spontaneous Fire Defect;

    b.    Intentionally concealed the foregoing from Plaintiffs and the Subclass;

    c.    Made incomplete representations about the safety and reliability of the Fire Defect Vehicles, while purposefully withholding material facts from Plaintiffs and the Subclass that contradicted these representations; and/or

    d.    Had duties under the TREAD Act and related regulations to disclose and remedy the defect.

331.   Because FCA fraudulently concealed the Spontaneous Fire Defect, Fire Defect Vehicle owners were deprived of the benefit of their bargain since the vehicles they purchased were worth less than they would have been if they were free from defects. Had Fire Defect Vehicle owners and lessees been aware of the

- 149 -

defects in their vehicles, they would have either not have bought or leased their Fire Defect Vehicles or would have paid less for them.

332.   FCA's concealment of the defects in the Fire Defect Vehicles was material to Plaintiffs and the Subclass.

333.   Plaintiffs and the Subclass suffered ascertainable loss caused by FCA's misrepresentations and its concealment of and failure to disclose Spontaneous Fire Defect. Plaintiffs and Subclass members either would have paid less for their vehicles or would not have purchased or leased them at all.

334.   FCA's violations present a continuing risk to Plaintiffs and the Subclass as well as to the general public. In particular and as alleged herein, FCA has yet to offer any fix for the Fire Defect Vehicles. FCA's unlawful acts and practices complained of herein affect the public interest.

335.   As a direct and proximate result of FCA's violations of the FUDTPA, Plaintiffs and the Subclass have suffered injury-in-fact and/or actual damage as alleged above.

336.   Plaintiffs and the Subclass are entitled to recover their actual damages under Fla. Stat. § 501.211(2) and attorneys' fees under Fla. Stat. § 501.2105(1).

337.   Plaintiffs also seek an order enjoining FCA's unfair, unlawful, and/or deceptive practices, declaratory relief, attorneys' fees, and any other just and proper relief available under the FUDTPA.

## COUNT XIII

### BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY UNDER FLORIDA LAW
### (Fla. Stat. § 672.314)

### (Alleged by Plaintiffs Latacki and Messeguer on behalf of the Florida Subclass)

338.   Plaintiffs and the Florida Subclass reallege and incorporate by reference all paragraphs as though fully set forth herein.

339.   Plaintiffs bring this claim on behalf of themselves and the Florida Subclass ("Subclass," for the purposes of this claim).

340.   FCA is a "merchant" within the meaning of Fla. Stat. § 672.104, and a "seller" of motor vehicles within the meaning of Fla. Stat. § 672.103(d).

341.   Under Florida law, an implied warranty of merchantability attaches to the Fire Defect Vehicles. Fla. Stat. § 672.314.

342.   The Fire Defect Vehicles were not merchantable when sold or leased because their hybrid propulsion systems are prone to spontaneous combustion, and pose an unreasonable risk of fires due to the Spontaneous Fire Defect as described herein. Without limitation, the Fire Defect Vehicles share a common defect in that they are all equipped with a hybrid propulsion system that makes the vehicles susceptible to a risk of spontaneous combustion, causing an unreasonable risk of death, serious bodily harm and/or property damage to lessees and owners of the Fire Defect Vehicles as well as their homes, passengers and bystanders. This defect

- 151 -

renders the Fire Defect Vehicles when sold/leased and at all times thereafter, unmerchantable and unfit for their ordinary use of driving. In fact, as a result of the defect, FCA specifically advises owners and lessees not to charge their batteries and not to drive the Fire Defect Vehicles in electric mode.

343.    Plaintiffs and Subclass members were and are third-party beneficiaries of FCA's contracts with FCA-certified/authorized retailers who sold or leased the Fire Defect Vehicles to Plaintiff and Florida Subclass members. *See* Fla. Stat. § 672.318.

344.    As a direct and proximate result of FCA's breach of the implied warranty of merchantability, Plaintiffs and Florida Subclass members have been damaged in an amount to be determined at trial.

### 5.    Georgia

## COUNT XIV

## VIOLATION OF GEORGIA'S FAIR BUSINESS PRACTICES ACT
### (Ga. Code Ann. § 10-1-390, *et seq.*)

### (Alleged by Plaintiff Spruance on behalf of the Georgia Subclass)

345.    Plaintiff and the Georgia Subclass reallege and incorporate by reference all paragraphs as though fully set forth herein.

346.    Plaintiff brings this claim on behalf of himself and the Georgia Subclass ("Subclass," for the purposes of this claim).

347. The Georgia Fair Business Practices Act ("Georgia FBPA") declares "[u]nfair or deceptive acts or practices in the conduct of consumer transactions and consumer acts or practices in trade or commerce" to be unlawful, Ga. Code. Ann. § 10-1-393(a), including, but not limited to, "representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities that they do not have," "[r]epresenting that goods or services are of a particular standard, quality, or grade … if they are of another," and "[a]dvertising goods or services with intent not to sell them as advertised," Ga. Code. Ann. § 10-1-393(b).

348. FCA's actions, as set forth above, occurred in the conduct of trade or commerce.

349. In the course of its business, FCA concealed the Spontaneous Fire Defect in the Fire Defect Vehicles as described herein and otherwise engaged in activities with a tendency or capacity to deceive. FCA also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of a material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of the Fire Defect Vehicles.

350. By failing to disclose and by actively concealing the Spontaneous Fire Defect in the Fire Defect Vehicles, which it marketed as safe, reliable, of high

- 153 -

quality, and fit for use as plug-in hybrid electric vehicles, FCA engaged in unfair and deceptive business practices in violation of the Georgia FBPA.

351.   In the course of FCA's business, it willfully failed to disclose and actively concealed the dangerous risk posed by the defects in the Fire Defect Vehicles.

352.   FCA's unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers, including Plaintiff and Subclass members, about the true safety and reliability of their vehicles.

353.   FCA intentionally and knowingly misrepresented material facts regarding the Fire Defect Vehicles with the intent to mislead Plaintiff and the Subclass.

354.   FCA knew or should have known that its conduct violated the Georgia FBPA.

355.   As alleged above, FCA made material statements about the safety and reliability of the Fire Defect Vehicles when operating as plug-in hybrid electric vehicles that were either false or misleading.

356.   FCA owed Plaintiff and the Subclass a duty to disclose the true safety and reliability of the Fire Defect Vehicles because FCA:

    a.    Possessed exclusive knowledge about the Spontaneous Fire Defect;

b. Intentionally concealed the foregoing from Plaintiff and the Subclass;

c. Made incomplete representations about the safety and reliability of the Fire Defect Vehicles, while purposefully withholding material facts from Plaintiff and the Subclass that contradicted these representations; and/or

d. Had duties under the TREAD Act and related regulations to disclose and remedy the defect.

357. Because FCA fraudulently concealed the Spontaneous Fire Defect, Fire Defect Vehicle owners were deprived of the benefit of their bargain since the vehicles they purchased were worth less than they would have been if they were free from defects. Had Fire Defect Vehicle owners and lessees been aware of the defects in their vehicles, they would have either not have bought or leased their Fire Defect Vehicles or would have paid less for them.

358. FCA's concealment of the defects in the Fire Defect Vehicles was material to Plaintiff and the Subclass.

359. Plaintiff and the Subclass suffered ascertainable loss caused by FCA's misrepresentations and its concealment of and failure to disclose Spontaneous Fire Defect. Plaintiff and Subclass members either would have paid less for their vehicles or would not have purchased or leased them at all.

360. FCA's violations present a continuing risk to Plaintiff and the Subclass as well as to the general public. In particular and as alleged herein, FCA

- 155 -

has yet to offer any fix for the Fire Defect Vehicles. FCA's unlawful acts and practices complained of herein affect the public interest.

361. As a direct and proximate result of FCA's violations of the Georgia FBPA, Plaintiff and the Subclass have suffered injury-in-fact and/or actual damage as alleged above.

362. Plaintiff and the Subclass are entitled to recover damages and exemplary damages (for intentional violations) per Ga. Code. Ann § 10-1-399(a).

363. Plaintiff and the Subclass also seek an order enjoining FCA's unfair, unlawful, and/or deceptive practices, attorneys' fees, and any other just and proper relief available under the Georgia FBPA per Ga. Code. Ann § 10-1-399.

364. On or about March 8, 2022, Plaintiffs' counsel sent a letter complying with Ga. Code. Ann § 10-1-399(b). Because FCA failed to remedy its unlawful conduct within the requisite time period, Plaintiff and the Subclass seek all damages and relief to which they are entitled

## COUNT XV

### BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY UNDER GEORGIA LAW
### (Ga. Code Ann. § 11-2-314(1))

**(Alleged by Plaintiff Spruance on behalf of the Georgia Subclass)**

365. Plaintiff and the Georgia Subclass reallege and incorporate by reference all paragraphs as though fully set forth herein.

366.    Plaintiff brings this claim on behalf of himself and the Georgia

Subclass ("Subclass," for the purposes of this claim).

367.    FCA is a "merchant" within the meaning of Ga. Code Ann. § 11-2-

and Ga. Code Ann. § 11-2-104(1), and a "seller" of motor vehicles within the

meaning of Ga. Code Ann. § 11-2-(103)(1)(d).

368.    Under Georgia law, an implied warranty of merchantability attaches

to the Fire Defect Vehicles. Ga. Code Ann. § 11-2-314(1).

369.    The Fire Defect Vehicles were not merchantable when sold or leased

because their hybrid propulsion systems are prone to spontaneous combustion, and

pose an unreasonable risk of fires due to the Spontaneous Fire Defect as described

herein. Without limitation, the Fire Defect Vehicles share a common defect in that

they are all equipped with a hybrid propulsion system that makes the vehicles

susceptible to a risk of spontaneous combustion, causing an unreasonable risk of

death, serious bodily harm and/or property damage to lessees and owners of the

Fire Defect Vehicles as well as their homes, passengers and bystanders. This defect

renders the Fire Defect Vehicles when sold/leased and at all times thereafter,

unmerchantable and unfit for their ordinary use of driving. In fact, as a result of the

defect, FCA specifically advises owners and lessees not to charge their batteries

and not to drive the Fire Defect Vehicles in electric mode.

- 157 -

370.   Plaintiff and the Subclass were and are third-party beneficiaries of FCA's contracts with FCA-certified/authorized retailers who sold or leased the Fire Defect Vehicles to Plaintiff and Subclass members.

371.   As a direct and proximate result of FCA's breach of the implied warranty of merchantability, Plaintiff and Subclass members have been damaged in an amount to be determined at trial.

**6.    Idaho**

## COUNT XVI

### VIOLATION OF THE IDAHO CONSUMER PROTECTION ACT
(Idaho Civ. Code § 48-601, *et seq.*)

**(Alleged by Plaintiff Keeth on behalf of the Idaho Subclass)**

372.   Plaintiff and the Idaho Subclass reallege and incorporate by reference all paragraphs as though fully set forth herein.

373.   Plaintiff brings this action on behalf of himself and the Idaho Subclass ("Subclass," for the purposes of this claim).

374.   FCA is a "person" under the Idaho Consumer Protection Act ("Idaho CPA"), Idaho Civ. Code § 48-602(1).

375.   FCA's acts or practices as set forth above occurred in the conduct of "trade" or "commerce" under Idaho Civ. Code § 48-602(2).

376.   FCA participated in misleading, false, or deceptive acts that violated the Idaho CPA. By systematically concealing the defects in the Fire Defect

- 158 -

Vehicles, FCA engaged in deceptive business practices prohibited by the Idaho

CPA, including: (1) representing that the Fire Defect Vehicles have characteristics,

uses, and benefits which they do not have; (2) representing that the Fire Defect

Vehicles are of a particular standard, quality, and grade when they are not;

(3) advertising the Fire Defect Vehicles with the intent not to sell them as

advertised; (4) engaging in acts or practices which are otherwise misleading, false,

or deceptive to the consumer; and (5) engaging in any unconscionable method, act

or practice in the conduct of trade or commerce. *See* Idaho Civ. Code § 48-603.

377.    FCA's actions, as set forth above, occurred in the conduct of trade or

commerce.

378.    In the course of its business, FCA concealed the Spontaneous Fire

Defect in the Fire Defect Vehicles as described herein and otherwise engaged in

activities with a tendency or capacity to deceive. FCA also engaged in unlawful

trade practices by employing deception, deceptive acts or practices, fraud,

misrepresentations, or concealment, suppression or omission of a material fact with

intent that others rely upon such concealment, suppression or omission, in

connection with the sale of the Fire Defect Vehicles.

379.    By failing to disclose and by actively concealing the Spontaneous Fire

Defect in the Fire Defect Vehicles, which it marketed as safe, reliable, of high

- 159 -

quality, and fit for use as plug-in hybrid electric vehicles, FCA engaged in unfair and deceptive business practices in violation of the Idaho CPA.

380.   In the course of FCA's business, it willfully failed to disclose and actively concealed the dangerous risk posed by the defects in the Fire Defect Vehicles.

381.   FCA's unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers, including Plaintiff and Subclass members, about the true safety and reliability of their vehicles.

382.   FCA intentionally and knowingly misrepresented material facts regarding the Fire Defect Vehicles with the intent to mislead Plaintiff and the Subclass.

383.   FCA knew or should have known that its conduct violated the Idaho CPA.

384.   As alleged above, FCA made material statements about the safety and reliability of the Fire Defect Vehicles when operating as plug-in hybrid electric vehicles that were either false or misleading.

385.   FCA owed Plaintiff and the Subclass a duty to disclose the true safety and reliability of the Fire Defect Vehicles because FCA:

> a.   Possessed exclusive knowledge about the Spontaneous Fire Defect;

b.   Intentionally concealed the foregoing from Plaintiff and the Subclass;

c.   Made incomplete representations about the safety and reliability of the Fire Defect Vehicles, while purposefully withholding material facts from Plaintiff and the Subclass that contradicted these representations; and/or

d.   Had duties under the TREAD Act and related regulations to disclose and remedy the defect.

386.   Because FCA fraudulently concealed the Spontaneous Fire Defect, Fire Defect Vehicle owners were deprived of the benefit of their bargain since the vehicles they purchased were worth less than they would have been if they were free from defects. Had Fire Defect Vehicle owners and lessees been aware of the defects in their vehicles, they would have either not have bought or leased their Fire Defect Vehicles or would have paid less for them.

387.   FCA's concealment of the defects in the Fire Defect Vehicles was material to Plaintiff and the Subclass.

388.   Plaintiff and the Subclass suffered ascertainable loss caused by FCA's misrepresentations and its concealment of and failure to disclose Spontaneous Fire Defect. Plaintiff and Subclass members either would have paid less for their vehicles or would not have purchased or leased them at all.

389.   FCA's violations present a continuing risk to Plaintiff and the Subclass as well as to the general public. In particular and as alleged herein, FCA

has yet to offer any fix for the Fire Defect Vehicles. FCA's unlawful acts and practices complained of herein affect the public interest.

390.   As a direct and proximate result of FCA's violations of the Idaho CPA, Plaintiff and the Subclass have suffered injury-in-fact and/or actual damage as alleged above.

391.   Pursuant to Idaho Code § 48-608, Plaintiff and the Subclass seek monetary relief against FCA measured as the greater of (a) actual damages in an amount to be determined at trial and (b) statutory damages in the amount of $1,000 for each Plaintiff and Subclass member.

392.   Plaintiff and the Subclass also seek an order enjoining FCA's unfair, unlawful, and/or deceptive practices, attorneys' fees, and any other just and proper relief available under the Idaho CPA.

393.   Plaintiff and the Subclass also seek punitive damages against FCA because FCA's conduct evidences an extreme deviation from reasonable standards. FCA flagrantly, maliciously, and fraudulently misrepresented the safety and reliability of the Fire Defect Vehicles, deceived Plaintiff and the Subclass on life-or-death matters, concealed material facts that only it knew, and repeatedly promised Plaintiff and the Subclass that the Fire Defect Vehicles were safe. FCA's unlawful conduct constitutes malice, oppression, and fraud warranting punitive damages.

## COUNT XVII

### BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY UNDER IDAHO LAW
### (Idaho Civ. Code § 28-2-314)

### (Alleged by Plaintiff Keeth on behalf of the Idaho Subclass)

394.   Plaintiff and the Idaho Subclass reallege and incorporate by reference all paragraphs as though fully set forth herein.

395.   Plaintiff brings this action on behalf of himself and the Idaho Subclass.

396.   FCA is a "merchant" within the meaning of Idaho Civ. Code § 28-2-104(1).

397.   Under Idaho law, an implied warranty of merchantability attaches to the Fire Defect Vehicles. Idaho Civ. Code § 28-2-314.

398.   The Fire Defect Vehicles were not merchantable when sold or leased because their hybrid propulsion systems are prone to spontaneous combustion, and pose an unreasonable risk of fires due to the Spontaneous Fire Defect as described herein. Without limitation, the Fire Defect Vehicles share a common defect in that they are all equipped with a hybrid propulsion system that makes the vehicles susceptible to a risk of spontaneous combustion, causing an unreasonable risk of death, serious bodily harm and/or property damage to lessees and owners of the Fire Defect Vehicles as well as their homes, passengers and bystanders. This defect

- 163 -

renders the Fire Defect Vehicles when sold/leased and at all times thereafter, unmerchantable and unfit for their ordinary use of driving. In fact, as a result of the defect, FCA specifically advises owners and lessees not to charge their batteries and not to drive the Fire Defect Vehicles in electric mode.

399.    Plaintiff and the other Idaho Subclass members were and are third-party beneficiaries to FCA's contracts with FCA-certified/authorized retailers who sold or leased the Fire Defect Vehicles to Plaintiff and Idaho Subclass members.

400.    As a direct and proximate result of FCA's breach of the implied warranty of merchantability, Plaintiff and the other Idaho Subclass members have been damaged in an amount to be determined at trial.

7.    **Illinois**

<div align="center">

### COUNT XVIII

**VIOLATION OF ILLINOIS CONSUMER FRAUD AND DECEPTIVE BUSINESS PRACTICES ACT
(810 ILCS 505/1, *et seq.*, and 720 ILCS 295/1A)**

**(Alleged by Plaintiffs Ferguson, Ryan, Su, and Voss
on behalf of the Illinois Subclass)**

</div>

401.    Plaintiffs and the Illinois Subclass ("Subclass," for the purposes of this claim) reallege and incorporate by reference all paragraphs as though fully set forth herein.

402.    Plaintiffs bring this claim on behalf of themselves and the Subclass.

403.    FCA is a "person" as that term is defined in 815 ILCS 505/1(c).

<div align="center">

- 164 -

</div>

404.   Plaintiffs the Subclass are "consumers" as that term is defined in 815 ILCS 505/1(e).

405.   The Illinois Consumer Fraud and Deceptive Business Practices Act ("Illinois CFA") prohibits "unfair or deceptive acts or practices, including, but not limited to, the use or employment of any deception, fraud, false pretense, false promise, misrepresentation or the concealment, suppression or omission of any material fact, with intent that others rely upon the concealment, suppression or omission of such material fact … in the conduct of trade or commerce … whether any person has in fact been misled, deceived or damaged thereby." 815 ILCS 505/2.

406.   FCA's actions, as set forth above, occurred in the conduct of trade or commerce.

407.   In the course of its business, FCA concealed the Spontaneous Fire Defect in the Fire Defect Vehicles and its failure to adequately design and test the vehicles to ensure their safety as described herein and otherwise engaged in activities with a tendency or capacity to deceive. FCA also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of a material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of the Fire Defect Vehicles.

- 165 -

408.   By failing to disclose and by actively concealing the defects in the Fire Defect Vehicles, which it marketed as safe, reliable, of high quality, and safe for use as plug-in hybrid electric vehicles, FCA engaged in unfair and deceptive business practices in violation of the Illinois CFA.

409.   In the course of FCA's business, it willfully failed to disclose and actively concealed the dangerous risk posed by the Spontaneous Fire Defect in the Fire Defect Vehicles.

410.   FCA's unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers, including Plaintiffs and the Subclass members, about the true safety and reliability of their vehicles.

411.   FCA intentionally and knowingly misrepresented material facts regarding the Fire Defect Vehicles with the intent to mislead Plaintiffs and the Subclass.

412.   FCA knew or should have known that its conduct violated the Illinois CFA.

413.   As alleged above, FCA made material statements about the safety and reliability of the Fire Defect Vehicles when operating as plug-in hybrid electric vehicles that were either false or misleading.

414.   FCA owed Plaintiffs and the Subclass a duty to disclose the true safety and reliability of the Fire Defect Vehicles because FCA:

- 166 -

a.    Possessed exclusive knowledge about the Spontaneous Fire Defect;

b.    Intentionally concealed the foregoing from Plaintiffs and the Subclass;

c.    Made incomplete representations about the safety and reliability of the Fire Defect Vehicles, while purposefully withholding material facts from Plaintiffs and Subclass that contradicted these representations; and/or

d.    Had duties under the TREAD Act and related regulations to disclose and remedy the defect.

415.   Because FCA fraudulently concealed the Spontaneous Fire Defect, Fire Defect Vehicle owners were deprived of the benefit of their bargain since the vehicles they purchased were worth less than they would have been if they were free from the known safety defect. Had Fire Defect Vehicle owners and lessees been aware of the defects in their vehicles, they would have either not have bought their Fire Defect Vehicles or would have paid less for them.

416.   FCA's concealment of the defects in the Fire Defect Vehicles was material to Plaintiff and the Subclass.

417.   Plaintiff and the Subclass suffered ascertainable loss caused by FCA's misrepresentations and its concealment of and failure to disclose Spontaneous Fire Defect. Plaintiff and the Subclass members either would have paid less for their vehicles or would not have purchased or leased them at all.

418.   FCA's violations present a continuing risk to Plaintiffs as well as to the general public. In particular and as alleged herein, FCA's failure to provide and

- 167 -

recall remedy leaves Fire Defect Vehicle owners facing a Hobson's choice: follow FCA's instructions, if possible, at the great inconvenience of parking far from home and the expense and environmental impact of additional consumption of gasoline; ignore FCA's instructions and risk calamity; or sell the vehicles at a substantial loss as a result of FCA's conduct. FCA's unlawful acts and practices complained of herein affect the public interest.

419.   As a direct and proximate result of FCA's violations of the Illinois CFA, Plaintiffs have suffered injury-in-fact and/or actual damage as alleged above. As a direct result of FCA's misconduct, all Plaintiffs and Subclass members incurred damages.

420.   Pursuant to 815 ILCS 505/10a(a), Plaintiffs seek monetary relief against FCA in the amount of actual damages, as well as punitive damages because FCA acted with fraud and/or malice and/or was grossly negligent.

421.   Plaintiffs also seek an order enjoining FCA's unfair and/or deceptive acts or practices, punitive damages, and attorneys' fees, and any other just and proper relief available under 815 ILCS § 505/1 *et seq.*

## COUNT XIX

**BREACH OF IMPLIED WARRANTY OF
MERCHANTABILITY UNDER ILLINOIS LAW
(810 ILCS 5/2-314)**

**(Alleged by Plaintiffs Ferguson, Ryan, Su, and Voss
on behalf of the Illinois Subclass)**

422.    Plaintiffs and the Illinois Subclass reallege and incorporate by reference all paragraphs as though fully set forth herein.

423.    Plaintiffs bring this claim on behalf of themselves and the Illinois Subclass.

424.    FCA is a "merchant" within the meaning of 810 ILCS 5/2-103(2) and 810 ILCS 5/2-104, and a "seller" of motor vehicles within the meaning of 810 ILCS 5/2-103(1)(d).

425.    Under Illinois law, an implied warranty of merchantability attaches to the Fire Defect Vehicles. 810 ILCS 5/2-314.

426.    The Fire Defect Vehicles were not merchantable when sold or leased because their hybrid propulsion systems are prone to spontaneous combustion, and pose an unreasonable risk of fires due to the Spontaneous Fire Defect as described herein. Without limitation, the Fire Defect Vehicles share a common defect in that they are all equipped with a hybrid propulsion system that makes the vehicles susceptible to a risk of spontaneous combustion, causing an unreasonable risk of death, serious bodily harm and/or property damage to lessees and owners of the

- 169 -

Fire Defect Vehicles as well as their homes, passengers and bystanders. This defect renders the Fire Defect Vehicles when sold/leased and at all times thereafter, unmerchantable and unfit for their ordinary use of driving. In fact, as a result of the defect, FCA specifically advises owners and lessees not to charge their batteries and not to drive the Fire Defect Vehicles in electric mode.

427.   Plaintiffs and the other Illinois Subclass members were and are third-party beneficiaries of FCA's contracts with FCA-certified/authorized retailers who sold or leased the Fire Defect Vehicles to Plaintiff and Illinois Subclass members.

428.   As a direct and proximate result of FCA's breach of the implied warranty of merchantability, Plaintiffs and the other Illinois Subclass members have been damaged in an amount to be determined at trial.

### 8.    Indiana

### COUNT XX

**VIOLATIONS OF THE INDIANA DECEPTIVE CONSUMER SALES ACT**
**(Ind. Code § 24-5, *et seq.*)**

**(Alleged by Plaintiff Winter on behalf of the Indiana Subclass)**

429.   Plaintiff and the Indiana Subclass (the "Subclass," for the purposes of this claim) reallege and incorporate by reference all paragraphs as though fully set forth herein.

430.   Plaintiff brings this claim on behalf of herself and the Indiana Subclass.

- 170 -

431.   FCA is a "person" within the meaning of Ind. Code § 25-5-0.5-2(a)(2) and "supplier" within the meaning of Ind. Code § 24-5-0.5-2(a)(3).

432.   Plaintiff's and the Subclass' vehicle purchases were "consumer transactions" within the meaning of Ind. Code § 24-5-0.5-2(a)(3).

433.   Indiana's Deceptive Consumer Sales Act (Indiana DCSA) prohibits a person from engaging in a "deceptive business practice[s]" or acts, including but not limited to "(1) That such subject of a consumer transaction has sponsorship, approval, performance, characteristics, accessories, uses, or benefits that they do not have, or that a person has a sponsorship, approval, status, affiliation, or connection it does not have; (2) That such subject of a consumer transaction is of a particular standard, quality, grade, style or model, if it is not and if the supplier knows or should reasonably know that it is not; … (7) That the supplier has a sponsorship, approval or affiliation in such consumer transaction that the supplier does not have, and which the supplier knows or should reasonably know that the supplier does not have; … (b) Any representations on or within a product or its packaging or in advertising or promotional materials which would constitute a deceptive act shall be the deceptive act both of the supplier who places such a representation thereon or therein, or who authored such materials, and such suppliers who shall state orally or in writing that such representation is true if such other supplier shall know or have reason to know that such representation was

- 171 -

false." In purchasing or leasing the Fire Defect Vehicles, Plaintiff and the other Subclass members were deceived by FCA's failure to disclose the Spontaneous Fire Defect.

434.    Plaintiff and Subclass members reasonably relied upon FCA's material omissions and false misrepresentations. They had no way of knowing that FCA's representations were false and gravely misleading. As alleged herein, FCA engaged in extremely sophisticated methods of deception. Plaintiff and Subclass members did not, and could not, unravel FCA's deception on their own.

435.    FCA's actions as set forth above occurred in the conduct of trade or commerce.

436.    FCA's unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers.

437.    FCA intentionally and knowingly failed to disclose and misrepresented material facts regarding the Fire Defect Vehicles with an intent to mislead Plaintiff and the Subclass.

438.    FCA knew or should have known that its conduct violated the Indiana DCSA.

439.    FCA owed Plaintiff and the Subclass a duty to disclose the truth about its emissions systems manipulation because FCA:

        a.    Possessed exclusive knowledge of the Spontaneous Fire Defect;

- 172 -

b.    Intentionally concealed the foregoing from Plaintiff and
the Subclass; and/or

c.    Made incomplete representations about the Fire Defect
Vehicles, while purposefully withholding material facts
from Plaintiff and the Subclass that contradicted these
representations.

440.    FCA had a duty to disclose the Spontaneous Fire Defect, because,

having volunteered to provide information to Plaintiff and Subclass members, FCA

had the duty to disclose not just the partial truth, but the entire truth. Further,

Plaintiff and the other Subclass members relied on FCA's material omissions and

representations that the Fire Defect Vehicles they were purchasing were safe, and

free from defects.

441.    Plaintiff and Subclass members were unaware of the omitted material

facts referenced herein, and they would not have acted as they did if they had

known of the concealed and/or suppressed facts, in that they would not have

purchased the Fire Defect Vehicles manufactured by FCA, would have paid less,

and/or would not have continued to drive their Fire Defect Vehicles, or would have

taken other affirmative steps in light of the information concealed from them.

Plaintiff's and Subclass members' actions were justified. FCA was in exclusive

control of the material facts, and such facts were not generally known to the public,

Plaintiff, or Subclass members.

442.   FCA's conduct proximately caused injuries to Plaintiff and the other Subclass members.

443.   Plaintiff and the other Subclass members were injured and suffered ascertainable loss, injury-in-fact, and/or actual damage as a proximate result of FCA's conduct in that Plaintiff and the other Subclass members overpaid for their Fire Defect Vehicles and did not receive the benefit of their bargain, and their Fire Defect Vehicles have suffered a diminution in value. These injuries are the direct and natural consequence of FCA's misrepresentations and omissions.

444.   FCA's violations present a continuing risk to Plaintiff as well as to the general public. FCA's unlawful acts and practices complained of herein affect the public interest.

445.   Pursuant to Ind. Code § 24-5-0.5-4, Plaintiff and the Subclass seek monetary relief against FCA measured as the greater of (a) actual damages in an amount to be determined at trial and (b) statutory damages in the amount of $500 for each plaintiff, including treble damages up to $1,000 for Defendants' willfully deceptive acts, and any other just and proper relief available under the Indiana DCSA.

- 174 -

**9.    Iowa**

## COUNT XXI

### VIOLATIONS OF THE IOWA PRIVATE RIGHT OF ACTION FOR CONSUMER FRAUDS ACT
### (Iowa Code § 714h.1, *et seq.*)

### (Alleged by Plaintiff Banas on behalf of the Iowa Subclass)

446.    Plaintiff and the Iowa Subclass (the "Subclass," for the purposes of this claim) reallege and incorporate by reference all paragraphs as though fully set forth herein.

447.    Plaintiff brings this claim on behalf of himself and the Iowa Subclass.

448.    FCA is "person" under Iowa Code § 714H.2(7).

449.    Plaintiff and the Subclass are "consumers," as defined by Iowa Code § 714H.2(3), who purchased or leased one or more Fire Defect Vehicles.

450.    The Iowa Private Right of Action for Consumer Frauds Act ("Iowa CFA") prohibits any "practice or act the person knows or reasonably should know is an unfair practice, deception, fraud, false pretense, or false promise, or the misrepresentation, concealment, suppression, or omission of a material fact, with the intent that others rely upon the unfair practice, deception, fraud, false pretense, false promise, misrepresentation, concealment, suppression, or omission in connection with the advertisement, sale, or lease of consumer merchandise." Iowa Code § 714H.3. FCA participated in misleading, false, or deceptive acts that violated the Iowa CFA.

- 175 -

451. FCA's actions, as set forth above, occurred in the conduct of trade or commerce.

452. In the course of its business, FCA concealed the Spontaneous Fire Defect in the Fire Defect Vehicles and its failure to adequately design and test the vehicles to ensure their safety as described herein and otherwise engaged in activities with a tendency or capacity to deceive. FCA also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of a material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of the Fire Defect Vehicles.

453. By failing to disclose and by actively concealing the defect in the Fire Defect Vehicles, which it marketed as safe, reliable, and of high quality, FCA engaged in unfair and deceptive business practices in violation of the Iowa CFA.

454. In the course of FCA's business, it willfully failed to disclose and actively concealed the dangerous risk posed by the defects in the Fire Defect Vehicles.

455. FCA's unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers, including Plaintiff and the Subclass, about the true safety and reliability of their vehicles.

- 176 -

456. FCA intentionally and knowingly misrepresented material facts regarding the Fire Defect Vehicles with the intent to mislead Plaintiff and the Subclass.

457. FCA knew or should have known that its conduct violated the Iowa CFA.

458. As alleged above, FCA made material statements about the safety and reliability of the Fire Defect Vehicles and their ability to operate as plug-in hybrid vehicles that were either false or misleading.

459. FCA owed Plaintiffs a duty to disclose the true safety and reliability of the Fire Defect Vehicles because FCA:

   a.    Possessed exclusive knowledge about the defects in the Fire Defect Vehicles;

   b.    Intentionally concealed the foregoing from Plaintiff and the Subclass

   c.    Made incomplete representations about the safety and reliability of the Fire Defect Vehicles, while purposefully withholding material facts from Plaintiffs that contradicted these representations; and/or

   d.    Had duties under the TREAD Act and related regulations to disclose and remedy the defects well prior to the issue of its confounding recall notice in 2022.

460. Because FCA fraudulently concealed the Spontaneous Fire Defect, Fire Defect Vehicle owners were deprived of the benefit of their bargain since the vehicles they purchased were worth less than they would have been if they were

- 177 -

free from the known serious safety defect. Had Fire Defect Vehicle owners been aware of the defects in their vehicles, they would have either not have bought their vehicles or would have paid less for them.

461.   FCA's concealment of the defects in the Fire Defect Vehicles was material to Plaintiff and the Iowa Subclass.

462.   Plaintiff and Subclass members suffered ascertainable loss caused by FCA's misrepresentations and its concealment of and failure to disclose the Spontaneous Fire Defect.

463.   FCA's violations present a continuing risk to Plaintiff and the Subclass as well as to the general public. In particular and as alleged herein, FCA's failure to provide and recall remedy leaves Fire Defect Vehicle owners facing a Hobson's choice: follow FCA's instructions, if possible, at the great inconvenience of parking far from home and the expense and environmental impact of additional consumption of gasoline, ignore FCA's instructions and risk calamity, or sell the vehicles at a substantial loss as a result of FCA's conduct. FCA's unlawful acts and practices complained of herein affect the public interest.

464.   As a direct and proximate result of FCA's violations of the Iowa CFA, all Subclass members have suffered injury-in-fact and/or actual damage as alleged above.

465.   Pursuant to Iowa Code § 714H.5, Plaintiff and the Subclass seek an

order enjoining FCA's unfair and/or deceptive acts or practices; actual damages; in

addition to an award of actual damages, statutory damages up to three times the

amount of actual damages awarded as a result of FCA's willful and wanton

disregard for the rights or safety of others; attorneys' fees; and such other equitable

relief as the Court deems necessary to protect the public from further violations of

the Iowa CFA.

## COUNT XXII

### BREACH OF IMPLIED WARRANTY OF
### MERCHANTABILITY UNDER IOWA LAW
### (Iowa Code § 554.2314)

**(Alleged by Plaintiff Banas on behalf of the Iowa Subclass)**

466.   Plaintiff and the Iowa Subclass reallege and incorporate by reference

all paragraphs as though fully set forth herein.

467.   Plaintiff brings this claim on behalf of himself and the Iowa Subclass.

468.   FCA is a "merchant" of the Fire Defect Vehicles within the meaning

of Iowa Code § 554.2104 and a "seller" of the Fire Defect Vehicles within the

meaning of Iowa Code § 554.2103(d), and the Fire Defect Vehicles are "goods"

under Iowa Code § 554.2105.

469.   Under Iowa law, an implied warranty of merchantability attaches to

the Fire Defect Vehicles. Iowa Code § 554.2314.

470.    The Fire Defect Vehicles were not merchantable when sold or leased because their hybrid propulsion systems are prone to spontaneous combustion, and pose an unreasonable risk of fires due to the Spontaneous Fire Defect as described herein. Without limitation, the Fire Defect Vehicles share a common defect in that they are all equipped with a hybrid propulsion system that makes the vehicles susceptible to a risk of spontaneous combustion, causing an unreasonable risk of death, serious bodily harm and/or property damage to lessees and owners of the Fire Defect Vehicles as well as their homes, passengers and bystanders. This defect renders the Fire Defect Vehicles when sold/leased and at all times thereafter, unmerchantable and unfit for their ordinary use of driving. In fact, as a result of the defect, FCA specifically advises owners and lessees not to charge their batteries and not to drive the Fire Defect Vehicles in electric mode.

471.    Plaintiff and the other Iowa Subclass members were and are third-party beneficiaries to FCA's contracts with FCA-certified/authorized retailers who sold or leased the Fire Defect Vehicles to Plaintiff and Iowa Subclass members.

472.    It was reasonable to expect that Plaintiff and the Iowa Subclass members would use, consume or be affected by the Fire Defect Vehicles, and they are therefore entitled to the protections of the implied warranty of merchantability under Iowa Code § 554.2318.

- 180 -

473.   FCA was provided notice of these issues within a reasonable time of Plaintiff's knowledge of the non-conforming or defective nature of the Fire Defect Vehicles by the filing of this Complaint, by letters from Plaintiff's counsel to FCA, consumer complaints to NHTSA regarding the defect that is the subject of this Complaint, and/or by the allegations contained in this Complaint.

474.   As a direct and proximate result of FCA's breach of the implied warranty of merchantability, Plaintiff and the other Iowa Subclass members have been damaged in an amount to be determined at trial.

**10.   Kansas**

## COUNT XXIII

**VIOLATIONS OF THE KANSAS CONSUMER PROTECTION ACT**
**(Kan. Stat. § 50-623, *et seq.*)**

**(Alleged by Plaintiff Vu on behalf of the Kansas Subclass)**

475.   Plaintiff incorporates by reference all paragraphs as though fully set forth herein.

476.   Plaintiff brings this claim on behalf of himself and the Kansas Subclass ("Subclass," for the purposes of this claim).

477.   The Kansas Consumer Protection Act ("Kansas CPA") states that "[n]o supplier shall engage in any deceptive act or practice in connection with a

consumer transaction."[47] Deceptive acts or practices include, but are not limited to:

"the willful use, in any oral or written representation, of exaggeration, falsehood,

innuendo or ambiguity as to a material fact"; "the willful failure to state a material

fact, or the willful concealment, suppression or omission of a material fact"; and

"making false or misleading representations, knowingly or with reason to know, of

fact concerning the reason for, existence of or amounts of price reductions."[48]

These acts constitute deceptive conduct "whether or not any consumer has in fact

been misled."[49]

478.   Plaintiff and Subclass members are "consumers" within the meaning

of Kan. Stat. Ann. § 50-624(b).

479.   The sale of Fire Defect Vehicles to Plaintiff and the Subclass was a

"consumer transaction" within the meaning of Kan. Stat. Ann. § 50-624(c).

480.   FCA's conduct, as described in this complaint, constitutes "deceptive"

practices in violation of the Kansas CPA.

481.   Under Kan. Stat. Ann. § 50-634, Plaintiff seeks monetary relief

against FCA measured as the greater of (a) actual damages in an amount to be

---

[47] Kan. Stat. § 50-626(a).

[48] *Id.* § 50-626(b).

[49] *Id.*

determined at trial or (b) statutory damages in the amount of $10,000 for each plaintiff.

482.    Plaintiff also seeks an order enjoining Defendant's unfair, unlawful, and/or deceptive practices, declaratory relief, attorneys' fees, and any other just and proper relief available under Kan. Stat. Ann. § 50-623, *et seq.*

## COUNT XXIV

### BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY
### (Kan. Stat. Ann. § 84-2-314)

### (Alleged by Plaintiff Vu on behalf of the Kansas Subclass)

483.    Plaintiff incorporates by reference all paragraphs as though fully set forth herein.

484.    Plaintiff brings this claim on behalf of himself and the Kansas Subclass ("Subclass," for the purposes of this claim).

485.    FCA was and is a merchant with respect to motor vehicles within the meaning of Kan. Stat. Ann. § 84-2-104(1).

486.    Under Kan. Stat. Ann. § 84-2-314, a warranty that the Fire Defect Vehicles were in merchantable condition was implied by law in the transactions when Plaintiffs purchased or leased their Fire Defect Vehicles.

487.    The Fire Defect Vehicles were not merchantable when sold or leased because their hybrid propulsion systems are prone to spontaneous combustion, and pose an unreasonable risk of fires due to the Spontaneous Fire Defect as described

- 183 -

herein. Without limitation, the Fire Defect Vehicles share a common defect in that they are all equipped with a hybrid propulsion system that makes the vehicles susceptible to a risk of spontaneous combustion, causing an unreasonable risk of death, serious bodily harm and/or property damage to lessees and owners of the Fire Defect Vehicles as well as their homes, passengers and bystanders. This defect renders the Fire Defect Vehicles when sold/leased and at all times thereafter, unmerchantable and unfit for their ordinary use of driving. In fact, as a result of the defect, FCA specifically advises owners and lessees not to charge their batteries and not to drive the Fire Defect Vehicles in electric mode.

488.   Plaintiff and Subclass members were and are third-party beneficiaries to FCA's contracts with FCA-certified/authorized retailers who sold or leased the Fire Defect Vehicles to Plaintiff and Subclass members.

489.   It was reasonable to expect that Plaintiff and Subclass members would use, consume or be affected by the Fire Defect Vehicles, and they are therefore entitled to the protections of the implied warranty of merchantability.

490.   FCA was provided notice of these issues within a reasonable time of Plaintiff's knowledge of the non-conforming or defective nature of the Fire Defect Vehicles by the filing of this Complaint, by letters from Plaintiff's counsel to FCA, consumer complaints to NHTSA regarding the defect that is the subject of this Complaint, and/or by the allegations contained in this Complaint.

491.   As a direct and proximate result of FCA's breach of the implied warranty of merchantability, Plaintiff and Subclass members have been damaged in an amount to be determined at trial.

### 11.   Maryland

## COUNT XXV

**VIOLATIONS OF THE MARYLAND CONSUMER PROTECTION ACT**
**(Md. Code Com. Law § 13-101, *et seq.*)**

**(Alleged by Plaintiffs Diane Davidson, David Davidson, and Hoffman on behalf of the Maryland Subclass)**

492.   Plaintiffs incorporate by reference all paragraphs as though fully set forth herein.

493.   Plaintiffs bring this claim on behalf of themselves and the Maryland Subclass ("Subclass" for purposes of this claim).

494.   FCA and Plaintiffs are "persons" within the meaning of Md. Code Com. Law § 13-101(h).

495.   The Maryland Consumer Protection Act ("Maryland CPA") provides that a person may not engage in any unfair or deceptive trade practice in the sale or lease of any consumer good. Md. Code Com. Law § 13-303. FCA participated in misleading, false, or deceptive acts that violated the Maryland CPA. By concealing the Spontaneous Fire Defect in Plaintiffs' vehicles, FCA engaged in deceptive business practices prohibited by the Maryland CPA.

- 185 -

496.   FCA's actions, as set forth above, occurred in the conduct of trade or commerce.

497.   In the course of its business, FCA concealed the Spontaneous Fire Defect in the Fire Defect Vehicles and its failure to adequately design and test the vehicles to ensure their safety as described herein, and otherwise engaged in activities with a tendency or capacity to deceive. FCA also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of a material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of the Fire Defect Vehicles.

498.   By failing to disclose and by actively concealing the defect in the Fire Defect Vehicles, which it marketed as safe, reliable, and of high quality, FCA engaged in unfair and deceptive business practices in violation of the Maryland CPA.

499.   In the course of FCA's business, it willfully failed to disclose and actively concealed the dangerous risk posed by the defects in the Fire Defect Vehicles.

500.   FCA's unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers, including Plaintiffs and Subclass members, about the true safety and reliability of their vehicles.

- 186 -

501.   FCA intentionally and knowingly misrepresented material facts regarding the Fire Defect Vehicles with the intent to mislead Plaintiffs and Subclass members.

502.   FCA knew or should have known that its conduct violated the Maryland CPA.

503.   As alleged above, FCA made material statements about the safety and reliability of the Fire Defect Vehicles and their ability to operate as plug-in hybrid vehicles that were either false or misleading.

504.   FCA owed Plaintiffs and Subclass members a duty to disclose the true safety and reliability of the Fire Defect Vehicles because FCA:

    a.    Possessed exclusive knowledge about the defects in the Fire Defect Vehicles;

    b.    Intentionally concealed the foregoing from Plaintiffs and Subclass members;

    c.    Made incomplete representations about the safety and reliability of the Fire Defect Vehicles, while purposefully withholding material facts from Plaintiffs and Subclass members that contradicted these representations; and/or

    d.    Had duties under the TREAD Act and related regulations to disclose and remedy the defects well prior to the issue of its confounding recall notice in 2022.

505.   Because FCA fraudulently concealed the Spontaneous Fire Defect, Fire Defect Vehicle owners were deprived of the benefit of their bargain since the vehicles they purchased were worth less than they would have been if they were

- 187 -

free from the known serious safety defect. Had Fire Defect Vehicle owners been aware of the defects in their vehicles, they would have either not have bought their vehicles or would have paid less for them.

506.   FCA's concealment of the defects in the Fire Defect Vehicles was material to Plaintiffs and Subclass members.

507.   Plaintiffs and Subclass members suffered ascertainable loss caused by FCA's misrepresentations and its concealment of and failure to disclose the Spontaneous Fire Defect.

508.   FCA's violations present a continuing risk to Plaintiffs and Subclass members as well as to the general public. In particular and as alleged herein, FCA's failure to provide and recall remedy leaves Fire Defect Vehicle owners facing a Hobson's choice: follow FCA's instructions, if possible, at the great inconvenience of parking far from home and the expense and environmental impact of additional consumption of gasoline; ignore FCA's instructions and risk calamity; or sell the vehicles at a substantial loss as a result of FCA's conduct. FCA's unlawful acts and practices complained of herein affect the public interest.

509.   As a direct and proximate result of FCA's violations of the Maryland CPA, Plaintiffs and Subclass members have suffered injury-in-fact and/or actual damage as alleged above.

- 188 -

510.    Pursuant to Md. Code Com. Law § 13-408, Plaintiffs seek actual

damages, attorneys' fees, and any other just and proper relief available under the

Maryland CPA.

## COUNT XXVI

### BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY UNDER MARYLAND LAW (Md. Code Com. Law § 2-314)

**(Alleged by Plaintiffs Diane Davidson, David Davidson and Hoffman on behalf of the Maryland Subclass)**

511.    Plaintiffs and the Maryland Subclass reallege and incorporate by

reference all paragraphs as though fully set forth herein.

512.    Plaintiffs brings this action on behalf of themselves and the Maryland

Subclass.

513.    FCA is a "merchant" of motor vehicles within the meaning of Md.

Com. Law § 2-104(1).

514.    Under Maryland law, an implied warranty of merchantability attaches

to the Fire Defect Vehicles. Md. Com. Law § 2-314.

515.    The Fire Defect Vehicles were not merchantable when sold or leased

because their hybrid propulsion systems are prone to spontaneous combustion, and

pose an unreasonable risk of fires due to the Spontaneous Fire Defect as described

herein. Without limitation, the Fire Defect Vehicles share a common defect in that

they are all equipped with a hybrid propulsion system that makes the vehicles

- 189 -

susceptible to a risk of spontaneous combustion, causing an unreasonable risk of death, serious bodily harm and/or property damage to lessees and owners of the Fire Defect Vehicles as well as their homes, passengers and bystanders. This defect renders the Fire Defect Vehicles when sold/leased and at all times thereafter, unmerchantable and unfit for their ordinary use of driving. In fact, as a result of the defect, FCA specifically advises owners and lessees not to charge their batteries and not to drive the Fire Defect Vehicles in electric mode.

516.    Plaintiffs and the other Maryland Subclass members were and are third-party beneficiaries to FCA's contracts with FCA-certified/authorized retailers who sold or leased the Fire Defect Vehicles to Plaintiffs and Maryland Subclass members.

517.    As a direct and proximate result of FCA's breach of the implied warranty of merchantability, Plaintiff sand the other Maryland Subclass members have been damaged in an amount to be determined at trial.

- 190 -

**12.     Massachusetts**

## <u>COUNT XXVII</u>

### DECEPTIVE ACTS OR PRACTICES PROHIBITED
### BY MASSACHUSETTS LAW
### (Mass. Gen. Laws Ch. 93A, § 1, *et seq.*)

**(Alleged by Plaintiffs Alicia Maltz, David Maltz, Natale, and Olson
on behalf of the Massachusetts Subclass)**

518.    Plaintiffs and the Massachusetts Subclass ("Plaintiffs," for the purposes of this claim) reallege and incorporate by reference all paragraphs as though fully set forth herein.

519.    Plaintiffs bring this claim on behalf of themselves and the Massachusetts Subclass ("Plaintiffs," for the purposes of this claim).

520.    FCA and Plaintiffs are "persons" within the meaning of Mass. Gen. Laws Ch. 93A, § 1(a).

521.    FCA engaged in "trade" or "commerce" within the meaning of Mass. Gen. Laws Ch. 93A, § 1(b).

522.    Massachusetts law (the "Massachusetts Act") prohibits "unfair or deceptive acts or practices in the conduct of any trade or commerce." Mass. Gen. Laws Ch. 93A, § 2. FCA participated in misleading, false, or deceptive acts that violated the Massachusetts Act. By concealing the known defect in Plaintiffs' vehicles, FCA engaged in deceptive business practices prohibited by the Massachusetts Act.

- 191 -

523.   FCA's actions, as set forth above, occurred in the conduct of trade or commerce.

524.   In the course of its business, FCA concealed the Spontaneous Fire Defect in the Fire Defect Vehicles and its failure to adequately design and test the vehicles to ensure their safety as described herein and otherwise engaged in activities with a tendency or capacity to deceive. FCA also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of a material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of the Fire Defect Vehicles.

525.   By failing to disclose and by actively concealing the defect in the Fire Defect Vehicles, which it marketed as safe, reliable, and of high quality, FCA engaged in unfair and deceptive business practices in violation of the Massachusetts Act.

526.   In the course of FCA's business, it willfully failed to disclose and actively concealed the dangerous risk posed by the defects in the Fire Defect Vehicles.

527.   FCA's unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers, including Plaintiffs, about the true safety and reliability of their vehicles.

- 192 -

528.   FCA intentionally and knowingly misrepresented material facts regarding the Fire Defect Vehicles with the intent to mislead Plaintiffs.

529.   FCA knew or should have known that its conduct violated the Massachusetts Act.

530.   As alleged above, FCA made material statements about the safety and reliability of the Fire Defect Vehicles and their ability to operate as plug-in hybrid vehicles that were either false or misleading.

531.   FCA owed Plaintiffs a duty to disclose the true safety and reliability of the Fire Defect Vehicles because FCA:

    a.   Possessed exclusive knowledge about the defects in the Fire Defect Vehicles;

    b.   Intentionally concealed the foregoing from Plaintiffs;

    c.   Made incomplete representations about the safety and reliability of the Fire Defect Vehicles, while purposefully withholding material facts from Plaintiffs that contradicted these representations; and/or

    d.   Had duties under the TREAD Act and related regulations to disclose and remedy the defects well prior to the issue of its confounding recall notice in 2022.

532.   Because FCA fraudulently concealed the Spontaneous Fire Defect, Fire Defect Vehicle owners were deprived of the benefit of their bargain since the vehicles they purchased were worth less than they would have been if they were free from the known serious safety defect. Had Fire Defect Vehicle owners been

- 193 -

aware of the defects in their vehicles, they would have either not have bought their vehicles or would have paid less for them.

533.   FCA's concealment of the defects in the Fire Defect Vehicles was material to Plaintiffs.

534.   Plaintiffs suffered ascertainable loss caused by FCA's misrepresentations and its concealment of and failure to disclose the Spontaneous Fire Defect.

535.   FCA's violations present a continuing risk to Plaintiffs as well as to the general public. In particular and as alleged herein, FCA's failure to provide and recall remedy leaves Fire Defect Vehicle owners facing a Hobson's choice: follow FCA's instructions, if possible, at the great inconvenience of parking far from home and the expense and environmental impact of additional consumption of gasoline; ignore FCA's instructions and risk calamity; or sell the vehicles at a substantial loss as a result of FCA's conduct. FCA's unlawful acts and practices complained of herein affect the public interest.

536.   As a direct and proximate result of FCA's violations of the Massachusetts Act, all Plaintiffs have suffered injury-in-fact and/or actual damage as alleged above.

537.   Pursuant to Mass. Gen. Laws Ch. 93A, § 9, Plaintiffs seek monetary relief against FCA measured as the greater of (a) actual damages in an amount to

be determined at trial and (b) statutory damages in the amount of $25 for each Plaintiff. Because FCA's conduct was committed willfully and knowingly, Plaintiffs are entitled to recover, for each Plaintiff, up to three times actual damages, but no less than two times actual damages.

538.    Plaintiffs also seek an order enjoining FCA's unfair and/or deceptive acts or practices, punitive damages, and attorneys' fees, costs, and any other just and proper relief available under the Massachusetts Act.

539.    On or about March 8, 2022, Plaintiffs' counsel sent a letter complying with Mass. Gen. Laws Ch. 93A, § 9(3).

## COUNT XXVIII

### BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY UNDER MASSACHUSETTS LAW (Alm Gl. Ch. 106, § 2-314)

**(Alleged by Plaintiffs Alicia Maltz, David Maltz, Natale, and Olson on behalf of the Massachusetts Subclass)**

540.    Plaintiffs and the Massachusetts Subclass reallege and incorporate by reference all paragraphs as though fully set forth herein.

541.    Plaintiffs brings this action on behalf of themselves and the Massachusetts Subclass.

542.    FCA is a "merchant" with respect to motor vehicles under ALM GL Ch. 106, § 2-104(1).

- 195 -

543.   Under ALM GL Ch. 106, § 2-314, a warranty that the Fire Defect Vehicles were in merchantable condition was implied by law in the transactions when Plaintiffs and the Massachusetts Subclass members purchased or leased them.

544.   The Fire Defect Vehicles were not merchantable when sold or leased at all times thereafter because their hybrid propulsion systems are prone to spontaneous combustion, and pose an unreasonable risk of fires due to the Spontaneous Fire Defect as described herein. Without limitation, the Fire Defect Vehicles share a common defect in that they are all equipped with a hybrid propulsion system that makes the vehicles susceptible to a risk of spontaneous combustion, causing an unreasonable risk of death, serious bodily harm and/or property damage to lessees and owners of the Fire Defect Vehicles as well as their homes, passengers and bystanders. This defect renders the Fire Defect Vehicles when sold/leased and at all times thereafter, unmerchantable and unfit for their ordinary use of driving. In fact, as a result of the defect, FCA specifically advises owners and lessees not to charge their batteries and not to drive the Fire Defect Vehicles in electric mode.

545.   It was reasonable to expect that Plaintiffs and the Massachusetts Subclass members would use, consume or be affected by the Fire Defect Vehicles.

546.   Plaintiffs and the other Massachusetts Subclass members were and are third-party beneficiaries to FCA's contracts with FCA-certified/authorized retailers who sold or leased the Fire Defect Vehicles to Plaintiffs and the Massachusetts Subclass.

547.   In addition, or in the alternative, Plaintiffs and the Massachusetts Subclass members directly relied on FCA's advertising, as alleged above.

548.   FCA was provided notice of these issues within a reasonable time of Plaintiffs' knowledge of the non-conforming or defective nature of the Fire Defect Vehicles by the filing of this Complaint, by letters from Plaintiffs' counsel to FCA, consumer complaints to  NHTSA regarding the defect that is the subject of this Complaint, and/or by the  allegations contained in this Complaint. In addition, on or about March 8, 2022, Plaintiffs' counsel sent notice letters to FCA to the extent such notice is required. Because FCA failed to remedy the Spontaneous Fire Defect within the requisite time period, Plaintiffs and the Massachusetts Subclass seek all damages and relief to which they are entitled.

549.   As a direct and proximate result of FCA's breach of the implied warranty of merchantability, Plaintiffs and the other Massachusetts Subclass members have been damaged in an amount to be determined at trial.

13.     **Michigan**

## COUNT XXIX

**BREACH OF IMPLIED WARRANTY OF
MERCHANTABILITY UNDER MICHIGAN LAW
(Mich. Comp. Laws § 440.314)**

**(Alleged by Plaintiff Kitzman on behalf of the Michigan Subclass)**

550.    Plaintiff and the Michigan Subclass ("Plaintiffs," for the purposes of this claim) reallege and incorporate by reference all paragraphs as though fully set forth herein.

551.    FCA is a "merchant" of motor vehicles within the meaning of Mich. Comp. Laws § 440.2314(1).

552.    Under Michigan law, an implied warranty of merchantability attaches to the Fire Defect Vehicles. Mich. Comp. Laws § 440.2314.

553.    The Fire Defect Vehicles were not merchantable when sold or leased because their hybrid propulsion systems are prone to spontaneous combustion, and pose an unreasonable risk of fires due to the Spontaneous Fire Defect as described herein. Without limitation, the Fire Defect Vehicles share a common defect in that they are all equipped with a hybrid propulsion system that makes the vehicles susceptible to a risk of spontaneous combustion, causing an unreasonable risk of death, serious bodily harm and/or property damage to lessees and owners of the Fire Defect Vehicles as well as their homes, passengers and bystanders. This defect renders the Fire Defect Vehicles when sold/leased and at all times thereafter,

- 198 -

unmerchantable and unfit for their ordinary use of driving. In fact, as a result of the defect, FCA specifically advises owners and lessees not to charge their batteries and not to drive the Fire Defect Vehicles in electric mode.

554.   Plaintiffs were and are third-party beneficiaries to FCA's contracts with FCA-certified/authorized retailers who sold or leased the Fire Defect Vehicles to Plaintiff and Michigan Subclass members.

555.   As a direct and proximate result of FCA's breach of the implied warranty of merchantability, Plaintiffs have been damaged in an amount to be determined at trial.

### 14.   Minnesota

## COUNT XXX

## VIOLATION OF MINNESOTA PREVENTION OF CONSUMER FRAUD ACT (Minn. Stat. § 325F.68, *et seq.*)

### (Alleged by Plaintiff Niemioja on behalf of the Minnesota Subclass)

556.   Plaintiff and the Minnesota Subclass reallege and incorporate by reference all paragraphs as though fully set forth herein.

557.   Plaintiff brings this action on behalf of herself and the Minnesota Subclass ("Plaintiffs," for the purposes of this claim).

558.   The Fire Defect Vehicles constitute "merchandise" within the meaning of Minn. Stat. § 325F.68(2).

559. The Minnesota Prevention of Consumer Fraud Act ("Minnesota CFA") prohibits "[t]he act, use, or employment by any person of any fraud, false pretense, false promise, misrepresentation, misleading statement or deceptive practice, with the intent that others rely thereon in connection with the sale of any merchandise, whether or not any person has in fact been misled, deceived, or damaged thereby." Minn. Stat. § 325F.69(1). FCA participated in misleading, false, or deceptive acts that violated the Minnesota CFA.

560. FCA's actions, as set forth above, occurred in the conduct of trade or commerce.

561. In the course of its business, FCA willfully failed to disclose and actively concealed the Spontaneous Fire Defect, and otherwise engaged in activities with a tendency or capacity to deceive. FCA also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression, or omission of any material fact with intent that others rely upon such concealment, suppression, or omission, in connection with the sale of the Fire Defect Vehicles.

562. FCA was aware that it valued profits over safety, and that it was manufacturing, selling, and distributing vehicles throughout the United States that did not perform as advertised and jeopardized the safety of the vehicle's occupants. FCA concealed this information as well.

563.   By marketing its vehicles as safe, reliable, and of high quality, and by presenting itself as a reputable manufacturer that valued safety and stood behind its vehicles after they were sold, FCA engaged in deceptive business practices in violation of the Minnesota CFA.

564.   In the course of FCA's business, it willfully failed to disclose and actively concealed the dangerous risk posed by the Spontaneous Fire Defect. FCA compounded the deception by repeatedly asserting that Fire Defect vehicles were safe, reliable, of high quality, and by claiming to be of a reputable manufacturer that valued safety and stood behind its vehicles once they are on the road.

565.   FCA's unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers, including Plaintiffs, about the true performance of the Fire Defect Vehicles, the devaluing of safety and performance at FCA, and the true value of the Fire Defect Vehicles.

566.   FCA intentionally and knowingly misrepresented material facts regarding the Fire Defect Vehicles with an intent to mislead Plaintiffs.

567.   FCA knew or should have known that its conduct violated the Minnesota CFA.

568.   As alleged above, FCA made material statements about the safety and utility of the Fire Defect Vehicles that were either false or misleading.

569.    FCA owed Plaintiffs a duty to disclose the true safety, performance,

and reliability of the Fire Defect Vehicles because FCA:

a.    Possessed exclusive knowledge about the defects in the
Fire Defect Vehicles;

b.    Intentionally concealed the foregoing from Plaintiffs;

c.    Made incomplete representations about the safety and
reliability of the Fire Defect Vehicles, while purposefully
withholding material facts from Plaintiffs that
contradicted these representations; and/or

d.    Had duties under the TREAD Act and related regulations
to disclose and remedy the defects well prior to the issue
of its confounding recall notice in 2022.

570.    FCA fraudulently concealed the Spontaneous Fire Defect and the true

performance of the Fire Defect Vehicles.

571.    The true performance and safety of the Fire Defect Vehicles were

material to Plaintiffs.

572.    Plaintiffs suffered ascertainable loss caused by FCA's

misrepresentations and its concealment of and failure to disclose material

information. Plaintiffs who purchased the Fire Defect Vehicles either would have

paid less for their vehicles or would not have purchased or leased them at all but

for FCA's violations of the Minnesota CFA.

573.    FCA had an ongoing duty to all FCA customers to refrain from unfair

and deceptive practices under the Minnesota CFA. All owners of the Fire Defect

Vehicles suffered ascertainable loss in the form of the diminished value of their

- 202 -

vehicles as a result of FCA's deceptive and unfair acts and practices made in the course of FCA's business.

574.   FCA's violations present a continuing risk to Plaintiffs as well as to the general public. FCA's unlawful acts and practices complained of herein affect the public interest.

575.   As a direct and proximate result of FCA's violations of the Minnesota CFA, Plaintiffs have suffered injury-in-fact and/or actual damage.

576.   Pursuant to Minn. Stat. § 8.31(3a), Plaintiffs seek actual damages, attorneys' fees, and any other just and proper relief available under the Minnesota CFA.

577.   Plaintiffs also seek punitive damages under Minn. Stat. § 549.20(1)(a) given the clear and convincing evidence that FCA's acts show deliberate disregard for the rights or safety of others.

## COUNT XXXI

**VIOLATION OF MINNESOTA UNIFORM
DECEPTIVE TRADE PRACTICES ACT
(Minn. Stat. § 325D.43-48, *et seq.*)**

**(Alleged by Plaintiff Niemioja on behalf of the Minnesota Subclass)**

578.   Plaintiff and the Minnesota Subclass reallege and incorporate by reference all paragraphs as though fully set forth herein.

- 203 -

579.    Plaintiff brings this action on behalf of herself and the Minnesota

Subclass ("Plaintiffs," for the purposes of this claim).

580.    The Minnesota Uniform Deceptive Trade Practices Act ("Minnesota

UDTPA") prohibits deceptive trade practices, which occur when a person "(5)

represents that goods or services have sponsorship, approval, characteristics,

ingredients, uses, benefits, or quantities that they do not have or that a person has a

sponsorship, approval, status, affiliation, or connection that the person does not

have;" "(7) represents that goods or services are of a particular standard, quality, or

grade, or that goods are of a particular style or model, if they are of another;" and

"(9) advertises goods or services with intent not to sell them as advertised." Minn.

Stat. § 325D.44. In the course of FCA's business, it systematically concealed the

Spontaneous Fire Defect and engaged in deceptive practices by representing that

the Fire Defect Vehicles have sponsorship, approval, characteristics, ingredients,

uses, benefits, or quantities that they do not have; representing that the Fire Defect

Vehicles are of a particular standard, quality, or grade, or that goods are of a

particular style or model, when they are of another; and advertising Fire Defect

Vehicles with intent not to sell them as advertised.

581.    FCA's actions, as set forth above, occurred in the conduct of trade or

commerce.

- 204 -

582.   In the course of its business, FCA willfully failed to disclose and actively concealed the Spontaneous Fire Defect, and otherwise engaged in activities with a tendency or capacity to deceive. FCA also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression, or omission of any material fact with intent that others rely upon such concealment, suppression, or omission, in connection with the sale of the Fire Defect Vehicles.

583.   FCA was aware that it valued profits over safety, and that it was manufacturing, selling, and distributing vehicles throughout the United States that did not perform as advertised and jeopardized the safety of the vehicle's occupants. FCA concealed this information as well.

584.   By marketing its vehicles as safe, reliable, and of high quality, and by presenting itself as a reputable manufacturer that valued safety and stood behind its vehicles after they were sold, FCA engaged in deceptive business practices in violation of the Minnesota UDTPA.

585.   In the course of FCA's business, it willfully failed to disclose and actively concealed the dangerous risk posed by the Spontaneous Fire Defect. FCA compounded the deception by repeatedly asserting that Fire Defect vehicles were safe, reliable, of high quality, and by claiming to be of a reputable manufacturer that valued safety and stood behind its vehicles once they are on the road.

- 205 -

586.    FCA's unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers, including Plaintiffs, about the true performance of the Fire Defect Vehicles, the devaluing of safety and performance at FCA, and the true value of the Fire Defect Vehicles.

587.    FCA intentionally and knowingly misrepresented material facts regarding the Fire Defect Vehicles with an intent to mislead Plaintiffs.

588.    FCA knew or should have known that its conduct violated the Minnesota UDTPA.

589.    As alleged above, FCA made material statements about the safety and utility of the Fire Defect Vehicles that were either false or misleading.

590.    FCA owed Plaintiffs a duty to disclose the true safety, performance, and reliability of the Fire Defect Vehicles, and the devaluing of safety and performance, because FCA:

      a.    Possessed exclusive knowledge about the defects in the Fire Defect Vehicles;

      b.    Intentionally concealed the foregoing from Plaintiffs;

      c.    Made incomplete representations about the safety and reliability of the Fire Defect Vehicles, while purposefully withholding material facts from Plaintiffs that contradicted these representations; and/or

      d.    Had duties under the TREAD Act and related regulations to disclose and remedy the defects well prior to the issue of its confounding recall notice in 2022.

- 206 -

591.   FCA fraudulently concealed the Spontaneous Fire Defect and the true performance of the Fire Defect Vehicles.

592.   The true performance and safety of the Fire Defect Vehicles were material to Plaintiffs.

593.   Plaintiffs suffered ascertainable loss caused by FCA's misrepresentations and its concealment of and failure to disclose material information. Plaintiffs who purchased the Fire Defect Vehicles either would have paid less for their vehicles or would not have purchased or leased them at all but for FCA's violations of the Minnesota UDTPA.

594.   FCA had an ongoing duty to all FCA customers to refrain from unfair and deceptive practices under the Minnesota UDTPA. All owners of the Fire Defect Vehicles suffered ascertainable loss in the form of the diminished value of their vehicles as a result of FCA's deceptive and unfair acts and practices made in the course of FCA's business.

595.   FCA's violations present a continuing risk to Plaintiffs as well as to the general public. FCA's unlawful acts and practices complained of herein affect the public interest.

596.   As a direct and proximate result of FCA's violations of the Minnesota UDTPA, Plaintiffs suffered injury-in-fact and/or actual damages as alleged above.

011086-11/1924902 V1

597.   Pursuant to Minn. Stat. § 8.31(3a) and 325D.45, Plaintiffs seek actual damages, attorneys' fees, and any other just and proper relief available under the Minnesota UDTPA.

598.   Plaintiffs also seek punitive damages under Minn. Stat. § 549.20(1)(a) given the clear and convincing evidence that FCA's acts show deliberate disregard for the rights or safety of others.

## COUNT XXXII

### BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY UNDER MINNESOTA LAW
### (Minn. Stat. § 336.2-314)

**(Alleged by Plaintiff Niemioja on behalf of the Minnesota Subclass)**

599.   Plaintiff and the Minnesota Subclass reallege and incorporate by reference all paragraphs as though fully set forth herein.

600.   Plaintiff brings this action on behalf of herself and the Minnesota Subclass.

601.   FCA is a "merchant" of motor vehicles within the meaning of Minn. Stat. § 336.2-104(1).

602.   Under Minnesota law, an implied warranty of merchantability attaches to the Fire Defect Vehicles. Minn. Stat. § 336.2-314.

603.   The Fire Defect Vehicles were not merchantable when sold or leased because their hybrid propulsion systems are prone to spontaneous combustion, and

- 208 -

pose an unreasonable risk of fires due to the Spontaneous Fire Defect as described herein. Without limitation, the Fire Defect Vehicles share a common defect in that they are all equipped with a hybrid propulsion system that makes the vehicles susceptible to a risk of spontaneous combustion, causing an unreasonable risk of death, serious bodily harm and/or property damage to lessees and owners of the Fire Defect Vehicles as well as their homes, passengers and bystanders. This defect renders the Fire Defect Vehicles when sold/leased and at all times thereafter, unmerchantable and unfit for their ordinary use of driving. In fact, as a result of the defect, FCA specifically advises owners and lessees not to charge their batteries and not to drive the Fire Defect Vehicles in electric mode.

604.    Plaintiff and the other Minnesota Subclass members were and are third-party beneficiaries to FCA's contracts with FCA-certified/authorized retailers who sold or leased the Fire Defect Vehicles to Plaintiff and Minnesota Subclass members.

605.    As a direct and proximate result of FCA's breach of the implied warranty of merchantability, Plaintiff and the other Minnesota Subclass members have been damaged in an amount to be determined at trial.

- 209 -

15.    **Missouri**

## COUNT XXXIII

**VIOLATION OF MISSOURI MERCHANDISING PRACTICES ACT**
**(Mo. Rev. Stat. § 407.010,** *et seq.***)**

**(Alleged by Plaintiff Perry on behalf of the Missouri Subclass)**

606.    Plaintiff and the Missouri Subclass reallege and incorporate by reference all paragraphs as though fully set forth herein.

607.    Plaintiff brings this action on behalf of himself and the Missouri Subclass ("Plaintiffs," for the purposes of this claim).

608.    Plaintiffs are "persons" within the meaning of Mo. Rev. Stat. § 407.010(5).

609.    The Missouri Merchandising Practices Act ("Missouri MPA") makes unlawful the "act, use or employment by any person of any deception, fraud, false pretense, misrepresentation, unfair practice, or the concealment, suppression, or omission of any material fact in connection with the sale or advertisement of any merchandise." Mo. Rev. Stat. § 407.020.

610.    In the course of its business, FCA willfully failed to disclose and actively concealed the Spontaneous Fire Defect, and otherwise engaged in activities with a tendency or capacity to deceive. FCA also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression, or omission of any material fact

- 210 -

with intent that others rely upon such concealment, suppression, or omission, in connection with the sale of the Fire Defect Vehicles.

611.   FCA was aware that it was manufacturing, selling, and distributing vehicles throughout the United States that did not perform as advertised and jeopardized the safety of the vehicle's occupants, surrounding vehicles and property, and bystanders. FCA concealed this information as well.

612.   By marketing its vehicles as safe, reliable, and of high quality, FCA engaged in deceptive business practices in violation of the Missouri MPA.

613.   In the course of FCA's business, it willfully failed to disclose and actively concealed the dangerous risk posed by the Spontaneous Fire Defect. FCA compounded the deception by repeatedly asserting that the Fire Defect vehicles were safe, reliable, and of high quality.

614.   FCA's unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers, including Plaintiffs, about the true safety, performance and value of the Fire Defect Vehicles.

615.   FCA intentionally and knowingly misrepresented material facts regarding the Fire Defect Vehicles with an intent to mislead Plaintiffs.

616.   FCA knew or should have known that its conduct violated the Missouri MPA.

617.   As alleged above, FCA made material statements about the safety and utility of the Fire Defect Vehicles that were either false or misleading.

618.   FCA owed Plaintiffs a duty to disclose the true safety, performance, and reliability of the Fire Defect Vehicles because FCA:

      a.      Possessed exclusive knowledge about the defects in the Fire Defect Vehicles;

      b.      Intentionally concealed the foregoing from Plaintiffs;

      c.      Made incomplete representations about the safety and reliability of the Fire Defect Vehicles, while purposefully withholding material facts from Plaintiffs that contradicted these representations; and/or

      d.      Had duties under the TREAD Act and related regulations to disclose and remedy the defects well prior to the issue of its confounding recall notice in 2022.

619.   FCA fraudulently concealed the Spontaneous Fire Defect and the true performance of the Fire Defect Vehicles.

620.   The true performance and safety of the Fire Defect Vehicles were material to Plaintiffs.

621.   Plaintiffs suffered ascertainable loss caused by FCA's misrepresentations and its concealment of and failure to disclose material information. Plaintiffs who purchased the Fire Defect Vehicles either would have paid less for their vehicles or would not have purchased or leased them at all but for FCA's violations of the Missouri MPA.

622.   FCA had an ongoing duty to all FCA customers to refrain from unfair and deceptive practices under the Missouri MPA. All owners of the Fire Defect Vehicles suffered ascertainable loss in the form of the diminished value of their vehicles as a result of FCA's deceptive and unfair acts and practices made in the course of FCA's business.

623.   FCA's violations present a continuing risk to Plaintiffs as well as to the general public. FCA's unlawful acts and practices complained of herein affect the public interest.

624.   As a direct and proximate result of FCA's violations of the Missouri MPA, Plaintiffs have suffered injury-in-fact and/or actual damage.

625.   FCA is liable to Plaintiffs for damages in amounts to be proven at trial, including attorneys' fees, costs, and punitive damages, as well as injunctive relief enjoining FCA's unfair and deceptive practices, and any other just and proper relief under Mo. Rev. Stat. § 407.025.

011086-11/1924902 V1

16.    **Nevada**

## COUNT XXXIV

**VIOLATION OF THE NEVADA DECEPTIVE TRADE PRACTICES ACT**
**(Nev. Rev. Stat. § 598.0903, *et seq.*)**

**(Alleged by Plaintiff Lewandowski on behalf of the Nevada Subclass)**

626.    Plaintiff and the Nevada Subclass ("Plaintiffs," for the purposes of this claim) reallege and incorporate by reference all paragraphs as though fully set forth herein.

627.    The Nevada Deceptive Trade Practices Act ("Nevada DTPA"), Nev. Rev. Stat. § 598.0903, *et seq.* prohibits deceptive trade practices Nev. Rev. Stat. § 598.0915 provides that a person engages in a "deceptive trade practice" if, in the course of business or occupation, the person: "5. Knowingly makes a false representation as to the characteristics, ingredients, uses, benefits, alterations or quantities of goods or services for sale or lease or a false representation as to the sponsorship, approval, status, affiliation or connection of a person therewith"; "7. Represents that goods or services for sale or lease are of a particular standard, quality or grade, or that such goods are of a particular style or model, if he or she knows or should know that they are of another standard, quality, grade, style or model"; "9. Advertises goods or services with intent not to sell or lease them as advertised"; or "15. Knowingly makes any other false representation in a transaction."

- 214 -

628.    FCA engaged in deceptive trade practices that violated the Nevada

DTPA, including: knowingly representing that Fire Defect Vehicles have uses and

benefits which they do not have; representing that Fire Defect Vehicles are of a

particular standard, quality, and grade when they are not; advertising Fire Defect

Vehicles with the intent not to sell or lease them as advertised; representing that

the subject of a transaction involving Fire Defect Vehicles has been supplied in

accordance with a previous representation when it has not; knowingly making

other false representations in a transaction; and concealing the known Spontaneous

Fire Defect in Plaintiffs' vehicles.

629.    FCA's actions, as set forth above, occurred in the conduct of trade or

commerce.

630.    In the course of its business, FCA concealed the Spontaneous Fire

Defect in the Fire Defect Vehicles and its failure to adequately design and test the

vehicles to ensure their safety as described herein and otherwise engaged in

activities with a tendency or capacity to deceive. FCA also engaged in unlawful

trade practices by employing deception, deceptive acts or practices, fraud,

misrepresentations, or concealment, suppression or omission of any material fact

with intent that others rely upon such concealment, suppression or omission, in

connection with the sale of the Fire Defect Vehicles.

- 215 -

631.    By failing to disclose and by actively concealing the defect in the Fire

Defect Vehicles, which it marketed as safe, reliable, and of high quality, FCA

engaged in unfair and deceptive business practices in violation of the Nevada

DTPA.

632.    In the course of FCA's business, it willfully failed to disclose and

actively concealed the dangerous risk posed by the defects in the Fire Defect

Vehicles.

633.    FCA's unfair or deceptive acts or practices were likely to and did in

fact deceive reasonable consumers, including Plaintiffs, about the true safety and

reliability of their vehicles.

634.    FCA intentionally and knowingly misrepresented material facts

regarding the Fire Defect Vehicles with the intent to mislead Plaintiffs.

635.    FCA knew or should have known that its conduct violated the Nevada

DTPA.

636.    As alleged above, FCA made material statements about the safety and

reliability of the Fire Defect Vehicles and their ability to operate as plug-in hybrid

vehicles that were either false or misleading.

637.    FCA owed Plaintiffs a duty to disclose the true safety and reliability

of the Fire Defect Vehicles because FCA:

> a.    Possessed exclusive knowledge about the Spontaneous
>        Fire Defect in the Fire Defect Vehicles;

b.   Intentionally concealed the foregoing from Plaintiffs;

c.   Made incomplete representations about the safety and reliability of the Fire Defect Vehicles, while purposefully withholding material facts from Plaintiffs that contradicted these representations; and/or

d.   Had duties under the TREAD Act and related regulations to disclose and remedy the defects well prior to the issue of its confounding recall notice in 2022.

638.   Because FCA fraudulently concealed the Spontaneous Fire Defect, Fire Defect Vehicle owners were deprived of the benefit of their bargain since the vehicles they purchased were worth less than they would have been if they were free from the known serious safety defect. Had Fire Defect Vehicle owners been aware of the defects in their vehicles, they would have either not have bought their vehicles or would have paid less for them.

639.   FCA's concealment of the defect in the Fire Defect Vehicles was material to Plaintiffs.

640.   Plaintiffs suffered ascertainable loss caused by FCA's misrepresentations and its concealment of and failure to disclose the Spontaneous Fire Defect.

641.   FCA's violations present a continuing risk to Plaintiffs as well as to the general public. In particular and as alleged herein, FCA's failure to provide and recall remedy leaves Fire Defect Vehicle owners facing a Hobson's choice: follow FCA's instructions, if possible, at the great inconvenience of parking far from

- 217 -

home and the expense and environmental impact of additional consumption of gasoline; ignore FCA's instructions and risk calamity; or sell the vehicles at a substantial loss as a result of FCA's conduct. FCA's unlawful acts and practices complained of herein affect the public interest.

642..  As a direct and proximate result of FCA's violations of the Nevada DTPA, all Plaintiffs have suffered injury-in-fact and/or actual damage as alleged above.

643.   Accordingly, Plaintiffs seek their actual damages, punitive damages, an order enjoining FCA's deceptive acts or practices, costs of Court, attorney's fees, and all other appropriate and available remedies under the Nevada Deceptive Trade Practices Act. Nev. Rev. Stat. § 41.600.

## COUNT XXXV

### BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY UNDER NEVADA LAW (Nev. Rev. Stat. § 104.2314)

### (Alleged by Plaintiff Lewandowski on behalf of the Nevada Subclass)

644.   Plaintiff brings this claim on behalf of himself and the Nevada Subclass.

645.   Plaintiff and the Nevada Subclass ("Plaintiffs," for the purposes of this claim) reallege and incorporate by reference all paragraphs as though fully set forth herein.

- 218 -

646.   FCA is a "merchant" of the Fire Defect Vehicles within the meaning of Nev. Rev. Stat. § 104.2104, and the Fire Defect Vehicles are "goods" under Nev. Rev. Stat. § 1-4.2105(1).

647.   Under Nevada law, an implied warranty of merchantability attaches to the Fire Defect Vehicles. Nev. Rev. Stat. § 1-4.2314.

648.   The Fire Defect Vehicles were not merchantable when sold or leased because their hybrid propulsion systems are prone to spontaneous combustion, and pose an unreasonable risk of fires due to the Spontaneous Fire Defect as described herein. Without limitation, the Fire Defect Vehicles share a common defect in that they are all equipped with a hybrid propulsion system that makes the vehicles susceptible to a risk of spontaneous combustion, causing an unreasonable risk of death, serious bodily harm and/or property damage to lessees and owners of the Fire Defect Vehicles as well as their homes, passengers and bystanders. This defect renders the Fire Defect Vehicles when sold/leased and at all times thereafter, unmerchantable and unfit for their ordinary use of driving. In fact, as a result of the defect, FCA specifically advises owners and lessees not to charge their batteries and not to drive the Fire Defect Vehicles in electric mode.

649.   Plaintiffs were and are third-party beneficiaries to FCA's contracts with FCA-certified/authorized retailers who sold or leased the Fire Defect Vehicles to Plaintiffs.

- 219 -

650.   It was reasonable to expect that Plaintiffs would use, consume or be affected by the Fire Defect Vehicles, and they are therefore entitled to the protections of the implied warranty of merchantability under Nev. Rev. Stat. § 1-4.2318.

651.   FCA was provided notice of these issues within a reasonable time of Plaintiff's knowledge of the non-conforming or defective nature of the Fire Defect Vehicles by the filing of this Complaint, by letters from Plaintiff's counsel,  FCA, consumer complaints to NHTSA regarding the defect that is the subject of this Complaint, and/or by the  allegations contained in this Complaint.

652.   As a direct and proximate result of FCA's breach of the implied warranty of merchantability, Plaintiffs have been damaged in an amount to be determined at trial.

**17.   New Hampshire**

## COUNT XXXVI

**VIOLATION OF NEW HAMPSHIRE CONSUMER PROTECTION ACT
(N.H. Rev. Stat. § 358-A:1, *et seq*.)**

**(Alleged by Plaintiffs Bergantino, Nicole Costa, and Stephen Costa
on behalf of the New Hampshire Subclass)**

653.   Plaintiffs and the New Hampshire Subclass ("Plaintiffs," for the purposes of this claim) reallege and incorporate by reference all paragraphs as though fully set forth herein.

654.   FCA and Plaintiffs are "persons" under the New Hampshire Consumer Protection Act ("New Hampshire CPA"), N.H. Rev. Stat. § 358-A:1.

655.   FCA's actions as set forth herein occurred in the conduct of trade or commerce as defined under N.H. Rev. Stat. § 358-A:1.

656.   The New Hampshire CPA prohibits a person, in the conduct of any trade or commerce, from using "any unfair or deceptive act or practice," including "but … not limited to, the following: … (V) Representing that goods or services have … characteristics, … uses, benefits, or quantities that they do not have;" "(VII) Representing that goods or services are of a particular standard, quality, or grade, … if they are of another;" and "(IX) Advertising goods or services with intent not to sell them as advertised." N.H. Rev. Stat. § 358-A:2.

657.   FCA participated in unfair or deceptive acts or practices that violated the New Hampshire CPA as described above and below. By devaluing safety and concealing the Spontaneous Fire Defect, FCA engaged in deceptive business practices prohibited by the CPA, including representing that Fire Defect Vehicles have characteristics, uses, benefits, and qualities which they do not have; representing that Fire Defect Vehicles are of a particular standard, quality, and grade when they are not; advertising Fire Defect Vehicles with the intent not to sell or lease them as advertised; representing that the subject of a transaction involving Fire Defect Vehicles has been supplied in accordance with a previous

- 221 -

representation when it has not; and engaging in other unconscionable, false, misleading, or deceptive acts or practices in the conduct of trade or commerce.

658. In the course of FCA's business, it willfully failed to disclose and actively concealed the dangerous risk posed by the defects in the Fire Defect Vehicles.

659. FCA's unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers, including Plaintiffs, about the true safety and reliability of their vehicles.

660. FCA intentionally and knowingly misrepresented material facts regarding the Fire Defect Vehicles with the intent to mislead Plaintiffs.

661. FCA knew or should have known that its conduct violated the New Hampshire CPA.

662. As alleged above, FCA made material statements about the safety and reliability of the Fire Defect Vehicles and their ability to operate as plug-in hybrid vehicles that were either false or misleading.

663. FCA owed Plaintiffs a duty to disclose the true safety and reliability of the Fire Defect Vehicles because FCA:

      a.    Possessed exclusive knowledge about the Spontaneous Fire Defect in the Fire Defect Vehicles;

      b.    Intentionally concealed the foregoing from Plaintiffs;

- 222 -

     c.     Made incomplete representations about the safety and reliability of the Fire Defect Vehicles, while purposefully withholding material facts from Plaintiffs that contradicted these representations; and/or

     d.     Had duties under the TREAD Act and related regulations to disclose and remedy the defects well prior to the issue of its confounding recall notice in 2022.

664.    Because FCA fraudulently concealed the Spontaneous Fire Defect, Fire Defect Vehicle owners were deprived of the benefit of their bargain since the vehicles they purchased were worth less than they would have been if they were free from the known serious safety defect. Had Fire Defect Vehicle owners been aware of the defects in their vehicles, they would have either not have bought their vehicles or would have paid less for them.

665.    FCA's concealment of the defect in the Fire Defect Vehicles was material to Plaintiffs.

666.    Plaintiffs suffered ascertainable loss caused by FCA's misrepresentations and its concealment of and failure to disclose the Spontaneous Fire Defect.

667.    FCA's violations present a continuing risk to Plaintiffs as well as to the general public. In particular and as alleged herein, FCA's failure to provide and recall remedy leaves Fire Defect Vehicle owners facing a Hobson's choice: follow FCA's instructions, if possible, at the great inconvenience of parking far from home and the expense and environmental impact of additional consumption of

- 223 -

gasoline; ignore FCA's instructions and risk calamity; or sell the vehicles at a substantial loss as a result of FCA's conduct. FCA's unlawful acts and practices complained of herein affect the public interest.

668.   Because FCA's willful conduct caused injury to Plaintiffs' property through violations of the New Hampshire CPA, Plaintiffs seek recovery of actual damages or $1,000, whichever is greater, treble damages, costs and reasonable attorneys' fees, an order enjoining FCA's unfair and/or deceptive acts and practices, and any other just and proper relief under N.H. Rev. Stat. § 358-A:10.

## COUNT XXXVII

### BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY UNDER NEW HAMPSHIRE LAW
### (N.H. Rev. Stat. § 382-A:2-314)

**(Alleged by Plaintiff Bergantino, Nicole Costa, and Stephen Costa on behalf of the New Hampshire Subclass)**

669.   Plaintiff and the New Hampshire Subclass ("Plaintiffs," for the purposes of this claim) reallege and incorporate by reference all paragraphs as though fully set forth herein.

670.   FCA is a "merchant" of motor vehicles within the meaning of N.H. N.H. Rev. Stat. § 382-A:2-104(1).

671.   Under New Hampshire law, an implied warranty of merchantability attaches to the Fire Defect Vehicles. N.H. Rev. Stat. § 382-A:2-314.

672.   The Fire Defect Vehicles were not merchantable when sold or leased because their hybrid propulsion systems are prone to spontaneous combustion, and pose an unreasonable risk of fires due to the Spontaneous Fire Defect as described herein. Without limitation, the Fire Defect Vehicles share a common defect in that they are all equipped with a hybrid propulsion system that makes the vehicles susceptible to a risk of spontaneous combustion, causing an unreasonable risk of death, serious bodily harm and/or property damage to lessees and owners of the Fire Defect Vehicles as well as their homes, passengers and bystanders. This defect renders the Fire Defect Vehicles when sold/leased and at all times thereafter, unmerchantable and unfit for their ordinary use of driving. In fact, as a result of the defect, FCA specifically advises owners and lessees not to charge their batteries and not to drive the Fire Defect Vehicles in electric mode.

673.   Plaintiffs were and are third-party beneficiaries to FCA's contracts with FCA-certified/authorized retailers who sold or leased the Fire Defect Vehicles to Plaintiffs and New Hampshire Subclass members.

674.   As a direct and proximate result of FCA's breach of the implied warranty of merchantability, Plaintiffs have been damaged in an amount to be determined at trial.

18.    **New Jersey**

## <u>COUNT XXXVIII</u>

**VIOLATION OF NEW JERSEY CONSUMER FRAUD ACT
(N.J. Stat. Ann. § 56:8-1, *et seq*.)**

**(Alleged by Plaintiff Brace on behalf of the New Jersey Subclass)**

675.    Plaintiff brings this action on behalf of herself and the New Jersey

Subclass ("Plaintiffs," for the purposes of this claim).

676.    Plaintiffs reallege and incorporate by reference all paragraphs as

though fully set forth herein.

677.    FCA and Plaintiffs are or were "persons" within the meaning of N.J.

Stat. Ann. § 56:8-1(d).

678.    FCA engaged in "sales" of "merchandise" within the meaning of N.J.

Stat. Ann. § 56:8-1(c), (d).

679.    FCA's actions, as set forth above, occurred in the conduct of trade or

commerce.

680.    The New Jersey Consumer Fraud Act ("New Jersey CFA") makes

unlawful "[t]he act, use or employment by any person of any unconscionable

commercial practice, deception, fraud, false pretense, false promise,

misrepresentation, or the knowing concealment, suppression or omission of any

material fact with the intent that others rely upon such concealment, suppression or

- 226 -

omission, in connection with the sale or advertisement of any merchandise or real estate, or with the subsequent performance of such person as aforesaid, whether or not any person has in fact been misled, deceived or damaged thereby…" N.J. Stat. Ann. § 56:8-2. FCA engaged in unconscionable or deceptive acts or practices that violated the New Jersey CFA as described above and below, and did so with the intent that Plaintiffs rely upon their acts, concealment, suppression or omissions.

681.   In the course of FCA's business, it willfully failed to disclose and actively concealed the dangerous risk posed by the defects in the Fire Defect Vehicles.

682.   FCA's unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers, including Plaintiffs, about the true safety and reliability of their vehicles.

683.   FCA intentionally and knowingly misrepresented material facts regarding the Fire Defect Vehicles with the intent to mislead Plaintiffs.

684.   FCA knew or should have known that its conduct violated the New Jersey CFA.

685.   As alleged above, FCA made material statements about the safety and reliability of the Fire Defect Vehicles and their ability to operate as plug-in hybrid vehicles that were either false or misleading.

686.    FCA owed Plaintiffs a duty to disclose the true safety and reliability of the Fire Defect Vehicles because FCA:

    a.    Possessed exclusive knowledge about the Spontaneous Fire Defect in the Fire Defect Vehicles;

    b.    Intentionally concealed the foregoing from Plaintiffs;

    c.    Made incomplete representations about the safety and reliability of the Fire Defect Vehicles, while purposefully withholding material facts from Plaintiffs that contradicted these representations; and/or

    d.    Had duties under the TREAD Act and related regulations to disclose and remedy the defects well prior to the issue of its confounding recall notice in 2022.

687.    Because FCA fraudulently concealed the Spontaneous Fire Defect, Fire Defect Vehicle owners were deprived of the benefit of their bargain since the vehicles they purchased were worth less than they would have been if they were free from the known serious safety defect. Had Fire Defect Vehicle owners been aware of the defects in their vehicles, they would have either not have bought their vehicles or would have paid less for them.

688.    FCA's concealment of the defect in the Fire Defect Vehicles was material to Plaintiffs.

689.    Plaintiffs suffered ascertainable loss caused by FCA's misrepresentations and its concealment of and failure to disclose the Spontaneous Fire Defect.

690.   FCA's violations present a continuing risk to Plaintiffs as well as to the general public. In particular and as alleged herein, FCA's failure to provide and recall remedy leaves Fire Defect Vehicle owners facing a Hobson's choice: follow FCA's instructions, if possible, at the great inconvenience of parking far from home and the expense and environmental impact of additional consumption of gasoline; ignore FCA's instructions and risk calamity; or sell the vehicles at a substantial loss as a result of FCA's conduct. FCA's unlawful acts and practices complained of herein affect the public interest.

691.   As a direct and proximate result of FCA's violations of the New Jersey CFA, Plaintiffs have suffered injury-in-fact and/or actual damage, as alleged above.

692.   Plaintiffs are entitled to recover legal and/or equitable relief including an order enjoining FCA's unlawful conduct, treble damages, costs and reasonable attorneys' fees pursuant to N.J. Stat. Ann. § 56:8-19, and any other just and appropriate relief.

011086-11/1924902 V1

## COUNT XXXIX

### BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY UNDER NEW JERSEY LAW
### (N.J. Stat. Ann. § 12A:2-314)

**(Alleged by Plaintiff Brace on behalf of the New Jersey Subclass)**

693.   Plaintiff and the New Jersey Subclass reallege and incorporate by reference all paragraphs as though fully set forth herein.

694.   Plaintiff brings this action on behalf of herself and the New Jersey Subclass.

695.   FCA is a "merchant" and "seller" of motor vehicles and the Fire Defect Vehicles are "goods" under New Jersey law. N.J. Stat. Ann. § 12A:2-104(1).

696.   Under New Jersey law, an implied warranty of merchantability attaches to the Fire Defect Vehicles under N.J. Stat. Ann. § 12A:2-104(1).

697.   The Fire Defect Vehicles were not merchantable when sold or leased because their hybrid propulsion systems are prone to spontaneous combustion, and pose an unreasonable risk of fires due to the Spontaneous Fire Defect as described herein. Without limitation, the Fire Defect Vehicles share a common defect in that they are all equipped with a hybrid propulsion system that makes the vehicles susceptible to a risk of spontaneous combustion, causing an unreasonable risk of death, serious bodily harm and/or property damage to lessees and owners of the

011086-11/1924902 V1

Fire Defect Vehicles as well as their homes, passengers and bystanders. This defect renders the Fire Defect Vehicles when sold/leased and at all times thereafter, unmerchantable and unfit for their ordinary use of driving. In fact, as a result of the defect, FCA specifically advises owners and lessees not to charge their batteries and not to drive the Fire Defect Vehicles in electric mode.

698.   It was reasonable to expect that Plaintiff and the New Jersey Subclass members would use, consume or be affected by the Fire Defect Vehicles.

699.   Plaintiff and the other New Jersey Subclass members were and are third-party beneficiaries to FCA's contracts with FCA-certified/authorized retailers who sold or leased the Fire Defect Vehicles to Plaintiff and New Jersey Subclass members.

700.   As a direct and proximate result of FCA's breach of the implied warranty of merchantability, Plaintiff and the other New Jersey Subclass members have been damaged in an amount to be determined at trial.

**19.    New York**

## COUNT XL

### DECEPTIVE ACTS OR PRACTICES
### (N.Y. Gen. Bus. Law §§ 349-350)

**(Alleged by Plaintiff Quattropani on behalf of the New York Subclass)**

701.   Plaintiff brings this action on behalf of himself and the New York Subclass ("Plaintiffs," for the purposes of this claim).

- 231 -

702.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

703.   Plaintiffs are "persons" within the meaning of New York General Business Law ("New York GBL"), N.Y. Gen. Bus. Law § 349(h).

704.   FCA is a "person," "firm," "corporation," or "association" within the meaning of N.Y. Gen. Bus. Law § 349.

705.   The New York GBL makes unlawful "[d]eceptive acts or practices in the conduct of any business, trade or commerce." N.Y. Gen. Bus. Law § 349. FCA's conduct, as described above and below, constitutes "deceptive acts or practices" within the meaning of the New York GBL. Furthermore, FCA's deceptive acts and practices, which were intended to mislead consumers who were in the process of purchasing and/or leasing Fire Defect Vehicles, was conduct directed at consumers.

706.   FCA's actions, as set forth above, occurred in the conduct of trade or commerce.

707.   In the course of FCA's business, it willfully failed to disclose and actively concealed the dangerous risk posed by the defects in the Fire Defect Vehicles.

708.   FCA's unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers, including Plaintiffs, about the true safety and reliability of their vehicles.

709.   FCA intentionally and knowingly misrepresented material facts regarding the Fire Defect Vehicles with the intent to mislead Plaintiffs.

710.   FCA knew or should have known that its conduct violated the New York GBL.

711.   As alleged above, FCA made material statements about the safety and reliability of the Fire Defect Vehicles and their ability to operate as plug-in hybrid vehicles that were either false or misleading.

712.   FCA owed Plaintiffs a duty to disclose the true safety and reliability of the Fire Defect Vehicles because FCA:

<div style="margin-left:2em">

a.   Possessed exclusive knowledge about the Spontaneous Fire Defect in the Fire Defect Vehicles;

b.   Intentionally concealed the foregoing from Plaintiffs;

c.   Made incomplete representations about the safety and reliability of the Fire Defect Vehicles, while purposefully withholding material facts from Plaintiffs that contradicted these representations; and/or

d.   Had duties under the TREAD Act and related regulations to disclose and remedy the defects well prior to the issue of its confounding recall notice in 2022.

</div>

713.   Because FCA fraudulently concealed the Spontaneous Fire Defect, Fire Defect Vehicle owners were deprived of the benefit of their bargain since the

- 233 -

vehicles they purchased were worth less than they would have been if they were free from the known serious safety defect. Had Fire Defect Vehicle owners been aware of the defects in their vehicles, they would have either not have bought their vehicles or would have paid less for them.

714.   FCA's concealment of the defect in the Fire Defect Vehicles was material to Plaintiffs.

715.   Plaintiffs suffered ascertainable loss caused by FCA's misrepresentations and its concealment of and failure to disclose the Spontaneous Fire Defect.

716.   FCA's violations present a continuing risk to Plaintiffs as well as to the general public. In particular and as alleged herein, FCA's failure to provide and recall remedy leaves Fire Defect Vehicle owners facing a Hobson's choice: follow FCA's instructions, if possible, at the great inconvenience of parking far from home and the expense and environmental impact of additional consumption of gasoline; ignore FCA's instructions and risk calamity; or sell the vehicles at a substantial loss as a result of FCA's conduct. FCA's unlawful acts and practices complained of herein affect the public interest.

717.   As a direct and proximate result of FCA's violations of the New York GBL, Plaintiffs have suffered injury-in-fact and/or actual damage, as alleged above.

- 234 -

718.   Because FCA's willful and knowing conduct caused injury to Plaintiffs, Plaintiffs seek recovery of actual damages or $50, whichever is greater, discretionary treble damages up to $1,000, punitive damages, reasonable attorneys' fees and costs, an order enjoining FCA's deceptive conduct, and any other just and proper relief available under N.Y. Gen. Bus. Law § 349.

## COUNT XLI

### BREACH OF IMPLIED WARRANTY
### OF MERCHANTABILITY UNDER NEW YORK LAW
### (N.Y. U.C.C. Law § 2-314)

**(Alleged by Plaintiff Quattropani on behalf of the New York Subclass)**

719.   Plaintiff and the New York Subclass reallege and incorporate by reference all paragraphs as though fully set forth herein.

720.   Plaintiff brings this action on behalf of himself and the New York Subclass.

721.   FCA is a "merchant" of the Fire Defect Vehicles within the meaning of N.Y. U.C.C. Law § 2-104(1), and "seller" of the Fire Defect Vehicles within the meaning of N.Y. U.C.C. Law § 2-103(1)(d), and the Fire Defect Vehicles are "goods" under New York U.C.C. Law § 2-105(1).

722.   Under New York law, an implied warranty of merchantability attaches to the Fire Defect Vehicles under N.Y. U.C.C. §§ 2-314.

723.   The Fire Defect Vehicles were not merchantable when sold or leased because their hybrid propulsion systems are prone to spontaneous and catastrophic fires. The Fire Defect Vehicles were not merchantable when sold or leased because their hybrid propulsion systems are prone to spontaneous combustion, and pose an unreasonable risk of fires due to the Spontaneous Fire Defect as described herein. Without limitation, the Fire Defect Vehicles share a common defect in that they are all equipped with a hybrid propulsion system that makes the vehicles susceptible to a risk of spontaneous combustion, causing an unreasonable risk of death, serious bodily harm and/or property damage to lessees and owners of the Fire Defect Vehicles as well as their homes, passengers and bystanders. This defect renders the Fire Defect Vehicles when sold/leased and at all times thereafter, unmerchantable and unfit for their ordinary use of driving. In fact, as a result of the defect, FCA specifically advises owners and lessees not to charge their batteries and not to drive the Fire Defect Vehicles in electric mode.

724.   It was reasonable to expect that Plaintiff and the New York Subclass members would use, consume or be affected by the Fire Defect Vehicles.

725.   Plaintiff and the other New York Subclass members were and are third-party beneficiaries to FCA's contracts with FCA-certified/authorized retailers who sold or leased the Fire Defect Vehicles to Plaintiff and New York Subclass members.

- 236 -

726.   As a direct and proximate result of FCA's breach of the implied warranty of merchantability, Plaintiff and other New York Subclass members have been damaged in an amount to be determined at trial.

**20.   North Carolina**

<u>COUNT XLII</u>

**VIOLATION OF NORTH CAROLINA UNFAIR AND DECEPTIVE ACTS AND PRACTICES ACT (N.C. Gen. State §§ 75-1.1, *et seq.*)**

**(Alleged by Plaintiff Fong on behalf of the North Carolina Subclass)**

727.   Plaintiff brings this action on behalf of himself and the North Carolina Subclass ("Plaintiffs," for the purposes of this claim).

728.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

729.   FCA engaged in "commerce" within the meaning of N.C. GEN. STAT. § 75- 1.1(b).

730.   The North Carolina UDTPA broadly prohibits "unfair or deceptive acts or practices in or affecting commerce." N.C. GEN. STAT. § 75-1.1(a). In the course of FCA's business, it willfully failed to disclose and actively concealed that the Spontaneous Fire Defect. Accordingly, FCA engaged in unfair and deceptive trade practices because it (1) had the capacity or tendency to deceive, (2) offends public policy, (3) is immoral, unethical, oppressive or unscrupulous, or (4) causes substantial injury to consumers.

- 237 -

731.    In purchasing or leasing the Fire Defect Vehicles, Plaintiffs were deceived by FCA's failure to disclose the Spontaneous Fire Defect.

732.    Plaintiffs reasonably relied upon FCA's material omissions and false misrepresentations. They had no way of knowing that FCA's representations were false and gravely misleading. As alleged herein, FCA engaged in extremely sophisticated methods of deception. Plaintiffs did not, and could not, unravel FCA's deception on their own.

733.    FCA's unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers.

734.    FCA intentionally and knowingly failed to disclose and misrepresented material facts regarding the Fire Defect Vehicles with an intent to mislead Plaintiffs.

735.    FCA knew or should have known that its conduct violated the North Carolina UDTPA.

736.    FCA owed Plaintiffs a duty to disclose the truth about its Fire Defect Vehicles because FCA:

      a.    Possessed exclusive knowledge of the Spontaneous Fire Defect;

      b.    Intentionally concealed the foregoing from Plaintiffs; and/or

011086-11/1924902 V1

     c.       Made incomplete representations while purposefully withholding material facts from Plaintiffs that contradicted these representations; and/or

     d.       Had duties under the TREAD Act and related regulations to disclose and remedy the defects well prior to the issue of its confounding recall notice in 2022.

737.   FCA had a duty to disclose the Spontaneous Fire Defect, because, having volunteered to provide information to Plaintiffs, FCA had the duty to disclose not just the partial truth, but the entire truth. Further, Plaintiffs relied on FCA's material omissions and representations that the Fire Defect Vehicles they were purchasing safe and free from defects.

738.   Plaintiffs were unaware of the omitted material facts referenced herein, and they would not have acted as they did if they had known of the concealed and/or suppressed facts, in that they would not have purchased the Fire Defect Vehicles manufactured by FCA, would have paid less, and/or would have taken other affirmative steps in light of the information concealed from them. Plaintiffs' actions were justified. FCA was in exclusive control of the material facts, and such facts were not generally known to the public or Plaintiffs.

739.   FCA's conduct proximately caused injuries to Plaintiffs.

740.   Plaintiffs were injured and suffered ascertainable loss, injury-in-fact, and/or actual damage as a proximate result of FCA's conduct in that Plaintiffs overpaid for their Fire Defect Vehicles and did not receive the benefit of their

bargain, and their Fire Defect Vehicles have suffered a diminution in value. These injuries are the direct and natural consequence of FCA's misrepresentations and omissions.

741.   FCA's violations present a continuing risk to Plaintiffs as well as to the general public. FCA's unlawful acts and practices complained of herein affect the public interest.

742.   Plaintiffs seek an order for treble their actual damages, costs of Court, attorneys' fees, and any other just and proper relief available under the North Carolina Act, N.C. GEN. STAT. § 75-16.

743.   Plaintiffs also seek punitive damages against FCA because FCA's conduct was malicious, willful, reckless, wanton, fraudulent and in bad faith.

## COUNT XLIII

### BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY UNDER NORTH CAROLINA LAW (N.C. Gen. Stat. § 25-2-314)

**(Alleged by Plaintiff Fong on Behalf of the North Carolina Subclass)**

744.   Plaintiff and the North Carolina Subclass ("Plaintiffs," for the purposes of this claim) reallege and incorporate by reference all paragraphs as though fully set forth herein.

- 240 -

745.   FCA is a "merchant" of the Fire Defect Vehicles within the meaning of N.C. Gen. Stat. § 25-2-314, and the Fire Defect Vehicles are "goods" under the statute.

746.   Under North Carolina law, an implied warranty of merchantability attaches to the Fire Defect Vehicles.

747.   The Fire Defect Vehicles were not merchantable when sold or leased because their hybrid propulsion systems are prone to spontaneous combustion, and pose an unreasonable risk of fires due to the Spontaneous Fire Defect as described herein. Without limitation, the Fire Defect Vehicles share a common defect in that they are all equipped with a hybrid propulsion system that makes the vehicles susceptible to a risk of spontaneous combustion, causing an unreasonable risk of death, serious bodily harm and/or property damage to lessees and owners of the Fire Defect Vehicles as well as their homes, passengers and bystanders. This defect renders the Fire Defect Vehicles when sold/leased and at all times thereafter, unmerchantable and unfit for their ordinary use of driving. In fact, as a result of the defect, FCA specifically advises owners and lessees not to charge their batteries and not to drive the Fire Defect Vehicles in electric mode.

748.   Plaintiffs were and are third-party beneficiaries to FCA's contracts with FCA-certified/authorized retailers who sold or leased the Fire Defect Vehicles to Plaintiffs.

- 241 -

749.   It was reasonable to expect that Plaintiffs would use, consume or be affected by the Fire Defect Vehicles, and they are therefore entitled to the protections of the implied warranty of merchantability under N.C. Gen. Stat. § 25-2-314.

750.   FCA was provided notice of these issues within a reasonable time of Plaintiff's knowledge of the non-conforming or defective nature of the Fire Defect Vehicles by the filing of this Complaint, by letters from Plaintiff's counsel to FCA, consumer complaints to NHTSA regarding the defect that is the subject of this Complaint, and/or by the allegations contained in this Complaint.

751.   As a direct and proximate result of FCA's breach of the implied warranty of merchantability, Plaintiffs have been damaged in an amount to be determined at trial.

**21.   Ohio**

## COUNT XLIV

**VIOLATION OF OHIO CONSUMER SALES PRACTICES ACT**
**(Ohio Rev. Code § 1345.01, *et seq.*)**

**(Alleged by Plaintiffs Gadomski Littleton and Huntington**
**on behalf of the Ohio Subclass)**

752.   Plaintiffs bring this claim on behalf of themselves and the Ohio Subclass ("Plaintiffs," for the purposes of this claim).

753.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

- 242 -

754.   FCA is a "supplier" as that term is defined in Ohio Rev. Code § 1345.01(C).

755.   Plaintiffs are "consumers" as that term is defined in Ohio Rev. Code § 1345.01(D), and their purchases and leases of the Fire Defect Vehicles are "consumer transactions" within the meaning of Ohio Rev. Code § 1345.01(A).

756.   The Ohio Consumer Sales Practices Act ("Ohio CSPA"), Ohio Rev. Code § 1345.02 *et seq.*, broadly prohibits unfair or deceptive acts or practices in connection with a consumer transaction. Specifically, and without limitation of the broad prohibition, the Ohio CSPA prohibits suppliers from representing (i) that goods have characteristics or uses or benefits which they do not have; (ii) that their goods are of a particular quality or grade they are not; and (iii) the subject of a consumer transaction has been supplied in accordance with a previous representation, if it has not. *Id.* FCA's conduct as alleged above and below constitutes unfair and/or deceptive consumer sales practices in violation of Ohio Rev. Code § 1345.02.

757.   By devaluing safety and concealing the Spontaneous Fire Defect, FCA engaged in deceptive business practices prohibited by the Ohio CSPA, including: representing that Fire Defect Vehicles have characteristics, uses, benefits, and qualities which they do not have; representing that vehicles are of a particular standard, quality, and grade when they are not; representing that the

- 243 -

subject of a transaction involving Fire Defect Vehicles has been supplied in accordance with a previous representation when it has not; and engaging in other unfair or deceptive acts or practices.

758.   In the course of its business, FCA concealed the Spontaneous Fire Defect in the Fire Defect Vehicles and its failure to adequately design and test the vehicles to ensure their safety as described herein and otherwise engaged in activities with a tendency or capacity to deceive. FCA also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of the Fire Defect Vehicles.

759.   By failing to disclose and by actively concealing the defect in the Fire Defect Vehicles, which it marketed as safe, reliable, and of high quality, FCA engaged in unfair and deceptive business practices in violation of the Ohio CSPA.

760.   In the course of FCA's business, it willfully failed to disclose and actively concealed the dangerous risk posed by the defects in the Fire Defect Vehicles.

761.   FCA's unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers, including Plaintiffs, about the true safety and reliability of their vehicles.

- 244 -

762.    FCA intentionally and knowingly misrepresented material facts regarding the Fire Defect Vehicles with the intent to mislead Plaintiffs.

763.    FCA knew or should have known that its conduct violated the Ohio CSPA.

764.    As alleged above, FCA made material statements about the safety and reliability of the Fire Defect Vehicles and their ability to operate as plug-in hybrid vehicles that were either false or misleading.

765.    FCA owed Plaintiffs a duty to disclose the true safety and reliability of the Fire Defect Vehicles because FCA:

    a.    Possessed exclusive knowledge about the defects in the Fire Defect Vehicles;

    b.    Intentionally concealed the foregoing from Plaintiffs;

    c.    Made incomplete representations about the safety and reliability of the Fire Defect Vehicles, while purposefully withholding material facts from Plaintiffs that contradicted these representations; and/or

    d.    Had duties under the TREAD Act and related regulations to disclose and remedy the defects well prior to the issue of its confounding recall notice in 2022.

766.    Because FCA fraudulently concealed the Spontaneous Fire Defect, Fire Defect Vehicle owners were deprived of the benefit of their bargain since the vehicles they purchased were worth less than they would have been if they were free from the known serious safety defect. Had Fire Defect Vehicle owners been

- 245 -

aware of the defects in their vehicles, they would have either not have bought their vehicles or would have paid less for them.

767.   FCA's concealment of the defects in the Fire Defect Vehicles was material to Plaintiffs.

768.   Plaintiffs suffered ascertainable loss caused by FCA's misrepresentations and its concealment of and failure to disclose the Spontaneous Fire Defect.

769.   FCA's violations present a continuing risk to Plaintiffs as well as to the general public. In particular and as alleged herein, FCA's failure to provide and recall remedy leaves Fire Defect Vehicle owners facing a Hobson's choice: follow FCA's instructions, if possible, at the great inconvenience of parking far from home and the expense and environmental impact of additional consumption of gasoline; ignore FCA's instructions and risk calamity; or sell the vehicles at a substantial loss as a result of FCA's conduct. FCA's unlawful acts and practices complained of herein affect the public interest.

770.   Plaintiffs seek punitive damages against FCA because FCA's conduct was egregious. FCA misrepresented the safety and reliability of thousands of vehicles, deceived Plaintiffs on life-or-death matters, and concealed material facts that only FCA knew, all to avoid the expense of instituting proper safety protocols

- 246 -

pre-launch and then the public relations nightmare of correcting the serious flaw in the Fire Defect Vehicles. FCA's egregious conduct warrants punitive damages.

771.   Plaintiffs specifically do not allege herein a claim for violation of Ohio Rev. Code § 1345.72.

772.   FCA was on notice pursuant to Ohio Rev. Code § 1345.09(B) that its actions constituted unfair, deceptive, and unconscionable practices by, for example, *Mason v. Mercedes-Benz USA, LLC*, 2005 Ohio App. LEXIS 3911, at *33 (S.D. Ohio Aug. 18, 2005), and *Lilly v. Hewlett-Packard Co.*, 2006 U.S. Dist. LEXIS 22114, at *17-18 (S.D. Ohio Apr. 21, 2006). Further, FCA's conduct as alleged above constitutes an act or practice previously declared to be deceptive or unconscionable by rule adopted under division (B)(2) of section 1345.05 and previously determined by Ohio courts to violate Ohio's Consumer Sales Practices Act and was committed after the decisions containing these determinations were made available for public inspection under division (A)(3) of Ohio Rev. Code § 1345.05. The applicable rule and Ohio court opinions include, but are not limited to: OAC 109:4-3-16; *Mason v. Mercedes-Benz USA, LLC*, 2005 Ohio 4296 (Ohio Ct. App. 2005); *Khouri v. Lewis*, Cuyahoga Common Pleas No. 342098 (2001); *State ex rel. Montgomery v. Canterbury*, Franklin App. No. 98CVH054085 (2000); and *Fribourg v. Vandemark* (July 26, 1999), Clermont App. No. CA99-02-017, unreported (PIF # 10001874).

773.   As a result of the foregoing wrongful conduct of FCA, Plaintiffs have

been damaged in an amount to be proven at trial, and seek all just and proper

remedies, including, but not limited to, actual and statutory damages, an order

enjoining FCA's deceptive and unfair conduct, treble damages, court costs and

reasonable attorneys' fees, pursuant to § 1345.09, *et seq.*

## COUNT XLV

### IMPLIED WARRANTY IN TORT UNDER OHIO LAW

### (Alleged by Plaintiffs Gadomski Littleton and Huntington
### on behalf of the Ohio Subclass)

774.   Plaintiffs bring this claim on behalf of themselves and the Ohio

Subclass ("Plaintiffs," for the purposes of this claim)

775.   Plaintiffs reallege and incorporate by reference all paragraphs as

though fully set forth herein.

776.   The Fire Defect Vehicles, when sold and at all times thereafter, were

not merchantable and are not fit for the ordinary purpose for which cars are used.

777.   The Fire Defect Vehicles are inherently defective because their hybrid

propulsion systems are prone to spontaneous combustion, and pose an

unreasonable risk of fires due to the Spontaneous Fire Defect as described herein.

Without limitation, the Fire Defect share a common defect in that they are all

equipped with a hybrid propulsion system that makes the vehicles susceptible to a

risk of spontaneous combustion, causing an unreasonable risk of death, serious

- 248 -

bodily harm and/or property damage to lessees and owners of the Fire Defect Vehicles as well as their homes, passengers and bystanders. This defect renders the Fire Defect Vehicles when sold/leased and at all times thereafter, unmerchantable and unfit for their ordinary use of driving. In fact, as a result of the defect, FCA specifically advise owners and lessees not to charge their batteries and not to drive the Fire Defect in electric mode.

778.   The design, manufacturing, and/or assembly defect existed at the time the Fire Defect Vehicles containing the defective hybrid propulsion systems left the possession or control of FCA.

779.   Based upon the dangerous product defect, FCA failed to meet the expectations of a reasonable consumer. The Fire Defect Vehicles failed their ordinary, intended use because the hybrid propulsion systems in the vehicles do not function as a reasonable consumer would expect. Moreover, the defect presents a serious danger to Plaintiffs that cannot be eliminated without significant cost and extreme inconvenience.

780.   FCA was provided notice of the Spontaneous Fire Defect and its consequences by pre-sale investigation, complaints made to NHTSA, and internal investigations before or within a reasonable amount of time after FCA issued the recall and the allegations of the defect became public.

- 249 -

781.   As a direct and proximate result of FCA's breach of the implied warranty of merchantability, Plaintiffs have been damaged in an amount to be proven at trial.

### 22.   Oregon

### COUNT XLVI

### VIOLATION OF THE OREGON UNLAWFUL TRADE PRACTICES ACT
(Or. Rev. Stat. §§ 646.605, *et seq.*)

### (Alleged by Plaintiffs Christie, Clea Van Tol, and Ladd Van Tol on behalf of the Oregon Subclass)

782.   Plaintiffs bring this claim on behalf of themselves and the Oregon Subclass ("Plaintiffs," for the purposes of this claim).

783.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

784.   Plaintiffs bring this claim on behalf of themselves and the Oregon Subclass.

785.   FCA is a person within the meaning of Or. Rev. Stat. § 646.605(4).

786.   The Fire Defect Vehicles at issue are "goods" obtained primarily for personal family or household purposes within the meaning of Or. Rev. Stat. § 646.605(6).

787.   The Oregon Unfair Trade Practices Act ("Oregon UTPA") prohibits a person from, in the course of the person's business, doing any of the following: "(e) Represent[ing] that … goods … have … characteristics … uses, benefits, …

- 250 -

or qualities that they do not have; (g) Represent[ing] that … goods … are of a particular standard [or] quality … if they are of another; (i) Advertis[ing] … goods or services with intent not to provide them as advertised;" and "(u) engag[ing] in any other unfair or deceptive conduct in trade or commerce." Or. Rev. Stat. § 646.608(1).

788.    FCA engaged in deceptive trade practices that violated the Oregon UTPA, including: knowingly representing that Fire Defect Vehicles have uses and benefits which they do not have; representing that Fire Defect Vehicles are of a particular standard, quality, and grade when they are not; advertising Fire Defect Vehicles with the intent not to sell or lease them as advertised; representing that the subject of a transaction involving Fire Defect Vehicles has been supplied in accordance with a previous representation when it has not; knowingly making other false representations in a transaction; and concealing the known Spontaneous Fire Defect in Plaintiffs' vehicles.

789.    FCA's actions, as set forth above, occurred in the conduct of trade or commerce.

790.    In the course of its business, FCA concealed the Spontaneous Fire Defect in the Fire Defect Vehicles and its failure to adequately design and test the vehicles to ensure their safety as described herein and otherwise engaged in activities with a tendency or capacity to deceive. FCA also engaged in unlawful

- 251 -

trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of the Fire Defect Vehicles.

791.    By failing to disclose and by actively concealing the defect in the Fire Defect Vehicles, which it marketed as safe, reliable, and of high quality, FCA engaged in unfair and deceptive business practices in violation of the Oregon UTPA.

792.    In the course of FCA's business, it willfully failed to disclose and actively concealed the dangerous risk posed by the defects in the Fire Defect Vehicles.

793.    FCA's unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers, including Plaintiffs, about the true safety and reliability of their vehicles.

794.    FCA intentionally and knowingly misrepresented material facts regarding the Fire Defect Vehicles with the intent to mislead Plaintiffs.

795.    FCA knew or should have known that its conduct violated the Oregon UTPA.

796.  As alleged above, FCA made material statements about the safety and reliability of the Fire Defect Vehicles and their ability to operate as plug-in hybrid vehicles that were either false or misleading.

797.  FCA owed Plaintiffs a duty to disclose the true safety and reliability of the Fire Defect Vehicles because FCA:

    a.    Possessed exclusive knowledge about the defects in the Fire Defect Vehicles;

    b.    Intentionally concealed the foregoing from Plaintiffs;

    c.    Made incomplete representations about the safety and reliability of the Fire Defect Vehicles, while purposefully withholding material facts from Plaintiffs that contradicted these representations; and/or

    d.    Had duties under the TREAD Act and related regulations to disclose and remedy the defects well prior to the issue of its confounding recall notice in 2022.

798.  Because FCA fraudulently concealed the Spontaneous Fire Defect, Fire Defect Vehicle owners were deprived of the benefit of their bargain since the vehicles they purchased were worth less than they would have been if they were free from the known serious safety defect. Had Fire Defect Vehicle owners been aware of the defects in their vehicles, they would have either not have bought their vehicles or would have paid less for them.

799.  FCA's concealment of the defect in the Fire Defect Vehicles was material to Plaintiffs.

800.    Plaintiffs suffered ascertainable loss caused by FCA's misrepresentations and its concealment of and failure to disclose the Spontaneous Fire Defect.

801.    FCA's violations present a continuing risk to Plaintiffs as well as to the general public. In particular and as alleged herein, FCA's failure to provide and recall remedy leaves Fire Defect Vehicle owners facing a Hobson's choice: follow FCA's instructions, if possible, at the great inconvenience of parking far from home and the expense and environmental impact of additional consumption of gasoline; ignore FCA's instructions and risk calamity; or sell the vehicles at a substantial loss as a result of FCA's conduct. FCA's unlawful acts and practices complained of herein affect the public interest.

802.    As a direct and proximate result of FCA's violations of the Oregon UTPA, all Plaintiffs have suffered injury-in-fact and/or actual damage as alleged above.

803.    Plaintiffs are entitled to recover the greater of actual damages or $200 pursuant to Or. Rev. Stat. § 646.638(1). Plaintiffs are also entitled to punitive damages because FCA engaged in conduct amounting to a particularly aggravated, deliberate disregard of the rights of others.

## COUNT XLVII

### BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY UNDER OREGON LAW
### (Or. Rev. Stat. §72.3140)

**(Alleged by Plaintiffs Christie, Clea Van Tol, and Ladd Van Tol on behalf of the Oregon Subclass)**

804.   Plaintiffs and the Oregon Subclass ("Plaintiffs," for the purposes of this claim) reallege and incorporate by reference all paragraphs as though fully set forth herein.

805.   Plaintiffs bring this claim on behalf of themselves and the Oregon Subclass.

806.   FCA is a "merchant" within the meaning of Or. Rev. Stat. § 72.1040(1), and "seller" of motor vehicles within the meaning of Or. Rev. Stat. § 72.1030(1)(d).

807.   The Fire Defect Vehicles are "goods" under Or. Rev. Stat. § 72.5010 (see Or. Rev. Stat. § 72.1030(2)(m)). Under Or. Rev. Stat. § 72.3140, an implied warranty of merchantability attaches to the Fire Defect Vehicles.

808.   The Fire Defect Vehicles were not merchantable when sold or leased, and all times thereafter, because their hybrid propulsion systems are prone to spontaneous combustion, and pose an unreasonable risk of fires due to the Spontaneous Fire Defect as described herein. Without limitation, the Fire Defect Vehicles share a common defect in that they are all equipped with a hybrid

- 255 -

propulsion system that makes the vehicles susceptible to a risk of spontaneous combustion, causing an unreasonable risk of death, serious bodily harm and/or property damage to lessees and owners of the Fire Defect Vehicles as well as their homes, passengers, and bystanders. This defect renders the Fire Defect Vehicles when sold/leased and at all times thereafter, unmerchantable and unfit for their ordinary use of driving. In fact, as a result of the defect, FCA specifically advises owners and lessees not to charge their batteries and not to drive the said Vehicles in electric mode.

809.   Plaintiffs were and are third-party beneficiaries of FCA's contracts with FCA-certified/authorized retailers who sold or leased the Fire Defect Vehicles to Plaintiffs.

810.   FCA was provided notice of these issues within a reasonable time of Plaintiffs' knowledge of the non-conforming or defective nature of the Fire Defect Vehicles by the filing of their initial complaints, by consumer complaints to NHTSA regarding the defect that is the subject of this. In addition, Plaintiffs' counsel sent notice letters to FCA to the extent such notice is required. FCA has failed to remedy the Spontaneous Fire Defect within the requisite time period. Plaintiffs seek all damages and relief to which they are entitled.

811.   As a direct and proximate result of FCA's breach of the implied warranty of merchantability, Plaintiffs and the Oregon Subclass members have been damaged in an amount to be determined at trial.

**23.   Pennsylvania**

<u>**COUNT XLVIII**</u>

**VIOLATION OF THE PENNSYLVANIA UNFAIR TRADE PRACTICES AND CONSUMER PROTECTION LAW (73 P.S. § 201-1, *et seq*.)**

**(Alleged by Plaintiff Ohodnicki on behalf of the Pennsylvania Subclass)**

812.   Plaintiff and the Pennsylvania Subclass ("Plaintiffs," for the purposes of this claim) reallege and incorporate by reference all paragraphs as though fully set forth herein.

813.   Plaintiff brings this action on behalf of himself and the Pennsylvania Subclass.

814.   Plaintiffs purchased or leased their Fire Defect Vehicles primarily for personal, family or household purposes within the meaning of 73 P.S. § 201-9.2.

815.   All of the acts complained of herein were perpetrated by FCA in the course of trade or commerce within the meaning of 73 P.S. § 201-2(3).

816.   The Pennsylvania Unfair Trade Practices and Consumer Protection Law ("Pennsylvania CPL") prohibits unfair or deceptive acts or practices, including: (i) "Representing that goods or services have … characteristics, …. Benefits or qualities that they do not have;" (ii) "Representing that goods or

- 257 -

services are of a particular standard, quality or grade … if they are of another;" (iii) "Advertising goods or services with intent not to sell them as advertised;" and (iv) "Engaging in any other fraudulent or deceptive conduct which creates a likelihood of confusion or misunderstanding." 73 P.S. § 201-2(4).

817.   FCA engaged in unlawful trade practices, including representing that Fire Defect Vehicles have characteristics, uses, benefits, and qualities which they do not have; representing that Fire Defect Vehicles are of a particular standard and quality when they are not; advertising Fire Defect with the intent not to sell them as advertised; and engaging in other fraudulent or deceptive conduct which creates a likelihood of confusion or of misunderstanding.

818.   In purchasing or leasing the Fire Defect Vehicles, Plaintiffs were deceived by FCA's failure to disclose the Spontaneous Fire Defect.

819.   Plaintiffs reasonably relied upon FCA's material omissions and false misrepresentations. They had no way of knowing that FCA's representations were false and gravely misleading. Plaintiffs did not, and could not, unravel FCA's deception on their own.

820.   FCA's unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers.

- 258 -

821.   FCA intentionally and knowingly failed to disclose and misrepresented material facts regarding the Fire Defect Vehicles with an intent to mislead Plaintiffs.

822.   FCA knew or should have known that its conduct violated the Pennsylvania CPL.

823.   FCA owed Plaintiffs a duty to disclose the truth about its Fire Defect Vehicles because FCA:

a.   Possessed exclusive knowledge of the Spontaneous Fire Defect;

b.   Intentionally concealed the foregoing from Plaintiffs;

c.   Made incomplete representations while purposefully withholding material facts from Plaintiffs that contradicted these representations; and/or

d.   Had duties under the TREAD Act and related regulations to disclose and remedy the defects.

824.   FCA had a duty to disclose the Spontaneous Fire Defect, because, having volunteered to provide information to Plaintiffs, FCA had the duty to disclose not just the partial truth, but the entire truth. Further, Plaintiffs relied on FCA's material omissions and representations that the Fire Defect Vehicles they were purchasing safe and free from serious safety defects.

825.   Plaintiffs were unaware of the omitted material facts referenced herein, and they would not have acted as they did if they had known of the concealed and/or suppressed facts, in that they would not have purchased the Fire

- 259 -

Defect Vehicles manufactured by FCA, would have paid less, and/or would have taken other affirmative steps in light of the information concealed from them. Plaintiffs' actions were justified. FCA was in exclusive control of the material facts, and such facts were not generally known to the public or Plaintiffs.

826.   FCA's conduct proximately caused injuries to Plaintiffs.

827.   Plaintiffs were injured and suffered ascertainable loss, injury-in-fact, and/or actual damage as a proximate result of FCA's conduct in that Plaintiffs overpaid for their Fire Defect Vehicles and did not receive the benefit of their bargain. These injuries are the direct and natural consequence of FCA's misrepresentations and omissions.

828.   FCA is liable to Plaintiffs for treble their actual damages or $100, whichever is greater, and attorneys' fees and costs. 73 P.S. § 201-9.2(a). Plaintiffs are also entitled to an award of punitive damages given that FCA's conduct was malicious, wanton, willful, oppressive, or exhibited a reckless indifference to the rights of others.

## COUNT XLIX

## BREACH OF IMPLIED WARRANTY OF
## MERCHANTABILITY UNDER PENNSYLVANIA LAW
## (13 Pa. Cons. Stat. Ann. § 2314)

### (Alleged by Plaintiff Ohodnicki on behalf of the Pennsylvania Subclass)

829.   Plaintiff brings this claim on behalf of himself and the Pennsylvania

Subclass ("Plaintiffs," for the purposes of this claim).

830.   Plaintiffs reallege and incorporate by reference all paragraphs as

though fully set forth herein.

831.   FCA is a "merchant" with respect to motor vehicles.

832.   Under Pennsylvania law, an implied warranty of merchantability

attaches to the Fire Defect Vehicles.

833.   The Fire Defect Vehicles were not merchantable when sold or leased

because their hybrid propulsion systems are prone to spontaneous combustion, and

pose an unreasonable risk of fires due to the Spontaneous Fire Defect as described

herein. Without limitation, the Fire Defect Vehicles share a common defect in that

they are all equipped with a hybrid propulsion system that makes the vehicles

susceptible to a risk of spontaneous combustion, causing an unreasonable risk of

death, serious bodily harm and/or property damage to lessees and owners of the

Fire Defect Vehicles as well as their homes, passengers and bystanders. This defect

renders the Fire Defect Vehicles when sold/leased and at all times thereafter,

unmerchantable and unfit for their ordinary use of driving. In fact, as a result of the defect, FCA specifically advises owners and lessees not to charge their batteries and not to drive the Fire Defect Vehicles in electric mode.

834.   Plaintiffs were and are third-party beneficiaries to FCA's contracts with FCA-certified/authorized retailers who sold or leased the Fire Defect Vehicles to Plaintiffs.

835.   It was reasonable to expect that Plaintiffs would use, consume or be affected by the Fire Defect Vehicles.

836.   FCA was provided notice of these issues within a reasonable time of Plaintiff's knowledge of the non-conforming or defective nature of the Fire Defect Vehicles by the filing of this Complaint, by letters from Plaintiffs' counsel to FCA, consumer complaints to NHTSA regarding the defect that is the subject of this Complaint, and/or by the allegations contained in this Complaint.

837.   As a direct and proximate result of FCA's breach of the implied warranty of merchantability, Plaintiffs have been damaged in an amount to be determined at trial.

- 262 -

24.   **Rhode Island**

## COUNT L

**VIOLATION OF THE RHODE ISLAND UNFAIR TRADE PRACTICES
AND CONSUMER PROTECTION ACT RHODE ISLAND LAW
(R.I. Gen. Laws § 6-13.1, *et seq.*)**

**(Alleged by Plaintiff Bartek on Behalf of the Rhode Island Subclass)**

838.   Plaintiff brings this claim on behalf of herself and the Rhode Island

Subclass ("Plaintiffs," for the purposes of this claim).

839.   Plaintiffs reallege and incorporate by reference all paragraphs as

though fully set forth herein.

840.   Plaintiffs are persons who purchased or leased one or more Fire

Defect Vehicles primarily for personal, family, or household purposes within the

meaning of R.I. Gen Laws § 6-13.1-5.2(a).

841.   Rhode Island's Unfair Trade Practices and Consumer Protection Act

("Rhode Island CPA") prohibits "unfair or deceptive acts or practices in the

conduct of any trade or commerce" including: "(v) Representing that goods or

services have sponsorship, approval, characteristics, ingredients, uses, benefits, or

quantities that they do not have"; "(vii) Representing that goods or services are of a

particular standard, quality, or grade …, if they are of another"; "(ix) Advertising

goods or services with intent not to sell them as advertised"; "(xii) Engaging in any

other conduct that similarly creates a likelihood of confusion or of

misunderstanding"; "(xiii) Engaging in any act or practice that is unfair or

- 263 -

deceptive to the consumer"; and "(xiv) Using any other methods, acts or practices which mislead or deceive members of the public in a material respect." R.I. Gen Laws § 6-13.1-1(6)

842.   In the course of its business, FCA concealed the Spontaneous Fire Defect in the Fire Defect Vehicles and its failure to adequately design and test the vehicles to ensure their safety as described herein and otherwise engaged in activities with a tendency or capacity to deceive. FCA also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of a material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of the Fire Defect Vehicles.

843.   By failing to disclose and by actively concealing the defect in the Fire Defect Vehicles, which it marketed as safe, reliable, and of high quality, FCA engaged in unfair and deceptive business practices in violation of the Rhode Island CPA.

844.   In the course of FCA's business, it willfully failed to disclose and actively concealed the dangerous risk posed by the defects in the Fire Defect Vehicles.

845.   FCA's unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers, including Plaintiffs, about the true safety and reliability of their vehicles.

846.   FCA intentionally and knowingly misrepresented material facts regarding the Fire Defect Vehicles with the intent to mislead Plaintiffs.

847.   FCA knew or should have known that its conduct violated the Rhode Island CPA.

848.   As alleged above, FCA made material statements about the safety and reliability of the Fire Defect Vehicles and their ability to operate as plug-in hybrid vehicles that were either false or misleading.

849.   FCA owed Plaintiffs a duty to disclose the true safety and reliability of the Fire Defect Vehicles because FCA:

    a.   Possessed exclusive knowledge about the defects in the Fire Defect Vehicles;

    b.   Intentionally concealed the foregoing from Plaintiffs;

    c.   Made incomplete representations about the safety and reliability of the Fire Defect Vehicles, while purposefully withholding material facts from Plaintiffs that contradicted these representations; and/or

    d.   Had duties under the TREAD Act and related regulations to disclose and remedy the defects well prior to the issue of its confounding recall notice in 2022.

850.   Because FCA fraudulently concealed the Spontaneous Fire Defect, Fire Defect Vehicle owners were deprived of the benefit of their bargain since the

- 265 -

vehicles they purchased were worth less than they would have been if they were free from the known serious safety defect. Had Fire Defect Vehicle owners been aware of the defects in their vehicles, they would have either not have bought their vehicles or would have paid less for them.

851.   FCA's concealment of the defects in the Fire Defect Vehicles was material to Plaintiffs.

852.   Plaintiffs suffered ascertainable loss caused by FCA's misrepresentations and its concealment of and failure to disclose the Spontaneous Fire Defect.

853.   FCA's violations present a continuing risk to Plaintiffs as well as to the general public. In particular and as alleged herein, FCA's failure to provide and recall remedy leaves Fire Defect Vehicle owners facing a Hobson's choice: follow FCA's instructions, if possible, at the great inconvenience of parking far from home and the expense and environmental impact of additional consumption of gasoline; ignore FCA's instructions and risk calamity; or sell the vehicles at a substantial loss as a result of FCA's conduct. FCA's unlawful acts and practices complained of herein affect the public interest.

854.   FCA's actions, as set forth above, occurred in the conduct of trade or commerce.

- 266 -

855.   Plaintiffs are entitled to recover the greater of actual damages or $200 pursuant to R.I. Gen Laws § 6-13.1-5.2(a). Plaintiffs also seek punitive damages in the discretion of the Court because of FCA's egregious disregard of consumer and public safety and its long-running concealment of the serious safety defect and its horrific consequences.

## COUNT LI

### BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY UNDER RHODE ISLAND LAW
### (R.I. Gen Laws § 6A-2-314)

### (Alleged by Plaintiff Bartek on Behalf of the Rhode Island Subclass)

856.   Plaintiff and the Rhode Island Subclass reallege and incorporate by reference all paragraphs as though fully set forth herein.

857.   Plaintiff brings this claim on behalf of herself and the Rhode Island Subclass.

858.   FCA is a "merchant" of the Fire Defect Vehicles within the meaning of R.I. Gen Laws § 6A-2-104, and "seller" within the meaning of R.I. Gen Laws § 6A-2-103(4), and the Fire Defect Vehicles are "goods" under R.I. Gen Laws. § 6A-2-105(1).

859.   Under Rhode Island law, an implied warranty of merchantability attaches to the Fire Defect Vehicles. R.I. Gen Laws § 6A-2-314).

011086-11/1924902 V1

860.   The Fire Defect Vehicles were not merchantable when sold or leased because their hybrid propulsion systems are prone to spontaneous combustion, and pose an unreasonable risk of fires due to the Spontaneous Fire Defect as described herein. Without limitation, the Fire Defect Vehicles share a common defect in that they are all equipped with a hybrid propulsion system that makes the vehicles susceptible to a risk of spontaneous combustion, causing an unreasonable risk of death, serious bodily harm and/or property damage to lessees and owners of the Fire Defect Vehicles as well as their homes, passengers and bystanders. This defect renders the Fire Defect Vehicles when sold/leased and at all times thereafter, unmerchantable and unfit for their ordinary use of driving. In fact, as a result of the defect, FCA specifically advises owners and lessees not to charge their batteries and not to drive the Fire Defect Vehicles in electric mode.

861.   Plaintiff and the other Rhode Island Subclass members were and are third-party beneficiaries to FCA's contracts with FCA-certified/authorized retailers who sold or leased the Fire Defect Vehicles to Plaintiff and Rhode Island Subclass members.

862.   It was reasonable to expect that Plaintiff and the Rhode Island Subclass members would use, consume or be affected by the Fire Defect Vehicles, and they are therefore entitled to the protections of the implied warranty of merchantability under R.I. Gen Laws § 6a-2-318.

- 268 -

863.   FCA was provided notice of these issues within a reasonable time of Plaintiff's knowledge of the non-conforming or defective nature of the Fire Defect Vehicles by the filing of this Complaint, by letters from Plaintiff's counsel to FCA, consumer complaints to NHTSA regarding the defect that is the subject of this Complaint, and/or by the allegations contained in this Complaint.

864.   As a direct and proximate result of FCA's breach of the implied warranty of merchantability, Plaintiff and the other Rhode Island Subclass members have been damaged in an amount to be determined at trial.

### 25.   South Carolina

### COUNT LII

**VIOLATIONS OF THE SOUTH CAROLINA REGULATION OF
MANUFACTURERS, DISTRIBUTORS, AND DEALERS ACT
(S.C. Code Ann. § 56-15-10, *et seq.*)**

**(Alleged by Plaintiffs Carbajales-Dale and Pedroza
on behalf of the South Carolina Subclass)**

865.   Plaintiffs and the South Carolina Subclass ("Plaintiffs," for the purposes of this claim) reallege and incorporate by reference all paragraphs as though fully set forth herein.

866.   Plaintiffs bring this claim on behalf of themselves and the South Carolina Subclass.

- 269 -

867.   FCA was a "manufacturer" within the meaning of S.C. Code Ann.

§ 56-15-10, as it was engaged in the business of manufacturing or assembling new

and unused motor vehicles.

868.   FCA committed unfair or deceptive acts or practices that violated the

South Carolina Regulation of Manufacturers, Distributors, and Dealers Act

("Dealers Act"), S.C. Code Ann. § 56-15-30.

869.   FCA engaged in actions which were arbitrary, in bad faith,

unconscionable, and which caused damage to Plaintiffs and to the public.

870.   FCA's bad faith and unconscionable actions include, but are not

limited to: (1) representing that the Fire Defect Vehicles have characteristics, uses,

benefits, and qualities which they do not have, (2) representing that Fire Defect

Vehicles are of a particular standard, quality, and grade when they are not,

(3) advertising Fire Defect Vehicles with the intent not to sell them as advertised,

(4) representing that a transaction involving Fire Defect Vehicles confers or

involves rights, remedies, and obligations which it does not, and (5) representing

that the subject of a transaction involving Fire Defect Vehicles has been supplied

in accordance with a previous representation when it has not.

871.   In the course of its business, FCA concealed the Spontaneous Fire

Defect in the Fire Defect Vehicles and its failure to adequately design and test the

vehicles to ensure their safety as described herein and otherwise engaged in

- 270 -

activities with a tendency or capacity to deceive. FCA also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of the Fire Defect Vehicles.

872. By failing to disclose and by actively concealing the defect in the Fire Defect Vehicles, which it marketed as safe, reliable, and of high quality, FCA violated the Dealers Act.

873. In the course of FCA's business, it willfully failed to disclose and actively concealed the dangerous risk posed by the defects in the Fire Defect Vehicles.

874. FCA's unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers, including Plaintiffs, about the true safety and reliability of their vehicles.

875. FCA intentionally and knowingly misrepresented material facts regarding the Fire Defect Vehicles with the intent to mislead Plaintiffs.

876. FCA knew or should have known that its conduct violated the Dealers Act.

877.   As alleged above, FCA made material statements about the safety and reliability of the Fire Defect Vehicles and their ability to operate as plug-in hybrid vehicles that were either false or misleading.

878.   FCA owed Plaintiffs a duty to disclose the true safety and reliability of the Fire Defect Vehicles because FCA:

a.   Possessed exclusive knowledge about the defects in the Fire Defect Vehicles;

b.   Intentionally concealed the foregoing from Plaintiffs;

c.   Made incomplete representations about the safety and reliability of the Fire Defect Vehicles, while purposefully withholding material facts from Plaintiffs that contradicted these representations; and/or

d.   Had duties under the TREAD Act and related regulations to disclose and remedy the defects well prior to the issue of its confounding recall notice in 2022.

879.   Because FCA fraudulently concealed the Spontaneous Fire Defect, Fire Defect Vehicle owners were deprived of the benefit of their bargain since the vehicles they purchased were worth less than they would have been if they were free from the known serious safety defect. Had Fire Defect Vehicle owners been aware of the defects in their vehicles, they would have either not have bought their vehicles or would have paid less for them.

880.   FCA's concealment of the defects in the Fire Defect Vehicles was material to Plaintiffs.

- 272 -

881.   Plaintiffs suffered ascertainable loss caused by FCA's misrepresentations and its concealment of and failure to disclose the Spontaneous Fire Defect.

882.   FCA's violations present a continuing risk to Plaintiffs as well as to the general public. In particular and as alleged herein, FCA's failure to provide and recall remedy leaves Fire Defect Vehicle owners facing 's choice: follow FCA's instructions, if possible, at the great inconvenience of parking far from home and the expense and environmental impact of additional consumption of gasoline; ignore FCA's instructions and risk calamity; or sell the vehicles at a substantial loss as a result of FCA's conduct. FCA's unlawful acts and practices complained of herein affect the public interest.

883.   FCA's actions, as set forth above, occurred in the conduct of trade or commerce.

884.   Plaintiffs bring this action pursuant to S.C. Code Ann. § 56-15-110(2), as the action is one of common or general interest to many persons and the parties are too numerous to bring them all before the court.

885.   Plaintiffs are entitled to double their actual damages, the cost of the suit, and attorney's fees pursuant to S.C. Code Ann. § 56-15-110. Plaintiffs also seek injunctive relief under S.C. Code Ann. § 56-15-110. Plaintiffs also seek treble damages because FCA acted maliciously.

- 273 -

## COUNT LIII

**BREACH OF IMPLIED WARRANTY OF
MERCHANTABILITY UNDER SOUTH CAROLINA LAW
(S.C. Code § 36-2-314)**

**(Alleged by Plaintiffs Carbajales-Dale and Pedroza
on behalf of the South Carolina Subclass)**

886.   Plaintiffs and the South Carolina Subclass bring this claim on behalf of themselves and the South Carolina Subclass ("Plaintiffs," for the purposes of this claim).

887.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

888.   FCA was a merchant with respect to motor vehicles under S.C. Code § 36-2-314.

889.   Under South Carolina law, an implied warranty of merchantability attaches to the Fire Defect Vehicles. S.C. Code § 36-2-314.

890.   The Fire Defect Vehicles were not merchantable when sold or leased because their hybrid propulsion systems are prone to spontaneous combustion, and pose an unreasonable risk of fires due to the Spontaneous Fire Defect as described herein. Without limitation, the Fire Defect Vehicles share a common defect in that they are all equipped with a hybrid propulsion system that makes the vehicles susceptible to a risk of spontaneous combustion, causing an unreasonable risk of death, serious bodily harm and/or property damage to lessees and owners of the

- 274 -

Fire Defect Vehicles as well as their homes, passengers and bystanders. This defect renders the Fire Defect Vehicles when sold/leased and at all times thereafter, unmerchantable and unfit for their ordinary use of driving. In fact, as a result of the defect, FCA specifically advises owners and lessees not to charge their batteries and not to drive the Fire Defect Vehicles in electric mode.

891.    Plaintiffs were and are third-party beneficiaries to FCA's contracts with FCA-certified/authorized retailers who sold or leased the Fire Defect Vehicles to Plaintiffs.

892.    It was reasonable to expect that Plaintiffs would use, consume or be affected by the Fire Defect Vehicles,

893.    FCA was provided notice of these issues within a reasonable time of Plaintiff's knowledge of the non-conforming or defective nature of the Fire Defect Vehicles by the filing of this Complaint, by letters from Plaintiffs' counsel to FCA, consumer complaints to NHTSA regarding the defect that is the subject of this Complaint, and/or by the allegations contained in this Complaint.

894.    As a direct and proximate result of FCA's breach of the implied warranty of merchantability, Plaintiffs have been damaged in an amount to be determined at trial.

26.    **Tennessee**

## COUNT LIV

**VIOLATION OF TENNESSEE CONSUMER PROTECTION ACT**
**( Tenn. Code Ann. § 47-18-101, *et seq.*)**

**(Alleged by Plaintiff Butler on behalf of the Rhode Island Subclass)**

895.    Plaintiff brings this claim on behalf of himself and the Tennessee

Subclass ("Plaintiffs," for the purposes of this claim).

896.    Plaintiffs reallege and incorporate by reference all paragraphs as

though fully set forth herein.

897.    Plaintiffs are "natural persons" and "consumers" within the meaning

of Tenn. Code Ann. § 47-18-103(2).

898.    FCA is a "person" within the meaning of Tenn. Code Ann. § 47-18-

103(2).

899.    FCA's conduct complained of herein affected "trade," "commerce" or

"consumer transactions" within the meaning of Tenn. Code Ann. § 47-18-103(19).

900.    The Tennessee Consumer Protection Act ("Tennessee CPA")

prohibits "[u]nfair or deceptive acts or practices affecting the conduct of any trade

or commerce," including but not limited to: "Representing that goods or services

have … characteristics, [or] … benefits … that they do not have…;" "Representing

that goods or services are of a particular standard, quality or grade… if they are of

another;" and "Advertising goods or services with intent not to sell them as

- 276 -

advertised." Tenn. Code Ann. § 47-18-104. FCA violated the Tennessee CPA by engaging in unfair or deceptive acts, including representing that Fire Defect Vehicles have characteristics or benefits that they did not have; representing that Fire Defect Vehicles are of a particular standard, quality, or grade when they are of another; and advertising Fire Defect Vehicles with intent not to sell them as advertised.

901.    FCA's actions, as set forth above, occurred in the conduct of trade or commerce.

902.    In the course of its business, FCA concealed the Spontaneous Fire Defect in the Fire Defect Vehicles and its failure to adequately design and test the vehicles to ensure their safety as described herein and otherwise engaged in activities with a tendency or capacity to deceive. FCA also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of the Fire Defect Vehicles.

903.    By failing to disclose and by actively concealing the defect in the Fire Defect Vehicles, which it marketed as safe, reliable, and of high quality, FCA engaged in unfair and deceptive business practices in violation of the Tennessee CPA.

- 277 -

904.   In the course of FCA's business, it willfully failed to disclose and actively concealed the dangerous risk posed by the defects in the Fire Defect Vehicles.

905.   FCA's unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers, including Plaintiffs, about the true safety and reliability of their vehicles.

906.   FCA intentionally and knowingly misrepresented material facts regarding the Fire Defect Vehicles with the intent to mislead Plaintiffs.

907.   FCA knew or should have known that its conduct violated the Tennessee CPA.

908.   As alleged above, FCA made material statements about the safety and reliability of the Fire Defect Vehicles and their ability to operate as plug-in hybrid vehicles that were either false or misleading.

909.   FCA owed Plaintiffs a duty to disclose the true safety and reliability of the Fire Defect Vehicles because FCA:

    a.    Possessed exclusive knowledge about the defects in the Fire Defect Vehicles;

    b.    Intentionally concealed the foregoing from Plaintiffs;

    c.    Made incomplete representations about the safety and reliability of the Fire Defect Vehicles, while purposefully withholding material facts from Plaintiffs that contradicted these representations; and/or

- 278 -

      d.    Had duties under the TREAD Act and related regulations to disclose and remedy the defects well prior to the issue of its confounding recall notice in 2022.

910.   Because FCA fraudulently concealed the Spontaneous Fire Defect, Fire Defect Vehicle owners were deprived of the benefit of their bargain since the vehicles they purchased were worth less than they would have been if they were free from the known serious safety defect. Had Fire Defect Vehicle owners been aware of the defects in their vehicles, they would have either not have bought their vehicles or would have paid less for them.

911.   FCA's concealment of the defects in the Fire Defect Vehicles was material to Plaintiffs.

912.   Plaintiffs suffered ascertainable loss caused by FCA's misrepresentations and its concealment of and failure to disclose the Spontaneous Fire Defect.

913.   FCA's violations present a continuing risk to Plaintiffs as well as to the general public. In particular and as alleged herein, FCA's failure to provide and recall remedy leaves Fire Defect Vehicle owners facing a Hobson's choice: follow FCA's instructions, if possible, at the great inconvenience of parking far from home and the expense and environmental impact of additional consumption of gasoline; ignore FCA's instructions and risk calamity; or sell the vehicles at a

substantial loss as a result of FCA's conduct. FCA's unlawful acts and practices

complained of herein affect the public interest.

914.    Pursuant to Tenn. Code § 47-18-109(a), Plaintiffs seek monetary

relief against FCA measured as actual damages in an amount to be determined at

trial, treble damages as a result of FCA's willful or knowing violations, and any

other just and proper relief available under the Tennessee CPA.

**27.    Texas**

## COUNT LV

### VIOLATIONS OF THE TEXAS DECEPTIVE TRADE PRACTICES CONSUMER PROTECTION ACT ("DTPA") (Tex. Bus. & Com. Code §§ 17.41, *et seq.*)

**(Alleged by Plaintiffs Meagan Findeiss, Cal Findeiss, Ransom, and Sheehan on behalf of the Texas Subclass)**

915.    Plaintiffs bring this claim on behalf of themselves and the Texas Subclass

("Plaintiffs," for the purposes of this claim).

916.    Plaintiffs incorporate by reference all paragraphs as though fully set

forth herein.

917.    Plaintiffs bring this claim under the Texas Deceptive Trade Practices-

Consumer Protection Act ("DTPA"), which makes it unlawful to commit "[f]alse,

misleading, or deceptive acts or practices in the conduct of any trade or commerce."

Tex. Bus. & Com. Code § 17.46.

- 280 -

918.   Plaintiffs are "consumers" within the meaning of Tex. Bus. & Com. Code § 17.46(4).

919.   FCA engaged in "trade or commerce" within the meaning of the DTPA.

920.   The DTPA prohibits "false, misleading, or deceptive acts or services in the conduct of any trade or commerce[.]" Tex. Bus. & Com. Code § 17.46(a). By its acts, omissions, failures, and conduct described in this Complaint, FCA has violated Tex. Bus. & Com. Code § 17.46(b)(1), (2), (5), (7), (9), (12) (13), (20), and (24). FCA engaged in unfair and deceptive  trade practices that violated the DTPA as described herein.

921.   In the course of its business, FCA concealed, omitted and suppressed material facts concerning the Spontaneous Fire Defect. FCA falsely represented the quality of the Fire Defect Vehicles and omitted material facts regarding the extreme risks associated with charging the lithium-ion batteries and/or driving the vehicles in electric mode (and the consequences of that risk), as well as the durability and overall value of the Fire Defect Vehicles, for the purpose of inducing Plaintiffs and other Texas Subclass members to purchase Fire Defect Vehicles, and to increase FCA's revenue and profits.

922.   Specifically, by misrepresenting the Fire Defect Vehicles as safe, reliable,  and capable of safely charging and operating in electric mode,  and by

- 281 -

failing to disclose and actively concealing the Spontaneous Fire Defect, FCA

engaged in deceptive business practices prohibited by the Texas DTPA, including:

   a.   Knowingly making a false representation as to the
        characteristics, uses, and benefits of the Fire Defect
        Vehicles;

   b.   Knowingly making a false representation as to whether
        the Fire Defect Vehicles are of a particular standard,
        quality, or grade;

   c.   Advertising the Fire Defect Vehicles with the intent not to
        sell them as advertised; and

   d.   Engaging in unconscionable, false, or deceptive act or
        practice in connection with the sale of the Fire Defect
        Vehicles.

923.   FCA's unfair or deceptive acts or practices, including the above-

mentioned concealments, omissions, and suppressions of material facts, had a

tendency or capacity to mislead and create a false impression in consumers and

were likely to and did in fact deceive reasonable consumers, including Plaintiffs,

about the true safety and reliability of Fire Defect Vehicles, the quality of the plug-

in hybrid electric vehicles, and the true value of the Fire Defect Vehicles.

924.   As alleged above, FCA intentionally and knowingly misrepresented

facts regarding the Fire Defect Vehicles and the defective Spontaneous Fire Defect

contained therein with an intent to mislead Plaintiffs.

925.   FCA knew or should have known that its conduct violated the

Texas DTPA.

926.   To protect its profits, FCA concealed the Spontaneous Fire Defect and continued to allow unsuspecting new and used vehicle purchasers to continue to buy, lease, and drive inherently defective Fire Defect Vehicles.

927.   FCA's representations violate subdivisions (b)(5) and (b)(24) of the DTPA in that they constitute representations that particular goods and services have certain qualities, uses or benefits when they did not; FCA also and failed to disclose information about goods or services with the intent to induce Plaintiffs to enter into transactions that they would not have entered into had the information been disclosed.

928.   FCA owed Plaintiffs a duty to disclose the truth about the quality, reliability, and safety of the Fire Defect Vehicles because FCA:

a.      Possessed exclusive knowledge about the defects in the Fire Defect Vehicles;

b.      Intentionally concealed the foregoing from Plaintiffs;

c.      Made incomplete representations about the safety and reliability of the Fire Defect Vehicles, while purposefully withholding material facts from Plaintiffs that contradicted these representations; and/or

d.      Had duties under the TREAD Act and related regulations to disclose and remedy the defects well prior to the issue of its confounding recall notice in 2022.

929.   Because FCA fraudulently concealed the Spontaneous Fire Defect in the Fire Defect Vehicles, and failed to disclose to Plaintiffs at the time of purchase or lease that the vehicles are prone to catastrophic fires when operated as FCA

- 283 -

marketed that they should be operated, the Fire Defect Vehicles were worth significantly less than the amounts paid by Plaintiffs at the time of purchase or lease. Indeed, consumers who purchased or leased the Fire Defect Vehicles would not have purchased or leased those vehicles, or would have paid significantly less for them, or would have purchased the much cheaper non-hybrid version of the Pacifica had they known of the existence of the Spontaneous Fire Defect prior to purchase or lease.

930.    Plaintiffs suffered ascertainable loss caused by FCA's misrepresentations and its failure to disclose material information. Plaintiffs did not receive the benefit of their bargains as a result of FCA's misconduct.

931.    As a direct and proximate result of FCA's violations of the Texas DTPA, Plaintiffs have suffered injury-in-fact and/or actual damages.

932.    Plaintiffs seek monetary relief against FCA pursuant to Tex. Bus. & Com. Code §§ 14.41, *et seq.* Plaintiffs also seek an order enjoining FCA's unfair, unlawful, and/or deceptive practices, attorneys' fees, and mental anguish damages and additional damages up to three times the amount of economic damages as permitted by the DTPA.

933.    On or around March 8, 2022, Plaintiffs' counsel made a demand in satisfaction of Tex. Bus. & Com. Code § 17.505(a). Because the 60-day statutory period has lapsed, and Plaintiffs seek relief under the Texas DTPA.

- 284 -

## COUNT LVI

### BREACH OF THE IMPLIED WARRANTY OF MERCHANTABILITY UNDER TEXAS LAW
### (Tex. Bus. & Com. Code § 2.314)

**(Alleged by Meagan Findeiss, Cal Findeiss, Ransom, and Sheehan on behalf of the Texas Subclass)**

934.   Plaintiffs bring this claim on behalf of themselves and the Texas Subclass ("Plaintiffs," for the purposes of this claim).

935.   Plaintiffs incorporate by reference all paragraphs as though fully set forth herein.

936.   FCA was and is a merchant with respect to motor vehicles under Tex. Bus. & Com. Code § 2.104.

937.   Under Tex. Bus. & Com. Code § 2.314, a warranty that the Fire Defect Vehicles were in merchantable condition was implied by law in the transactions when Plaintiffs purchased or leased their Fire Defect Vehicles.

938.   The Fire Defect Vehicles were not merchantable when sold or leased because their hybrid propulsion systems are prone to spontaneous combustion, and pose an unreasonable risk of fires due to the Spontaneous Fire Defect as described herein. Without limitation, the Fire Defect Vehicles share a common defect in that they are all equipped with a hybrid propulsion system that makes the vehicles susceptible to a risk of spontaneous combustion, causing an unreasonable risk of death, serious bodily harm and/or property damage to lessees and owners of the

- 285 -

Fire Defect Vehicles as well as their homes, passengers and bystanders. This defect renders the Fire Defect Vehicles when sold/leased and at all times thereafter, unmerchantable and unfit for their ordinary use of driving. In fact, as a result of the defect, FCA specifically advises owners and lessees not to charge their batteries and not to drive the Fire Defect Vehicles in electric mode.

939. Plaintiffs were and are third-party beneficiaries to FCA's contracts with FCA-certified/authorized retailers who sold or leased the Fire Defect Vehicles to Plaintiffs.

940. It was reasonable to expect that Plaintiffs would use, consume or be affected by the Fire Defect Vehicles,

941. FCA was provided notice of these issues within a reasonable time of Plaintiff's knowledge of the non-conforming or defective nature of the Fire Defect Vehicles by the filing of this Complaint, by letters from Plaintiffs' counsel to FCA, consumer complaints to NHTSA regarding the defect that is the subject of this Complaint, and/or by the allegations contained in this Complaint.

942. As a direct and proximate result of FCA's breach of the implied warranty of merchantability, Plaintiffs have been damaged in an amount to be determined at trial.

011086-11/1924902 V1

28.    **Virginia**

## COUNT LVII

### VIOLATION OF VIRGINIA CONSUMER PROTECTION
### (Va. Code Ann. §§ 59.1-196, *et seq.*)

**(Alleged by Plaintiffs Golland and Ventura on behalf of the Virginia Subclass)**

943.    Plaintiffs bring this claim on behalf of themselves and the Virginia Subclass ("Plaintiffs," for the purposes of this claim.

944.    Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

945.    FCA is a "supplier" under VA. CODE ANN. § 59.1-198.

946.    The sale of the Fire Defect Vehicles to Plaintiffs was a "consumer transaction" within the meaning of VA. CODE ANN. § 59.1-198.

947.    The Virginia Consumer Protection Act ("Virginia CPA") lists prohibited "practices" which include: "5. Misrepresenting that goods or services have certain characteristics;" "6. Misrepresenting that goods or services are of a particular standard, quality, grade style, or model;" "8. Advertising goods or services with intent not to sell them as advertised, or with intent not to sell at the price or upon the terms advertised;" "9. Making false or misleading statements of fact concerning the reasons for, existence of, or amounts of price reductions;" and "14. Using any other deception, fraud, or misrepresentation in connection with a consumer transaction." VA. CODE ANN. § 59.1-200. FCA violated the Virginia

- 287 -

CPA by misrepresenting that Fire Defect Vehicles had certain quantities, characteristics, ingredients, uses, or benefits; misrepresenting that Fire Defect Vehicles were of a particular standard, quality, grade, style, or model when they were another; advertising Fire Defect Vehicles with intent not to sell them as advertised; and otherwise "using any other deception, fraud, false pretense, false promise, or misrepresentation in connection with a consumer transaction."

948.    FCA's actions, as set forth above, occurred in the conduct of trade or commerce.

949.    In the course of its business, FCA concealed the Spontaneous Fire Defect in the Fire Defect Vehicles and its failure to adequately design and test the vehicles to ensure their safety as described herein and otherwise engaged in activities with a tendency or capacity to deceive. FCA also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of the Fire Defect Vehicles.

950.    By failing to disclose and by actively concealing the defect in the Fire Defect Vehicles, which it marketed as safe, reliable, and of high quality, FCA engaged in unfair and deceptive business practices in violation of the Virginia CPA.

- 288 -

951.    In the course of FCA's business, it willfully failed to disclose and actively concealed the dangerous risk posed by the defects in the Fire Defect Vehicles.

952.    FCA's unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers, including Plaintiffs, about the true safety and reliability of their vehicles.

953.    FCA intentionally and knowingly misrepresented material facts regarding the Fire Defect Vehicles with the intent to mislead Plaintiffs.

954.    FCA knew or should have known that its conduct violated the Virginia CPA.

955.    As alleged above, FCA made material statements about the safety and reliability of the Fire Defect Vehicles and their ability to operate as plug-in hybrid vehicles that were either false or misleading.

956.    FCA owed Plaintiffs a duty to disclose the true safety and reliability of the Fire Defect Vehicles because FCA:

a.    Possessed exclusive knowledge about the defects in the Fire Defect Vehicles;

b.    Intentionally concealed the foregoing from Plaintiffs;

c.    Made incomplete representations about the safety and reliability of the Fire Defect Vehicles, while purposefully withholding material facts from Plaintiffs that contradicted these representations; and/or

      d.    Had duties under the TREAD Act and related regulations
to disclose and remedy the defects well prior to the issue
of its confounding recall notice in 2022.

957.   Because FCA fraudulently concealed the Spontaneous Fire Defect,

Fire Defect Vehicle owners were deprived of the benefit of their bargain since the

vehicles they purchased were worth less than they would have been if they were

free from the known serious safety defect. Had Fire Defect Vehicle owners been

aware of the defects in their vehicles, they would have either not have bought their

vehicles or would have paid less for them.

958.   FCA's concealment of the defects in the Fire Defect Vehicles was

material to Plaintiffs.

959.   Plaintiffs suffered ascertainable loss caused by FCA's

misrepresentations and its concealment of and failure to disclose the Spontaneous

Fire Defect.

960.   FCA's violations present a continuing risk to Plaintiffs as well as to

the general public. In particular and as alleged herein, FCA's failure to provide and

recall remedy leaves Fire Defect Vehicle owners facing a Hobson's choice: follow

FCA's instructions, if possible, at the great inconvenience of parking far from

home and the expense and environmental impact of additional consumption of

gasoline; ignore FCA's instructions and risk calamity; or sell the vehicles at a

substantial loss as a result of FCA's conduct. FCA's unlawful acts and practices complained of herein affect the public interest.

961.   Pursuant to VA. CODE ANN. § 59.1-204, Plaintiffs seek monetary relief against FCA measured as the greater of (a) actual damages in an amount to be determined at trial and (b) statutory damages in the amount of $500 for each Plaintiff. Because FCA's conduct was committed willfully and knowingly, Plaintiffs are entitled to recover, for each Plaintiff, the greater of (a) three times actual damages or (b) $1,000.

962.   Plaintiffs also seek an order enjoining FCA's unfair and/or deceptive acts or practices, punitive damages, and attorneys' fees, and any other just and proper relief available under VA. CODE ANN. § 59.1-204.

## COUNT LVIII

### BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY UNDER VIRGINIA LAW (Va. Code Ann. § 8.2-314)

**(Alleged by Plaintiffs Golland and Ventura on behalf of the Virginia Subclass)**

963.   Plaintiffs and the Virginia Subclass reallege and incorporate by reference all paragraphs as though fully set forth herein.

964.   Plaintiffs bring this action on behalf of themselves and the Virginia Subclass.

965.   FCA is a "merchant" and "seller" of motor vehicles.

966.   Under Virginia law, an implied warranty of merchantability attaches to the Fire Defect Vehicles. Va. Code Ann. § 8.2-314.

967.   The Fire Defect Vehicles were not merchantable when sold or leased because their hybrid propulsion systems are prone to spontaneous combustion, and pose an unreasonable risk of fires due to the Spontaneous Fire Defect as described herein. Without limitation, the Fire Defect Vehicles share a common defect in that they are all equipped with a hybrid propulsion system that makes the vehicles susceptible to a risk of spontaneous combustion, causing an unreasonable risk of death, serious bodily harm and/or property damage to lessees and owners of the Fire Defect Vehicles as well as their homes, passengers and bystanders. This defect renders the Fire Defect Vehicles when sold/leased and at all times thereafter, unmerchantable and unfit for their ordinary use of driving. In fact, as a result of the defect, FCA specifically advises owners and lessees not to charge their batteries and not to drive the Fire Defect Vehicles in electric mode.

968.   Plaintiffs and the other Virginia Subclass members were and are third-party beneficiaries to FCA's contracts with FCA-certified/authorized retailers who sold or leased the Fire Defect Vehicles to Plaintiffs and Virginia Subclass members.

969.   It was reasonable to expect that Plaintiffs and the other Virginia Subclass members would use, consume or be affected by the Fire Defect Vehicles,

- 292 -

970.   FCA was provided notice of these issues within a reasonable time of Plaintiffs' knowledge of the non-conforming or defective nature of the Fire Defect Vehicles by the filing of this Complaint, by letters from Plaintiffs' counsel to FCA, consumer complaints to NHTSA regarding the defect that is the subject of this Complaint, and/or by the allegations contained in this Complaint.

971.   As a direct and proximate result of FCA's breach of the implied warranty of merchantability, Plaintiffs and the other Virginia Subclass members have been damaged in an amount to be determined at trial.

### 29.   Washington

## COUNT LIX

### VIOLATION OF THE WASHINGTON CONSUMER PROTECTION ACT
### (Rev. Code Wash. §§ 19.86.010, *et seq.*)

### (Alleged by Plaintiff Benzur on behalf of the Washington Subclass)

972.   Plaintiff brings this claim on behalf of herself and the Washington Subclass ("Plaintiffs" for purposes of this claim).

973.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

974.   FCA committed the acts complained of herein in the course of "trade" or "commerce" within the meaning of RCW § 19.96.010.

- 293 -

975.   The Washington Consumer Protection Act ("Washington CPA") broadly prohibits "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce." RCW § 19.96.010.

976.   In the course of its business, FCA concealed the Spontaneous Fire Defect in the Fire Defect Vehicles and its failure to adequately design and test the vehicles to ensure their safety as described herein and otherwise engaged in activities with a tendency or capacity to deceive. FCA also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of the Fire Defect Vehicles.

977.   By failing to disclose and by actively concealing the defect in the Fire Defect Vehicles, which it marketed as safe, reliable, and of high quality, FCA engaged in unfair and deceptive business practices in violation of the Washington CPA.

978.   In the course of FCA's business, it willfully failed to disclose and actively concealed the dangerous risk posed by the defects in the Fire Defect Vehicles.

979.   FCA's unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers, including Plaintiffs, about the true safety and reliability of their vehicles.

980.   FCA intentionally and knowingly misrepresented material facts regarding the Fire Defect Vehicles with the intent to mislead Plaintiffs.

981.   FCA knew or should have known that its conduct violated the Washington CPA.

982.   As alleged above, FCA made material statements about the safety and reliability of the Fire Defect Vehicles and their ability to operate as plug-in hybrid vehicles that were either false or misleading.

983.   FCA owed Plaintiffs a duty to disclose the true safety and reliability of the Fire Defect Vehicles because FCA:

   a.   Possessed exclusive knowledge about the defects in the Fire Defect Vehicles;

   b.   Intentionally concealed the foregoing from Plaintiffs;

   c.   Made incomplete representations about the safety and reliability of the Fire Defect Vehicles, while purposefully withholding material facts from Plaintiffs that contradicted these representations; and/or

   d.   Had duties under the TREAD Act and related regulations to disclose and remedy the defects well prior to the issue of its confounding recall notice in 2022.

984.   Because FCA fraudulently concealed the Spontaneous Fire Defect, Fire Defect Vehicle owners were deprived of the benefit of their bargain since the

- 295 -

vehicles they purchased were worth less than they would have been if they were

free from the known serious safety defect. Had Fire Defect Vehicle owners been

aware of the defects in their vehicles, they would have either not have bought their

vehicles or would have paid less for them.

985.   FCA's concealment of the defect in the Fire Defect Vehicles was

material to Plaintiffs.

986.    Plaintiffs suffered ascertainable loss caused by FCA's

misrepresentations and its concealment of and failure to disclose the Spontaneous

Fire Defect.

987.   FCA's violations present a continuing risk to Plaintiffs as well as to

the general public. In particular and as alleged herein, FCA's failure to provide and

recall remedy leaves Fire Defect Vehicle owners facing a Hobson's choice: follow

FCA's instructions, if possible, at the great inconvenience of parking far from

home and the expense and environmental impact of additional consumption of

gasoline; ignore FCA's instructions and risk calamity; or sell the vehicles at a

substantial loss as a result of FCA's conduct. FCA's unlawful acts and practices

complained of herein affect the public interest.

988.   As a direct and proximate result of FCA's violations of the

Washington CPA, Plaintiffs have suffered injury-in-fact and/or actual damage, as

alleged above.

- 296 -

989.   FCA is liable to Plaintiffs for damages in amounts to be proven at trial, including attorneys' fees, costs, and treble damages, as well as any other remedies the Court may deem appropriate under RCW § 19.86.090.

## COUNT LX

### BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY UNDER WASHINGTON LAW
### (Rev. Code Wash. § 62A.2-314)

**(Alleged by Plaintiff Benzur on behalf of the Washington Subclass)**

990.   Plaintiff brings this claim on behalf of herself and the Washington Subclass ("Plaintiffs" for purposes of this claim).

991.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

992.   FCA is a "merchant" and "seller" of motor vehicles.

993.   Under Washington law, an implied warranty of merchantability attaches to the Fire Defect Vehicles. RCW § 62A.2-314.

994.   The Fire Defect Vehicles were not merchantable when sold or leased because their hybrid propulsion systems are prone to spontaneous combustion, and pose an unreasonable risk of fires due to the Spontaneous Fire Defect as described herein. Without limitation, the Fire Defect Vehicles share a common defect in that they are all equipped with a hybrid propulsion system that makes the vehicles susceptible to a risk of spontaneous combustion, causing an unreasonable risk of

- 297 -

death, serious bodily harm and/or property damage to lessees and owners of the

Fire Defect Vehicles as well as their homes, passengers and bystanders. This defect

renders the Fire Defect Vehicles when sold/leased and at all times thereafter,

unmerchantable and unfit for their ordinary use of driving. In fact, as a result of the

defect, FCA specifically advises owners and lessees not to charge their batteries

and not to drive the Fire Defect Vehicles in electric mode.

995. Plaintiffs were and are third-party beneficiaries to FCA's contracts

with FCA-certified/authorized retailers who sold or leased the Fire Defect Vehicles

to Plaintiffs.

996. It was reasonable to expect that Plaintiffs would use, consume or be

affected by the Fire Defect Vehicles,

997. FCA was provided notice of these issues within a reasonable time of

Plaintiff's knowledge of the non-conforming or defective nature of the Fire Defect

Vehicles by the filing of this Complaint, by letters from Plaintiffs' counsel to

FCA, consumer complaints to NHTSA regarding the defect that is the subject of

this Complaint, and/or by the allegations contained in this Complaint.

998. As a direct and proximate result of FCA's breach of the implied

warranty of merchantability, Plaintiffs have been damaged in an amount to be

determined at trial.

## REQUEST FOR RELIEF

WHEREFORE, Plaintiffs, individually and on behalf of members of the

Class and Subclasses, respectfully request that the Court enter judgment in their

favor and against FCA, as follows:

A.     Certification of the proposed Nationwide and State Subclasses,

including appointment of Plaintiffs' counsel as Class Counsel;

B.     Restitution, including at the election of Class and Subclass members,

recovery of the purchase price of their Fire Defect Vehicles, or the overpayment

for their vehicles;

C.     Damages, including punitive damages, costs, and disgorgement in an

amount to be determined at trial;

D.     An order requiring FCA to pay both pre- and post-judgment interest

on any amounts awarded;

E.     An award of costs and attorneys' fees; and

F.     Such other or further relief as may be appropriate.

## DEMAND FOR JURY TRIAL

Plaintiffs hereby demand a jury trial for all claims so triable.

011086-11/1924902 V1

DATED: June 23, 2022                    Respectfully Submitted,

*/s/ Steve W. Berman*
Steve W. Berman
Thomas E. Loeser
**Hagens Berman Sobol Shapiro LLP**
1301 Second Avenue, Suite 2000
Seattle, WA 98101
Telephone: (206) 623-7292
Facsimile: (206) 623-0594
steve@hbsslaw.com
toml@hbsslaw.com

E. Powell Miller (P39487)
Sharon S. Almonrode (P33938)
**The Miller Law Firm PC**
950 W. University Dr., Ste. 300
Rochester, MI 48307
Telephone: (248) 841-2200
Facsimile: (248) 652-2852
epm@millerlawpc.com
ssa@millerlawpc.com

Stephen R. Basser
Samuel M. Ward
**Barrack, Rodos, & Bacine**
600 W Broadway, Suite 900
San Diego, CA 92101
Telephone: (619)230-0800
Facsimile: (619) 230-1874
sbasser@barrack.com
sward@barrack.com

Jeffrey W. Golan
**Barrack, Rodos & Bacine**
Two Commerce Square
2001 Market Street, Suite 3300
Philadelphia, PA 19103
Telephone: (215) 963-0600
jgolan@barrack.com

- 300 -

John G. Emerson
**Emerson Firm, PLLC**
2500 Wilcrest Drive, Suite 300
Houston, TX 77042
Telephone: (800) 551-8649
Facsimile: (501) 286-4659
jemerson@emersonfirm.com

*Attorneys for Plaintiffs*

## **CERTIFICATE OF SERVICE**

I hereby certify that, on June 23, 2022, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will notify all counsel of record authorized to receive such filings.

*/s/ Steve W. Berman*
Steve W. Berman